IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PING LU | § | |
| | § | |
| V. | § | C.A. No. _____ |
| | § | |
| ANADARKO PETROLEUM | § | |
| CORPORATION CHANGE OF | § | |
| CONTROL SEVERANCE PLAN and | § | |
| ANADARKO PETROLEUM | § | |
| CORPORATION HEALTH AND | § | |
| WELFARE BENEFITS | § | |
| ADMINISTRATIVE COMMITTEE | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Ping Lu files this Original Complaint asserting causes of action in law and at equity against Anadarko Petroleum Corporation Change of Control Severance Plan and Anadarko Petroleum Corporation Welfare Benefits Administrative Committee.

## I.
## PARTIES

1.     Plaintiff, Ping Lu ("Lu") is a resident citizen of Houston, Texas.

2.     Defendant, Anadarko Petroleum Corporation Change of Control Severance Plan ("Plan"), is a domestic or foreign company licensed to do business and doing business in the state of Texas. It can be served with process by serving its registered agent, CT Corporation, 350 N. Paul St., Dallas, TX 75201, or by serving General Counsel, Anadarko Petroleum Corporation, P.O. Box 1330, 1201 Lake Robbins Dr., The Woodlands, TX, 77380-1330, or wherever it may be found.

1

3.    Defendant, Anadarko Petroleum Corporation Welfare Benefits Administrative Committee, ("Committee"), is a domestic or foreign company licensed to do business and doing business in the state of Texas and can be served with process by serving its registered agent, CT Corporation, 350 N. Paul St., Dallas, TX 75201, or wherever it may be found.

## II.
## JURISDICTION AND VENUE

4.    This action against Defendants arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001 *et seq.* This Court has jurisdiction over this action pursuant to 29 U.S.C. §1132(e)(1).

5.    Venue is proper in this District and Division pursuant to 29 U.S.C. §1132(e)(2) because Defendants maintain business activity in and may be found in this district.

6.    Pursuant to 29 U.S.C. §1132(h), this Complaint has been served upon the Secretary of Labor, Pension and Welfare Benefits Administration, at 200 Constitution Avenue N.W., Washington, D.C. 20210 and the Secretary of the Treasury at 111 Constitution Avenue N.W., Washington, D.C. 20024, by certified mail return receipt requested.

## III.
## STATEMENT OF FACTS

7.    Ping Lu began working for Anadarko Petroleum Corporation ("Anadarko") in 2017 as a Senior Data Scientist Manager of Data Science and Advanced Analytics. He was eventually promoted to Manager. His role was part of

Anadarko's Advanced Analytics & Emerging Technology Department ("AAET"). AAET had four primary functional units:



8.    Within the Data Science group, Mr. Lu was the Manager of the Advanced Analytics R&D subgroup. The subgroup consisted of one data scientist, one senior data scientist, one staff data engineer, and one data engineer. They worked closely with colleagues from the Emerging Geoscience and Geoscience Technology teams.

Oxy's Acquisition of Anadarko

9.    Oxy is an international oil and gas exploration and production company with operations in the United States, Middle East, and Latin America. It is one of the largest U.S. oil and gas companies, based on equity market capitalization.

10.    After a lengthy bidding war with Chevron, Oxy acquired Anadarko on August 8, 2019 in a transaction valued at $55B.[1]

---

[1] https://www.businesswire.com/news/home/20190808005586/en/Occidental-Completes-Acquisition-of-Anadarko

11.    The acquisition came with problems.[2] For instance, Oxy reported a loss of $8.4B for the second quarter of 2020. Oxy's loss included a write-down of its oil and gas assets of $6.2B, adding to a total $36B in debt.

12.    Oxy admitted that, while it was trying to sell off non-core assets to reduce its debt, it might not be able to execute those sales quickly enough to service the debt in a timely manner. One example was when Total backed out of a deal to buy Oxy's Ghana assets in May.[3] That deal was a key part of Oxy's effort to raise $15B through divestitures to help repay investors who funded the Anadarko acquisition by the end of 2021.

13.    Oxy had about $6.4B in debt due in 2021, with $4.7B more due in 2022. As a stop-gap measure, Oxy issued $2 billion in bonds, all of which carried a staggering 8% interest rate.

14.    Defendants' actions to routinely deny severance claims must be seen in light of their master's financial difficulties.

Applicable Plan Terms

15.    The Plan was created because the Anadarko Board of Directors understood that a potential sale, merger, or reorganization could affect numerous employees. If a change of control took place, the Board of Directors wanted to ensure that eligible employees could apply for and receive a severance.

---

[2] https://www.forbes.com/sites/davidblackmon/2020/08/11/oxy-struggles-to-cope-with-the-impacts-of-its-acquisition-of-anadarko/?sh=74e699772e7e

[3] https://www.houstonchronicle.com/business/energy/article/Total-backs-out-of-deal-with-Oxy-to-buy-15277590.php#:~:text=Total%20has%20backed%20out%20of,driven%20by%20the%20coronavirus%20pandemic.&text=Oxy%20was%20forced%20to%20write,oil%20prices%20plunged%20in%20March.

16.   The Plan Sponsor is Anadarko.

17.   The Plan Administrator is the Committee. The Committee is made up of at least five members, and they are appointed by the Senior Vice President Responsible for Human Resources of Anadarko. The members of the Committee are kept secret from Anadarko employees.

18.   An employee is entitled to Separation Benefits under the Plan "if your employment terminates for Good Reason within one year after the occurrence of a Change of Control, provided that you initiate the termination of your employment within 90 days of the event triggering your right to terminate for Good Reason".

19.   In late 2019, Anadarko notified its employees of the following:

> On August 8, 2019, Occidental Petroleum Corporation ("Oxy") acquired Anadarko Petroleum Corporation ("Anadarko") pursuant to that certain merger agreement by and among Anadarko, Oxy and a subsidiary of Oxy ("the Merger Agreement"), which acquisition constituted a Change of Control under the Anadarko Petroleum Corporation Change of Control Severance Plan (the "COC Plan"). Among other things, the COC Plan provides that Participants may resign their employment within 90 days of a Good Reason event occurring and receive Separation Benefits from the COC Plan.

20.   The Plan defines "Good Reason" as the occurrence of one or more of the following:

- A material and adverse reduction of your duties and responsibilities as compared to those immediately prior to the Change of Control;
- A material reduction in your Base Salary as compared to your Base Salary immediately prior to the Change of Control;
- A material reduction in the aggregate value of your Base Salary plus Total Target Incentive Compensation compared to such value immediately prior to the Change of Control;

- A change in your required worksite location to more than 25 miles from your location immediately prior to the Change of Control;
- A requirement that you take an assignment or position that requires you to travel on frequent overnight trips resulting in extended stays away from home on a consistent basis and to a substantially greater extent compared to required business travel prior to the Change of Control (excluding assignments or positions that may require temporary travel for a specified, short duration of time); and/or
- A requirement, without your prior written consent, to perform a job for which you are not skilled or trained.

21. If an eligible employee provides any of the previously listed "Good Reasons", he is entitled to a severance under the Plan.

### Material and Adverse Reduction of Duties and Responsibilities

22. After Oxy's acquisition of Anadarko, Mr. Lu's duties and responsibilities were materially and adversely diminished in the following ways:

1) The $0 allocation to Geophysical R&D in the 2020 budget decimated Mr. Lu's individual and collaborative research duties.
2) The slashing of the Geophysical R&D budget terminated the development of deep-learning models.
3) The reduction of seismic licensing prevented Mr. Lu from performing research and publication duties.
4) Mr. Lu lost all geophysicist collaborators and could no longer develop deep-learning models for Geophysical R&D projects.
5) Mr. Lu lost all of the Data Engineers on his team, reducing his ability to perform R&D activities and thwarting all R&D potential.
6) Mr. Lu's team leadership responsibilities were significantly diminished because he was excluded from communications, meetings, and activities in Geophysical R&D.
7) Mr. Lu's project assignments came with extremely reduced discretion and a much narrower scope than before.
8) Post-acquisition budget cuts forced Mr. Lu to withdraw publications and cease pursuing new publication opportunities that were required by Anadarko.
9) Cancellation of the Data Science Internship Program eliminated Mr. Lu's substantial duties relating to the program.

### The $0 Allocation to Geophysical R&D Decimated Mr. Lu's Research Duties

23. At Anadarko, Mr. Lu worked with external technology organizations, including joint industry projects, external industry technology organizations, and key university departments through research consortiums to improve digital capabilities. He was also in charge of leading algorithm deployment and maintenance for E&P project domains, including seismic acquisition, processing, inversion, and interpretation.

24. Each of these tasks required support through third party research and development.

25. In 2018-19, Mr. Lu was involved in the following activities, which required investments totaling over $6.6M.

   a. AAET collaborated with Bluware to build a powerful, interactive interpretation package to deploy Anadarko's geophysical deep-learning models. (over $750,000)

   b. AAET and Schlumberger signed a contract to develop the Delfi environment where Anadarko's deep-learning models could be deployed, plus a user-interface with GUI capability for geophysicists to provide training labels and QC results from those models. ($750,000)

   c. AAET spent about $5.1M on the Geophysical R&D team during 2018 and 2019, including internal labor of $3.3M and $1.8M in capital and operating expenses.

   d. AAET planned to collaborate with CGG on re-processing the BOA project to incorporate dirty salt/inclusions from Anadarko's deep-learning predictions into vendor processing workflow.

   e. AAET worked on a collaboration with WesternGeco to leverage the GPU technology in seismic processing for the BEVO project with the integration of the deep-learning models.

   f. AAET planned to continue to participate in consortiums through the University of Texas at Austin Bureau of Economic Geology and Georgia Tech University's ML4Seismic, as well as considered joining

consortiums through Stanford University, SEG SEAM AI, University of Leeds, and the Fraunhofer Institute.

    g.   AAET collaborated with Halliburton for development of fault segmentation tool.

    h.   AAET invested Topcoder for seeking solutions with fault segmentation solutions.

26.    In a September 9, 2019 meeting, Oxy advised that it would reduce the investment for AAET project and product development from $37.5M to $4.6M, a reduction of 88%. Specifically, all Geophysical R&D projects were frozen, with no budget allocation for 2020, Before the acquisition, Anadarko had allocated $4M to Geophysical R&D for the year 2020.

27.    With a $0 budget, all R&D research and collaborations with third parties was terminated. The deep-learning models that Mr. Lu developed had no commercial platforms to deploy in the future. The now defunded critical research projects were a major supplement to the R&D activities within his group. In addition, promotion of developed technologies, one of Mr. Lu's responsibilities at Anadarko, was completely eliminated.

    Slashing the Geophysical R&D Budget Ended Deep-Learning Model Development

28.    Before acquisition, Mr. Lu was actively involved in the Core R&D projects listed under the AAET website:

    a.  Machine Augmented Seismic Interpretation
- DL- based seismic fault interpretation
- DL- based seismic salt interpretation
- DL- based seismic stratigraphic interpretation

    b.  Advanced Reservoir Characterization & Quantitative Interpretation Solutions
- ML- based seismic inversion
- ML- based noise attenuation

29.    At Anadarko, Mr. Lu led the effort to develop deep-learning models for geophysical projects. Several areas were identified as collaborations with the Geophysical team at AAET, Geoscience Technology, and Asset teams. Before the acquisition, Mr. Lu was involved in the following R&D geophysical projects:

    a. Channel detection for the assets in Mozambique, Horn Mountain, Ghana;
    b. Salt/Salt inclusion detection for the assets in GoM K2, BOA, BEVO;
    c. MTC detection for the assets in Columbia, GoM;
    d. Horizon pickings for the assets in GoM Cretaceous, Horn Mountain, Ghana;
    e. Sand thickness detection for the assets in Mozambique, Horn Mountain;
    f. Seismic bandwidth extension for the assets in Mozambique, Horn Mountain;
    g. AVO anomaly detection for the assets in Mozambique; and
    h. Attenuations of multiples for the assets in GoM K2

30.    Before acquisition, all in-flight and future projects were well defined. Mr. Lu's responsibilities for those projects were clearly defined throughout 2021. They included (1) roadmap for geophysical DL projects, (2) roadmap of salt identification projects, and (3) as stated by CTO Sanjay Paranji to the Anadarko Governance and Risk Committee, "there are 2-3 years of R&D required to get through it all. The catalog has been circulated amongst staff and exploration leadership to prioritize by business needs."

31.    However, Mr. Lu was not provided with any projects. The only two projects assigned to his group were only relevant to his colleague's work. Those two projects, "compressive sensing" and "deployment of fault detection", were

assigned by Klaas Koster[4] and Reza Rastegar[5]. Neither of the projects had anything relevant to Mr. Lu's duties.

32.     For the first project, Mr. Koster's request was initially assigned to team members Yanyan Zhang and Yuan Xiao. Mr. Lu was not asked to provide any work. Ms. Zhang and Mr. Xiao responded to emails from Mr. Kloster and were invited to a meeting with Mr. Koster. Mr. Lu was not asked to join the meeting.

33.     For the second project, it had been always performed by Ms. Zhang. She had all the interactions with counterparts and performed all the data science work before acquisition. Mr. Lu was not asked to participate in that project.

34.     In an October 14 meeting at Oxy, team member Nikos Mitsakos presented the compressive sensing work. Ms. Zhang presented the fault deployment work.

35.     Jeremy Graybill, director at Anadarko, emailed Mr. Rastegar and noted that Mr. Lu was not involved in either of the projects. He asked Mr. Rastagar why Mr. Lu was invited to the meeting at Oxy to provide "deep technical details in some domains" when he had not done the work.

36.     In addition, with the Geophysical R&D budget slashed to zero, all ongoing and backlogged research and development projects were suspended. Since the acquisition, Mr. Lu did not perform any duties related to the projects listed above. Like the Geophysical R&D budget, his responsibility for these R&D activities has been totally eliminated.

---

[4] Mr. Kloster is a geophysicist at Oxy.

[5] Mr, Rastegar is a director at Oxy. A complete organizational chart is found at *Exhibit 1*.

37.    His full-time basis was previously occupied by 8 primary projects. None of the projects were mentioned by Mr. Koster or Mr. Rastegar, so Oxy was not interested in any of those projects. None of the projects was interested by OXY and none of the research and development work continued.

38.    Mr. Lu's full-time basis work was eliminated, along with any support to conduct research and development. The GPU machines were never used after the acquisition closed. Mr. Lu did was not involved in any R&D activities to develop deep-learning models. He was not involved in any interactions with counterparts. He was not assigned to any meetings. His role of leading the R&D effort was substantially diminished.

Reduction of Seismic Licensing Prevented Research and Publication Duties

39.    At Anadarko, Mr. Lu's job required that he (1) leads the execution of a wide range of projects across core focus areas of AAET, leveraging significant data within the operational and production domains for all core E&P business functions to deliver tangible business value and (2) generates content for external publications and presentations in conference and scientific journals, participating and presenting in external conferences and meetings to promote Anadarko's name as a leader in technology.

40.    The Geophysical R&D research topics required large volumes of datasets to support Mr. Lu's R&D activities. Access to these datasets provided him with the necessary background information to develop deep-learning models designed for each research topic and integrate regional deep-learning models for commercial platforms. Anadarko purchased access to all the seismic

datasets from assets in the Gulf of Mexico and international assets, including Mozambique, Ghana, Colombia, and Argentina.

41. Oxy, however, reduced the seismic data licensing budget from major vendors in the Gulf of Mexico. In addition, Oxy sold its ownership of international assets, as it actively sought to service its crippling debt. In total, the licensing of seismic data was reduced by about 60% since acquisition.

42. Without continued licensing of the datasets which Mr. Lu could previously access, most of his current research activities ceased. Because of this, 80% of his research topics were terminated: without those datasets, he could not develop deep-learning models and test ideas with developing models.

43. In addition, Mr. Lu could no longer publish scientific papers relevant to the data which Oxy sold to other companies or no longer licensed. For instance, Mozambique and Ghana's datasets were used for publications for several research topics including channel, sand detection, and bandwidth extension projects. Without access to these datasets, none of the publications, including any of the previous work based on the African assets, could be developed.

Mr. Lu Lost All Geophysicist Collaborators

44. Because Mr. Lu lost all of his geophysicist collaborators, he could no longer develop deep-learning models for Geophysical R&D projects.

45. At Anadarko, two of Mr. Lu's duties were to (1) work intimately and collaboratively with business geoscientists in leading advanced applied research and development for challenging and high impact problems within

12

the E&P operations domains and (2) network internally and externally to build relationships that foster technology transfer and collaboration. Before acquisition, he worked closely with 10 geophysicists from AAET and Geophysics Technology.

46.    Deep-learning models for Geophysical R&D projects require the input, support and total dedication of geophysicists, who have specialized knowledge and expertise. That team included:

   a.  Karilys Castillo and Cody Comiskey for the channel detection.
   b.  Hunter Danque and Cody Comiskey for Salt/Salt inclusion detection.
   c.  Matt Morris and Cody Comiskey for MTC detection.
   d.  Matt Morris, Carrie Kidd, and Cody Comiskey for horizon pickings.
   e.  Stan Morris, Grace Yu, Scott Geauner, Lin Yang, and Mike Seeber for sand thickness detection.
   f.  Stan Morris, Grace Yu, Scott Geauner, Lin Yang, and Mike Seeber for seismic bandwidth extension.
   g.  Olga Brusova, Krilys Castillo, and Cody Comiskey for AVO anomaly detection.
   h.  David Sixta, Jianxiong Chen, and Mike Seeber for multiple attenuation.

47.    Mr. Lu's ability to successfully perform this key duty depended on the expertise of geophysicists who define the scope of geophysical R&D and build connections with the business units.  However, all 10 of his prior collaborators either took change of control severance packages, moved to Total, or reported to a new business unit Mr. Koster.

48.    In an August 21, 2019 meeting, Mr. Koster stated that his group would not support Geophysical R&D activities, and that his team would not collaborate with Geophysical R&D.

49.    That lack of cooperation and support materially affected Mr. Lu as follows:

    a. There were no planning meetings, which were once held with Mr. Comiskey and Mr. Seeber's team, to initiate R&D efforts between geophysicists and Mr. Lu's team to present the scope of projects, exchange opinions, and understand the feasibility of developing deep-learning models.

    b. There were no interactions from his previous partners or new partners at Oxy other than Mr. Koster, who directly delivered the data.

    c. Mr. Lu was bypassed from the initial request by Mr. Koster, who ignored him and did not provide any technical information. Mr. Koster never contacted Mr. Lu regarding any collaborations.

    d. Comparisons of calendars before and after acquisitions show a 100% reduction of activities and communications from geophysical collaborators.

50. For example, on October 28, 2019, Ms. Zhang was advised that Mr. Koster wanted someone else to take over the fault detection algorithm and perform the task to Oxy's dataset. There was no intent to collaborate with Mr. Lu for any R&D activities.

51. Because Mr. Lu no longer had partners to collaborate with, he could not develop any deep-learning models for Geophysical R&D projects. Oxy had no plans to rebuild a centralized team to support collaboration activities. Its focus was simply on reducing its debt.

    Losing All Data Engineers Reduced Ability to Perform R&D Activities

52. A large part of Mr. Lu's role at Anadarko was providing leadership to various positions within his team, including data engineering. Before acquisition, his team had two Data Engineers, Yuan Xiao and Jerry Xiao. Both had very strong coding capabilities and geophysical backgrounds.

53. Yuan Xiao was the first data engineer hired at AAET in June 2017. He was brought onboard to work closely with Mr. Lu to provide dedicated Geophysical

R&D research data. All of the team members from their group and the geophysical group relied heavily on Mr. Xiao's work. His job duties involved:

    a. Managing the design and development of all seismic data workflows and pipelines to support Mr. Lu's research activities.
    b. Connecting the gap between data scientists and geophysicists. The programs and codes developed by Mr. Xiao provided a significant backbone to Mr. Lu's daily work.
    c. Involvement in all Geophysical R&D projects, activities, and interactions from the start of his employment in 2017.
    d. Collaborating with external vendors to develop tools to integrate the deep-learning capabilities for the developed geophysical projects.

54.    Mr. Xiao's performance reviews showed the importance of his work in supporting R&D activities.

55.    Jerry Xiao focused on the Geophysical R&D projects by:

    a. developing and conducting algorithms for seismic interpretation projects and support for geophysicists;
    b. researching 3D visualization and quality control tools for seismic data and deep-learning output;
    c. Supporting deep-learning research activities; and
    d. Generating geological models for use in training the deep-learning models.

56.    On October 17, 2019, Yuan Xiao was transferred to a geophysical group led by Mr. Koster. Jerry Xiao resigned on September 21, 2019. There were no longer any Data Engineers working in Mr. Lu's group, and there were no plans to hire any new Data Engineers. With no Data Engineers, all R&D activities eventually stopped.

57.    Contrary to Mr. Rastegar's allegations, Mr. Lu was never told that another team member would be assigned. After Yuan Xiao transferred to Mr. Koster's group, he was preoccupied by his new role and no longer assisted Mr. Lu.

Before acquisition, Yuan Xiao dedicated 100% of his time to Mr. Lu's group and was involved in all of the projects.

Team Leadership Responsibilities Significantly Diminished by Exclusion

58.    Next, Mr. Lu's team leadership responsibilities were significantly diminished because he was excluded from communications, meetings, and activities in Geophysical R&D.

59.    As a manager leading the Geophysical R&D activities, Mr. Lu had always been informed of technical discussions with collaborators and his supervisor, as he was considered as a technical lead. He was invited to all Geophysical R&D meetings and activities and involved with all Geophysical R&D projects. Examples include:

   a. Steering research directions for internal project planning and during external collaboration;
   b. Interacting with researchers from University of Texas at Austin about R&D efforts;
   c. Selecting which consortiums to join;
   d. Presenting the Geophysical R&D program to the Executive Committee;
   e. Joining the Executive Committee engagement with Google in San Jose; and
   f. Collaborating with Google to develop 3D deep-learning models.

60.    Performance review for 2017 and 2018 evidence Mr. Lu's active involvement in these activities with his colleagues, internally and externally.

61.    But after acquisition, Mr. Lu was bypassed by several people. One was Mr. Koster. He received several emails from Mr. Koster advising that deep-learning projects were sent to his team members Ms. Zhang and Yuan Xiao without advance notice. On Sept, 26, 2019, Mr. Koster emailed Yuan Xiao and

Ms. Zhang, asking them to apply the DL compressive sensing reconstruction. Mr. Lu was also not asked for his opinion about the feasibility of performing these tasks.

62.     Yuan Xiao's attendance was requested at several of Mr. Koster's team meetings. Mr. Lu was never notified of, nor invited to, those meetings. On August 23, 2019, Mr. Lu shared his concern about this exclusion with his manager, Jeremy Grabill.

63.     On October 8, 2019, Mr. Koster again bypassed Mr. Lu and sent emails directly to Ms. Zhang and Yuan Xiao, asking them to travel to Oxy's office to have technical discussions. Once again, Mr. Lu was never notified of, nor invited to, that meeting.

64.     Another person who bypassed Mr. Lu was Yongfeng Li, a Lead Technical Analyst. On October 21, Mr. Li directly called Ms. Zhang to perform a task. Mr. Lu was not asked for his opinion about the feasibility of performing the task. On October 9, 2019, Maksym Pryporov, mathematical scientist, sent a technical paper to Ms. Zhang and Yuan Xiao for comments or suggestions. Once again, Mr. Lu was not asked for his opinions.

65.     After acquisition, Mr. Rastegar took away Mr. Lu's technical support. This manifested in numerous ways:

    a. Mr. Rastegar intentionally locked Mr. Lu's previous manager, Jeremy Graybill, out of any meeting and integration efforts;

    b. Mr. Lu was not provided with technical support. Mr. Rastegar ignored Mr. Lu's opinions, locked him out of discussions, and did not share of any of the technical suggestions from the meetings attended by Mr. Li and Mr. Pryporov;

    c.  Mr. Lu was forced to work on the compressive sensing project and given an unreasonable deadline to solve the issue. Mr. Lu advised Mr. Rastegar about the unfeasibility of applying deep-learning models to the compressive sensing problems. However, Mr. Rastegar ignored Mr. Lu and issued his own commands.

    d.  Mr. Lu asked to seek technical suggestions from Google. However, Mr. Rastegar refused to approve that request. He also refused Mr. Lu's request for third party support when deep-learning solutions were unavailable.

    e.  Mr. Rastegar purposely cancelled weekly team meetings by lying to Mr. Lu, which cut Mr. Lu off from all communication on those projects.

66.    As demonstrated, Mr. Lu's responsibilities to his team were significantly reduced. He was excluded from key communications related to his job duties.

### Project Assignments Had Reduced Discretion and Narrower Scope

67.    The responsibility of the advanced analytics R&D team is to focus on development of deep-learning models by providing the most advanced technologies and capabilities for the problems brought to Mr. Lu's group. At Anadarko, he had the freedom to initiate research topics and engage as much or as little as he felt necessary with existing projects. In short, Mr. Lu was given the discretion to select the most appropriate approach to conduct research to produce the most compelling results.

68.    In addition, all the deep-learning models that Mr. Lu's team developed and applied to the Geophysical R&D projects in 2018-19 were compiled with the latest deep-learning frameworks − TensorFlow or PyTorch. All the developed deep-learning models heavily rely on GPUs or TPUs and cloud technologies. Two DGX-1 boxes and one DGX-2 box are solely allocated for geophysical research efforts.

     a. DGX-1 was dedicated to Mr. Lu's team thanks to CTO Sanjay Paranji.
     b. Presentation slides were delivered to Nvidia GPU Technology Conference in San Jose in 2019 that showed how GPUs were heavily leveraged to develop deep-learning models.
     c. DGX-2 was dedicated to develop geophysical research.
     d. Emails demonstrate that Mr. Lu was fully utilizing GPUs for the DGX-1 box.
     e. DGX-2 was purchased solely for development of geophysical research

69. However, Mr. Lu's autonomy was materially and substantially reduced at Oxy, and his team's approach was significantly narrowed. Some examples include:

     a. Team members Ms. Zhang and Yuan Xiao explained to Mr. Rastegar that there was no way to apply deep-learning models to the compressive sensing tasks assigned by Mr. Koster;
     b. Mr. Lu also explained to Mr. Rastegar why it was not possible to apply deep-learning models to the compressive sensing tasks assigned by Mr. Koster. However, Mr. Rastegar ignored him and continued to insist that deep-learning models be applied; and
     c. Mr. Lu was asked to analyze a paper that Mr. Pryporov used to develop an algorithm which had no connection to GPU or deep-learning models. Mr. Lu explained that it was beyond his responsibilities as data scientist. Mr. Rastegar claimed that Mr. Lu was a mathematician, and algorithms to solve compressive sensing tasks were relevant to his job. However, Mr. Lu never worked on a mathematical project since he joined Anadarko, only projects for developing deep-learning models with GPU technologies.

70. Mr. Lu's previous manager, Jeremy Graybill, also mentioned to Mr. Rastegar and David Bowlby, Mr. Rastegar's supervisor, about the differences in work between their groups. Mr. Rastegar again ignored Mr. Graybill and Mr. Lu.

Budget Cuts Forced Withdrawal of Publications and New Publication Opportunities

71. At Anadarko, Mr. Lu was required to (1) generate content for external publications and presentations in conference and scientific journals, (2) participate and present in external conferences and meetings to promote Anadarko's name as a leader in technology, (3) encouraged to pursue

continuous learning, literature, and training opportunities to keep up with academic and industry research and trends, and (4) ensure that the most advanced technologies and capabilities were being implemented.

72.   Mr. Lu was given the chance to attend, present, and publish papers at conferences, workshops, and journals at AAET. AAET even reserved a budget for conferences and training.

73.   He gave technical presentations in Houston, San Antonio, San Jose, Anaheim, and Montreal. He attended various consortiums at the University of Texas at Austin, Georgia Tech, Stanford, the Fraunhofer Institute, and the University of Leeds.

74.   He was encouraged to write papers and submit publications. He provided technical support for 10 publications.

75.   Mr. Lu also attended several Google trainings and was given opportunities to work with Google.

76.   After acquisition, Oxy refused to allow Mr. Lu to attend conferences, present papers, publish papers, or attend consortiums or training. On information and belief, this was just another part of Oxy's "belt tightening" to help it reduce its debt. However, it materially and substantially affected Mr. Lu's job duties.

77.   Some examples of this conduct include:

    a.   A paper was accepted by the 2019 SEG 3rd International Workshop on Mathematical Geophysics: Traditional vs. Learning. The workshop was held in November 2019. Before acquisition, Mr. Lu was allowed to attend the workshop. After acquisition, on October 17, 2019, Mr. Lu was advised that he could no longer attend. The reason provided was "budget constraints". Mr. Lu was forced to

withdraw his paper from the workshop, injuring his professional reputation.

b. Another paper was accepted for a NIPS conference in December 2019. However, Mr. Lu's supervisor has denied his request to attend the conference. Mr. Lu was forced to withdraw his paper from the workshop, injuring his professional reputation.

c. Another paper that was pending acceptance by The Leading Edge Journal was declined for final publication by Mr. Koster. The reason provided was "budget constraints".

d. Mr. Lu's team members were also denied requests to attend consortiums.

78. In short, Mr. Lu's duties to generate publications, present papers, and promote further training and opportunities for himself and his team were eliminated.

## Cancellation of Data Science Internship Program

79. One of Mr. Lu's job duties at Anadarko was to promote digital transformation, training, and development of other Data Scientists, Citizen Data Scientists, and peers throughout the company. A major component of this job duty was the Data Science Internship Program.

80. Over the years, the Data Science Internship Program has been an unqualified success.

81. In 2018 and 2019, Mr. Lu's group was assigned four interns. He was actively involved in the internship program, including assisting with the campus information session, recruiting session, interviewing sessions, proposing and determining projects for interns, mentoring, management, project advisement, publications, and extending employment offers.

82. On August 28, 2019, Oxy terminated the Data Science Internship Program. It chose not to make a single offer to any of Anadarko's 2019 summer interns. It

also cancelled all of Anadarko's scheduled campus informational sessions, recruiting sessions, and interviewing sessions.

83. Without the internship program in 2020, the number of resources that can be dedicated to Mr. Lu's research topics and projects in my group would have been largely reduced.

84. The cancellation of the Data Science Internship Program meant that Mr. Lu lost the following job responsibilities:

    a. Providing input into which Data Science candidates should be hired as returning interns or as new hires after graduation;

    b. Recruiting Data Science candidates at the various college campuses and through other recruiting efforts;

    c. Interviewing Data Science candidates for summer 2020 internship opportunities, both through recruiting efforts and formal scheduled interviews;

    d. Deciding which candidates would be selected to receive internship offers;

    e. Extending offers to Data Science intern candidates;

    f. Determining which Data Science projects the interns would work on and preparing for the Data Science summer internship program; and

    g. Providing individual mentorship, management, project advisement, and general internship program mentorship and input throughout the program.

85. The cancellation of the Data Science Internship Program was a material and substantial diminishment of Mr. Lu's job duties.

The Claim and Appeal

86. Mr. Lu resigned from his job at Anadarko on November 1, 2019.

87.   On December 12, 2019, Mr. Lu sent his Formal Claim to the Committee. Among other things, he outlined how his role as Manager of Data Science and Advanced Analytics had been materially and adversely diminished.

88.   On March 13, 2020, The Committee denied the Formal Claim. In doing so, it claimed to have interviewed David Bowlby, Reza Rastegar, and Klass Koster. The Committee also claimed that "reducing the assets of the organization does not correlate with fewer research and development opportunities". Finally, the Committee contended that Mr. Lu resigned before a Good Reason took place.

89.   Mr. Lu sent his appeal on December 30, 2020. In the appeal, he provided 175 pages of evidence of the material and adverse diminishment of his job duties.

90.   The Committee denied Mr. Lu's appeal on April 28, 2021.

Defendants Rely on Limited Evidence in Denying Claim and Appeal

91.   In denying Mr. Lu's appeal, Defendants relied on inaccurate statements from Mr. Rastegar, Mr. Bowlby, and Mr. Koster. Each of these employees could not be trusted, and their evidence to the Committee is worthless. Moreover, the manner in which their evidence was reviewed reveals Defendants' motivation to deny Mr. Lu's claim.

92.   Evidence of Defendants' blind reliance on these statements comes from internal emails. For instance, the informal inquiry was denied on November 9, 2019, one day after email exchanges between Lisa Barton, counsel for Oxy, Mr. Bowlby, and Mr. Koster. There was no evidence that the Committee met or

came to any decision. Instead, it appeared that Ms. Barton decided to deny the informal inquiry.

93.   Similarly, the Formal Claim was denied on March 13, 2020. One day before, there was a flurry of email exchanges between Ms. Barton, Mr. Rastegar, Mr. Bowlby, and Mr. Koster. There was no evidence that the Committee met or came to any decision. Instead, it appeared that Ms. Barton decided to deny the Formal Claim.

94.   On information and belief, the same flurry of emails between Ms. Barton, Mr. Rastegar, Mr. Bowlby, and Mr. Koster took place just before Defendants denied Mr. Lu's appeal. There is no evidence that the Committee met or came to any decision. Instead, it appeared that Ms. Barton decided to deny the appeal.

95.   All of the referenced emails were between Ms. Barton, Mr. Rastegar, Mr. Bowlby, and Mr. Koster. There was no evidence that Ms. Barton interacted with the Committee. There was no evidence that the Committee interacted with anyone.

96.   Lisa Barton is not on the Committee. She is not a Plan fiduciary. She is not authorized to decide informal inquiries, Formal Claims, or appeals.

Unequal Treatment of Severance Claims

97.   In this claim, Defendants have abused their discretion in denying Mr. Lu's claim based on their behavior in other claims. The decisions have been arbitrary, and they can be proven through specific examples. Although several employees, including Mr. Lu, have had their severance claims denied, other surprising

24

cases have been approved for Managers of Data Science in AAET. Some of those employees include (1) Alex Bayeh, (2) Natalie Berestovsky, and (3) Dingzhou Cao.

98.    In the Fifth Circuit, courts must generally remain within the administrative record in conducting a review of the administrator's findings once the record is finalized. *Ariana M. v. Humana Health Plan of Texas, Inc.*, 884 F.3d 246, 256 (5th Cir. 2018). However, a district court may admit evidence "to explain how the administrator has interpreted the plan's terms in previous instances". *Id.* This information is available to the Court under any standard of review.

99.    Mr. Lu is entitled to discovery on how Defendants interpreted the Plan's terms in other severance claims, including the other employees listed above.

Exhaustion of Administrative Remedies

100.    Having exhausted his administrative remedies, Ping Lu brings this action to recover the severance benefits under the Plan to which he is entitled, which total approximately $500,000.

**IV.**
**CLAIMS & CAUSE OF ACTION**

101.    The Plan is governed by ERISA. 29 U.S.C. §1001, *et. seq.* Anadarko was the Plan Sponsor for the Plan. The Committee was the Plan Administrator, and it is the named fiduciary under the Plan.

102.    As Plan fiduciary, the Committee is obligated to handle claims for the benefit of the Plan and Plan beneficiaries, and to deliver the benefits promised in the

Plan. It is also obligated as a fiduciary to conduct its investigation of a claim in a fair, objective, and evenhanded manner.

103. Defendant's adjustment or "adjudication" of Mr. Lu's claim was instead biased and outcome oriented. This was in part reflected by its denial of Mr. Lu's claim, even after being presented with substantial evidence that his job duties had been materially and adversely diminished in comparison to the duties and responsibilities he enjoyed before acquisition.

104. Defendants' interpretation of the Plan was not legally correct. It was also contrary to a plain reading of the Plan.

105. Defendants' interpretation of the Plan and Plan language was contrary to that of the average Plan participant and policyholder. It was contrary to the common and ordinary usage of the Plan terms. Alternatively, the Plan language upon which Defendants based their denial decision was ambiguous. The ambiguous nature of those terms requires those terms be construed against Defendants and in favor of Mr. Lu.

106. Defendants' denial was made without substantial supporting evidence. Their decision to deny Mr. Lu's claim was instead based upon rank speculation and guesswork. Defendants' denial decision was *de novo* wrong. Alternatively, it was arbitrary and capricious.

107. Defendants' denial of Mr. Lu's claim breached the terms of the Plan. This breach violated 29 U.S.C. §1132(a)(1), entitling Mr. Lu to the severance

benefits to which he is entitled under the Plan, along with pre-judgment interest on the amounts due and unpaid, all for which he now sues.

## VI.
## REQUEST FOR PREJUDGMENT INTEREST

108.    Mr. Lu requests, in addition to the benefits withheld, prejudgment interest on any such award. He is entitled to prejudgment interest as additional compensation on principles of equity.

## VII.
## CLAIM FOR ATTORNEYS FEES & COSTS

109.    Mr. Lu seeks an award of his reasonable attorneys' fees incurred and to be incurred in the prosecution of this claim for benefits. He is entitled to recover those fees, together with his costs of court, pursuant to 29 U.S.C. §1132(g).

## VIII.
## PRAYER

Ping Lu, Plaintiff, respectfully prays that upon trial of this matter or other final disposition, this Court find in his favor and against Defendants Anadarko Petroleum Corporation Change of Control Severance Plan and Anadarko Petroleum Corporation Welfare Benefits Administrative Committee, and issue judgment against Defendants as follows:

A.    Pay to Mr. Lu the severance benefits to which he is entitled under the Plan, as well as all prejudgment interest due thereon and as allowed by law and equitable principles;

B.    Pay all reasonable attorney's fees incurred and to be incurred by Mr. Lu in obtaining the relief sought herein, along with the costs associated with the prosecution of this matter;

C.    All such other relief, whether at law or in equity, to which Mr. Lu may show himself justly entitled.


Respectfully submitted,


By:____*/s/ Amar Raval*_____
           Amar Raval, TBA #24046682
           S.D. No. 619209
           Berg Plummer Johnson & Raval LLP
           3700 Buffalo Speedway, Suite 1150
           Houston, TX 77098
           (713) 526-0200
           (832) 615-2665 (Fax)
           araval@bergplummer.com

           ATTORNEYS FOR PLAINTIFF