## Information and recommendation for Anadarko Data Scientists moving forward

From:   Jeremy_Graybill@oxy.com

To:   David_Bowlby@oxy.com

Cc:   Mustafa_Rizvi@oxy.com

Date:   Thursday, August 22, 2019, 11:49 PM CDT

David,

As we discussed and was requested this morning, here is some additional information.  Through discussions with my team members (my team includes both my organization and my dotted line Data Science team members within Anadarko), there are a number of things that I've heard from them, and I think it's very important that you are aware of all of this as you consider the path forward.  I like being open with people, and value honesty and integrity, so I wish we could have spoken earlier about much of this, such as before or soon after Day 1, but that was evidently not the plan or the intention on Oxy's side.  You may even recall that in the single integration meeting I was involved in at Oxy, I mentioned my concerns around understanding and combining our sub-cultures from the beginning in order for this to be a successful integration, but evidently that was also not of interest to Oxy, since I was not once asked about what made our Data Science environment, culture, and employees work so effectively.  Therefore, I am providing as much information as possible in this email, beginning with some background, what I have heard from my employees through this process, some very upsetting items, and finally my recommendation.

### **Background**

As some background, I want to provide some of the reasons that my team members (my team again includes both my organization and my dotted line Data Science team members within Anadarko) joined Anadarko and loved working here:

- They wanted and want to be Data Scientists, they joined Anadarko as Data Scientists, and they are Data Scientists.  They are not and do not want to be simply Mathematicians, Statisticians, Computer Scientists, Engineers, Physicists, etc., and they definitely don't want to be Analytics Engineers.  Reza may dislike and not understand the Data Science label, role, or function, but the rest of the world outside of Oxy enthusiastically embraces that label, role, and work, including the entire Data Science population at Anadarko.
- They loved the strategy of performing Applied Research and Development using Data Science techniques and advanced technologies (Google Cloud, NVIDIA, advanced Data Science architectures and approaches, etc.).  They have no interest in performing ad-hoc, short cycle project work using less advanced methods and technologies, including Excel, Spotfire, Matlab, and R-Shiny.
- They loved working closely with phenomenal subject matter experts on very challenging and complex problems (some of which take months and even years of research and work) as part of a centralized Data Science organization embedded within an organization which includes Geoscientists and Petroleum Engineers.
- I have developed Data Science career paths and ladders for them, which they are excited about and which provided future growth and career opportunities.
- Our Data Science environment and culture allows for many things they desire and value: advanced research, creativity, flexibility (including a formal work from home policy and flexible hours), open publication opportunities, incredible and challenging work, very high expectations, continuous education, support, growth, significant mentorship opportunities (including an excellent Data Science internship program), and direct business value contributions back to the business.
- They each interviewed me as part of the interview process as well, joined Anadarko because they wanted to work for me, and have grown to trust and respect me.  After years of working together, we are a family, and most of the team wants to continue working for me, whether that's at Anadarko, Oxy, or elsewhere.

Occidental [Ping Lu] 000249

I don't mean to be harsh with my following words, but I think it's important for the path forward that you know the truth in how my organization, including our dotted line Data Scientists, views things.  Through the actions from Day 1, Oxy has shown the entire team that Oxy does not care at all about the reasons they are here, the reasons they want to work here, their future careers, or anything.  Oxy never asked them what they wanted, and immediately took away all of the points above on Day 1.  It is widely known that we have gone to great lengths to recruit and hire the absolute best Data Scientists possible.  Oxy taking away all of the reasons that these individuals chose to work at Anadarko was naturally not going to be a successful strategy or approach to retain these individuals.  In addition, the fact that you had my entire organization including myself reporting to Reza from Day 1, and that I was never involved in any decisions or discussions on the path forward (and was completely bypassed in any discussions with my team, even when some team members requested that I be included), showed the team one thing: Oxy legacy was valued over competence, experience, and expertise.  That is entirely Oxy's prerogative of course, as Oxy bought Anadarko and not the other way around, and we all understand why Oxy made that decision, but you may also want to understand the ramifications of taking that approach.

Based on their experiences and conversations with numerous outside individuals and sources, our team has developed the strong feeling and belief (whether it's true or not) that we've potentially built the best Data Science organization within the Oil & Gas industry, and I am fortunate to be well respected both internally and externally for building and leading this organization.  You placed that extremely talented organization under someone who is not capable or qualified in leading the team, and based on many of my team's own external conversations across the space, is someone who is not respected outside of Oxy.  In addition, from what many of my team and other Anadarko peers have heard through conversations with business units within Oxy, the Data Science organization was placed under someone who is not at all respected internally across larger Oxy.  And finally, when each one of them interacted with Reza and "interviewed" him themselves, Reza's attitude and actions led them to quickly develop a complete lack of respect, trust, loyalty, or any positive feelings about him as a leader.  As a number of my employees have stated to me, if it was their choice, they would never ever choose to work for or under Reza, or even recommend him being a part of their own teams.  As one of my employees phrased it, Oxy came in and took a sledge hammer to a well-oiled and high performing machine, without understanding how or why it worked, and now that you busted it up you're trying to figure out how to re-use some of the broken parts and pieces without any sort of manual.  If you try to force fit any of those parts and pieces within your own machine, which they were never intended for, then you could be risking sub-optimal performance or even catastrophe.

Oxy had one chance to make a first impression, and what has been done can never be undone.  As I mentioned to you, up until the acquisition, while it was difficult, I was doing my best to motivate the team on the possibility of most of us continuing with Oxy for the future, even though I was receiving zero first-hand information.  Through internal discussions and polling, which I had documented, around 25% of my employees strongly wanted to be let go by Oxy at the time of the acquisition, partly due to the attraction of trying for the COC.  After the first day of communications from Oxy (Monday 8/12) and Reza's initial interactions with some of the team (when I had no involvement since I was on vacation, and I was purposefully bypassed by Reza completely), that changed to ~80%+ of my employees strongly wanting to be let go by Oxy.  As I shared with you in email, I assumed that you would be pleased to hear that based on the approach Reza was taking with our Data Scientists, many of the team did not want to be retained, as you would be able to make plenty of cuts to reach your synergy targets, so I informed you of the viewpoints of my team.  However, while I never heard anything back in response, Reza immediately changed his approach with the team.  It became clear then that he was working to sell certain individuals (but only some individuals) on Oxy instead of being hostile, belittling, and using intimidation tactics as he was initially doing and was still doing with others.  This flip-flopping and lack of any consistency in his interviews was very pronounced and concerning to the entire team, as it showed them that they couldn't trust anything he was saying, one way or another.  He also provided different information to different individuals on similar topics, strategy, and policies, likely due to ulterior motives, which again led to the development of a deep mistrust across the team.  In addition, Reza bad mouthed people including yourself to several of my employees, stating that you were not very knowledgeable or smart.  He also made disparaging remarks about individuals and teams within the Oxy business as well.  All of these comments further eroded any trust or respect from the team, and led my entire organization to question his motives and ethics.  Many of the team is even concerned about retaliation activities from Reza in the future, based on some of the things he has said and some of his actions to date, including Reza mentioning finding ways to fire people for cause (without COC) if they didn't do as he said in the future roles which he would assign them to.

**Unacceptable and inexcusable actions by Reza Rastegar**

The most concerning, upsetting, and inexcusable items are something that I hesitate to mention, but feel that it is my duty to report it at a high level.  In his interactions with a particular class of employees, Reza completely and unprofessionally crossed discrimination and harassment lines towards those employees, and treated them completely differently than his interactions with all other classes of employees.  The reason I hesitate to mention this, is that for this class of employees, while they are very hurt by the interactions and his actions, they would rather be discriminated against and harassed in this specific situation, because they are hoping to be let go by Oxy and they would much rather have nothing to do with Reza or Oxy now or in the future.  I apologized to all of those individuals for Reza's actions, and am extremely disturbed and upset by the circumstances communicated to me, as is the rest of the team and others outside of the team who were made aware of his actions.  If this was a normal situation, then it would absolutely not have been tolerated by Anadarko, and complaints and an investigation would have been raised to HR and outside sources as necessary, which in my experience and based on feedback I've received from external HR specialists, would likely result in disciplinary actions.  However, these employees requested that I not raise the issue with HR or outside sources at this time, because they very much prefer to be let go soon with the COC, and they are also fearful of Reza and they fear retaliation from Reza and/or Oxy in the future, as they have absolutely no reason to trust Oxy in any way at this point.  While these types of actions are not allowed at Anadarko, these employees now feel that this may be common practice at Oxy, based on their only interactions with Oxy to date.  Almost every single one of our Data Science employees has been negatively affected by Reza's actions in these specific situations, as this information has been impossible to contain.  If the affected employees are not let go by Oxy and don't receive the COC, then they will decide on appropriate actions at that time.


After all of the actions above, all but one of the team (my team again includes both my organization and my dotted line Data Science team members within Anadarko) wants nothing to do with Reza in any way, shape, or form, in the future.  As communicated to you previously, two of my employees are willing to consider openings with Oxy (although one of those individuals also wants nothing to do with Reza), while the remainder of our Data Science employees want nothing to do with Reza and do not want to continue their careers with Oxy.  Based on Reza's interactions and actions to date, Reza will never earn the respect, trust, or loyalty of a single Anadarko Data Scientist now or in the future.


**My Recommendation**

I realize you may not want my recommendation after what I've shared above.  I still want to provide it, because I think it's the best path for my people, and I honestly feel that it would also be the best and easiest path for Oxy to move forward at this point.  The fact is that Oxy needs to cut significantly, and we all know that, since Oxy overspent for Anadarko.  We also know that based on your defined path forward for DMA, and Reza's strategy and approach to advanced analytics at Oxy, few of my employees are critical to your success (the most critical individuals are likely the contractors who are supporting IPSO and any other applications you decide to retain).  You could easily cut more than you are requested to cut to meet your synergy targets, because those targets are the minimum expected, while Oxy and the investors would eagerly welcome even more cuts.


***My recommendation is that you let go of any and all Anadarko Data Science employees who want to leave, and provide them with the COC.***  If you keep employees who have absolutely no interest in being at Oxy, at best you'll have dead weight to carry around for as long as they stay on the payroll, and it's likely that you and Reza will also have a silent (or even vocal) mutiny on your hands.  If you try to keep them and make it difficult for them to obtain the COC, then you will create deeper resentment within those individuals and the rest of the team, that will only grow and build on the complete lack of trust, respect, or loyalty that has already been developed through Reza's interactions and actions to date.  In addition, the team is a very close-knit family, and if you further harm certain individuals (such as effectively forcing them to resign and then not paying out the COC, or cutting the few individuals who are open to staying), then those team members that remain with Oxy will immediately learn about those actions, and the resentment will build and spread further.  As you know, one bad apple ruins a bunch, so it would not be a good idea to retain individuals who are not at all interested in working for Oxy, versus focusing on moving forward with those who want to be there.  Reza already has a team of individuals who I assume would love to remain with Oxy.  There are also a couple employees from my team who are open to staying as well given their specific situations (as long as one of them does not report up to Reza), and I have several strong contractors who are open to staying.  With that entire group, you should have more than enough individuals to move forward with and be successful with in your desired mission, while still being able to meet or exceed your synergy targets, and you could avoid the distractions and headaches of having a number of extremely disgruntled employees on staff who despise, do not trust, and are fearful of their manager.

I really wish this had gone down differently, especially in several circumstances of course, but the past cannot be changed.  I also apologize for any harsh tone in this email, but I am very upset with how the individuals on my team have been treated, especially related to several items, and I will support and defend my employees 100% until I am walked out by Oxy and beyond.  I would strongly encourage you to consider my recommendation for the good of the APC Data Scientists and for Oxy moving forward.  On the positive side, letting go of these employees will benefit Oxy's synergy targets and be viewed positively by Oxy's investors, as letting go of every Data Scientist employee who is interested will provide **over $5 Million in annual synergy savings** through employee costs alone.  This was a difficult situation that nobody signed up for or wanted to go through, and it became much worse due to Reza's interactions and actions.  The best thing for all sides at this point would be for you to make the appropriate changes so we can all move on as quickly as possible.  I look forward to further discussions with you and hearing what your future plans and actions are, so I can better understand next steps.


Thanks,


**Jeremy L. Graybill**, PMP

Director of Data Science & Advanced Analytics | AAET

Jeremy.Graybill@anadarko.com | 832.636.4783




Note: I'm also copying Mustafa, because of his role in leading the DMA integration efforts, and because the broader team and I have grown to respect him and his judgement through limited interactions.

# EXHIBIT 15

Occidental [Ping Lu] 000253

**From:**        Rastegar, Reza <Reza_Rastegar2@oxy.com>
**Sent:**        Friday, October 18, 2019 1:56 PM
**To:**          Lu, Ping
**Subject:**     Re: Conferences, Events, etc

Ping,

Thanks for sharing your thought. However, for the reason I mentioned I'd like to still decline your request.

Thanks for your understanding.
Reza

Sent from my iPhone

On Oct 18, 2019, at 1:37 PM, "Ping_Lu@oxy.com" <Ping_Lu@oxy.com> wrote:

> I would like to share with you some extra points to support for the importance as well as consequence of cancelling this business trip.
>
> 1. Attending both the Rice Data Science and SEG conferences have been previously approved by Jeremy, and they are all closely relevant to business purposes of enhancement of keeping up with academic and industry research and trends as well as exchanging knowledges with other colleagues to better serve for my daily work.
> 2. This workshop organized by SEG is well recognized in the geophysical community both from the industry and academy. The technical contents and results presented in this paper strongly illustrated the advancement of the deep-learning technology applied for seismic in a way that a closely tactic collaboration between AAET and WesternGeco (WG) was demonstrated. That was why I got technical and financial support and approval from both APC and WG about presenting and promoting the group as a leader in the technology.
> 3. This paper has been accepted by the workshop committee, and will be published at the SEG proceedings contingent on the presentation of the paper to be finally delivered at the workshop. If an absence of the presentation is present, the paper will be automatically considered as a rescission. Temporal cancellation of the promised talk at the workshop will both significantly harm the reputation of the company and myself, especially since the agenda of the workshop has been finalized and published. In addition, a notice to WG seeking their permission is also needed for cancellation of the talk as one of the authors is from WG.
> 4. The expenses of airfare and registration of the workshop have been previously approved by the company, and reimbursements of the expenses have been accomplished accordingly. Please note that cancellation of both will not get the refund of expenses eventually.
>
> Please let me know if you still would like to decline the request. Thanks.
>
> Ping

---

**From:** Rastegar, Reza <Reza_Rastegar2@oxy.com>
**Sent:** Thursday, October 17, 2019 3:37 PM

1

**Occidental [Ping Lu] 000254**

**To:** Lu, Ping <Ping_Lu@oxy.com>
**Subject:** Re: Conferences, Events, etc

Ok I'm fine with your PTO request.

With regard to the conference,

1) I have to decline your request for attending the conference. In addition to the fact that we are under budget constraints, there are more urgent business related tasks that you have been tasked to do. And I would you to demonstrate substantial progress on those tasks before we can discuss other activities, especially considering the fact that you just attended another event this week.

2) if you still like to publish you paper without attending the conference, I would still like to have paper approved in pr.oxy.com according the guideline I sent a few weeks ago.

Thanks for your understanding.

Reza

Sent from my iPhone

On Oct 17, 2019, at 2:27 PM, "Ping_Lu@oxy.com" <Ping_Lu@oxy.com> wrote:

> Reza,
>
> I would like to take one week PTO for the week of Oct.28th.
>
> In addition, we submitted one paper on July 2nd, prior to the acquisition, to the "2019 SEG 3rd International Workshop on Mathematical Geophysics: Traditional vs. Learning". Both of the paper and presentation slides have obtained the approvals from the APC's committee. I will attend and present at the event, which will be held on the week of Nov.4th, and the registration and flight fare have already been paid.
>
> Ping
>
> ---
>
> **From:** Rastegar, Reza <Reza_Rastegar2@oxy.com>
> **Sent:** Wednesday, October 16, 2019 10:41 AM
> **To:** Li, Yongfeng <Yongfeng_Li@oxy.com>; Leung, Ivan <Ivan_Leung@oxy.com>; Khodabakhshi, Morteza <Morteza_Khodabakhshi@oxy.com>; Cao, Dingzhou <Dingzhou.Cao@anadarko.com>; Berestovsky, Natalie <Natalie.Berestovsky@anadarko.com>; Lu, Ping <Ping_Lu@oxy.com>; Bayeh, Alex <Alex.Bayeh@anadarko.com>; Banirazi, Reza <Reza_Banirazi@oxy.com>
> **Subject:** Conferences, Events, etc
>
> Team,

Occidental [Ping Lu] 000255

Just a reminder that if you or your team members are interested in attending events/conferences either representing OXY/traveling on the companies budget/during work hours, please send me a note one week ahead of the event (2-3 weeks if you are going to present). There is an approval process that we need to go through.

Thanks,
Reza

*Reza Rastegar*
*Director of Data Analytics*
*Occidental Oil and Gas Corp.* | *Data Management & Analytics*
*Phone:: +1 (713) 366-5971 | Mobile: +1(281) 731-9977*
*Office Location: 14.167*

3

# EXHIBIT 16

Occidental [Ping Lu] 000257

**From:** Graybill, Jeremy
**Sent:** Thursday, September 12, 2019 7:39 PM
**To:** Kilcrease, Lindsay <Lindsay.Kilcrease@anadarko.com>
**Subject:** Our discussion

Lindsay,

Thank you so much for speaking with me today.  I would like to document a few of the points that we discussed, so you are able to pass them along to whomever you feel you need to provide the information to.  I'm trying my best to let you know the viewpoints of my organization, without providing you specific information tied to specific individuals, because I have been requested not to disclose additional information at this time.  Please know that while there is unanimous, or almost unanimous opinions regarding some points below, there are also other points below which may only apply to several individuals (and other individuals on the team may have a completely different viewpoint for that point).

- It is unanimously agreed by the individuals on my team that the reason that the integration efforts have gone very poorly in our area can be tied to a single Oxy individual, in Reza Rastegar.  Many other collaboration meetings that my team has participated in with other individuals and teams at Oxy, where my team has openly collaborated, have gone very well.  Based on the interactions with and actions by Reza to date, 95% of the individuals in my organization want no part in ever working with or dealing with Reza in the future.  This fact is completely beyond repair.

- I have communicated the above fact, along with more details and concerns about Reza, to David Bowlby at Oxy.  In fact, the points which I raised to David were directly from the individuals on my team, as they worked with me in drafting the details.  In addition, several individuals on my team have also communicated their concerns and views with David as well.  The individuals on my team have not been pleased with David's response, and do not feel that their concerns have been heard at all.

- The negative interactions with Reza have not been limited to the individuals in my organization.  There are other individuals at APC outside of my team, along with individuals at Oxy, who have told us of very negative interactions with and actions by Reza (sometimes using some very choice words and language).

- A number of individuals on my team have told me that if an HR investigation is opened into some of the actions, that they will have no comment at this time.  Several individuals on the team have consulted with lawyers, and they have also looked into EEOC laws and claim filing rules, and have determined that the best course of action is to wait until they see what steps are taken by Oxy, before deciding on their own next steps and/or before having any comment to HR.  In addition, most of my team has no reason to trust Oxy HR at any point in the future, so that is also why they won't be having any comment until it best serves them.

- While 95% of the individuals on my team will try for the Change of Control at the time which suits them best, there are individuals who have been told by Reza that they will be given positions which will not qualify them for Change of Control, so most of the team is fully aware that they may not be able to qualify.  But they will still give it their best try, and many of them already have spoken to their attorneys as they prepare for next steps.

- Since Data Science is one of the most in demand skillsets in the world right now, nobody on my team is worried about getting a job in the future.  I know of at least a handful of individuals on my team who already have job offers (some accepted).  They will try for the Change of Control, but the number one ultimate priority for most of my organization is leaving Oxy so that they don't have to deal with Reza in the future.

- There are individuals on my team who have been told by Reza that if they don't do what he says, then they will be fired for cause without the Change of Control.  Due to this threat, and the fact that some of the team feels like they will not be given the CoC by Oxy anyway, there are individuals on the team that would actually like to be fired for cause by Oxy (especially since those individuals have job offers already lined up).  There are individuals who have told me that due to the very negative interactions they've had with Reza and some of his actions to date, they would ultimately like to file suit against Oxy if they don't receive the Change of Control,

Occidental [Ping Lu] 000258

especially if they are fired for cause, and they would also like the opportunity to take the facts to the court of public opinion through the media.

Again, the points above don't all apply to everyone on my team, unless noted otherwise.  I've done my best to listen to and best represent the viewpoints of my team to David, and now to you.  I'd also be happy to discuss this in more detail with other individuals, as needed.

Thanks,

**Jeremy L. Graybill**, PMP

Director of Data Science & Advanced Analytics | AAET

Jeremy.Graybill@anadarko.com | 832.636.4783

**Occidental [Ping Lu] 000259**

# EXHIBIT 17

Occidental [Ping Lu] 000260

| | |
|---|---|
| **From:** | Jeremy Graybill  <jlgraybill7@yahoo.com> |
| **Sent:** | Tuesday, October 01, 2019 3:17 PM |
| **To:** | Barbara_Bergerson@oxy.com |
| **Cc:** | Palmer, Robert; Cameron_Rempel@oxy.com; LaForge, Bob; Swartz, Harris; Justin_Stone@oxy.com; Alex_Bayeh@oxy.com; Natalie_Berestovsky@oxy.com; Dingzhou_Cao@oxy.com; Vincent_LeMoine@oxy.com; Ping_Lu@oxy.com; Ingrid_Tobar@oxy.com |
| **Subject:** | [EXTERNAL] Some concerns regarding the Anadarko / DMA integration efforts |
| **Attachments:** | Email - Reaching synergy targets with Anadarko Data Scientists.pdf; Email - Information and recommendation for Anadarko Data Scientists moving forward.pdf; Email - Our discussion.pdf |

Barbara,

While today is my last day at Anadarko, I wanted to make you aware of some integration concerns I have regarding the individuals in my organization.  All I care about, is that my people are treated fairly, professionally, and ethically through the integration.  When Vicki first visited Anadarko, she promised that Oxy would not play games regarding people and the COC, and yet the individuals in my organization feel like that's exactly what is occurring.  David Bowlby told my organization today that they would ultimately be offered positions which are in The Woodlands to "avoid COC triggers" as Oxy has decided to retain individuals who are not at all interested in staying with Oxy in the future.

The attached emails between myself and Reza Rastegar, David Bowlby, and Anadarko HR, respectively, provides an overview of why most of my team is very interested in raising their hand to be let go.  I know a number of individuals across Anadarko have been offered positions in Greenway so that they could easily trigger COC, while also helping Oxy with reaching their synergy targets, and my organization would very much welcome and appreciate that as an option as well.  If you would like more information, I would encourage you to follow up with the individuals within my organization (the managers are cc'ed on this email), so you are also able to understand our side of the story, which is very much different than David's and Reza's.  There are some excellent people at Oxy which I have met, and obviously there are many excellent individuals from legacy Anadarko who will continue with Oxy in the future, so I sincerely wish you all the best through the integration and beyond.

Thanks,

**Jeremy L. Graybill**
Director of Data Science and Advanced Analytics | AAET

Occidental [Ping Lu] 000261

**From:** Rastegar, Reza <Reza_Rastegar2@oxy.com>
**Sent:** Monday, August 19, 2019 9:29 PM
**To:** Graybill, Jeremy <Jeremy_Graybill@oxy.com>
**Cc:** Bowlby, David <David_Bowlby@oxy.com>
**Subject:** Re: Reaching synergy targets with Anadarko Data Scientists

Jeremy,

Thanks for sharing your thought. I understand that some people may not have any interest in staying in OXY. But as I made it clear to your team members my job at this point to asses people skillset and identify where they belong to in the organization. After we identify the positions and make offers/communicate their roles, they can make their decisions of course.

Thanks
Reza

Sent from my iPhone

On Aug 19, 2019, at 8:51 PM, "Jeremy_Graybill@oxy.com" <Jeremy_Graybill@oxy.com> wrote:

> Reza,
>
> Now that I'm back in the office, as you requested and I promised, I gathered more information and specifics from my employees today.  As I also mentioned to you that I would ask them, every employee on the team did in fact want me to represent them regarding their thoughts and views.
>
> **After hearing from you over the past week plus, the following employees on my team have absolutely zero interest in being retained by Oxy for the future, in any capacity.**
> Akkam Veetil, Dilshad
> Bayeh, Alex
> Ben, Yuxing
> Berestovsky, Natalie
> Cao, Dingzhou
> Fernandez, Ricardo
> Gupta, Himanshu
> Kara, Mustafa
> Lu, Ping
> Madarshahian, Ramin
> Mitsakos, Nikolaos
> Perrotte, Michael
> Tobar, Ingrid
> Zhan, Cheng
> Zhang, Yanyan
>
> **The following individuals are open to considering future positions with Oxy.**
> Felipe Teixeira de Moraes, Luis
> Xiao, Yuan
>
> Therefore, you will easily be able to meet and even exceed your synergy targets by letting go of everyone above who has absolutely no interest in being retained by Oxy, which I'm sure will be enthusiastically received by Oxy upper management and by Oxy's investors.  Please let me know if you'd like to set up some time to discuss this in more detail.

Thanks,
-Jeremy

---

**From:** Graybill, Jeremy
**Sent:** Wednesday, August 14, 2019 1:54 PM
**To:** Rastegar, Reza <Reza_Rastegar2@oxy.com>
**Cc:** Bowlby, David <David_Bowlby@oxy.com>; Rizvi, Mustafa Y <Mustafa_Rizvi@oxy.com>
**Subject:** Reaching synergy targets with Anadarko Data Scientists

Reza,

Good news for your synergy target efforts.  In performing a soft poll and discussions with much of the team, as you had requested yesterday, most of my organization (~80%) have absolutely no interest in being retained by Oxy.  I can provide you with more information and specifics next week as I gather it when I'm back in the office.  While I don't know what your actual targets are, you should easily be able to get to your synergy targets without laying off any of your own staff as you had feared.

Thanks,

**Jeremy L. Graybill**, PMP
Director of Data Science & Advanced Analytics | AAET
Jeremy.Graybill@anadarko.com | 832.636.4783

Occidental [Ping Lu] 000263

## Information and recommendation for Anadarko Data Scientists moving forward

From:   Jeremy_Graybill@oxy.com

To:     David_Bowlby@oxy.com

Cc:     Mustafa_Rizvi@oxy.com

Date:   Thursday, August 22, 2019, 11:49 PM CDT

David,

As we discussed and was requested this morning, here is some additional information.  Through discussions with my team members (my team includes both my organization and my dotted line Data Science team members within Anadarko), there are a number of things that I've heard from them, and I think it's very important that you are aware of all of this as you consider the path forward.  I like being open with people, and value honesty and integrity, so I wish we could have spoken earlier about much of this, such as before or soon after Day 1, but that was evidently not the plan or the intention on Oxy's side.  You may even recall that in the single integration meeting I was involved in at Oxy, I mentioned my concerns around understanding and combining our sub-cultures from the beginning in order for this to be a successful integration, but evidently that was also not of interest to Oxy, since I was not once asked about what made our Data Science environment, culture, and employees work so effectively.  Therefore, I am providing as much information as possible in this email, beginning with some background, what I have heard from my employees through this process, some very upsetting items, and finally my recommendation.

**Background**

As some background, I want to provide some of the reasons that my team members (my team again includes both my organization and my dotted line Data Science team members within Anadarko) joined Anadarko and loved working here:

- They wanted and want to be Data Scientists, they joined Anadarko as Data Scientists, and they are Data Scientists.  They are not and do not want to be simply Mathematicians, Statisticians, Computer Scientists, Engineers, Physicists, etc., and they definitely don't want to be Analytics Engineers.  Reza may dislike and not understand the Data Science label, role, or function, but the rest of the world outside of Oxy enthusiastically embraces that label, role, and work, including the entire Data Science population at Anadarko.
- They loved the strategy of performing Applied Research and Development using Data Science techniques and advanced technologies (Google Cloud, NVIDIA, advanced Data Science architectures and approaches, etc.).  They have no interest in performing ad-hoc, short cycle project work using less advanced methods and technologies, including Excel, Spotfire, Matlab, and R-Shiny.
- They loved working closely with phenomenal subject matter experts on very challenging and complex problems (some of which take months and even years of research and work) as part of a centralized Data Science organization embedded within an organization which includes Geoscientists and Petroleum Engineers.
- I have developed Data Science career paths and ladders for them, which they are excited about and which provided future growth and career opportunities.
- Our Data Science environment and culture allows for many things they desire and value: advanced research, creativity, flexibility (including a formal work from home policy and flexible hours), open publication opportunities, incredible and challenging work, very high expectations, continuous education, support, growth, significant mentorship opportunities (including an excellent Data Science internship program), and direct business value contributions back to the business.
- They each interviewed me as part of the interview process as well, joined Anadarko because they wanted to work for me, and have grown to trust and respect me.  After years of working together, we are a family, and most of the team wants to continue working for me, whether that's at Anadarko, Oxy, or elsewhere.

I don't mean to be harsh with my following words, but I think it's important for the path forward that you know the truth in how my organization, including our dotted line Data Scientists, views things.  Through the actions from Day 1, Oxy has shown the entire team that Oxy does not care at all about the reasons they are here, the reasons they want to work here, their future careers, or anything.  Oxy never asked them what they wanted, and immediately took away all of the points above on Day 1.  It is widely known that we have gone to great lengths to recruit and hire the absolute best Data Scientists possible.  Oxy taking away all of the reasons that these individuals chose to work at Anadarko was naturally not going to be a successful strategy or approach to retain these individuals.  In addition, the fact that you had my entire organization including myself reporting to Reza from Day 1, and that I was never involved in any decisions or discussions on the path forward (and was completely bypassed in any discussions with my team, even when some team members requested that I be included), showed the team one thing: Oxy legacy was valued over competence, experience, and expertise.  That is entirely Oxy's prerogative of course, as Oxy bought Anadarko and not the other way around, and we all understand why Oxy made that decision, but you may also want to understand the ramifications of taking that approach.

Based on their experiences and conversations with numerous outside individuals and sources, our team has developed the strong feeling and belief (whether it's true or not) that we've potentially built the best Data Science organization within the Oil & Gas industry, and I am fortunate to be well respected both internally and externally for building and leading this organization.  You placed that extremely talented organization under someone who is not capable or qualified in leading the team, and based on many of my team's own external conversations across the space, is someone who is not respected outside of Oxy.  In addition, from what many of my team and other Anadarko peers have heard through conversations with business units within Oxy, the Data Science organization was placed under someone who is not at all respected internally across larger Oxy.  And finally, when each one of them interacted with Reza and "interviewed" him themselves, Reza's attitude and actions led them to quickly develop a complete lack of respect, trust, loyalty, or any positive feelings about him as a leader.  As a number of my employees have stated to me, if it was their choice, they would never ever choose to work for or under Reza, or even recommend him being a part of their own teams.  As one of my employees phrased it, Oxy came in and took a sledge hammer to a well-oiled and high performing machine, without understanding how or why it worked, and now that you busted it up you're trying to figure out how to re-use some of the broken parts and pieces without any sort of manual.  If you try to force fit any of those parts and pieces within your own machine, which they were never intended for, then you could be risking sub-optimal performance or even catastrophe.

Oxy had one chance to make a first impression, and what has been done can never be undone.  As I mentioned to you, up until the acquisition, while it was difficult, I was doing my best to motivate the team on the possibility of most of us continuing with Oxy for the future, even though I was receiving zero first-hand information.  Through internal discussions and polling, which I had documented, around 25% of my employees strongly wanted to be let go by Oxy at the time of the acquisition, partly due to the attraction of trying for the COC.  After the first day of communications from Oxy (Monday 8/12) and Reza's initial interactions with some of the team (when I had no involvement since I was on vacation, and I was purposefully bypassed by Reza completely), that changed to ~80%+ of my employees strongly wanting to be let go by Oxy.  As I shared with you in email, I assumed that you would be pleased to hear that based on the approach Reza was taking with our Data Scientists, many of the team did not want to be retained, as you would be able to make plenty of cuts to reach your synergy targets, so I informed you of the viewpoints of my team.  However, while I never heard anything back in response, Reza immediately changed his approach with the team.  It became clear then that he was working to sell certain individuals (but only some individuals) on Oxy instead of being hostile, belittling, and using intimidation tactics as he was initially doing and was still doing with others.  This flip-flopping and lack of any consistency in his interviews was very pronounced and concerning to the entire team, as it showed them that they couldn't trust anything he was saying, one way or another.  He also provided different information to different individuals on similar topics, strategy, and policies, likely due to ulterior motives, which again led to the development of a deep mistrust across the team.  In addition, Reza bad mouthed people including yourself to several of my employees, stating that you were not very knowledgeable or smart.  He also made disparaging remarks about individuals and teams within the Oxy business as well.  All of these comments further eroded any trust or respect from the team, and led my entire organization to question his values and ethics.  Many of the team is even concerned about retaliation activities from Reza in the future, based on some of the things he has said and some of his actions to date, including Reza mentioning finding ways to fire people for cause (without COC) if they didn't do as he said in the future roles which he would assign them to.

**Unacceptable and inexcusable actions by Reza Rastegar**

The most concerning, upsetting, and inexcusable items are something that I hesitate to mention, but feel that it is my duty to report it at a high level.  In his interactions with a particular class of my employees, Reza completely and unprofessionally crossed discrimination and harassment lines towards those employees, and treated them completely differently than his interactions with all other classes of employees.  The reason I hesitate to mention this, is that for this class of employees, while they are very hurt by the interactions and his actions, they would rather be discriminated against and harassed in this specific situation, because they are hoping to be let go by Oxy and they would much rather have nothing to do with Reza or Oxy now or in the future.  I apologized to all of those individuals for Reza's actions, and am extremely disturbed and upset by the circumstances communicated to me, as is the rest of the team and others outside of the team who were made aware of his actions.  If this was a normal situation, then it would absolutely not have been tolerated by Anadarko, and complaints and an investigation would have been raised to HR and outside sources as necessary, which in my experience and based on feedback I've received from external HR specialists, would likely result in disciplinary actions.  However, these employees requested that I not raise the issue with HR or outside sources at this time, because they very much prefer to be let go soon with the COC, and they are also fearful of Reza and they fear retaliation from Reza and/or Oxy in the future, as they have absolutely no reason to trust Oxy in any way at this point.  While these types of actions are not allowed at Anadarko, these employees now feel that this may be common practice at Oxy, based on their only interactions with Oxy to date.  Almost every single one of our Data Science employees has been negatively affected by Reza's actions in these specific situations, as this information has been impossible to contain.  If the affected employees are not let go by Oxy and don't receive the COC, then they will decide on appropriate actions at that time.


After all of the actions above, all but one of the team (my team again includes both my organization and my dotted line Data Science team members within Anadarko) wants nothing to do with Reza in any way, shape, or form, in the future.  As communicated to you previously, two of my employees are willing to consider openings with Oxy (although one of those individuals also wants nothing to do with Reza), while the remainder of our Data Science employees want nothing to do with Reza and do not want to continue their careers with Oxy.  Based on Reza's interactions and actions to date, Reza will never earn the respect, trust, or loyalty of a single Anadarko Data Scientist now or in the future.


**My Recommendation**

I realize you may not want my recommendation after what I've shared above.  I still want to provide it, because I think it's the best path for my people, and I honestly feel that it would also be the best and easiest path for Oxy to move forward at this point.  The fact is that Oxy needs to cut significantly, and we all know that, since Oxy overspent for Anadarko.  We also know that based on your defined path forward for DMA, and Reza's strategy and approach to advanced analytics at Oxy, few of my employees are critical to your success (the most critical individuals are likely the contractors who are supporting IPSO and any other applications you decide to retain).  You could easily cut more than you are requested to cut to meet your synergy targets, because those targets are the minimum expected, while Oxy and the investors would eagerly welcome even more cuts.


***My recommendation is that you let go of any and all Anadarko Data Science employees who want to leave, and provide them with the COC.***  If you keep employees who have absolutely no interest in being at Oxy, at best you'll have dead weight to carry around for as long as they stay on the payroll, and it's likely that you and Reza will also have a silent (or even vocal) mutiny on your hands.  If you try to keep them and make it difficult for them to obtain the COC, then you will create deeper resentment within those individuals and the rest of the team, that will only grow and build on the complete lack of trust, respect, or loyalty that has already been developed through Reza's interactions and actions to date.  In addition, the team is a very close-knit family, and if you further harm certain individuals (such as effectively forcing them to resign and then not paying out the COC, or cutting the few individuals who are open to staying), then those team members that remain with Oxy will immediately learn about those actions, and the resentment will build and spread further.  As you know, one bad apple ruins a bunch, so it would not be a good idea to retain individuals who are not at all interested in working for Oxy, versus focusing on moving forward with those who want to be there.  Reza already has a team of individuals who I assume would love to remain with Oxy.  There are also a couple employees from my team who are open to staying as well given their specific situations (as long as one of them does not report up to Reza), and I have several strong contractors who are open to staying.  With that entire group, you should have more than enough individuals to move forward with and be successful with in your desired mission, while still being able to meet or exceed your synergy targets, and you could avoid the distractions and headaches of having a number of extremely disgruntled employees on staff who despise, do not trust, and are fearful of their manager.

I really wish this had gone down differently, especially in several circumstances of course, but the past cannot be changed.  I also apologize for any harsh tone in this email, but I am very upset with how the individuals on my team have been treated, especially related to several items, and I will support and defend my employees 100% until I am walked out by Oxy and beyond.  I would strongly encourage you to consider my recommendation for the good of the APC Data Scientists and for Oxy moving forward.  On the positive side, letting go of these employees will benefit Oxy's synergy targets and be viewed positively by Oxy's investors, as letting go of every Data Scientist employee who is interested will provide **over $5 Million in annual synergy savings** through employee costs alone.  This was a difficult situation that nobody signed up for or wanted to go through, and it became much worse due to Reza's interactions and actions.  The best thing for all sides at this point would be for you to make the appropriate changes so we can all move on as quickly as possible.  I look forward to further discussions with you and hearing what your future plans and actions are, so I can better understand next steps.


Thanks,


**Jeremy L. Graybill**, PMP

Director of Data Science & Advanced Analytics | AAET

Jeremy.Graybill@anadarko.com | 832.636.4783




Note: I'm also copying Mustafa, because of his role in leading the DMA integration efforts, and because the broader team and I have grown to respect him and his judgement through limited interactions.

**Occidental [Ping Lu] 000267**

**From:** Graybill, Jeremy
**Sent:** Thursday, September 12, 2019 7:39 PM
**To:** Kilcrease, Lindsay <Lindsay.Kilcrease@anadarko.com>
**Subject:** Our discussion

Lindsay,

Thank you so much for speaking with me today.  I would like to document a few of the points that we discussed, so you are able to pass them along to whomever you feel you need to provide the information to.  I'm trying my best to let you know the viewpoints of my organization, without providing you specific information tied to specific individuals, because I have been requested not to disclose additional information at this time.  Please know that while there is unanimous, or almost unanimous opinions regarding some points below, there are also other points below which may only apply to several individuals (and other individuals on the team may have a completely different viewpoint for that point).

- It is unanimously agreed by the individuals on my team that the reason that the integration efforts have gone very poorly in our area can be tied to a single Oxy individual, in Reza Rastegar.  Many other collaboration meetings that my team has participated in with other individuals and teams at Oxy, where my team has openly collaborated, have gone very well.  Based on the interactions with and actions by Reza to date, 95% of the individuals in my organization want no part in ever working with or dealing with Reza in the future.  This fact is completely beyond repair.

- I have communicated the above fact, along with more details and concerns about Reza, to David Bowlby at Oxy.  In fact, the points which I raised to David were directly from the individuals on my team, as they worked with me in drafting the details.  In addition, several individuals on my team have also communicated their concerns and views with David as well.  The individuals on my team have not been pleased with David's response, and do not feel that their concerns have been heard at all.

- The negative interactions with Reza have not been limited to the individuals in my organization.  There are other individuals at APC outside of my team, along with individuals at Oxy, who have told us of very negative interactions with and actions by Reza (sometimes using some very choice words and language).

- A number of individuals on my team have told me that if an HR investigation is opened into some of the actions, that they will have no comment at this time.  Several individuals on the team have consulted with lawyers, and they have also looked into EEOC laws and claim filing rules, and have determined that the best course of action is to wait until they see what steps are taken by Oxy, before deciding on their own next steps and/or before having any comment to HR.  In addition, most of my team has no reason to trust Oxy HR at any point in the future, so that is also why they won't be having any comment until it best serves them.

- While 95% of the individuals on my team will try for the Change of Control at the time which suits them best, there are individuals who have been told by Reza that they will be given positions which will not qualify them for Change of Control, so most of the team is fully aware that they may not be able to qualify.  But they will still give it their best try, and many of them already have spoken to their attorneys as they prepare for next steps.

- Since Data Science is one of the most in demand skillsets in the world right now, nobody on my team is worried about getting a job in the future.  I know of at least a handful of individuals on my team who already have job offers (some accepted).  They will try for the Change of Control, but the number one ultimate priority for most of my organization is leaving Oxy so that they don't have to deal with Reza in the future.

- There are individuals on my team who have been told by Reza that if they don't do what he says, then they will be fired for cause without the Change of Control.  Due to this threat, and the fact that some of the team feels like they will not be given the CoC by Oxy anyway, there are individuals on the team that would actually like to be fired for cause by Oxy (especially since those individuals have job offers already lined up).  There are individuals who have told me that due to the very negative interactions they've had with Reza and some of his actions to date, they would ultimately like to file suit against Oxy if they don't receive the Change of Control,

especially if they are fired for cause, and they would also like the opportunity to take the facts to the court of public opinion through the media.

Again, the points above don't all apply to everyone on my team, unless noted otherwise.  I've done my best to listen to and best represent the viewpoints of my team to David, and now to you.  I'd also be happy to discuss this in more detail with other individuals, as needed.

Thanks,

**Jeremy L. Graybill**, PMP

Director of Data Science & Advanced Analytics | AAET

Jeremy.Graybill@anadarko.com | 832.636.4783

**Occidental [Ping Lu] 000269**

# TAB B

Occidental [Ping Lu] 000270

# AMENDED AND RESTATED
# ANADARKO PETROLEUM CORPORATION
# CHANGE OF CONTROL SEVERANCE PLAN

## Introduction

The Board of Directors of Anadarko Petroleum Corporation (the "Company") recognizes that, from time to time, the Company may explore potential transactions that could result in a Change of Control of the Company. This possibility and the uncertainty it creates may result in the loss or distraction of employees of the Company and its Subsidiaries to the detriment of the Company and its shareholders.

The Board considers the avoidance of such loss and distraction to be essential to protecting and enhancing the best interests of the Company and its shareholders. The Board also believes that when a Change of Control is perceived as imminent, or is occurring, the Board should be able to receive and rely on disinterested service from employees regarding the best interests of the Company and its shareholders without concern that employees might be distracted or concerned by the personal uncertainties and risks created by the perception of an imminent or occurring Change of Control.

In addition, the Board believes that it is consistent with the Company's employment practices and policies and in the best interests of the Company and its shareholders to provide severance compensation for its eligible employees whose employment terminates following a Change of Control.

Accordingly, the Board has determined that appropriate steps should be taken to assure the Company of the continued employment and attention and dedication to duty of its employees and to seek to ensure the availability of their continued service, notwithstanding the possibility or occurrence of a Change of Control.

Therefore, in order to fulfill the above purposes, the following plan, originally adopted as of January 29, 1998, is hereby adopted as amended and restated herein, effective as of the Effective Date.

## ARTICLE I
## ESTABLISHMENT OF AMENDED AND RESTATED PLAN

As of the Effective Date, the Company hereby amends and restates this separation compensation plan known as the Anadarko Petroleum Corporation Change of Control Severance Plan, as set forth in this document.

## ARTICLE II
## DEFINITIONS

As used herein, the following words and phrases shall have the following respective meanings, unless the context clearly indicates otherwise.

Occidental [Ping Lu] 000271

(a)  Annual Bonus.  The highest aggregate amount a Participant received as an annual bonus for any single year under the Company's Annual Incentive Plan and the Anadarko Performance Bonus Plan, but excluding any other annual incentive bonus plan, policy or program of the Company unless specifically designated by the Plan Administrator as an included plan at the time of a Change of Control for any of the three calendar bonus plan years prior to termination of Employment, or if higher, for the year of termination of Employment.  Bonuses shall be considered to be paid for the year with respect to which performance is measured, regardless of when paid, and all amounts paid as annual bonuses with respect to the same year, regardless of when paid, shall be aggregated.

(b)  Annual Compensation.  The sum of a Participant's Required Base Salary and Annual Bonus.

(c)  Applicable Period.  Upon the occurrence of a Change of Control, the Applicable Period for a termination without Cause pursuant to clause (i) of Section 4.2(a) or a voluntary termination of employment by the Participant pursuant to clause (iii) of Section 4.2(a) shall be the period from the date of the Change of Control through the third anniversary thereof (subject to such extensions of the Applicable Period as the Company may determine to be appropriate from time to time), and the Applicable Period for a termination for Good Reason pursuant to clause (ii) of Section 4.2(a) shall be the period from the date of the Change of Control through the first anniversary thereof (subject to such extensions of the Applicable Period as the Company may determine to be appropriate from time to time).

(d)  Base Salary.  The annual rate of base compensation paid by the Employers to a Participant (including amounts which the Participant could have received in cash had he or she not elected to contribute to an employee benefit plan or a deferred compensation program maintained by any Employer), excluding overtime pay, bonuses, employee benefits, added premiums, differentials, components of foreign service assignments, and all forms of incentive compensation. For a Participant who is paid by the hour, the annual rate of base compensation is determined by multiplying the Participant's base hourly rate of pay times 2,080 hours, except where the Participant's annual effective compensation includes scheduled overtime, as determined by the Employer, in which case the annual rate of base compensation will be determined by multiplying the Participant's base hourly rate times the effective annual work hours.  For a Participant who is paid semimonthly or monthly, the annual rate of base compensation is determined by multiplying the Participant's monthly rate of pay times twelve (12).  For a regular part-time Participant, the annual rate of base compensation is determined by multiplying the Participant's hourly rate by the product of (i) the normally scheduled weekly work hours divided by forty hours, times (ii) 2,080 hours.  All computations of Base Salary shall be made by the Plan Administrator and be final and binding.

(e)  Benefit Determination Date.  A date established by the Company, in its discretion, for a Participant, to adjust for breaks in service as the Company deems appropriate, to comply with any purchase or sale agreement covenant or for such other purposes as the Company deems appropriate or advisable.

(f)  Board.  The Board of Directors of Anadarko Petroleum Corporation.

Occidental [Ping Lu] 000272

(g)    Cause.   Cause shall mean the occurrence of any of the following with respect to a Participant:

(i)    conviction of any felony or of a misdemeanor involving moral turpitude;

(ii)    willful failure to perform his or her duties or responsibilities;

(iii)    engaging in conduct which is injurious (monetarily or otherwise) to any Employer or its affiliates (including, without limitation, misuse of an Employer's or affiliate's funds or other property);

(iv)    engaging in business activities which are in conflict with the business interests of any Employer;

(v)    insubordination;

(vi)    engaging in conduct which is in violation of any Employer's applicable safety rules or standards or which otherwise causes or may cause injury to another employee or any other person;

(vii)    engaging in conduct which is in violation of any applicable policy or work rule of any Employer; or

(viii)    engaging in conduct which is in violation of any Employer's Code of Business Conduct and Ethics or which is otherwise inappropriate in the office or work environment.

For purposes of clause (ii) above, no act or failure to act, on the part of the Participant, shall be considered "willful" unless it is done, or omitted to be done, by the Participant in bad faith or without reasonable belief that the Participant's action or omission was in the best interests of the Employer.  Any act, or failure to act, based upon authority given pursuant to a resolution duly adopted by the Board or based upon the advice of legal counsel for the Employer shall be conclusively presumed to be done, or omitted to be done, by the Participant in good faith and in the best interests of the Employer.

(h)    Change of Control.   For purposes of the Plan, a "Change of Control" shall mean:

(i)    The acquisition by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) (a "Person") of beneficial ownership (within the meaning of Rule 13d3 promulgated under the Exchange Act) of 20% or more of either (A) the then outstanding shares of common stock of the Company (the "Outstanding Company Common Stock") or (B) the combined voting power of the then outstanding voting securities of the Company entitled to vote generally in the election of directors (the "Outstanding Company Voting Securities"); provided, however, that for purposes of this subsection (a), the following acquisitions shall not constitute a Change of Control:  (w) any acquisition directly from the Company, (x) any acquisition by the

Company, (y) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Company or any corporation or other entity controlled by the Company, or (z) any acquisition pursuant to a transaction which complies with clauses (A), (B) and (C) of subsection (iii) of this paragraph (h); or

(ii)      Individuals who, as of the Effective Date, constitute the Board (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board; provided, however, that any individual becoming a director subsequent to the Effective Date whose election, or nomination for election by the Company's shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board; or

(iii)      Consummation by the Company of a reorganization, merger or consolidation or sale or other disposition of all or substantially all of the assets of the Company or the acquisition of assets of another entity (a "Business Combination"), in each case, unless, following such Business Combination, (A) all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Company Common Stock and Outstanding Company Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 60% of, respectively, the then outstanding shares of common stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation (or its parent) resulting from such Business Combination (including, without limitation, a corporation which as a result of such transaction owns the Company or all or substantially all of the Company's assets either directly or through one or more subsidiaries) in substantially the same proportions as their ownership, immediately prior to such Business Combination of the Outstanding Company Common Stock and Outstanding Company Voting Securities, as the case may be, (B) no Person (excluding any employee benefit plan (or related trust) of the Company or such corporation (or its parent) resulting from such Business Combination) beneficially owns, directly or indirectly, 20% or more of, respectively, the then outstanding shares of common stock of the corporation (or its parent) resulting from such Business Combination or the combined voting power of the then outstanding voting securities of such corporation (or its parent) except to the extent that such ownership existed prior to the Business Combination, and (C) at least a majority of the members of the board of directors of the corporation (or its parent) resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement, or of the action of the Board, providing for such Business Combination; or

(iv)      Approval by the shareholders of the Company of a complete liquidation or dissolution of the Company.

(i)      Code.  The Internal Revenue Code of 1986, as amended from time to time, and any regulations and other authoritative guidance promulgated thereunder by the appropriate governmental authority.

(j)     Committee.  The Compensation and Benefits Committee of the Board.

(k)     Company.  Anadarko Petroleum Corporation and any successor thereto.

(l)     Date of Hire.   The most recent date the Participant was hired by any Employer.

(m)     Date of Termination.   The date on which a Participant's termination of Employment takes effect without the concurrent or immediate re-employment of the Participant by another Employer.

(n)     Effective Date.  The effective date of this amendment and restatement of the Plan which is September 1, 2007.

(o)     Employee.  Provided he or she is employed by an Employer on the date of a Change of Control, any Employee (as designated on an Employer's United States payroll) who is classified as a regular full-time or regular part-time Employee. Notwithstanding the previous sentence, "Employee" excludes:

(i)     Any individual who is not on the Employer's United States payroll for whatever reason, including but not limited to a worker that the Employer considers to be an independent contractor, a leased employee, a contractor, or an agency or staffing worker.

(ii)     Any individual not designated in the Employer's payroll records, or otherwise not considered by the Employer, to be a regular full-time or regular part-time employee. This exclusion includes an individual on the Employer's payroll classified as a "limited benefit" or "limited benefit only" employee.

(iii)     Any individual who is a participant in another change of control severance plan or program sponsored by the Company (or a subsidiary of the Company) and who is currently entitled to protections and/or benefits thereunder due to a change of control (as defined in that plan or program) that has occurred prior to a Change of Control.

(iv)     Any individual who is a party to a Key Manager Change of Control Contract, a Key Employee Change of Control Contract, or other form of individual written agreement or contract with an Employer providing for benefits in the event of a change of control.

(v)     Any individual who is covered by the Anadarko Petroleum Corporation Officer Severance Plan (or any successor plan thereto).

(vi)     Any employee whose employment terms and conditions are subject to being governed by a collective bargaining agreement, unless such agreement expressly provides for coverage under the Plan.

(p) <u>ERISA</u>.  The Employee Retirement Income Security Act of 1974, as amended, and the regulations and other authority issued thereunder by the appropriate governmental authority.

(q) <u>Employer</u>.  The Company or a Subsidiary of the Company which has adopted the Plan pursuant to <u>Article V</u> .

(r) <u>Employment</u>.  Employment means that the individual is employed as an Employee of any Employer.

(s) <u>Good Reason</u>.  Good Reason shall mean the occurrence of any of the following:

(i) the Participant's duties and responsibilities as an Employee are materially and adversely diminished in comparison to the duties and responsibilities enjoyed by the Participant immediately prior to the Change of Control;

(ii) the Participant's Base Salary is materially reduced in comparison to the Base Salary enjoyed by the Participant immediately prior to the Change of Control;

(iii) the aggregate value of the Participant's Base Salary plus Total Target Incentive Compensation is materially reduced in comparison to the aggregate value of the Participant's Base Salary plus Total Target Incentive Compensation immediately prior to the Change of Control;

(iv) the Participant is required to be based at a location more than 25 miles from the primary location where the Participant was based and performed services immediately prior to the Change of Control;

(v) the Participant is required by the Employer to take an assignment or position that requires him or her to travel on frequent overnight trips resulting in extended stays away from home on a consistent basis and to a substantially greater extent than was required immediately prior to the Change of Control (this provision excludes assignments or positions that might require temporary travel for a specified, short duration of time, regardless of whether such assignment or position is the result of circumstances related to the Change of Control); or

(vi) The Participant is required, without the Participant's prior written consent, to perform in a job position, or a substantial job assignment, for which he or she is not skilled or trained.

(t) <u>Monthly Salary</u>.  The Participant's Annual Compensation divided by twelve (12).

(u) <u>Participant</u>.  An Employee who meets the eligibility requirements of <u>Section 3.1</u> to participate in the Plan.

(v)     Plan.  The Amended and Restated Anadarko Petroleum Corporation Change of Control Severance Plan, as it may be amended from time to time.

(w)     Plan Administrator.  The Company, or a committee or individual appointed by the Company to serve as Plan Administrator.

(x)     Required Base Salary.  With respect to any Participant, the higher of (i) the Participant's Base Salary as in effect immediately prior to the Change of Control and (ii) the Participant's highest Base Salary in effect at any time thereafter.

(y)     Retirement.  A termination of employment by the Participant due to his or her voluntary normal or early retirement under a pension plan sponsored by his or her Employer or any of its affiliates, as defined in such plan.

(z)     Sale of Business.  Such term is defined in Section 4.2 (a)(iii).

(aa)    Separation Benefits.  The payments and benefits due pursuant to Section 4.3.

(bb)    "Specified Employee" means an Employee who is a "key employee" (as defined in Code Section 416(i) without regard to Code Section 416(i)(5)) of the Employer (or an entity which is considered to be a single employer with the Employer under Code Sections 414(b) or 414(c)), as determined under Code Section 409A at any time during the twelve (12) month period ending on December 31, but only if the Employer is considered to have any stock that is publicly traded on an established securities market or otherwise required under Section 409A.  An Eligible Employee who is a key employee (as determined under the preceding sentence) will be deemed to be a Specified Employee for the period of April 1 through March 31 following such December 31, except as otherwise required under Section 409A.

(cc)    Subsidiary.  Any corporation or other entity in which the Company, directly or indirectly, holds a majority of the voting power of such corporation's outstanding shares of capital stock or other voting equity interests, as applicable.

(dd)    Target Bonus.  The Participant's annual target bonus opportunity under the Company's Annual Incentive Plan and the Anadarko Performance Bonus Plan, but excluding any other annual incentive bonus plan, policy or program of the Company unless specifically designated by the Plan Administrator as an included plan at the time of a Change of Control.

(ee)    Target Long-Term Incentive Compensation.  The Participant's annual target long-term incentive compensation opportunity under the Company's long-term incentive plan, but excluding any other similar long-term incentive plan, policy or program of the Company unless specifically designated by the Plan Administrator as an included plan at the time of a Change of Control; provided, that, as determined by the Company, the Participant's job grade is a job grade with respect to which long-term-term incentive compensation is considered a normal, regular compensation element.

(ff)    Total Target Incentive Compensation.  With respect to any Participant, the sum of the Participant's Target Bonus and Target Long-Term Incentive Compensation.

(gg)   WARN Act Notice Pay.  Any payment made to an Employee by an Employer in lieu of providing a minimum notice of termination with the intent of complying with the requirements or the purposes of the Worker Adjustment and Retraining Notification Act (29 USC §§ 2101 – 2109) and any other similar state or federal law mandating the provision of notice to employees prior to employment termination.

(hh)   Year of Service.  With respect to a Participant, the full year and any prorated portion of a year included in such Participant's continuous Employment from his or her Date of Hire or his or her Benefit Determination Date, as the case may be, to the Date of Termination (determined by subtracting the Date of Hire or Benefit Determination Date from the Date of Termination, whichever produces the greater number of Years of Service).

## ARTICLE III
## ELIGIBILITY

3.1   Participation.  Each Employee shall be a Participant; provided that, any Employee may be designated as not being a Participant by action of the Committee at any time prior to the occurrence of a Change of Control if such designation is not made in connection with or in anticipation of a Change of Control.

3.2   Duration of Participation.  A Participant shall cease to be a Participant when he or she is no longer an Employee as defined herein.  Notwithstanding the foregoing, a Participant who is entitled, as a result of ceasing to be an Employee, to payment of Separation Benefits or any other amounts due under the Plan shall remain a Participant until all such Separation Benefits have been paid to the Participant.

## ARTICLE IV
## SEPARATION BENEFITS

4.1   Right to Separation Benefits.  A Participant shall be entitled to receive Separation Benefits as provided in Section 4.3 if a Change of Control occurs and his or her Employment terminates under a circumstance specified in Section 4.2(a).  An additional Change of Control shall not trigger any additional Separation Benefits for the Participant.

4.2   Termination of Employment.

(a)   Terminations Which Give Rise to Separation Benefits Under This Plan.

(i)   A termination without Cause during the Applicable Period;

(ii)   A termination for Good Reason during the Applicable Period; provided, that, the Participant terminates his or her Employment within ninety (90) days of such occurrence; or

(iii)   If, during the Applicable Period, the Employer or any affiliate of the Employer sells or otherwise distributes or disposes of the subsidiary, division, branch or other business unit in which the Participant was employed before such sale, distribution or other disposition (a "Sale of Business") and the requirements of subsection (b)(vi) of this Section 4.2

are not met, a Participant may terminate his or her Employment within ninety (90) days after such Sale of Business and be entitled to Separation Benefits hereunder.

(b)     Terminations Which Do Not Give Rise to Separation Benefits Under This Plan.  If a Participant's Employment is terminated for any of the following reasons, the Participant shall not be entitled to Separation Benefits under the Plan, regardless of the occurrence of a Change of Control:

(i)      A termination by the Employer for Cause;

(ii)     A termination by the Employer as a result of the Participant's inability to perform the essential functions of his or her position with or without a reasonable accommodation that is required by law;

(iii)    The death of the Participant;

(iv)     A termination by the Employee due to Retirement; provided, however, a termination that otherwise meets the requirements of clauses (i), (ii) or (iii) of Section 4.2(a) shall not be deemed to be a Retirement for purposes of this Section 4.2(b), despite the fact that the Participant may qualify for normal or early retirement benefits under a pension plan of his or her Employer or any of its affiliates;

(v)      The voluntary termination of the Participant when neither of the conditions of clauses (ii) or (iii) of Section 4.2(a) have been met during the Applicable Period; or

(vi)     A Sale of Business occurs, and the Participant is offered employment with the purchaser or an affiliate thereof on substantially the same terms and conditions of Employment as for the Employer (including, without limitation, base salary, material job duties and responsibilities substantially similar employee benefit plans, and primary location where based).  Such terms and conditions shall also include, without limitation, a legally binding agreement or plan covering such Participant, providing that upon a termination of employment with the purchaser and its affiliates, or any successor of the kind described in Article VI, within three (3) years after a Change of Control, the Participant's then employer will pay to such former Participant an amount equal to the Separation Benefits that such former Participant would have received under the Plan had he or she been a Participant at the time of such termination.  For purposes of this clause (vi), the new employer plan or agreement must treat all employment service with both any Employer (irrespective of whether the Employer was an affiliate of the Company or the Employee was a Participant at the time of such service) and the new employer (or its affiliate or successor) as being continuous employment service for all purposes of calculating the Participant's Separation Benefits.

4.3     Separation Benefits.

(a)     In General.  If a Participant's Employment is terminated in circumstances entitling him or her to Separation Benefits as provided in Section 4.2(a), and the Participant executes a full release and confidentiality agreement, as prepared and provided by the Company and containing such terms and conditions as the Company deems appropriate in its discretion, and if such agreement is revocable, the Participant does not revoke the agreement ), the

Participant's Employer or the Company shall pay such Participant, within a reasonable time (but not more than 75 days following the Participant's Date of Termination), a lump sum cash payment equal to the sum of the following amounts, net of applicable withholdings:

      (i)     One-half (50%) of the Participant's Monthly Salary for each Year of Service; and

      (ii)     One Monthly Salary for each Ten Thousand Dollars ($10,000) of Annual Compensation; provided, that, for this purpose, if the Participant's Annual Compensation is not a multiple of $10,000, it shall be deemed to equal the next highest whole multiple of $10,000.

The amount of Separation Benefits determined pursuant to this Section 4.3(a) shall be reduced by the total of the following items, unless determined otherwise by the Company in its sole discretion:

      (i)     WARN Act Notice Pay;

      (ii)     any payment provided to Participant on or around the time of termination of employment that Participant was not legally entitled to receive (e.g., continuation of salary for a short period of time following termination of employment); and

      (iii)     any amounts owed to the Employer by the Participant for any reason.

      (b)     Minimum Separation Benefit.  Notwithstanding Section 4.3(a) above, the minimum amount payable to a Participant under Section 4.3(a) will equal three (3) times the Participant's Monthly Salary (the "Minimum Separation Benefit").

      (c)     Maximum Separation Benefit.  Notwithstanding Section 4.3(a) above, the maximum amount that is payable to a Participant under Section 4.3(a) will be equal to twenty-four (24) times the Participant's Monthly Salary.

      (d)     Welfare Benefits.  A Participant who is entitled to Separation Benefits will continue to be provided, for a period of six months, with Employer provided life insurance coverage under the Employer's group term life insurance policy.  The Participant shall also be entitled to continue the Participant's and his or her family members' coverage under the Employer's group medical and dental benefit plans ("Group Health Plans") for a period of up to six (6) months at active employee contribution rates (provided the Participant agrees to the continuation and submits payment for the required costs of such coverage).  Continuation coverage under any Group Health Plan may be discontinued without advance notice due to a failure by Participant to pay the required premiums.  Such coverage may be continued only at the level and for the person or persons covered as in effect as of the Participant's Date of Termination.  Notwithstanding the foregoing, if the Participant becomes reemployed by another employer and is eligible to receive medical/dental coverage under another employer-provided plan, the continuation coverage described herein shall be secondary to coverage provided under such other plans.  Should a Group Health Plan change during this 6-month period, the Participant shall be entitled to continue his or her benefits for the six-month period under the Employer's

then current Group Health Plan.  Benefits provided pursuant to this <u>Section 4.3(d)</u> are not to be considered a continuation of coverage as provided under Section 601 et seq. of ERISA and Section 4980B of the Code;  any Participant who is entitled to COBRA continuation coverage may elect such coverage in accordance with applicable COBRA law following the termination of the six-month period.

(e)     <u>Pro Rata Target Bonus</u>.  A Participant who is entitled to Separation Benefits will also be paid a cash amount determined by multiplying the Participant's Target Bonus, as of the Date of Termination, by a fraction, the numerator of which is the number of months in the year of termination of Employment up to and including the Date of Termination (with any partial month counting as a full month), and the denominator of which is twelve (12). Such amount will be reduced by actual payments, if any, under the Company's Annual Incentive Plan, the Anadarko Performance Bonus Plan, and any other annual incentive bonus plan, policy or program of the Company designated by the Plan Administrator as an included plan at the time of a Change of Control, where such payments are made with respect to performance that is measured during the year of termination as determined by the Plan Administrator.

(f)     <u>Personal Time Off (PTO)</u>.  A Participant entitled to Separation Benefits will also be paid a cash amount in lieu of (i) all accrued unused PTO as of the Date of Termination for the year of termination of Employment, and (ii) a pro-rata portion of the next year's PTO, determined by multiplying the amount of PTO accrued for the year of termination by a fraction, the numerator of which is the number of days in the year of termination up to and including the Date of Termination, and the denominator of which is 365.

(g)     <u>Failure to Execute Release</u>.  If a Participant does not execute (or revokes) the release and confidentiality agreement provided by the Company pursuant to <u>Section 4.3(a)</u>, the only benefits under this Plan to which the Participant is entitled are those set forth in <u>Section 4.3(b)</u>.  For the avoidance of doubt, such a Participant will not be entitled to benefits provided for under <u>Sections 4.3(a), (c), (d), (e) or (f)</u>.

4.4     <u>Other Benefits Payable and Offset</u>.

The Separation Benefits described in <u>Section 4.3</u> shall be payable in addition to, and not in lieu of, other accrued or vested or earned but deferred compensation, rights, options or other benefits which are owed to a Participant upon or following termination of Employment, including but not limited to accrued amounts or benefits previously earned and payable under any bonus or other compensation plans, stock option plan, stock ownership plan, stock purchase plan, life insurance plan, health plan, disability plan or similar or successor plan. Notwithstanding the foregoing, any Separation Benefits paid under this Plan will be reduced, on a dollar for dollar basis, by any severance pay, Warn Act Notice Pay or other statutory benefits paid by the Employer to an Employee under applicable law.

In addition, in the event that a Participant is eligible to receive benefits under (i) this Plan and (ii) any other severance or change-of-control plan, program, contract, or agreement ("<u>Other Source</u>"), then any monetary benefits due under this Plan will be reduced by the monetary benefits due from the Other Source, with the result being that the Participant receives, in the aggregate, all monetary benefits due under this Plan but nothing more.  Further, in the

event that non-monetary benefits are due from an Other Source, the Plan Administrator will compare such non-monetary benefits to the non-monetary benefits due under this Plan and, where the non-monetary benefits are of the same nature or class, the Employee will be provided with the better of the two non-monetary benefits; provided, however, under no circumstances shall the Employee receive duplicate non-monetary benefits as determined by the Plan Administrator, with the result being that the Participant receives, in the aggregate, all non-monetary benefits due under this Plan but nothing more.

4.5   Certain Additional Payments by the Company.

(a)   Anything in the Plan to the contrary notwithstanding, in the event it is determined by the Plan Administrator that any payment or distribution by the Employer to or for the benefit of the Participant (whether paid or payable or distributed or distributable pursuant to the terms of the Plan or otherwise, but determined without regard to any additional payment required under this Section 4.5) (a "Payment") would be subject to the excise tax imposed by Section 4999 of the Code or any corresponding provisions of state or local tax laws, or any interest or penalties are incurred by the Participant with respect to such excise tax (such excise tax, together with any such interest and penalties, are hereinafter collectively referred to as the "Excise Tax"), then the Participant shall be entitled to receive an additional payment (a "Gross-Up Payment") in an amount such that after payment by the Participant of all taxes (including any interest or penalties imposed with respect to such taxes), including, without limitation, any income taxes (and any interest and penalties imposed with respect thereto) and Excise Tax imposed upon the Gross-Up Payment, the Participant retains an amount of the Gross-Up Payment equal to the Excise Tax imposed upon all the Payments.

(b)   Subject to the provisions of Section 4.5(c), all determinations required to be made under this Section 4.5, including whether and when a Gross-Up Payment is required and the amount of such Gross-Up Payment and the assumptions to be utilized in arriving at such determination, shall be made by such certified public accounting firm as may be designated by the Company (the "Accounting Firm"), which shall provide detailed supporting calculations both to the Company and the Participant within 15 business days of the receipt of notice from the Participant that there has been a Payment, or such earlier time as is requested by the Company. In the event that the Accounting Firm is serving as accountant or auditor for the individual, entity or group effecting the Change of Control, the Company shall appoint another nationally recognized accounting firm to make the determinations required hereunder (which accounting firm shall then be referred to as the Accounting Firm hereunder). All fees and expenses of the Accounting Firm shall be borne solely by the Company. Any Gross-Up Payment, as determined pursuant to this Section 4.5, shall be paid by the Company to the Participant within five (5) business days of the receipt of the Accounting Firm's determination. Any determination by the Accounting Firm shall be binding upon the Company and the Participant. As a result of the uncertainty in the application of Section 4999 of the Code at the time of the initial determination by the Accounting Firm hereunder, it is possible that Gross-Up Payments which will not have been made by the Company should have been made ("Underpayment"), consistent with the calculations required to be made hereunder. In the event that the Company exhausts its remedies pursuant to Section 4.5(c) and the Participant thereafter is required to make a payment of any Excise Tax, the Accounting Firm shall determine the amount of the Underpayment that has

occurred and any such Underpayment shall be paid within five (5) business days by the Company to or for the benefit of the Participant.

(c)     The Participant shall notify the Company in writing of any claim by the Internal Revenue Service that, if successful, would require the payment by the Company of the Gross-Up Payment. Such notification shall be given as soon as practicable but no later than ten (10) business days after the Participant is informed in writing of such claim and shall apprise the Company of the nature of such claim and the date on which such claim is requested to be paid. The Participant shall not pay such claim prior to the expiration of the 30-day period following the date on which the Participant gives such notice to the Company (or such shorter period ending on the date that any payment of taxes with respect to such claim is due). If the Company notifies the Participant in writing prior to the expiration of such period that it desires to contest such claim, the Participant shall:

(i)     give the Company any information reasonably requested by the Company relating to such claim,

(ii)     take such action in connection with contesting such claim as the Company shall reasonably request in writing from time to time, including, without limitation, accepting legal representation with respect to such claim by an attorney selected by the Company,

(iii)     cooperate with the Company in good faith in order effectively to contest such claim, and

(iv)     permit the Company to participate in any proceedings related to such claim;

provided, however, that the Company shall bear and pay directly all costs and expenses (including additional interest and penalties) incurred in connection with such contest and shall indemnify and hold the Participant harmless, on an after-tax basis, for any Excise Tax or income tax (including interest and penalties with respect thereto) imposed as a result of such representation and payment of costs and expenses.   Without limitation of the foregoing provisions of this Section 4.5(c), the Company shall control all proceedings taken in connection with such contest and, at its sole option, may pursue or forgo any and all administrative appeals, proceedings, hearings and conferences with the taxing authority in respect of such claim and may, at its sole option, either direct the Participant to pay the tax claimed and sue for a refund or contest the claim in any permissible manner, and the Participant agrees to prosecute such contest to a determination before any administrative tribunal, in a court of initial jurisdiction and in one or more appellate courts, as the Company shall determine; provided, however, that if the Company directs the Participant to pay such claim and sue for a refund, the Company shall advance the amount of such payment to the Participant, on an interest-free basis and shall indemnify and hold the Participant harmless, on an after-tax basis, from any Excise Tax or income tax (including interest or penalties with respect thereto) imposed with respect to such advance or with respect to any imputed income with respect to such advance; and further provided that any extension of the statue of limitations relating to payment of taxes for the taxable year of the Participant with respect to which such contested amount is claimed to be due

is limited solely to such contested amount.  Furthermore, the Company's control of the contest shall be limited to issues with respect to which a Gross-Up Payment would be payable hereunder and the Participant shall be entitled to settle or contest, as the case may be, any other issue raised by the Internal Revenue Service or any other taxing authority.

(d)      If, after the receipt by the Participant of an amount advanced by the Company pursuant to Section 4.5(c), the Participant becomes entitled to receive any refund with respect to such claim, the Participant shall (subject to the Company's complying with the requirements of Section 4.5(c)) promptly pay to the Company the amount of such refund (together with any interest paid or credited thereon after taxes applicable thereto).  If, after the receipt by the Participant of an amount advanced by the Company pursuant to Section 4.5(c), a determination is made that the Participant shall not be entitled to any refund with respect to such claim and the Company does not notify the Participant in writing of its intent to contest such denial of refund prior to the expiration of 30 days after such determination, then such advance shall be forgiven and shall not be required to be repaid and the amount of such advance shall offset, to the full extent thereof, the amount of Gross-Up Payment required to be paid.

4.6     Payment Obligations Absolute.

Upon a Change of Control, the obligations of the Company and the Employer to pay the Separation Benefits described in Section 4.3 shall be absolute and unconditional and shall not be affected by any circumstances, including, without limitation, any set-off, counterclaim, recoupment, defense or other right which the Employer may have against any Participant.  In no event shall a Participant be obligated to seek other employment or take any other action by way of mitigation of the amounts payable to a Participant under any of the provisions of this Plan, nor shall the amount of any payment hereunder be reduced by any compensation earned by a Participant as a result of employment by another employer.

ARTICLE V
PARTICIPATING EMPLOYERS

For purposes of the Plan, the Company shall continue to be an Employer as of the Effective Date, and each Subsidiary of the Company shall be an Employer upon the effective date of its adoption of the Plan.  Upon such adoption, the Subsidiary shall become an Employer hereunder and the provisions of the Plan shall be fully applicable to the Employees of that Subsidiary who are eligible to be Participants.

ARTICLE VI
SUCCESSOR TO COMPANY

This Plan shall bind any successor of the Company, its assets or its businesses (whether direct or indirect, by purchase, merger, consolidation or otherwise), in the same manner and to the same extent that the Company would be obligated under this Plan if no succession had taken place.

In the case of any transaction in which a successor would not by the foregoing provision or by operation of law be bound by this Plan, the Company, as a condition precedent to such transaction, shall require such successor expressly and unconditionally to assume and agree

to perform the Company's obligations under this Plan, in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place. The term "Company," as used in this Plan, shall mean the Company as hereinbefore defined and any successor or assignee to the business or assets which by reason hereof becomes bound by this Plan.

In addition, any successor must treat employment service with any Employer (irrespective of whether the Employer was an affiliate of the Company or the Employee was a Participant at the time of such service) and the new employer as continuous service in Employment for all purposes of calculating Separation Benefits.

## ARTICLE VII
## AMENDMENT AND TERMINATION

7.1    Amendment and Termination.  The Plan may be terminated or amended in any respect by resolution adopted by a majority of the Board, unless a Change of Control has previously occurred. However, in connection with or in anticipation of a Change of Control, this Plan may not be terminated or amended in any manner which would adversely affect the rights or potential rights of Participants. If a Change of Control occurs, the Plan shall no longer be subject to amendment, change, substitution, deletion, revocation or termination in any respect which adversely affects the rights of Participants.

7.2    Form of Amendment.  The form of any amendment or termination of the Plan shall be a written instrument signed by a duly authorized officer or officers of the Company, certifying that the amendment or termination has been approved or ratified by the Board.  An amendment of the Plan in accordance with the terms hereof shall automatically effect a corresponding amendment to all Participants' rights hereunder.  A termination of the Plan shall in accordance with the terms hereof automatically effect a termination of all Participants' rights and benefits hereunder.

## ARTICLE VIII
## MISCELLANEOUS

8.1    Employment Status.  This Plan does not constitute a contract of employment or impose on the Participant or the Participant's Employer any obligation to retain the Participant as an Employee, to change the status of the Participant's Employment, or to change the Employer's policies regarding termination of Employment.  Nothing contained in the Plan will be construed as (a) an employment contract between an Employer and any Employee, (b) a right of any Employee to be continued in the employment of an Employer, or (c) a limitation of the right of an Employer to discharge any Employee, with or without Cause, at any time. All Employees will be subject to discharge to the same extent as if the Plan had never been adopted.

8.2    Validity and Severability.  The invalidity or unenforceability of any provision of the Plan shall not affect the validity or enforceability of any other provision of the Plan, which shall remain in full force and effect, and any prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

8.3    Sources of Payment.  The benefits provided under the Plan will be paid from the general assets of the Employer in accordance with the terms and provisions of the Plan. Nothing herein will be construed to require the Employer to maintain any trust, fund, or otherwise segregate any amount for the benefit of any person.  Furthermore, no person with a claim for Separation Benefits hereunder will have any claim against, right to, security or other interest in, any fund, account, or assets of any Employer.

8.4    Non-Alienation/Payment to Beneficiary.  In the event of the Employee's death prior to receipt of all of his or her Separation Benefits, any remaining benefits should not be subject in any manner to alienation, sale, transfer, assignment, pledge, encumbrance, charge, garnishment, execution or levy of any kind, either voluntary or involuntary, prior to actually being received by the person entitled to the Benefits.  Any attempt to alienate, sell, assign, pledge, charge or otherwise transfer or encumber any right to benefits provided hereunder will be void and without effect.   In the event that a Participant dies prior to receiving entire payment of his Separation Benefits, his remaining benefits shall be paid to his surviving lawful spouse, if any, or if not, then to his estate. Taxes and any other applicable withholdings will be withheld from Separation Benefits as deemed necessary or appropriate by the Employer.

8.5    Applicability of Code Section 409A.  Notwithstanding any other provision contained herein, to the extent this Plan provides for nonqualified deferred compensation subject to Code Section 409A, it is intended to comply with Section 409A.  The Company shall interpret and administer the Plan in accordance therewith.  The Company may make amendments to the Plan or revise the timing of any payments to be made hereunder in accordance with Section 409A including, without limitation, delaying payments to Specified Employees as deemed appropriate for six months following termination of Employment.  In addition, any provision in this Plan document that is determined by the Company to violate the requirements of Section 409A shall be void and without effect, and any provision that is required to appear in this Plan document to comply with Section 409A that is not expressly set forth shall be deemed to be set forth herein and the Plan shall be administered, in all respects, as if all such provisions were expressly set forth herein.  If any provision herein results in the imposition of an excise tax on any Employee under Section 409A, such provision will be reformed to avoid any such imposition in such manner as the Plan Administrator determines, with the advice of legal counsel, is appropriate to comply with Section 409A.

8.6    Tax Withholding; No Guarantee of Tax Consequences.  The Employer shall have the power to deduct or withhold, or require the Participant to remit to the Employer, any amount deemed sufficient to satisfy federal, state, and local taxes, domestic or foreign, as deemed necessary or appropriate.  No representation, commitment or guarantee is made that any amounts paid under the Plan will be excludable from the recipient's gross income for any tax purpose, or that any other tax treatment will apply or be available to such person.

8.7    Severability.  Any provision in the Plan that is prohibited or unenforceable in any jurisdiction by reason of applicable law shall, as to such jurisdiction, be ineffective only to the extent of such prohibition or unenforceability without invalidating or affecting the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

8.8     Construction and Interpretation.  Whenever the context of the Plan so requires, any gender will include the other gender, and words used in the singular or plural will include the other.  The words "herein," "hereof," "hereunder," and other similar compounds of the word "here" will refer to the entire Plan, not to any particular article, section or provision of the Plan.  Headings of articles and sections as used herein are inserted solely for convenience and reference and do not create any inference as to the construction of the Plan.

8.9     Governing Law.  The terms, conditions and provisions of the Plan will be construed, governed and enforced under the laws of the State of Texas, without regard to its conflicts of law provisions, except as may be preempted by ERISA or other controlling federal law.  This Plan is an "employee welfare benefit plan", as defined in Section 3(1) of ERISA, established solely for the purpose of providing severance benefits to Eligible Employees, shall be construed accordingly.

ARTICLE IX
ADMINISTRATION AND CLAIMS PROCEDURE

9.1     Administration.  For the purposes of the Plan and ERISA, the "plan administrator" and named fiduciary of the Plan is the Plan Administrator.  The Plan Administrator shall establish such rules and procedures as may be necessary to enable it to discharge its duties hereunder.  The Plan Administrator shall have all powers necessary or proper to administer the Plan and to discharge its duties hereunder.  The Plan Administrator may allocate to others certain aspects of the management, operation and responsibilities of the Plan, including the employment of advisors and the delegation of any ministerial duties or functions, to qualified individuals or entities.  In writing, or by custom, practice or in operation, the Plan Administrator may provide for the allocation or delegation of any of its duties hereunder among officers or employees of an Employer including, without limitation, those who may qualify as Employees hereunder.  The Plan Administrator will also be authorized to engage or employ agents, attorneys, accountants, consultants, and other advisors which it deems to be necessary or appropriate to assist in discharging its duties hereunder.  Service of legal process may be made upon the Plan Administrator at the following address:

General Counsel
Anadarko Petroleum Corporation
P.O. Box 1330
1201 Lake Robbins Drive
The Woodlands, Texas  77380-1330

9.2     Notice of Claim.  Normally, a Participant does not need to present a formal claim for Benefits payable under the Plan.  However, in the event that an Employee or other person (referred to as the "Claimant") has a claim for any Separation Benefits that he or she believes were not provided in accordance with the terms and provisions of the Plan or otherwise, the Claimant must file a claim with the Plan Administrator within six (6) months from the date of the affected Employee's termination of employment with an Employer.  Any Claimant who fails to file a claim within such 6-month period will completely and irrevocably forfeit and lose any and all rights that he may have, or had, to receive any benefits under the Plan at any time.  Claims for Plan benefits and reviews of appeals of Plan benefit claims which have

been denied or modified are to be processed in accordance with the claims procedures established by the Plan Administrator, which procedures are hereby incorporated by reference as part of the Plan.

Prior to authorizing and awarding any Separation Benefits hereunder, the Plan Administrator may require the Claimant to provide additional information, and to complete any required or requested releases, forms or other documents hereunder, including filing of all claims and requests for payment from any other source.

9.3    Claims Review Procedure. If any claim for Separation Benefits filed by a Claimant is wholly or partially denied, the Plan Administrator will notify the Claimant of its decision in writing. Such notification will be written in a manner calculated to be understood by the average Claimant, and will contain (a) specific reasons for the denial, (b) specific reference to pertinent Plan provisions, (c) a description of any additional material or information necessary for the Claimant to perfect such claim and an explanation of why such material or information is necessary, and (d) information as to the steps to be taken if the Claimant wishes to submit a request for review. Such notification will be given within 60 days after the claim is received by the Plan Administrator (or within 120 days if special circumstances require an extension of time for processing the claim, and if written notice of such extension and circumstances is given to the Claimant within the initial 60-day period). If such notification is not given within such period, the claim will be considered denied as of the last day of such period, and the Claimant may then request a review of the claim.

Within 60 days after the date on which a Claimant receives a written notice of a denied claim (or, if applicable, within 60 days after the date on which such denial is considered to have occurred) the Claimant (or his duly authorized representative) may (a) file a written request (including pertinent documents) with the Plan Administrator for a review of the denied claim, and (b) submit written issues and comments to the Plan Administrator. The Plan Administrator will review the claim and notify the Claimant of its decision in writing. Such notification will be written in a manner calculated to be understood by the Claimant and will contain specific reasons for the decision, as well as specific references to pertinent Plan provisions. The decision on review will be made within 60 days after the request for review is received by the Plan Administrator, or within 120 days if special circumstances require an extension of time for processing the request, such as a decision by the Plan Administrator to hold a hearing, provided that written notice of such extension and circumstances is given to the Claimant within the initial 60-day period. If the decision on review is not made within such period, the claim will be considered denied as of the last day of such period. All final determinations and other decisions concerning claims made pursuant to these claims review procedures will not be subject to further review, but will be final, conclusive and binding on the Claimant and all other persons and entities. To the extent the Plan Administrator has been granted discretionary authority under the Plan, the Plan Administrator's prior exercise of such authority will not obligate it to exercise its authority in a like fashion thereafter.

9.4    Exhaustion of Administrative Remedies. Completion of the claims procedures described in Sections 9.2 and 9.3 is a condition precedent to the commencement of any legal or equitable action in connection with a claim for any benefits under the Plan by a Claimant or by any other person or entity claiming rights individually or through a Claimant;

provided, however, the Plan Administrator may, in its discretion, waive compliance with such claims procedures as a condition precedent to filing of any such action. Any legal or equitable action in connection with, or arising out of, a claim for benefits under the Plan, including any claim denial, will be reviewed on the basis of the information supplied to the Plan Administrator, will not be subject to a deferential review, and must be brought no later than one year following a final decision by the Plan Administrator on the claim pursuant to Section 8.2.

IN WITNESS WHEREOF, the Plan Sponsor has caused this Plan, as amended and restated, to be duly executed in multiple counterparts by its duly authorized officer, to be effective as of September 1, 2007.

ATTEST:                                ANADARKO PETROLEUM CORPORATION

By: _Lynn Moffett_                     By: _PRESTON JOHNSON JR_

Name: _Lynn Moffett_                   Name: _Prst John_

Title: _HR Advisor_                    Title: _Vice President_

Date: _April 15, 2008_                 Date: _April 15, 2008_

Occidental [Ping Lu] 000289

## FIRST AMENDMENT TO ANADARKO PETROLEUM CORPORATION CHANGE OF CONTROL SEVERANCE PLAN

**THIS FIRST AMENDMENT ("AMENDMENT")** is made effective as of January 1, 2008 (the "Effective Date"), by Anadarko Petroleum Corporation, a Delaware corporation (the "Company"), and amends the Anadarko Petroleum Corporation Change of Control Severance Plan originally adopted by the Company on January 29, 1998, and most recently amended and restated effective as of September 1, 2007 (the "Plan") in order to comply with the requirements of Section 409A of the Internal Revenue Code of 1986, as amended (the "Code").

*The Plan is hereby amended as follows:*

*Section 2(bb) is amended to add the following new sentence to the end thereof:*

The Company may apply an alternative method to identify Specified Employees in accordance with Code Section 409A and authoritative guidance thereunder, provided that the alternative method (i) is reasonably designed to include all Specified Employees, (ii) is an objectively determinable standard and (iii) results in either all Employees or no more than 200 Employees being identified as Specified Employees as of any date.

*The first sentence of Section 4.3(e) is deleted, in its entirety, and replaced with the following new sentence:*

A Participant who is entitled to Separation Benefits will also be paid a cash amount, within 75 days following the Participant's Date of Termination, determined by multiplying the Participant's Target Bonus, as of the Date of Termination, by a fraction, the numerator of which is the number of months in the year of termination of Employment up to and including the Date of Termination (with any partial month counting as a full month), and the denominator of which is twelve (12).

*Section 4.3(f) is deleted, in its entirety, and replaced with the following new Section 4.3(f):*

(f)     Personal Time Off (PTO).  A Participant entitled to Separation Benefits will also be paid a cash payment, made within 75 days following the Participant's Date of Termination, in lieu of (i) all accrued and unused PTO as of the Date of Termination for the year of termination of Employment, and (ii) a pro-rata portion of the next year's PTO, as determined by multiplying the amount of PTO accrued for the year of termination by a fraction, the numerator of which is the number of days in the year of termination up to and including the Date of Termination, and the denominator of which is 365.

*Section 4.4 is amended to add the following new sentence to the end of the second paragraph thereof:*

If the Participant is eligible to receive benefits from any Other Source, the form and timing of payments under such Other Source will be determined as set forth by such Other Source,

H-1st Admt to APC Change of Control Severance Plan #718078v7.doc

**Occidental [Ping Lu] 000290**

and the form and timing of any remaining monetary and non-monetary benefits payable under this Plan will be as described herein.

*Section 4.5(b) is amended to add the following new sentence to the end thereof:*

Notwithstanding the above provisions of this Section 4.5(b), any Gross-Up Payment or Underpayment shall be paid to the Participant by the Company not later than by the end of the calendar year following the calendar year in which the Excise Tax is remitted to the Internal Revenue Service.

*The following new Section 4.7 is added to the Plan:*

4.7   Six Month Delay for Specified Employee.

Notwithstanding any other provision to the contrary, if Separation Benefits under this Article IV are payable to a Specified Employee, no payment shall be made before the date which is six (6) months after the date of the Specified Employee's Date of Termination, or such earlier date upon which such amount can be paid or provided under Code Section 409A without being subject to additional taxes thereunder.

*Section 8.5 is deleted, in its entirety, and replaced with the following new Section 8.5:*

8.5   Applicability of Code Section 409A.   Notwithstanding any other provision contained herein, to the extent that this Plan provides for nonqualified deferred compensation subject to Code Section 409A, it is intended to comply with Section 409A. The Company shall interpret and administer the Plan in accordance with the intention of complying with Section 409A without being subject to additional taxes thereunder.

*Section 9.3 is deleted, in its entirety, and replaced with the following new Section 9.3:*

9.3   Claims Review Procedure.

(a)   Denial of Claim.   In the case of the denial of a claim respecting benefits paid or payable with respect to a Participant, a written notice will be furnished to the Claimant within 90 days of the date on which the claim is received by the Committee. If special circumstances (such as for a hearing) require a longer period, the Claimant will be notified in writing, prior to the expiration of the 90-day period, of the reasons for an extension of time; provided, however, that no extension will be permitted beyond 90 days after expiration of the initial 90-day period.

(b)   Reasons for Denial.   A denial or partial denial of a claim will be dated and signed by the Committee and will clearly set forth:

(i)   the specific reason or reasons for the denial;

Occidental [Ping Lu] 000291

(ii) specific reference to pertinent Plan provisions on which the denial is based;

(iii) a description of any additional material or information necessary for the Claimant to perfect the claim and an explanation of why such material or information is necessary; and

(iv) an explanation of the procedure for review of the denied or partially denied claim set forth below, including the Claimant's right to bring a civil action under ERISA Section 502(a) following an adverse benefit determination on review.

(c) <u>Review of Denial</u>.  Upon denial of a claim, in whole or in part, a Claimant or his duly authorized representative will have the right to submit a written request to the Committee for a full and fair review of the denied claim by filing a written notice of appeal with the Committee within 60 days of the receipt by the Claimant of written notice of denial of the claim.  A Claimant or the Claimant's authorized representative will have, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the Claimant's claim for benefits and may submit issues and comments in writing.  The review will take into account all comments, documents, records, and other information submitted by the Claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

If the Claimant fails to file a request for review within 60 days of the denial notification, the claim will be deemed abandoned and the Claimant precluded from reasserting it.  If the Claimant does file a request for review, his request must include a description of the issues and evidence he deems relevant.  Failure to raise issues or present evidence on review will preclude those issues or evidence from being presented in any subsequent proceeding or judicial review of the claim.

(d) <u>Decision Upon Review</u>.  The Committee will provide a prompt written decision on review.  If the claim is denied on review, the decision shall set forth:

(i) the specific reason or reasons for the adverse determination;

(ii) specific reference to pertinent Plan provisions on which the adverse determination is based;

(iii) a statement that the Claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the Claimant's claim for benefits; and

(iv) a statement describing any voluntary appeal procedures offered by the Plan and the Claimant's right to obtain the information about such procedures, as well as a statement of the Claimant's right to bring an action under ERISA Section 502(a).

Occidental [Ping Lu] 000292

A decision will be rendered no more than 60 days after the Committee's receipt of the request for review, except that such period may be extended for an additional 60 days if the Committee determines that special circumstances (such as for a hearing) require such extension. If an extension of time is required, written notice of the extension will be furnished to the Claimant before the end of the initial 60-day period.

To the extent of its responsibility to review the denial of benefit claims, the Committee will have full authority to interpret and apply in its discretion the provisions of the Plan. The decision of the Committee will be final and binding upon any and all Claimants, including, but not limited to, Participants, and any other individuals making a claim through them.

(e)     <u>Other Procedures</u>.  Notwithstanding the foregoing, the Committee in its discretion, may adopt different procedures for different claims without being bound by past actions.  Any procedures adopted, however, shall be designed to afford a Claimant a full and fair review of his claim and shall comply with applicable regulations under ERISA.

(f)     <u>Finality of Determinations; Exhaustion of Remedies</u>.  To the extent permitted by law, decisions reached under the claims procedures set forth in this Section shall be final and binding on all parties.  No legal action for benefits under the Plan shall be brought unless and until the Claimant has exhausted his remedies under this Section. In any such legal action, the Claimant may only present evidence and theories which the Claimant presented during the claims procedure.  Any claims which the Claimant does not in good faith pursue through the review stage of the procedure shall be treated as having been irrevocably waived.  Judicial review of a Claimant's denied claim shall be limited to a determination of whether the denial was an abuse of discretion based on the evidence and theories the Claimant presented during the claims procedure.  Any suit or legal action initiated by a Claimant under the Plan must be brought by the Claimant no later than one year following a final decision on the claim for benefits by the Committee. The one-year limitation on suits for benefits will apply in any forum where a Claimant initiates such suit or legal action.

(g)     <u>Effect of Committee Action</u>.  The Plan shall be interpreted by the Committee in accordance with the terms of the Plan and their intended meanings. However, the Committee shall have the discretion to make any findings of fact needed in the administration of the Plan, and shall have the discretion to interpret or construe ambiguous, unclear or implied (but omitted) terms in any fashion that the Committee deems to be appropriate in its sole judgment.  The validity of any such finding of fact, interpretation, construction or decision shall not be given *de novo* review if challenged in court, by arbitration or in any other forum, and shall be upheld unless clearly arbitrary or capricious.  To the extent the Committee has been granted discretionary authority under the Plan, the Committee's prior exercise of such authority shall not obligate it to exercise its authority in a like fashion thereafter.  If, due to errors in drafting, any Plan provision does not accurately reflect its intended meaning, as demonstrated by consistent interpretations or other evidence of intent, or as determined by the Committee in it sole and exclusive judgment, the provision shall be considered ambiguous and shall be

Occidental [Ping Lu] 000293

interpreted by the Committee in a fashion consistent with its intent, as determined by the Committee in its sole discretion.  The Committee, without the need for approval by the Board, may amend the Plan retroactively to cure any such ambiguity.  This <u>Section 9.3</u> may not be invoked by any person to require the Plan to be interpreted in a manner which is inconsistent with its interpretation by the Committee.   All actions taken and all determinations made in good faith by the Committee shall be final and binding upon all persons claiming any interest in or under the Plan.

*Section 9.4 is deleted in its entirety from the Plan.*

*As expressly amended hereby, the Plan is ratified and confirmed in all respects and shall remain in full force and effect.*

*[Signature page follows.]*

Occidental [Ping Lu] 000294

IN WITNESS WHEREOF, the undersigned, being a duly authorized officer of the Company, has approved, ratified and executed this Amendment on this 15th day of April , 2008.

ANADARKO PETROLEUM CORPORATION

By: _Preston Johnson Jr._

Name: PRESTON JOHNSON JR.

Title: VICE PRESIDENT



Occidental [Ping Lu] 000295

**SECOND AMENDMENT TO ANADARKO PETROLEUM CORPORATION
CHANGE OF CONTROL SEVERANCE PLAN**

**THIS SECOND AMENDMENT ("AMENDMENT")** is made effective as of January 1, 2009 (the "Effective Date"), by Anadarko Petroleum Corporation, a Delaware corporation (the "Company"), and amends the Anadarko Petroleum Corporation Change of Control Severance Plan originally adopted by the Company on January 29, 1998, and most recently amended and restated effective as of September 1, 2007 (the "Plan") in order to update certain administration and amendment provisions of the Plan.

*Section 2(j) is amended by deleting such section in its entirety and replacing it with the following new Section 2(j) in lieu thereof:*

(j)   Committee.   The Anadarko Petroleum Corporation Health and Welfare Benefits Administrative Committee.   The Committee shall consist of at least five members, as appointed from time to time by the Company by action of the Senior Vice President Responsible for Human Resources of the Company (the "SVP-HR").   The members of the Committee shall serve at the discretion of the SVP-HR without additional compensation, but may be reimbursed for proper expenditures incurred during the course of performance of duties hereunder in accordance with applicable law.

*Section 2(w) is amended by deleting such section in its entirety and replacing it with the following new Section 2(w) in lieu thereof:*

(w)   Plan Administrator.   The Committee, which is appointed by the SVP-HR to act as Plan Administrator of the Plan.   References herein to the Committee or Plan Administrator shall include, when appropriate, any Employee or other person or entity who has been delegated the appropriate authority by the Committee as Plan Administrator.

*Section 7.1 is amended by deleting such section in its entirety and replacing it with the following new Section 7.1 in lieu thereof:*

7.1   Amendment and Termination.   The Plan may be terminated or amended in any respect by resolution adopted by a majority of the Board, unless a Change of Control has previously occurred.   Notwithstanding the previous sentence, unless a Change of Control has previously occurred, (a) the Chief Financial Officer of the Company (the "CFO") and the Chief Executive Officer of the Company acting jointly, or (b) the CFO and the General Counsel of the Company acting jointly, will each have the power to approve, adopt, and execute any amendment to the Plan that (i) is required to comply with changes in applicable law or (ii) does not increase the cost of the Plan by more than five percent (5%) per year as determined in good faith and with the certification of an actuary if necessary.

However, in connection with or in anticipation of a Change of Control, this Plan may not be terminated or amended in any manner which would adversely affect the rights or potential rights of Participants.   If a Change of Control occurs, the Plan shall no longer

Occidental [Ping Lu] 000296

be subject to amendment, change, substitution, deletion, revocation or termination in any respect which adversely affects the rights of Participants.

*Section 9.1 is amended by deleting the address at which service of legal process may be made and replacing it with the following new address in lieu thereof:*

Anadarko Petroleum Corporation Health and Welfare Benefits Administrative Committee
Anadarko Petroleum Corporation Change of Control Severance Plan
Anadarko Petroleum Corporation
c/o CT Corporation System
350 N. St. Paul Street
Dallas, TX 75201

*As expressly amended hereby, the Plan is ratified and confirmed in all respects and shall remain in full force and effect.*

**IN WITNESS WHEREOF**, the Company has caused this Second Amendment to be adopted and executed by its duly authorized officer on this 26 TH day of October , 2009.

**ANADARKO PETROLEUM CORPORATION**

By: Julie Struble

Name: JULIE STRUBLE

Title: VP, HUMAN RESOURCES

Occidental [Ping Lu] 000297

**THIRD AMENDMENT TO ANADARKO PETROLEUM CORPORATION
CHANGE OF CONTROL SEVERANCE PLAN**

**THIS THIRD AMENDMENT ("AMENDMENT")** is made effective as of December 10, 2010 (the "Effective Date") by Anadarko Petroleum Corporation, a Delaware corporation (the "Company"), and amends the Anadarko Petroleum Corporation Change of Control Severance Plan originally adopted by the Company on January 29, 1998, as amended and restated effective as of September 1, 2007, and further amended effective as of January 1, 2008, and most recently amended effective as of January 1, 2009 (the "Plan") in order to comply with the requirements of Section 409A of the Internal Revenue Code.

> *The Plan is hereby amended as follows:*

> *The first sentence of Section 4.3(a) is deleted, in its entirety, and replaced with the following new sentence:*

If a Participant's Employment is terminated in circumstances entitling him or her to Separation Benefits as provided in Section 4.2(a), and the Participant executes a full release and confidentiality agreement, as prepared and provided by the Company and containing such terms and conditions as the Company deems appropriate in its discretion, and if such agreement is revocable, the Participant does not revoke the agreement, the Participant's Employer or the Company shall pay such Participant, within 70 days following the Participant's Date of Termination (provided that such payment shall be made in the second taxable year if such 70-day period begins in one taxable year and ends in a subsequent taxable year), a lump sum cash payment equal to the sum of the following amounts, net of applicable withholdings:

> *The first sentence of Section 4.3(e) is deleted, in its entirety, and replaced with the following new sentence:*

A Participant who is entitled to Separation Benefits will also be paid a cash amount, within 70 days following the Participant's Date of Termination (provided that such payment shall be made in the second taxable year if such 70-day period begins in one taxable year and ends in a subsequent taxable year), determined by multiplying the Participant's Target Bonus, as of the Date of Termination, by a fraction, the numerator of which is the number of months in the year of termination of Employment up to and including the Date of Termination (with any partial month counting as a full month), and the denominator of which is twelve (12).

> *Section 4.3(f) is deleted, in its entirety, and replaced with the following new Section 4.3(f):*

(f)   Personal Time Off (PTO).   A Participant entitled to Separation Benefits will also be paid a cash payment, within 70 days following the Participant's Date of Termination (provided that such payment shall be made in the second taxable year if such 70-day period begins in one taxable year and ends in a subsequent taxable year), in lieu

Occidental [Ping Lu] 000298

of (i) all accrued and unused PTO as of the Date of Termination for the year of termination of Employment, and (ii) a pro-rata portion of the next year's PTO, as determined by multiplying the amount of PTO accrued for the year of termination by a fraction, the numerator of which is the number of days in the year of termination up to and including the Date of Termination, and the denominator of which is 365.

*Section 4.3(g) is deleted, in its entirety, and replaced with the following new Section 4.3(g):*

(g)     Failure to Execute Release. If a Participant does not execute (or revokes) the release and confidentiality agreement provided by the Company pursuant to Section 4.3(a), the only benefits under this Plan to which the Participant is entitled are those set forth in Section 4.3(b). For the avoidance of doubt, such a Participant will not be entitled to benefits provided for under Sections 4.3(a), (c), (d), (e) or (f). The release described in this Section 4.3(g) must be effective and irrevocable by the 60th day after the Date of Termination.

*Section 4.5(c) is amended to add the following new sentence to the end thereof:*

In no event shall a reimbursement of expenses incurred under this Section 4.5(c) be made after the end of the Participant's taxable year in which the taxes that are the subject of the claim by the Internal Revenue Service (or other taxing authority) are remitted to the taxing authority, or if no taxes are remitted, the end of the Participant's taxable year following the taxable year in which the claim is completed.

*Section 8.5 is amended to add the following new sentence to the end thereof:*

Without limiting the scope of the preceding provisions of this Section 8.5, it is specifically provided that any offset to the benefits provided hereunder for amounts owed to the Employer by the Participant for any reason (whether pursuant to clause (iii) of the last sentence of Section 4.3(a) or otherwise) shall be subject to the limitations of Treasury regulation section 1.409A-3(j)(4)(xiii). Specifically, any amount payable hereunder to a Participant that constitutes nonqualified deferred compensation subject to Code Section 409A may be offset for a debt of the Participant to the Employer only where such debt is incurred in the ordinary course of the service relationship, the entire amount of reduction in any of the Employer's taxable years does not exceed $5,000, and the reduction is made at the same time and in the same amount as the debt otherwise would have been due and collected from the Participant.

*As expressly amended hereby, the Plan is ratified and confirmed in all respects and shall remain in full force and effect.*

*[Signature page follows.]*

Occidental [Ping Lu] 000299

IN WITNESS WHEREOF, the undersigned, being a duly authorized officer of the Company, has approved, ratified and executed this Amendment on this _20_ day of _December_, 20_10_.

ANADARKO PETROLEUM CORPORATION

By: _Julia A. Struble_

Name: _Julia A. Struble_

Title: _Vice President, Human Resources_

US 668916v2

3

Occidental [Ping Lu] 000300

# Morgan Lewis

**Lisa H. Barton**
Partner
+1.617.341.7522
lisa.barton@morganlewis.com

April 22, 2020

**VIA EMAIL and VIA U.S. FIRST CLASS MAIL**

Ping Lu
124 South Brooksedge Circle
The Woodlands, TX 77382
xiaomadawolewo@gmail.com

Re:     Request for Documents

Dear Mr. Lu:

On behalf of the Health and Welfare Benefits Administrative Committee (the "Benefits Administrative Committee"), I am responding to your request for documents under the Anadarko Petroleum Change of Control Severance Plan (the "COC Plan") regarding your claim appeal.

**Request for Documents, Records and Information**
In your email dated March 23, 2020, you asked for a complete copy of all documents, records and other information relevant to your claim.  As requested, attached are the following documents relating to your claim:

- Anadarko Petroleum Change of Control Severance Plan document and Amendments One, Two and Three;

- Anadarko Petroleum Change of Control Severance Plan Summary Plan Description;

- Email correspondence; and

- Documents presented to the Health and Welfare Benefits Administrative Committee.

The Committee also reviewed your claim letter, dated March 13, 2020, and all attachments.

While we believe that we have provided you with the documentation that we are required to provide in accordance with ERISA, if there are additional documents that you believe you are entitled to receive, please send your request to my attention or to the Oxy Good Reason in-box (goodreason@oxy.com) and identify the materials to which you believe you are entitled and the basis for your request.

Very truly yours,

Lisa H. Barton

**Morgan, Lewis & Bockius LLP**

One Federal Street
Boston, MA  02110-1726
United States

☎ +1.617.341.7700
🖷 +1.617.341.7701

# AMENDED AND RESTATED
# ANADARKO PETROLEUM CORPORATION
# CHANGE OF CONTROL SEVERANCE PLAN

## Introduction

The Board of Directors of Anadarko Petroleum Corporation (the "Company") recognizes that, from time to time, the Company may explore potential transactions that could result in a Change of Control of the Company. This possibility and the uncertainty it creates may result in the loss or distraction of employees of the Company and its Subsidiaries to the detriment of the Company and its shareholders.

The Board considers the avoidance of such loss and distraction to be essential to protecting and enhancing the best interests of the Company and its shareholders. The Board also believes that when a Change of Control is perceived as imminent, or is occurring, the Board should be able to receive and rely on disinterested service from employees regarding the best interests of the Company and its shareholders without concern that employees might be distracted or concerned by the personal uncertainties and risks created by the perception of an imminent or occurring Change of Control.

In addition, the Board believes that it is consistent with the Company's employment practices and policies and in the best interests of the Company and its shareholders to provide severance compensation for its eligible employees whose employment terminates following a Change of Control.

Accordingly, the Board has determined that appropriate steps should be taken to assure the Company of the continued employment and attention and dedication to duty of its employees and to seek to ensure the availability of their continued service, notwithstanding the possibility or occurrence of a Change of Control.

Therefore, in order to fulfill the above purposes, the following plan, originally adopted as of January 29, 1998, is hereby adopted as amended and restated herein, effective as of the Effective Date.

## ARTICLE I
## ESTABLISHMENT OF AMENDED AND RESTATED PLAN

As of the Effective Date, the Company hereby amends and restates this separation compensation plan known as the Anadarko Petroleum Corporation Change of Control Severance Plan, as set forth in this document.

## ARTICLE II
## DEFINITIONS

As used herein, the following words and phrases shall have the following respective meanings, unless the context clearly indicates otherwise.

(a)    <u>Annual Bonus</u>.  The highest aggregate amount a Participant received as an annual bonus for any single year under the Company's Annual Incentive Plan and the Anadarko Performance Bonus Plan, but excluding any other annual incentive bonus plan, policy or program of the Company unless specifically designated by the Plan Administrator as an included plan at the time of a Change of Control for any of the three calendar bonus plan years prior to termination of Employment, or if higher, for the year of termination of Employment.  Bonuses shall be considered to be paid for the year with respect to which performance is measured, regardless of when paid, and all amounts paid as annual bonuses with respect to the same year, regardless of when paid, shall be aggregated.

(b)    <u>Annual Compensation</u>.  The sum of a Participant's Required Base Salary and Annual Bonus.

(c)    <u>Applicable Period</u>.  Upon the occurrence of a Change of Control, the Applicable Period for a termination without Cause pursuant to <u>clause (i) of Section 4.2(a)</u> or a voluntary termination of employment by the Participant pursuant to <u>clause (iii) of Section 4.2(a)</u> shall be the period from the date of the Change of Control through the third anniversary thereof (subject to such extensions of the Applicable Period as the Company may determine to be appropriate from time to time), and the Applicable Period for a termination for Good Reason pursuant to <u>clause (ii) of Section 4.2(a)</u> shall be the period from the date of the Change of Control through the first anniversary thereof (subject to such extensions of the Applicable Period as the Company may determine to be appropriate from time to time).

(d)    <u>Base Salary</u>.  The annual rate of base compensation paid by the Employers to a Participant (including amounts which the Participant could have received in cash had he or she not elected to contribute to an employee benefit plan or a deferred compensation program maintained by any Employer), excluding overtime pay, bonuses, employee benefits, added premiums, differentials, components of foreign service assignments, and all forms of incentive compensation. For a Participant who is paid by the hour, the annual rate of base compensation is determined by multiplying the Participant's base hourly rate of pay times 2,080 hours, except where the Participant's annual effective compensation includes scheduled overtime, as determined by the Employer, in which case the annual rate of base compensation will be determined by multiplying the Participant's base hourly rate times the effective annual work hours.   For a Participant who is paid semimonthly or monthly, the annual rate of base compensation is determined by multiplying the Participant's monthly rate of pay times twelve (12).  For a regular part-time Participant, the annual rate of base compensation is determined by multiplying the Participant's hourly rate by the product of (i) the normally scheduled weekly work hours divided by forty hours, times (ii) 2,080 hours.  All computations of Base Salary shall be made by the Plan Administrator and be final and binding.

(e)    <u>Benefit Determination Date</u>.  A date established by the Company, in its discretion, for a Participant, to adjust for breaks in service as the Company deems appropriate, to comply with any purchase or sale agreement covenant or for such other purposes as the Company deems appropriate or advisable.

(f)    <u>Board</u>.  The Board of Directors of Anadarko Petroleum Corporation.

Occidental [Ping Lu] 000303

(g)    Cause.   Cause shall mean the occurrence of any of the following with respect to a Participant:

(i)    conviction of any felony or of a misdemeanor involving moral turpitude;

(ii)    willful failure to perform his or her duties or responsibilities;

(iii)    engaging in conduct which is injurious (monetarily or otherwise) to any Employer or its affiliates (including, without limitation, misuse of an Employer's or affiliate's funds or other property);

(iv)    engaging in business activities which are in conflict with the business interests of any Employer;

(v)    insubordination;

(vi)    engaging in conduct which is in violation of any Employer's applicable safety rules or standards or which otherwise causes or may cause injury to another employee or any other person;

(vii)    engaging in conduct which is in violation of any applicable policy or work rule of any Employer; or

(viii)    engaging in conduct which is in violation of any Employer's Code of Business Conduct and Ethics or which is otherwise inappropriate in the office or work environment.

For purposes of clause (ii) above, no act or failure to act, on the part of the Participant, shall be considered "willful" unless it is done, or omitted to be done, by the Participant in bad faith or without reasonable belief that the Participant's action or omission was in the best interests of the Employer. Any act, or failure to act, based upon authority given pursuant to a resolution duly adopted by the Board or based upon the advice of legal counsel for the Employer shall be conclusively presumed to be done, or omitted to be done, by the Participant in good faith and in the best interests of the Employer.

(h)    Change of Control.   For purposes of the Plan, a "Change of Control" shall mean:

(i)    The acquisition by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) (a "Person") of beneficial ownership (within the meaning of Rule 13d3 promulgated under the Exchange Act) of 20% or more of either (A) the then outstanding shares of common stock of the Company (the "Outstanding Company Common Stock") or (B) the combined voting power of the then outstanding voting securities of the Company entitled to vote generally in the election of directors (the "Outstanding Company Voting Securities"); provided, however, that for purposes of this subsection (a), the following acquisitions shall not constitute a Change of Control: (w) any acquisition directly from the Company, (x) any acquisition by the

Company, (y) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Company or any corporation or other entity controlled by the Company, or (z) any acquisition pursuant to a transaction which complies with clauses (A), (B) and (C) of subsection (iii) of this paragraph (h); or

(ii)     Individuals who, as of the Effective Date, constitute the Board (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board; provided, however, that any individual becoming a director subsequent to the Effective Date whose election, or nomination for election by the Company's shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board; or

(iii)     Consummation by the Company of a reorganization, merger or consolidation or sale or other disposition of all or substantially all of the assets of the Company or the acquisition of assets of another entity (a "Business Combination"), in each case, unless, following such Business Combination, (A) all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Company Common Stock and Outstanding Company Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 60% of, respectively, the then outstanding shares of common stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation (or its parent) resulting from such Business Combination (including, without limitation, a corporation which as a result of such transaction owns the Company or all or substantially all of the Company's assets either directly or through one or more subsidiaries) in substantially the same proportions as their ownership, immediately prior to such Business Combination of the Outstanding Company Common Stock and Outstanding Company Voting Securities, as the case may be, (B) no Person (excluding any employee benefit plan (or related trust) of the Company or such corporation (or its parent) resulting from such Business Combination) beneficially owns, directly or indirectly, 20% or more of, respectively, the then outstanding shares of common stock of the corporation (or its parent) resulting from such Business Combination or the combined voting power of the then outstanding voting securities of such corporation (or its parent) except to the extent that such ownership existed prior to the Business Combination, and (C) at least a majority of the members of the board of directors of the corporation (or its parent) resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement, or of the action of the Board, providing for such Business Combination; or

(iv)     Approval by the shareholders of the Company of a complete liquidation or dissolution of the Company.

(i)     Code.  The Internal Revenue Code of 1986, as amended from time to time, and any regulations and other authoritative guidance promulgated thereunder by the appropriate governmental authority.

(j)     <u>Committee</u>.  The Compensation and Benefits Committee of the Board.

(k)     <u>Company</u>.  Anadarko Petroleum Corporation and any successor thereto.

(l)     <u>Date of Hire</u>.  The most recent date the Participant was hired by any Employer.

(m)     <u>Date of Termination</u>.  The date on which a Participant's termination of Employment takes effect without the concurrent or immediate re-employment of the Participant by another Employer.

(n)     <u>Effective Date</u>.  The effective date of this amendment and restatement of the Plan which is September 1, 2007.

(o)     <u>Employee</u>.  Provided he or she is employed by an Employer on the date of a Change of Control, any Employee (as designated on an Employer's United States payroll) who is classified as a regular full-time or regular part-time Employee. Notwithstanding the previous sentence, "Employee" excludes:

(i)     Any individual who is not on the Employer's United States payroll for whatever reason, including but not limited to a worker that the Employer considers to be an independent contractor, a leased employee, a contractor, or an agency or staffing worker.

(ii)     Any individual not designated in the Employer's payroll records, or otherwise not considered by the Employer, to be a regular full-time or regular part-time employee. This exclusion includes an individual on the Employer's payroll classified as a "limited benefit" or "limited benefit only" employee.

(iii)     Any individual who is a participant in another change of control severance plan or program sponsored by the Company (or a subsidiary of the Company) and who is currently entitled to protections and/or benefits thereunder due to a change of control (as defined in that plan or program) that has occurred prior to a Change of Control.

(iv)     Any individual who is a party to a Key Manager Change of Control Contract, a Key Employee Change of Control Contract, or other form of individual written agreement or contract with an Employer providing for benefits in the event of a change of control.

(v)     Any individual who is covered by the Anadarko Petroleum Corporation Officer Severance Plan (or any successor plan thereto).

(vi)     Any employee whose employment terms and conditions are subject to being governed by a collective bargaining agreement, unless such agreement expressly provides for coverage under the Plan.

(p)      ERISA.   The Employee Retirement Income Security Act of 1974, as amended, and the regulations and other authority issued thereunder by the appropriate governmental authority.

(q)      Employer.   The Company or a Subsidiary of the Company which has adopted the Plan pursuant to Article V .

(r)      Employment.   Employment means that the individual is employed as an Employee of any Employer.

(s)      Good Reason.   Good Reason shall mean the occurrence of any of the following:

(i)      the Participant's duties and responsibilities as an Employee are materially and adversely diminished in comparison to the duties and responsibilities enjoyed by the Participant immediately prior to the Change of Control;

(ii)      the Participant's Base Salary is materially reduced in comparison to the Base Salary enjoyed by the Participant immediately prior to the Change of Control;

(iii)      the aggregate value of the Participant's Base Salary plus Total Target Incentive Compensation is materially reduced in comparison to the aggregate value of the Participant's Base Salary plus Total Target Incentive Compensation immediately prior to the Change of Control;

(iv)      the Participant is required to be based at a location more than 25 miles from the primary location where the Participant was based and performed services immediately prior to the Change of Control;

(v)      the Participant is required by the Employer to take an assignment or position that requires him or her to travel on frequent overnight trips resulting in extended stays away from home on a consistent basis and to a substantially greater extent than was required immediately prior to the Change of Control (this provision excludes assignments or positions that might require temporary travel for a specified, short duration of time, regardless of whether such assignment or position is the result of circumstances related to the Change of Control); or

(vi)      The Participant is required, without the Participant's prior written consent, to perform in a job position, or a substantial job assignment, for which he or she is not skilled or trained.

(t)      Monthly Salary.   The Participant's Annual Compensation divided by twelve (12).

(u)      Participant.   An Employee who meets the eligibility requirements of Section 3.1 to participate in the Plan.

(v)     Plan.  The Amended and Restated Anadarko Petroleum Corporation Change of Control Severance Plan, as it may be amended from time to time.

(w)     Plan Administrator.   The  Company,  or  a  committee  or  individual appointed by the Company to serve as Plan Administrator.

(x)     Required Base Salary.   With respect to any Participant, the higher of (i) the Participant's Base Salary as in effect immediately prior to the Change of Control and (ii) the Participant's highest Base Salary in effect at any time thereafter.

(y)     Retirement.  A termination of employment by the Participant due to his or her voluntary normal or early retirement under a pension plan sponsored by his or her Employer or any of its affiliates, as defined in such plan.

(z)     Sale of Business.  Such term is defined in Section 4.2 (a)(iii).

(aa)    Separation Benefits.   The  payments  and  benefits  due  pursuant  to Section 4.3.

(bb)    "Specified Employee" means an Employee who is a "key employee" (as defined in Code Section 416(i) without regard to Code Section 416(i)(5)) of the Employer (or an entity which is considered to be a single employer with the Employer under Code Sections 414(b) or 414(c)), as determined under Code Section 409A at any time during the twelve (12) month period ending on December 31, but only if the Employer is considered to have any stock that is publicly traded on an established securities market or otherwise required under Section 409A.  An Eligible Employee who is a key employee (as determined under the preceding sentence) will be deemed to be a Specified Employee for the period of April 1 through March 31 following such December 31, except as otherwise required under Section 409A.

(cc)    Subsidiary.   Any corporation or other entity in which the Company, directly or indirectly, holds a majority of the voting power of such corporation's outstanding shares of capital stock or other voting equity interests, as applicable.

(dd)    Target Bonus.  The Participant's annual target bonus opportunity under the Company's Annual Incentive Plan and the Anadarko Performance Bonus Plan, but excluding any other annual incentive bonus plan, policy or program of the Company unless specifically designated by the Plan Administrator as an included plan at the time of a Change of Control.

(ee)    Target Long-Term Incentive Compensation.   The Participant's annual target long-term incentive compensation opportunity under the Company's long-term incentive plan, but excluding any other similar long-term incentive plan, policy or program of the Company unless specifically designated by the Plan Administrator as an included plan at the time of a Change of Control; provided, that, as determined by the Company, the Participant's job grade is a job grade with respect to which long-term-term incentive compensation is considered a normal, regular compensation element.

(ff)    Total Target Incentive Compensation.  With respect to any Participant, the sum of the Participant's Target Bonus and Target Long-Term Incentive Compensation.

(gg)   WARN Act Notice Pay.  Any payment made to an Employee by an Employer in lieu of providing a minimum notice of termination with the intent of complying with the requirements or the purposes of the Worker Adjustment and Retraining Notification Act (29 USC §§ 2101 – 2109) and any other similar state or federal law mandating the provision of notice to employees prior to employment termination.

(hh)   Year of Service.  With respect to a Participant, the full year and any prorated portion of a year included in such Participant's continuous Employment from his or her Date of Hire or his or her Benefit Determination Date, as the case may be, to the Date of Termination (determined by subtracting the Date of Hire or Benefit Determination Date from the Date of Termination, whichever produces the greater number of Years of Service).

ARTICLE III
ELIGIBILITY

3.1   Participation.  Each Employee shall be a Participant; provided that, any Employee may be designated as not being a Participant by action of the Committee at any time prior to the occurrence of a Change of Control if such designation is not made in connection with or in anticipation of a Change of Control.

3.2   Duration of Participation.  A Participant shall cease to be a Participant when he or she is no longer an Employee as defined herein.  Notwithstanding the foregoing, a Participant who is entitled, as a result of ceasing to be an Employee, to payment of Separation Benefits or any other amounts due under the Plan shall remain a Participant until all such Separation Benefits have been paid to the Participant.

ARTICLE IV
SEPARATION BENEFITS

4.1   Right to Separation Benefits.  A Participant shall be entitled to receive Separation Benefits as provided in Section 4.3 if a Change of Control occurs and his or her Employment terminates under a circumstance specified in Section 4.2(a).  An additional Change of Control shall not trigger any additional Separation Benefits for the Participant.

4.2   Termination of Employment.

(a)   Terminations Which Give Rise to Separation Benefits Under This Plan.

(i)   A termination without Cause during the Applicable Period;

(ii)   A termination for Good Reason during the Applicable Period; provided, that, the Participant terminates his or her Employment within ninety (90) days of such occurrence; or

(iii)   If, during the Applicable Period, the Employer or any affiliate of the Employer sells or otherwise distributes or disposes of the subsidiary, division, branch or other business unit in which the Participant was employed before such sale, distribution or other disposition (a "Sale of Business") and the requirements of subsection (b)(vi) of this Section 4.2

are not met, a Participant may terminate his or her Employment within ninety (90) days after such Sale of Business and be entitled to Separation Benefits hereunder.

(b)　　Terminations Which Do Not Give Rise to Separation Benefits Under This Plan.  If a Participant's Employment is terminated for any of the following reasons, the Participant shall not be entitled to Separation Benefits under the Plan, regardless of the occurrence of a Change of Control:

(i)　　A termination by the Employer for Cause;

(ii)　　A termination by the Employer as a result of the Participant's inability to perform the essential functions of his or her position with or without a reasonable accommodation that is required by law;

(iii)　　The death of the Participant;

(iv)　　A termination by the Employee due to Retirement; provided, however, a termination that otherwise meets the requirements of clauses (i), (ii) or (iii) of Section 4.2(a) shall not be deemed to be a Retirement for purposes of this Section 4.2(b), despite the fact that the Participant may qualify for normal or early retirement benefits under a pension plan of his or her Employer or any of its affiliates;

(v)　　The voluntary termination of the Participant when neither of the conditions of clauses (ii) or (iii) of Section 4.2(a) have been met during the Applicable Period; or

(vi)　　A Sale of Business occurs, and the Participant is offered employment with the purchaser or an affiliate thereof on substantially the same terms and conditions of Employment as for the Employer (including, without limitation, base salary, material job duties and responsibilities substantially similar employee benefit plans, and primary location where based).  Such terms and conditions shall also include, without limitation, a legally binding agreement or plan covering such Participant, providing that upon a termination of employment with the purchaser and its affiliates, or any successor of the kind described in Article VI, within three (3) years after a Change of Control, the Participant's then employer will pay to such former Participant an amount equal to the Separation Benefits that such former Participant would have received under the Plan had he or she been a Participant at the time of such termination.  For purposes of this clause (vi), the new employer plan or agreement must treat all employment service with both any Employer (irrespective of whether the Employer was an affiliate of the Company or the Employee was a Participant at the time of such service) and the new employer (or its affiliate or successor) as being continuous employment service for all purposes of calculating the Participant's Separation Benefits.

4.3　　Separation Benefits.

(a)　　In General.  If a Participant's Employment is terminated in circumstances entitling him or her to Separation Benefits as provided in Section 4.2(a), and the Participant executes a full release and confidentiality agreement, as prepared and provided by the Company and containing such terms and conditions as the Company deems appropriate in its discretion, and if such agreement is revocable, the Participant does not revoke the agreement ), the

Participant's Employer or the Company shall pay such Participant, within a reasonable time (but not more than 75 days following the Participant's Date of Termination), a lump sum  cash payment equal to the sum of the following amounts, net of applicable withholdings:

> (i)      One-half (50%) of the Participant's Monthly Salary for each Year of Service; and

> (ii)     One Monthly Salary for each Ten Thousand Dollars ($10,000) of Annual Compensation; provided, that, for this purpose, if the Participant's Annual Compensation is not a multiple of $10,000, it shall be deemed to equal the next highest whole multiple of $10,000.

The amount of Separation Benefits determined pursuant to this Section 4.3(a) shall be reduced by the total of the following items, unless determined otherwise by the Company in its sole discretion:

> (i)      WARN Act Notice Pay;

> (ii)     any payment provided to Participant on or around the time of termination of employment that Participant was not legally entitled to receive (e.g., continuation of salary for a short period of time following termination of employment); and

> (iii)    any amounts owed to the Employer by the Participant for any reason.

(b)    Minimum Separation Benefit.  Notwithstanding Section 4.3(a) above, the minimum amount payable to a Participant under Section 4.3(a) will equal three (3) times the Participant's Monthly Salary (the "Minimum Separation Benefit").

(c)    Maximum Separation Benefit.  Notwithstanding Section 4.3(a) above, the maximum amount that is payable to a Participant under Section 4.3(a) will be equal to twenty-four (24) times the Participant's Monthly Salary.

(d)    Welfare Benefits.  A Participant who is entitled to Separation Benefits will continue to be provided, for a period of six months, with Employer provided life insurance coverage under the Employer's group term life insurance policy.  The Participant shall also be entitled to continue the Participant's and his or her family members' coverage under the Employer's group medical and dental benefit plans ("Group Health Plans") for a period of up to six (6) months at active employee contribution rates (provided the Participant agrees to the continuation and submits payment for the required costs of such coverage).  Continuation coverage under any Group Health Plan may be discontinued without advance notice due to a failure by Participant to pay the required premiums.  Such coverage may be continued only at the level and for the person or persons covered as in effect as of the Participant's Date of Termination.  Notwithstanding the foregoing, if the Participant becomes reemployed by another employer and is eligible to receive medical/dental coverage under another employer-provided plan, the continuation coverage described herein shall be secondary to coverage provided under such other plans.  Should a Group Health Plan change during this 6-month period, the Participant shall be entitled to continue his or her benefits for the six-month period under the Employer's

then current Group Health Plan.   Benefits provided pursuant to this Section 4.3(d) are not to be considered a continuation of coverage as provided under Section 601 et seq. of ERISA and Section 4980B of the Code;  any Participant who is entitled to COBRA continuation coverage may elect such coverage in accordance with applicable COBRA law following the termination of the six-month period.

 (e) Pro Rata Target Bonus.   A Participant who is entitled to Separation Benefits will also be paid a cash amount determined by multiplying the Participant's Target Bonus, as of the Date of Termination, by a fraction, the numerator of which is the number of months in the year of termination of Employment up to and including the Date of Termination (with any partial month counting as a full month), and the denominator of which is twelve (12). Such amount will be reduced by actual payments, if any, under the Company's Annual Incentive Plan, the Anadarko Performance Bonus Plan, and any other annual incentive bonus plan, policy or program of the Company designated by the Plan Administrator as an included plan at the time of a Change of Control, where such payments are made with respect to performance that is measured during the year of termination as determined by the Plan Administrator.

 (f) Personal Time Off (PTO).   A Participant entitled to Separation Benefits will also be paid a cash amount in lieu of (i) all accrued unused PTO as of the Date of Termination for the year of termination of Employment, and (ii) a pro-rata portion of the next year's PTO, determined by multiplying the amount of PTO accrued for the year of termination by a fraction, the numerator of which is the number of days in the year of termination up to and including the Date of Termination, and the denominator of which is 365.

 (g) Failure to Execute Release.   If a Participant does not execute (or revokes) the release and confidentiality agreement provided by the Company pursuant to Section 4.3(a), the only benefits under this Plan to which the Participant is entitled are those set forth in Section 4.3(b).  For the avoidance of doubt, such a Participant will not be entitled to benefits provided for under Sections 4.3(a), (c), (d), (e) or (f).

 4.4 Other Benefits Payable and Offset.

 The Separation Benefits described in Section 4.3 shall be payable in addition to, and not in lieu of, other accrued or vested or earned but deferred compensation, rights, options or other benefits which are owed to a Participant upon or following termination of Employment, including but not limited to accrued amounts or benefits previously earned and payable under any bonus or other compensation plans, stock option plan, stock ownership plan, stock purchase plan, life insurance plan, health plan, disability plan or similar or successor plan. Notwithstanding the foregoing, any Separation Benefits paid under this Plan will be reduced, on a dollar for dollar basis, by any severance pay, Warn Act Notice Pay or other statutory benefits paid by the Employer to an Employee under applicable law.

 In addition, in the event that a Participant is eligible to receive benefits under (i) this Plan and (ii) any other severance or change-of-control plan, program, contract, or agreement ("Other Source"), then any monetary benefits due under this Plan will be reduced by the monetary benefits due from the Other Source, with the result being that the Participant receives, in the aggregate, all monetary benefits due under this Plan but nothing more.  Further, in the

event that non-monetary benefits are due from an Other Source, the Plan Administrator will compare such non-monetary benefits to the non-monetary benefits due under this Plan and, where the non-monetary benefits are of the same nature or class, the Employee will be provided with the better of the two non-monetary benefits; provided, however, under no circumstances shall the Employee receive duplicate non-monetary benefits as determined by the Plan Administrator, with the result being that the Participant receives, in the aggregate, all non-monetary benefits due under this Plan but nothing more.

    4.5   Certain Additional Payments by the Company.

    (a)    Anything in the Plan to the contrary notwithstanding, in the event it is determined by the Plan Administrator that any payment or distribution by the Employer to or for the benefit of the Participant (whether paid or payable or distributed or distributable pursuant to the terms of the Plan or otherwise, but determined without regard to any additional payment required under this Section 4.5) (a "Payment") would be subject to the excise tax imposed by Section 4999 of the Code or any corresponding provisions of state or local tax laws, or any interest or penalties are incurred by the Participant with respect to such excise tax (such excise tax, together with any such interest and penalties, are hereinafter collectively referred to as the "Excise Tax"), then the Participant shall be entitled to receive an additional payment (a "Gross-Up Payment") in an amount such that after payment by the Participant of all taxes (including any interest or penalties imposed with respect to such taxes), including, without limitation, any income taxes (and any interest and penalties imposed with respect thereto) and Excise Tax imposed upon the Gross-Up Payment, the Participant retains an amount of the Gross-Up Payment equal to the Excise Tax imposed upon all the Payments.

    (b)    Subject to the provisions of Section 4.5(c), all determinations required to be made under this Section 4.5, including whether and when a Gross-Up Payment is required and the amount of such Gross-Up Payment and the assumptions to be utilized in arriving at such determination, shall be made by such certified public accounting firm as may be designated by the Company (the "Accounting Firm"), which shall provide detailed supporting calculations both to the Company and the Participant within 15 business days of the receipt of notice from the Participant that there has been a Payment, or such earlier time as is requested by the Company. In the event that the Accounting Firm is serving as accountant or auditor for the individual, entity or group effecting the Change of Control, the Company shall appoint another nationally recognized accounting firm to make the determinations required hereunder (which accounting firm shall then be referred to as the Accounting Firm hereunder). All fees and expenses of the Accounting Firm shall be borne solely by the Company. Any Gross-Up Payment, as determined pursuant to this Section 4.5, shall be paid by the Company to the Participant within five (5) business days of the receipt of the Accounting Firm's determination. Any determination by the Accounting Firm shall be binding upon the Company and the Participant. As a result of the uncertainty in the application of Section 4999 of the Code at the time of the initial determination by the Accounting Firm hereunder, it is possible that Gross-Up Payments which will not have been made by the Company should have been made ("Underpayment"), consistent with the calculations required to be made hereunder. In the event that the Company exhausts its remedies pursuant to Section 4.5(c) and the Participant thereafter is required to make a payment of any Excise Tax, the Accounting Firm shall determine the amount of the Underpayment that has

occurred and any such Underpayment shall be paid within five (5) business days by the Company to or for the benefit of the Participant.

        (c)     The Participant shall notify the Company in writing of any claim by the Internal Revenue Service that, if successful, would require the payment by the Company of the Gross-Up Payment. Such notification shall be given as soon as practicable but no later than ten (10) business days after the Participant is informed in writing of such claim and shall apprise the Company of the nature of such claim and the date on which such claim is requested to be paid. The Participant shall not pay such claim prior to the expiration of the 30-day period following the date on which the Participant gives such notice to the Company (or such shorter period ending on the date that any payment of taxes with respect to such claim is due). If the Company notifies the Participant in writing prior to the expiration of such period that it desires to contest such claim, the Participant shall:

        (i)     give the Company any information reasonably requested by the Company relating to such claim,

        (ii)     take such action in connection with contesting such claim as the Company shall reasonably request in writing from time to time, including, without limitation, accepting legal representation with respect to such claim by an attorney selected by the Company,

        (iii)     cooperate with the Company in good faith in order effectively to contest such claim, and

        (iv)     permit the Company to participate in any proceedings related to such claim;

provided, however, that the Company shall bear and pay directly all costs and expenses (including additional interest and penalties) incurred in connection with such contest and shall indemnify and hold the Participant harmless, on an after-tax basis, for any Excise Tax or income tax (including interest and penalties with respect thereto) imposed as a result of such representation and payment of costs and expenses. Without limitation of the foregoing provisions of this Section 4.5(c), the Company shall control all proceedings taken in connection with such contest and, at its sole option, may pursue or forgo any and all administrative appeals, proceedings, hearings and conferences with the taxing authority in respect of such claim and may, at its sole option, either direct the Participant to pay the tax claimed and sue for a refund or contest the claim in any permissible manner, and the Participant agrees to prosecute such contest to a determination before any administrative tribunal, in a court of initial jurisdiction and in one or more appellate courts, as the Company shall determine; provided, however, that if the Company directs the Participant to pay such claim and sue for a refund, the Company shall advance the amount of such payment to the Participant, on an interest-free basis and shall indemnify and hold the Participant harmless, on an after-tax basis, from any Excise Tax or income tax (including interest or penalties with respect thereto) imposed with respect to such advance or with respect to any imputed income with respect to such advance; and further provided that any extension of the statue of limitations relating to payment of taxes for the taxable year of the Participant with respect to which such contested amount is claimed to be due

is limited solely to such contested amount.  Furthermore, the Company's control of the contest shall be limited to issues with respect to which a Gross-Up Payment would be payable hereunder and the Participant shall be entitled to settle or contest, as the case may be, any other issue raised by the Internal Revenue Service or any other taxing authority.

(d)     If, after the receipt by the Participant of an amount advanced by the Company pursuant to Section 4.5(c), the Participant becomes entitled to receive any refund with respect to such claim, the Participant shall (subject to the Company's complying with the requirements of Section 4.5(c)) promptly pay to the Company the amount of such refund (together with any interest paid or credited thereon after taxes applicable thereto).  If, after the receipt by the Participant of an amount advanced by the Company pursuant to Section 4.5(c), a determination is made that the Participant shall not be entitled to any refund with respect to such claim and the Company does not notify the Participant in writing of its intent to contest such denial of refund prior to the expiration of 30 days after such determination, then such advance shall be forgiven and shall not be required to be repaid and the amount of such advance shall offset, to the full extent thereof, the amount of Gross-Up Payment required to be paid.

4.6     Payment Obligations Absolute.

Upon a Change of Control, the obligations of the Company and the Employer to pay the Separation Benefits described in Section 4.3 shall be absolute and unconditional and shall not be affected by any circumstances, including, without limitation, any set-off, counterclaim, recoupment, defense or other right which the Employer may have against any Participant.  In no event shall a Participant be obligated to seek other employment or take any other action by way of mitigation of the amounts payable to a Participant under any of the provisions of this Plan, nor shall the amount of any payment hereunder be reduced by any compensation earned by a Participant as a result of employment by another employer.

ARTICLE V
PARTICIPATING EMPLOYERS

For purposes of the Plan, the Company shall continue to be an Employer as of the Effective Date, and each Subsidiary of the Company shall be an Employer upon the effective date of its adoption of the Plan.  Upon such adoption, the Subsidiary shall become an Employer hereunder and the provisions of the Plan shall be fully applicable to the Employees of that Subsidiary who are eligible to be Participants.

ARTICLE VI
SUCCESSOR TO COMPANY

This Plan shall bind any successor of the Company, its assets or its businesses (whether direct or indirect, by purchase, merger, consolidation or otherwise), in the same manner and to the same extent that the Company would be obligated under this Plan if no succession had taken place.

In the case of any transaction in which a successor would not by the foregoing provision or by operation of law be bound by this Plan, the Company, as a condition precedent to such transaction, shall require such successor expressly and unconditionally to assume and agree

to perform the Company's obligations under this Plan, in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place. The term "Company," as used in this Plan, shall mean the Company as hereinbefore defined and any successor or assignee to the business or assets which by reason hereof becomes bound by this Plan.

In addition, any successor must treat employment service with any Employer (irrespective of whether the Employer was an affiliate of the Company or the Employee was a Participant at the time of such service) and the new employer as continuous service in Employment for all purposes of calculating Separation Benefits.

## ARTICLE VII
## AMENDMENT AND TERMINATION

7.1    _Amendment and Termination_.  The Plan may be terminated or amended in any respect by resolution adopted by a majority of the Board, unless a Change of Control has previously occurred.  However, in connection with or in anticipation of a Change of Control, this Plan may not be terminated or amended in any manner which would adversely affect the rights or potential rights of Participants.  If a Change of Control occurs, the Plan shall no longer be subject to amendment, change, substitution, deletion, revocation or termination in any respect which adversely affects the rights of Participants.

7.2    _Form of Amendment_.  The form of any amendment or termination of the Plan shall be a written instrument signed by a duly authorized officer or officers of the Company, certifying that the amendment or termination has been approved or ratified by the Board.  An amendment of the Plan in accordance with the terms hereof shall automatically effect a corresponding amendment to all Participants' rights hereunder.  A termination of the Plan shall in accordance with the terms hereof automatically effect a termination of all Participants' rights and benefits hereunder.

## ARTICLE VIII
## MISCELLANEOUS

8.1    _Employment Status_.  This Plan does not constitute a contract of employment or impose on the Participant or the Participant's Employer any obligation to retain the Participant as an Employee, to change the status of the Participant's Employment, or to change the Employer's policies regarding termination of Employment.  Nothing contained in the Plan will be construed as (a) an employment contract between an Employer and any Employee, (b) a right of any Employee to be continued in the employment of an Employer, or (c) a limitation of the right of an Employer to discharge any Employee, with or without Cause, at any time.  All Employees will be subject to discharge to the same extent as if the Plan had never been adopted.

8.2    _Validity and Severability_.  The invalidity or unenforceability of any provision of the Plan shall not affect the validity or enforceability of any other provision of the Plan, which shall remain in full force and effect, and any prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

8.3     Sources of Payment.  The benefits provided under the Plan will be paid from the general assets of the Employer in accordance with the terms and provisions of the Plan. Nothing herein will be construed to require the Employer to maintain any trust, fund, or otherwise segregate any amount for the benefit of any person.  Furthermore, no person with a claim for Separation Benefits hereunder will have any claim against, right to, security or other interest in, any fund, account, or assets of any Employer.

8.4     Non-Alienation/Payment to Beneficiary.  In the event of the Employee's death prior to receipt of all of his or her Separation Benefits, any remaining benefits should not be subject in any manner to alienation, sale, transfer, assignment, pledge, encumbrance, charge, garnishment, execution or levy of any kind, either voluntary or involuntary, prior to actually being received by the person entitled to the Benefits.  Any attempt to alienate, sell, assign, pledge, charge or otherwise transfer or encumber any right to benefits provided hereunder will be void and without effect.    In the event that a Participant dies prior to receiving entire payment of his Separation Benefits, his remaining benefits shall be paid to his surviving lawful spouse, if any, or if not, then to his estate. Taxes and any other applicable withholdings will be withheld from Separation Benefits as deemed necessary or appropriate by the Employer.

8.5     Applicability of Code Section 409A.  Notwithstanding any other provision contained herein, to the extent this Plan provides for nonqualified deferred compensation subject to Code Section 409A, it is intended to comply with Section 409A.  The Company shall interpret and administer the Plan in accordance therewith.  The Company may make amendments to the Plan or revise the timing of any payments to be made hereunder in accordance with Section 409A including, without limitation, delaying payments to Specified Employees as deemed appropriate for six months following termination of Employment.  In addition, any provision in this Plan document that is determined by the Company to violate the requirements of Section 409A shall be void and without effect, and any provision that is required to appear in this Plan document to comply with Section 409A that is not expressly set forth shall be deemed to be set forth herein and the Plan shall be administered, in all respects, as if all such provisions were expressly set forth herein.  If any provision herein results in the imposition of an excise tax on any Employee under Section 409A, such provision will be reformed to avoid any such imposition in such manner as the Plan Administrator determines, with the advice of legal counsel, is appropriate to comply with Section 409A.

8.6     Tax Withholding; No Guarantee of Tax Consequences.  The Employer shall have the power to deduct or withhold, or require the Participant to remit to the Employer, any amount deemed sufficient to satisfy federal, state, and local taxes, domestic or foreign, as deemed necessary or appropriate.  No representation, commitment or guarantee is made that any amounts paid under the Plan will be excludable from the recipient's gross income for any tax purpose, or that any other tax treatment will apply or be available to such person.

8.7     Severability. Any provision in the Plan that is prohibited or unenforceable in any jurisdiction by reason of applicable law shall, as to such jurisdiction, be ineffective only to the extent of such prohibition or unenforceability without invalidating or affecting the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

8.8     Construction and Interpretation.  Whenever the context of the Plan so requires, any gender will include the other gender, and words used in the singular or plural will include the other.  The words "herein," "hereof," "hereunder," and other similar compounds of the word "here" will refer to the entire Plan, not to any particular article, section or provision of the Plan.  Headings of articles and sections as used herein are inserted solely for convenience and reference and do not create any inference as to the construction of the Plan.

8.9     Governing Law.  The terms, conditions and provisions of the Plan will be construed, governed and enforced under the laws of the State of Texas, without regard to its conflicts of law provisions, except as may be preempted by ERISA or other controlling federal law.  This Plan is an "employee welfare benefit plan", as defined in Section 3(1) of ERISA, established solely for the purpose of providing severance benefits to Eligible Employees, shall be construed accordingly.

ARTICLE IX
ADMINISTRATION AND CLAIMS PROCEDURE

9.1     Administration.  For the purposes of the Plan and ERISA, the "plan administrator" and named fiduciary of the Plan is the Plan Administrator.  The Plan Administrator shall establish such rules and procedures as may be necessary to enable it to discharge its duties hereunder.  The Plan Administrator shall have all powers necessary or proper to administer the Plan and to discharge its duties hereunder.  The Plan Administrator may allocate to others certain aspects of the management, operation and responsibilities of the Plan, including the employment of advisors and the delegation of any ministerial duties or functions, to qualified individuals or entities.  In writing, or by custom, practice or in operation, the Plan Administrator may provide for the allocation or delegation of any of its duties hereunder among officers or employees of an Employer including, without limitation, those who may qualify as Employees hereunder.  The Plan Administrator will also be authorized to engage or employ agents, attorneys, accountants, consultants, and other advisors which it deems to be necessary or appropriate to assist in discharging its duties hereunder.  Service of legal process may be made upon the Plan Administrator at the following address:

General Counsel
Anadarko Petroleum Corporation
P.O. Box 1330
1201 Lake Robbins Drive
The Woodlands, Texas  77380-1330

9.2     Notice of Claim.  Normally, a Participant does not need to present a formal claim for Benefits payable under the Plan.  However, in the event that an Employee or other person (referred to as the "Claimant") has a claim for any Separation Benefits that he or she believes were not provided in accordance with the terms and provisions of the Plan or otherwise, the Claimant must file a claim with the Plan Administrator within six (6) months from the date of the affected Employee's termination of employment with an Employer.  Any Claimant who fails to file a claim within such 6-month period will completely and irrevocably forfeit and lose any and all rights that he may have, or had, to receive any benefits under the Plan at any time.  Claims for Plan benefits and reviews of appeals of Plan benefit claims which have

been denied or modified are to be processed in accordance with the claims procedures established by the Plan Administrator, which procedures are hereby incorporated by reference as part of the Plan.

Prior to authorizing and awarding any Separation Benefits hereunder, the Plan Administrator may require the Claimant to provide additional information, and to complete any required or requested releases, forms or other documents hereunder, including filing of all claims and requests for payment from any other source.

9.3     Claims Review Procedure.  If any claim for Separation Benefits filed by a Claimant is wholly or partially denied, the Plan Administrator will notify the Claimant of its decision in writing.  Such notification will be written in a manner calculated to be understood by the average Claimant, and will contain (a) specific reasons for the denial, (b) specific reference to pertinent Plan provisions, (c) a description of any additional material or information necessary for the Claimant to perfect such claim and an explanation of why such material or information is necessary, and (d) information as to the steps to be taken if the Claimant wishes to submit a request for review.  Such notification will be given within 60 days after the claim is received by the Plan Administrator (or within 120 days if special circumstances require an extension of time for processing the claim, and if written notice of such extension and circumstances is given to the Claimant within the initial 60-day period).  If such notification is not given within such period, the claim will be considered denied as of the last day of such period, and the Claimant may then request a review of the claim.

Within 60 days after the date on which a Claimant receives a written notice of a denied claim (or, if applicable, within 60 days after the date on which such denial is considered to have occurred) the Claimant (or his duly authorized representative) may (a) file a written request (including pertinent documents) with the Plan Administrator for a review of the denied claim, and (b) submit written issues and comments to the Plan Administrator.  The Plan Administrator will review the claim and notify the Claimant of its decision in writing.  Such notification will be written in a manner calculated to be understood by the Claimant and will contain specific reasons for the decision, as well as specific references to pertinent Plan provisions.  The decision on review will be made within 60 days after the request for review is received by the Plan Administrator, or within 120 days if special circumstances require an extension of time for processing the request, such as a decision by the Plan Administrator to hold a hearing, provided that written notice of such extension and circumstances is given to the Claimant within the initial 60-day period.  If the decision on review is not made within such period, the claim will be considered denied as of the last day of such period.  All final determinations and other decisions concerning claims made pursuant to these claims review procedures will not be subject to further review, but will be final, conclusive and binding on the Claimant and all other persons and entities.  To the extent the Plan Administrator has been granted discretionary authority under the Plan, the Plan Administrator's prior exercise of such authority will not obligate it to exercise its authority in a like fashion thereafter.

9.4     Exhaustion of Administrative Remedies.  Completion of the claims procedures described in Sections 9.2 and 9.3 is a condition precedent to the commencement of any legal or equitable action in connection with a claim for any benefits under the Plan by a Claimant or by any other person or entity claiming rights individually or through a Claimant;

provided, however, the Plan Administrator may, in its discretion, waive compliance with such claims procedures as a condition precedent to filing of any such action. Any legal or equitable action in connection with, or arising out of, a claim for benefits under the Plan, including any claim denial, will be reviewed on the basis of the information supplied to the Plan Administrator, will not be subject to a deferential review, and must be brought no later than one year following a final decision by the Plan Administrator on the claim pursuant to Section 8.2.

IN WITNESS WHEREOF, the Plan Sponsor has caused this Plan, as amended and restated, to be duly executed in multiple counterparts by its duly authorized officer, to be effective as of September 1, 2007.

ATTEST:                                          ANADARKO PETROLEUM CORPORATION

By: _Lynn Moffett_                               By: _PRESTON JOHNSON JR_

Name: _Lynn Moffett_                             Name: _Prst John_

Title: _HR Advisor_                              Title: _Vice President_

Date: _April 15, 2008_                           Date: _April 15, 2008_

Occidental [Ping Lu] 000320

## FIRST AMENDMENT TO ANADARKO PETROLEUM CORPORATION CHANGE OF CONTROL SEVERANCE PLAN

**THIS FIRST AMENDMENT ("AMENDMENT")** is made effective as of January 1, 2008 (the "Effective Date"), by Anadarko Petroleum Corporation, a Delaware corporation (the "Company"), and amends the Anadarko Petroleum Corporation Change of Control Severance Plan originally adopted by the Company on January 29, 1998, and most recently amended and restated effective as of September 1, 2007 (the "Plan") in order to comply with the requirements of Section 409A of the Internal Revenue Code of 1986, as amended (the "Code").

*The Plan is hereby amended as follows:*

*Section 2(bb) is amended to add the following new sentence to the end thereof:*

The Company may apply an alternative method to identify Specified Employees in accordance with Code Section 409A and authoritative guidance thereunder, provided that the alternative method (i) is reasonably designed to include all Specified Employees, (ii) is an objectively determinable standard and (iii) results in either all Employees or no more than 200 Employees being identified as Specified Employees as of any date.

*The first sentence of Section 4.3(e) is deleted, in its entirety, and replaced with the following new sentence:*

A Participant who is entitled to Separation Benefits will also be paid a cash amount, within 75 days following the Participant's Date of Termination, determined by multiplying the Participant's Target Bonus, as of the Date of Termination, by a fraction, the numerator of which is the number of months in the year of termination of Employment up to and including the Date of Termination (with any partial month counting as a full month), and the denominator of which is twelve (12).

*Section 4.3(f) is deleted, in its entirety, and replaced with the following new Section 4.3(f):*

(f)     Personal Time Off (PTO). A Participant entitled to Separation Benefits will also be paid a cash payment, made within 75 days following the Participant's Date of Termination, in lieu of (i) all accrued and unused PTO as of the Date of Termination for the year of termination of Employment, and (ii) a pro-rata portion of the next year's PTO, as determined by multiplying the amount of PTO accrued for the year of termination by a fraction, the numerator of which is the number of days in the year of termination up to and including the Date of Termination, and the denominator of which is 365.

*Section 4.4 is amended to add the following new sentence to the end of the second paragraph thereof:*

If the Participant is eligible to receive benefits from any Other Source, the form and timing of payments under such Other Source will be determined as set forth by such Other Source,

Occidental [Ping Lu] 000321

and the form and timing of any remaining monetary and non-monetary benefits payable under this Plan will be as described herein.

*Section 4.5(b) is amended to add the following new sentence to the end thereof:*

Notwithstanding the above provisions of this Section 4.5(b), any Gross-Up Payment or Underpayment shall be paid to the Participant by the Company not later than by the end of the calendar year following the calendar year in which the Excise Tax is remitted to the Internal Revenue Service.

*The following new Section 4.7 is added to the Plan:*

4.7     Six Month Delay for Specified Employee.

Notwithstanding any other provision to the contrary, if Separation Benefits under this Article IV are payable to a Specified Employee, no payment shall be made before the date which is six (6) months after the date of the Specified Employee's Date of Termination, or such earlier date upon which such amount can be paid or provided under Code Section 409A without being subject to additional taxes thereunder.

*Section 8.5 is deleted, in its entirety, and replaced with the following new Section 8.5:*

8.5     Applicability of Code Section 409A.  Notwithstanding any other provision contained herein, to the extent that this Plan provides for nonqualified deferred compensation subject to Code Section 409A, it is intended to comply with Section 409A. The Company shall interpret and administer the Plan in accordance with the intention of complying with Section 409A without being subject to additional taxes thereunder.

*Section 9.3 is deleted, in its entirety, and replaced with the following new Section 9.3:*

9.3     Claims Review Procedure.

(a)     Denial of Claim.  In the case of the denial of a claim respecting benefits paid or payable with respect to a Participant, a written notice will be furnished to the Claimant within 90 days of the date on which the claim is received by the Committee. If special circumstances (such as for a hearing) require a longer period, the Claimant will be notified in writing, prior to the expiration of the 90-day period, of the reasons for an extension of time; provided, however, that no extension will be permitted beyond 90 days after expiration of the initial 90-day period.

(b)     Reasons for Denial.  A denial or partial denial of a claim will be dated and signed by the Committee and will clearly set forth:

(i)     the specific reason or reasons for the denial;

Occidental [Ping Lu] 000322

  (ii)  specific reference to pertinent Plan provisions on which the denial is based;

  (iii)  a description of any additional material or information necessary for the Claimant to perfect the claim and an explanation of why such material or information is necessary; and

  (iv)  an explanation of the procedure for review of the denied or partially denied claim set forth below, including the Claimant's right to bring a civil action under ERISA Section 502(a) following an adverse benefit determination on review.

  (c)  <u>Review of Denial</u>.  Upon denial of a claim, in whole or in part, a Claimant or his duly authorized representative will have the right to submit a written request to the Committee for a full and fair review of the denied claim by filing a written notice of appeal with the Committee within 60 days of the receipt by the Claimant of written notice of denial of the claim.  A Claimant or the Claimant's authorized representative will have, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the Claimant's claim for benefits and may submit issues and comments in writing.  The review will take into account all comments, documents, records, and other information submitted by the Claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

  If the Claimant fails to file a request for review within 60 days of the denial notification, the claim will be deemed abandoned and the Claimant precluded from reasserting it.  If the Claimant does file a request for review, his request must include a description of the issues and evidence he deems relevant.  Failure to raise issues or present evidence on review will preclude those issues or evidence from being presented in any subsequent proceeding or judicial review of the claim.

  (d)  <u>Decision Upon Review</u>.  The Committee will provide a prompt written decision on review.  If the claim is denied on review, the decision shall set forth:

  (i)  the specific reason or reasons for the adverse determination;

  (ii)  specific reference to pertinent Plan provisions on which the adverse determination is based;

  (iii)  a statement that the Claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the Claimant's claim for benefits; and

  (iv)  a statement describing any voluntary appeal procedures offered by the Plan and the Claimant's right to obtain the information about such procedures, as well as a statement of the Claimant's right to bring an action under ERISA Section 502(a).

A decision will be rendered no more than 60 days after the Committee's receipt of the request for review, except that such period may be extended for an additional 60 days if the Committee determines that special circumstances (such as for a hearing) require such extension. If an extension of time is required, written notice of the extension will be furnished to the Claimant before the end of the initial 60-day period.

To the extent of its responsibility to review the denial of benefit claims, the Committee will have full authority to interpret and apply in its discretion the provisions of the Plan. The decision of the Committee will be final and binding upon any and all Claimants, including, but not limited to, Participants, and any other individuals making a claim through them.

(e)     Other Procedures. Notwithstanding the foregoing, the Committee in its discretion, may adopt different procedures for different claims without being bound by past actions. Any procedures adopted, however, shall be designed to afford a Claimant a full and fair review of his claim and shall comply with applicable regulations under ERISA.

(f)     Finality of Determinations; Exhaustion of Remedies. To the extent permitted by law, decisions reached under the claims procedures set forth in this Section shall be final and binding on all parties. No legal action for benefits under the Plan shall be brought unless and until the Claimant has exhausted his remedies under this Section. In any such legal action, the Claimant may only present evidence and theories which the Claimant presented during the claims procedure. Any claims which the Claimant does not in good faith pursue through the review stage of the procedure shall be treated as having been irrevocably waived. Judicial review of a Claimant's denied claim shall be limited to a determination of whether the denial was an abuse of discretion based on the evidence and theories the Claimant presented during the claims procedure. Any suit or legal action initiated by a Claimant under the Plan must be brought by the Claimant no later than one year following a final decision on the claim for benefits by the Committee. The one-year limitation on suits for benefits will apply in any forum where a Claimant initiates such suit or legal action.

(g)     Effect of Committee Action. The Plan shall be interpreted by the Committee in accordance with the terms of the Plan and their intended meanings. However, the Committee shall have the discretion to make any findings of fact needed in the administration of the Plan, and shall have the discretion to interpret or construe ambiguous, unclear or implied (but omitted) terms in any fashion that the Committee deems to be appropriate in its sole judgment. The validity of any such finding of fact, interpretation, construction or decision shall not be given *de novo* review if challenged in court, by arbitration or in any other forum, and shall be upheld unless clearly arbitrary or capricious. To the extent the Committee has been granted discretionary authority under the Plan, the Committee's prior exercise of such authority shall not obligate it to exercise its authority in a like fashion thereafter. If, due to errors in drafting, any Plan provision does not accurately reflect its intended meaning, as demonstrated by consistent interpretations or other evidence of intent, or as determined by the Committee in it sole and exclusive judgment, the provision shall be considered ambiguous and shall be

Occidental [Ping Lu] 000324

interpreted by the Committee in a fashion consistent with its intent, as determined by the Committee in its sole discretion.  The Committee, without the need for approval by the Board, may amend the Plan retroactively to cure any such ambiguity.  This <u>Section 9.3</u> may not be invoked by any person to require the Plan to be interpreted in a manner which is inconsistent with its interpretation by the Committee.  All actions taken and all determinations made in good faith by the Committee shall be final and binding upon all persons claiming any interest in or under the Plan.

*Section 9.4 is deleted in its entirety from the Plan.*

*As expressly amended hereby, the Plan is ratified and confirmed in all respects and shall remain in full force and effect.*

*[Signature page follows.]*

Occidental [Ping Lu] 000325

IN WITNESS WHEREOF, the undersigned, being a duly authorized officer of the Company, has approved, ratified and executed this Amendment on this 15ᵗʰ day of April, 2008.

ANADARKO PETROLEUM CORPORATION

By: _____

Name: PRESTON JOHNSON JR.

Title: VICE PRESIDENT



Occidental [Ping Lu] 000326

## SECOND AMENDMENT TO ANADARKO PETROLEUM CORPORATION
## CHANGE OF CONTROL SEVERANCE PLAN

**THIS SECOND AMENDMENT ("AMENDMENT")** is made effective as of January 1, 2009 (the "Effective Date"), by Anadarko Petroleum Corporation, a Delaware corporation (the "Company"), and amends the Anadarko Petroleum Corporation Change of Control Severance Plan originally adopted by the Company on January 29, 1998, and most recently amended and restated effective as of September 1, 2007 (the "Plan") in order to update certain administration and amendment provisions of the Plan.

*Section 2(j) is amended by deleting such section in its entirety and replacing it with the following new Section 2(j) in lieu thereof:*

(j)    Committee.    The Anadarko Petroleum Corporation Health and Welfare Benefits Administrative Committee.    The Committee shall consist of at least five members, as appointed from time to time by the Company by action of the Senior Vice President Responsible for Human Resources of the Company (the "SVP-HR").    The members of the Committee shall serve at the discretion of the SVP-HR without additional compensation, but may be reimbursed for proper expenditures incurred during the course of performance of duties hereunder in accordance with applicable law.

*Section 2(w) is amended by deleting such section in its entirety and replacing it with the following new Section 2(w) in lieu thereof:*

(w)    Plan Administrator.    The Committee, which is appointed by the SVP-HR to act as Plan Administrator of the Plan.    References herein to the Committee or Plan Administrator shall include, when appropriate, any Employee or other person or entity who has been delegated the appropriate authority by the Committee as Plan Administrator.

*Section 7.1 is amended by deleting such section in its entirety and replacing it with the following new Section 7.1 in lieu thereof:*

7.1    Amendment and Termination.    The Plan may be terminated or amended in any respect by resolution adopted by a majority of the Board, unless a Change of Control has previously occurred.    Notwithstanding the previous sentence, unless a Change of Control has previously occurred, (a) the Chief Financial Officer of the Company (the "CFO") and the Chief Executive Officer of the Company acting jointly, or (b) the CFO and the General Counsel of the Company acting jointly, will each have the power to approve, adopt, and execute any amendment to the Plan that (i) is required to comply with changes in applicable law or (ii) does not increase the cost of the Plan by more than five percent (5%) per year as determined in good faith and with the certification of an actuary if necessary.

However, in connection with or in anticipation of a Change of Control, this Plan may not be terminated or amended in any manner which would adversely affect the rights or potential rights of Participants.    If a Change of Control occurs, the Plan shall no longer

H-800242_3.DOC
H-809330v1.pdf

Occidental [Ping Lu] 000327

be subject to amendment, change, substitution, deletion, revocation or termination in any respect which adversely affects the rights of Participants.

*Section 9.1 is amended by deleting the address at which service of legal process may be made and replacing it with the following new address in lieu thereof:*

Anadarko Petroleum Corporation Health and Welfare Benefits Administrative Committee
Anadarko Petroleum Corporation Change of Control Severance Plan
Anadarko Petroleum Corporation
c/o CT Corporation System
350 N. St. Paul Street
Dallas, TX 75201

*As expressly amended hereby, the Plan is ratified and confirmed in all respects and shall remain in full force and effect.*

**IN WITNESS WHEREOF,** the Company has caused this Second Amendment to be adopted and executed by its duly authorized officer on this 26TH day of October , 2009.

**ANADARKO PETROLEUM CORPORATION**

By: _Julie Struble_

Name: _JULIE STRUBLE_

Title: _VP, HUMAN RESOURCES_

Occidental [Ping Lu] 000328

## THIRD AMENDMENT TO ANADARKO PETROLEUM CORPORATION
## CHANGE OF CONTROL SEVERANCE PLAN

**THIS THIRD AMENDMENT ("AMENDMENT")** is made effective as of December 10, 2010 (the "Effective Date") by Anadarko Petroleum Corporation, a Delaware corporation (the "Company"), and amends the Anadarko Petroleum Corporation Change of Control Severance Plan originally adopted by the Company on January 29, 1998, as amended and restated effective as of September 1, 2007, and further amended effective as of January 1, 2008, and most recently amended effective as of January 1, 2009 (the "Plan") in order to comply with the requirements of Section 409A of the Internal Revenue Code.

*The Plan is hereby amended as follows:*

*The first sentence of Section 4.3(a) is deleted, in its entirety, and replaced with the following new sentence:*

If a Participant's Employment is terminated in circumstances entitling him or her to Separation Benefits as provided in <u>Section 4.2(a)</u>, and the Participant executes a full release and confidentiality agreement, as prepared and provided by the Company and containing such terms and conditions as the Company deems appropriate in its discretion, and if such agreement is revocable, the Participant does not revoke the agreement, the Participant's Employer or the Company shall pay such Participant, within 70 days following the Participant's Date of Termination (provided that such payment shall be made in the second taxable year if such 70-day period begins in one taxable year and ends in a subsequent taxable year), a lump sum cash payment equal to the sum of the following amounts, net of applicable withholdings:

*The first sentence of Section 4.3(e) is deleted, in its entirety, and replaced with the following new sentence:*

A Participant who is entitled to Separation Benefits will also be paid a cash amount, within 70 days following the Participant's Date of Termination (provided that such payment shall be made in the second taxable year if such 70-day period begins in one taxable year and ends in a subsequent taxable year), determined by multiplying the Participant's Target Bonus, as of the Date of Termination, by a fraction, the numerator of which is the number of months in the year of termination of Employment up to and including the Date of Termination (with any partial month counting as a full month), and the denominator of which is twelve (12).

*Section 4.3(f) is deleted, in its entirety, and replaced with the following new Section 4.3(f):*

(f)    <u>Personal Time Off (PTO)</u>.    A Participant entitled to Separation Benefits will also be paid a cash payment, within 70 days following the Participant's Date of Termination (provided that such payment shall be made in the second taxable year if such 70-day period begins in one taxable year and ends in a subsequent taxable year), in lieu

Occidental [Ping Lu] 000329

of (i) all accrued and unused PTO as of the Date of Termination for the year of termination of Employment, and (ii) a pro-rata portion of the next year's PTO, as determined by multiplying the amount of PTO accrued for the year of termination by a fraction, the numerator of which is the number of days in the year of termination up to and including the Date of Termination, and the denominator of which is 365.

*Section 4.3(g) is deleted, in its entirety, and replaced with the following new Section 4.3(g):*

(g)     Failure to Execute Release. If a Participant does not execute (or revokes) the release and confidentiality agreement provided by the Company pursuant to Section 4.3(a), the only benefits under this Plan to which the Participant is entitled are those set forth in Section 4.3(b). For the avoidance of doubt, such a Participant will not be entitled to benefits provided for under Sections 4.3(a), (c), (d), (e) or (f). The release described in this Section 4.3(g) must be effective and irrevocable by the 60th day after the Date of Termination.

*Section 4.5(c) is amended to add the following new sentence to the end thereof:*

In no event shall a reimbursement of expenses incurred under this Section 4.5(c) be made after the end of the Participant's taxable year in which the taxes that are the subject of the claim by the Internal Revenue Service (or other taxing authority) are remitted to the taxing authority, or if no taxes are remitted, the end of the Participant's taxable year following the taxable year in which the claim is completed.

*Section 8.5 is amended to add the following new sentence to the end thereof:*

Without limiting the scope of the preceding provisions of this Section 8.5, it is specifically provided that any offset to the benefits provided hereunder for amounts owed to the Employer by the Participant for any reason (whether pursuant to clause (iii) of the last sentence of Section 4.3(a) or otherwise) shall be subject to the limitations of Treasury regulation section 1.409A-3(j)(4)(xiii).  Specifically, any amount payable hereunder to a Participant that constitutes nonqualified deferred compensation subject to Code Section 409A may be offset for a debt of the Participant to the Employer only where such debt is incurred in the ordinary course of the service relationship, the entire amount of reduction in any of the Employer's taxable years does not exceed $5,000, and the reduction is made at the same time and in the same amount as the debt otherwise would have been due and collected from the Participant.

*As expressly amended hereby, the Plan is ratified and confirmed in all respects and shall remain in full force and effect.*

*[Signature page follows.]*

Occidental [Ping Lu] 000330

IN WITNESS WHEREOF, the undersigned, being a duly authorized officer of the Company, has approved, ratified and executed this Amendment on this _20_ day of _December_, 20 _10_.

ANADARKO PETROLEUM CORPORATION

By: _Julia A. Struble_
Name: _JULIA A. STRUBLE_
Title: _VICE PRESIDENT, HUMAN RESOURCES_

US 668916v2

3

Occidental [Ping Lu] 000331

# Amended and Restated
# Anadarko Petroleum Corporation
# Change of Control Severance Plan

**(Amended and Restated Effective September 1, 2007)**

## Summary Plan Description

*(Issued January 1, 2011)*

Occidental [Ping Lu] 000332

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................... - 3 -

CHANGE OF CONTROL SEVERANCE PLAN SUMMARY ................................................ - 3 -

ELIGIBLE EMPLOYEES ....................................................................................................... - 3 -

SEPARATION BENEFITS ...................................................................................................... - 4 -

ADDITIONAL INFORMATION ABOUT THE PLAN ........................................................... - 7 -

FILING A CLAIM FOR BENEFITS ....................................................................................... - 7 -

ERISA RIGHTS AND ADDITIONAL PLAN INFORMATION ............................................. - 8 -

DEFINITIONS ...................................................................................................................... - 10 -

CLAIMS PROCEDURES ...................................................................................................... - 14 -

Occidental [Ping Lu] 000333

## INTRODUCTION

This Summary Plan Description ("SPD") has been prepared to provide you with information regarding the Amended and Restated Anadarko Petroleum Corporation Change of Control Severance Plan (the "Plan").  Please note that, if the first letter of a word is capitalized, then there may be a definition for that word later in the SPD.

## CHANGE OF CONTROL SEVERANCE PLAN SUMMARY

The Board of Directors of Anadarko Petroleum Corporation (the "Company") recognizes that, from time to time, a corporation may explore a potential sale, merger, or reorganization that could result in a change in the ownership or control of the corporation.  As a result, this Plan has been created and provides that, if a Change of Control occurs and your employment terminates for certain reasons, you may be eligible for Separation Benefits under the Plan.

## ELIGIBLE EMPLOYEES

### *Who Is Eligible?*

Except as otherwise provided below, any regular full-time or part-time Employee of the Company is eligible to receive Separation Benefits under the Plan; provided, that, he or she is employed by the Company on the date of a Change of Control.  Notwithstanding the previous sentence, the Plan Administrator may decide that a particular employee shall not be a Participant in the Plan so long as such decision is not made in anticipation of a Change of Control.

### *Which Employees Are Not Eligible?*

The following types of Employees are not eligible for Separation Benefits under the Plan:

- Employees who are parties to a Key Employee or Key Manager Change of Control Contract;

- Employees subject to a collective bargaining agreement; or

- Employees who are participants in another severance plan or program or parties to individual written agreements or contracts with the Company providing for severance payments or benefits unless such agreement specifically provides otherwise.

### *Under What Circumstances Will I Be Entitled To Separation Benefits?*

Provided you meet the eligibility criteria stated in the section above, you will be eligible for Separation Benefits if a Change of Control occurs and, within three years thereafter, your employment terminates under the following circumstances:

- the Company terminates your employment without Cause; or

- a Sale of Business occurs, you are not offered employment on substantially the same material terms and conditions (such as base salary, job responsibilities, benefits, and work location) as you had immediately prior with the Company, and you terminate your employment within 90 days of such Sale of Business.

**Occidental [Ping Lu] 000334**

You will also be entitled to Separation Benefits under the Plan if your employment terminates for Good Reason within one year after the occurrence of a Change of Control, provided that you initiate the termination of your employment within 90 days of the event triggering your right to terminate for Good Reason.

### What Types of Terminations Do Not Give Rise To Separation Benefits?

You will not be eligible for Separation Benefits under the Plan if your employment terminates for any of the following reasons, regardless of the occurrence of a Change of Control:

- You are terminated for Cause;

- You are terminated as a result of your inability to perform the essential functions of your position provided that you have been provided with any reasonable accommodation as may be required by law;

- You die;

- You retire (if you retire after your employment is terminated under circumstances giving you an entitlement to receive Separation Benefits, your retirement will not disqualify you from receiving Separation Benefits);

- You voluntarily terminate your employment for reasons other than a Good Reason; and/or

- A Sale of Business occurs; you are offered employment with the purchaser on substantially the same material terms and conditions (such as base salary, job responsibilities, benefits, and worksite location) as you had immediately prior with the Company; and the purchaser enters into a legally binding agreement or plan to continue any rights and protections that you have under the Plan for up to three years following the occurrence of a Change of Control.

## SEPARATION BENEFITS

If you are eligible for Separation Benefits under the Plan and you execute (and do not revoke) a release of claims agreement provided by the Company, you will receive the following benefits set forward in this section, pursuant to the time periods specified herein.

### Lump-Sum Cash Payment

The lump-sum cash payment will be calculated as follows:

(i)     One-half of your Monthly Salary for each Year of Service; plus

(ii)     Your entire Monthly Salary for each $10,000 of Annual Compensation

*If your Annual Compensation is not a multiple of $10,000, then for purposes of this clause (ii), your Annual Compensation will be deemed to equal the next highest whole multiple of $10,000.  For example, if your Annual Compensation is $125,000, the calculation of your Monthly Salary for this purpose will be based on Annual Compensation of $130,000.*

This lump-sum cash payment will be reduced by any amounts you owe to the Company, subject to the restrictions of the subsection below entitled "***Timing of Payment and Section 409A***."

---

Occidental [Ping Lu] 000335

Notwithstanding (i) and (ii) above, if you are entitled to Separation Benefits, the minimum lump-sum cash payment you will receive is three times your Monthly Salary (the "Minimum Separation Benefit"), and the maximum lump-sum cash payment you will receive is 24 times your Monthly Salary.

If you are eligible to receive this lump-sum cash payment, this benefit will be paid to you within 70 days following your date of termination.  If the 70-day period begins in one taxable year and ends in a subsequent taxable year, the benefit shall be payable in the second taxable year.

### *Pro-Rata Target Bonus*

You will receive a portion of your Target Bonus, pro-rated for the number of months which have passed in the year of termination.  For purposes of this calculation, each partial month will count as a full month.  The pro-rata Target Bonus will be reduced by any actual payments covering services performed during the year of termination which are made pursuant to certain of the Company's annual bonus plans, as designated by the Plan Administrator.

If you are eligible to receive this payment, this benefit will be paid to you within 70 days following your date of termination.  If the 70-day period begins in one taxable year and ends in a subsequent taxable year, the benefit shall be payable in the second taxable year.

### *Paid-Time-Off ("PTO") Benefits*

You will receive a cash payment for (i) all unused PTO as of the date of termination for the year of termination and (ii) the PTO that you would have been entitled to earn for the next calendar year following your termination of employment, as pro-rated for the time employed in the year of your termination. If the applicable PTO policy requires payment to you of unused PTO for the year in which you terminate employment, you will receive this payment outside of the Plan and will not receive the benefit set forward in this subsection under (i).

If you are eligible to receive this payment, this benefit will be paid to you within 70 days following your date of termination.  If the 70-day period begins in one taxable year and ends in a subsequent taxable year, the benefit shall be payable in the second taxable year.

### *Benefits Continuation*

You will be entitled to continue the following benefits for a period of up to six months following your date of termination:

- Company paid employee life insurance under the Company's group term life insurance policy; and

- Medical/dental insurance coverage you elected as an active employee (including coverage for family members).

Your contributions for continued coverage will be the same as those you had as an active employee, if any, and will be deducted from your severance check.

If you begin working for another employer during the period of continued coverage and are eligible for medical and/or dental coverage under that employer's plan, the medical and dental benefits described above will be secondary to those provided under your new employer's plan.

If benefit programs change during the period you receive benefits continuation, you will be entitled to benefits under the Company's then-current plans.  The Company reserves the right to amend or terminate its plans at any time without notice.

**Occidental [Ping Lu] 000336**

The continued coverage described above is offered in addition to any coverage offered under COBRA. Your COBRA continuation period will begin as soon as the continued coverage described above is exhausted.

***Failure to Sign a Release or Revocation of a Release***

If you do not execute a valid release (on the form provided by the Company) or if you revoke your release, you will receive the Minimum Separation Benefit only. For the avoidance of doubt, if you do not execute a release, you will not be entitled to any Separation Benefits (including those listed above) except for the Minimum Separation Benefit.

A release must be effective and irrevocable within 60 days following your date of termination.

If you are eligible to receive the Minimum Separation Benefit only, this benefit will be paid to you within 70 days following your date of termination. If the 70-day period begins in one taxable year and ends in a subsequent taxable year, the benefit shall be payable in the second taxable year.

***Other Benefits Payable***

The Separation Benefits are in addition to all other deferred compensation, rights, options, or other benefits which you may be entitled to receive upon or following your termination of employment. However, the Plan does not provide duplicate benefits, and thus any Separation Benefits will be reduced by any severance pay or other similar benefits paid by the Company under applicable law or any other plan or program of the Company not described in the immediately prior sentence. For instance, if you are eligible to participate in this Plan and any other severance plan (or are a party to any contract providing for severance benefits), the benefits due under this Plan will be reduced such that you will receive, when considering all sources, all Separation Benefits due under this Plan but nothing more. The form and timing of the Separation Benefits payable under the Plan will be as described in the Plan, and the form and timing of all other benefits payable under any other plan or program of the Company will be as described in such other plan or program.

***WARN Act***

In the event that you are due notice pay as required by the federal Worker Adjustment and Retraining Notification Act ("WARN Act") or any similar state law, any Separation Payments paid under this Plan will be automatically reduced by the amount of WARN Act notice pay provided. The result will be that you will receive a payment composed of both WARN Act notice pay and reduced Separation Benefits. This composite payment will be equal to the amount of all Separation Benefits due under the Plan but nothing more.

***Tax Information***

Cash payments made pursuant to the Plan are subject to all applicable federal, state, and local tax withholding, including FICA.

***Timing of Payment and Section 409A***

Section 409A is a provision of the Internal Revenue Code (the "Code") governing deferred compensation. The Company may revise the timing of any Separation Benefits that are deemed nonqualified deferred compensation under Section 409A and may make other changes to the Plan to conform with Section 409A.

**Occidental [Ping Lu] 000337**

If the Company determines that you are a "specified employee" (as defined in Section 409A) when you separate from service, no Separation Benefits will be paid until 6 months have passed since your separation from service, unless they could be paid earlier in accordance with Section 409A without incurring additional taxes under Section 409A.

Any offset to the benefits due to you under the Plan for amounts you owe to the Company are subject to the restrictions imposed by Section 409A including but not limited to Treasury Regulation § 1.409A-3(j)(4)(xiii).

## ADDITIONAL INFORMATION ABOUT THE PLAN

### Gross-Up Payment

If it is determined that a payment to you (whether or not paid or payable under the Plan) would be subject to the excise tax under Section 4999 of the Code, or interest and penalties with respect to such excise tax, then you shall be entitled to an additional "gross-up payment" to cover the excise tax and any interest or penalties.  You must notify the Company in writing of any claim by the Internal Revenue Service that, if successful, would require the Company to make a gross-up payment.  Such notification must be given as soon as practicable but no later than ten business days after you are informed of the claim and must apprise the Company of the nature of the claim and the date by which such claim should be paid.  You may not pay any such claim prior to the expiration of 30 days following the date on which you provide notice to the Company (or such shorter period ending on the date that any payment is due).  If the Company notifies you that it desires to contest the claim, you must cooperate fully with the Company.  Any "gross-up payment" will be paid to you by the end of the year following the year in which the excise tax was paid to the Internal Revenue Service.

In no event shall a reimbursement of expenses incurred under this section be made after the end of your taxable year in which the taxes that are the subject of the claim by the Internal Revenue Service (or other taxing authority) are remitted to the applicable taxing authority, or if no taxes are remitted, the end of your taxable year following the taxable year in which the claim is completed.

### Mitigation

Except as set forth above regarding medical and dental benefits or duplicate benefits, Separation Benefits will not be reduced or mitigated if you seek or accept other employment, unemployment compensation, or other forms of income from a third party.

## FILING A CLAIM FOR BENEFITS

If you become eligible for Separation Benefits, normally you will not need to take any action because Separation Benefits will automatically be paid to you pursuant to the terms of the Plan. If you believe that you are eligible to receive Separation Benefits and you have not automatically received them, you may file a claim for Separation Benefits with the Plan Administrator.

Occidental [Ping Lu] 000338

## ERISA RIGHTS AND ADDITIONAL PLAN INFORMATION

The Plan is regulated by the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

### ERISA Rights

As a participant in the Plan you are entitled to certain rights and protections under ERISA. ERISA provides that all participants shall be entitled to:

### Receive Information About Your Plan and Benefits

- Examine without charge, at the Plan Administrator's office, all Plan documents, including insurance contracts, and a copy of the latest annual report (Form 5500 Series) filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Employee Benefits Security Administration.

- Obtain, upon written request to the Plan Administrator, copies of documents governing the operation of the Plan, including insurance contracts, and copies of the latest annual report (Form 5500 Series) and updated summary plan description.  The Plan Administrator may make a reasonable charge for the copies.

- Receive a summary of the Plan's annual financial report. The Plan Administrator is required by law to furnish each participant with a copy of this summary annual report.

### Prudent Actions by Plan Fiduciaries

In addition to creating rights for participants, ERISA imposes obligations upon the people who are responsible for the operation of the Plan. The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other participants and beneficiaries. No one, including your employer or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining welfare benefits or exercising your rights under ERISA.

### Enforce Your Rights

If your claim for a welfare benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights.  For instance, if you request copies of Plan documents or the latest annual report from the Plan and do not receive them within 30 days, you may file suit in a Federal court.  In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the administrator.  If you have a claim for benefits which is denied or ignored, in whole or in part, and you disagree with that denial, you must file an appeal of that denial in accordance with the Claims Procedures described in this summary.  If your appeal is denied in accordance with the Claims Procedures herein, and you have exhausted the administrative remedies provided to you under the Plan, you may file suit in a state or Federal court.  If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court. The court will decide who should pay court costs and legal fees.  If you are successful, the

**Occidental [Ping Lu] 000339**

court may order the person you have sued to pay these costs and fees.  If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

*Assistance with Your Questions*

If you have any questions about the Plan, you should contact the Plan Administrator.   If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the Plan Administrator, you should contact the nearest office of the Employee Benefits Security Administration, U. S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

*Additional Plan Information*

| | |
|---|---|
| **Name of Plan** | Anadarko Petroleum Corporation Change of Control Severance Plan |
| **Type of Plan** | The Plan is a self-funded "employee welfare benefit plan" subject to ERISA that provides severance pay benefits.  No trust is maintained in connection with the Plan and the Plan is not considered to be "funded" for ERISA purposes. |
| **Employer Identification Number** | 76-0146568 |
| **Plan Number** | 506 |
| **Plan Year** | January 1 through December 31 |
| **Plan Sponsor** | Anadarko Petroleum Corporation<br>c/o Benefits Department – Human Resources<br>1201 Lake Robbins Drive<br>The Woodlands, TX 77380<br>(832) 636-1000 |
| **Plan Administrator** | Anadarko Petroleum Corporation Health and Welfare Benefits Administrative Committee<br>1201 Lake Robbins Drive<br>The Woodlands, TX 77380<br>(832) 636-1000 |
| **Participating Employer** | Anadarko Petroleum Corporation |
| **Type of Administration** | The Plan is administered by the Plan Administrator with benefits provided in accordance with the terms and conditions of the Plan. |

**Occidental [Ping Lu] 000340**

| Agent for Service of Legal Process | Anadarko Petroleum Corporation Health and Welfare Benefits Administrative Committee |
| --- | --- |
| | Anadarko Petroleum Corporation Change of Control Severance Plan |
| | Anadarko Petroleum Corporation |
| | c/o CT Corporation System |
| | 350 N. St. Paul Street |
| | Dallas, TX 75201 |
| | Process may also be served on the Plan Administrator at the address above. |
| Sources of Contributions | The Company provides all contributions to the Plan.  No Employee contributions are required. |

### Plan Documents

This document provides a summary of the Plan.  The statements contained in this summary are subject to the provisions of the Plan document which legally governs the operation of the Plan.  If there is any conflict between this summary and the Plan document, the Plan document will govern.  This document does not give you any rights that are not expressly provided under the Plan document.

### Amendment/Termination

Until a Change of Control occurs, the Company reserves the right to amend or terminate the Plan; provided, that, in connection with or in anticipation of a Change of Control, the Plan may not be terminated or amended in a way that would adversely affect Participants' rights.  Upon the occurrence of a Change of Control, the Plan will no longer be subject to termination or amendment in any way that would adversely affect the rights of Participants.

Any questions concerning benefits under the Plan should be directed to the Human Resources Department of the Company.

## DEFINITIONS

Throughout this Summary Plan Description, the following terms have the meanings set forth below:

**Annual Bonus** – The highest aggregate amount you received as an annual bonus under the Company's Annual Incentive Program (but excluding any other annual incentive bonus plan, program or policy of the Company unless specifically designated by the Plan Administrator as an included plan at the time of a Change of Control) for any of the three calendar bonus plan years prior to termination of employment, or if higher, the year of termination of employment.

**Annual Compensation** – The sum of your Required Base Salary and Annual Bonus.

**Base Salary** – The annual rate of base compensation paid to you (including amounts that you could have received in cash had you not elected to contribute to an employee benefit plan or a deferred compensation program), but excluding overtime pay, bonuses, employee benefits, added premiums, differentials, components of foreign service assignments, and all forms of incentive compensation.  If you are paid by the hour, the annual rate of base compensation is determined

**Occidental [Ping Lu] 000341**

by multiplying your base hourly rate of pay times 2,080 hours, except where your annual effective compensation includes scheduled overtime, as determined by the Company, in which case the annual rate of base compensation will be determined by multiplying your base hourly rate times the effective annual work hours.  If you are paid semimonthly or monthly, the annual rate of base compensation is determined by multiplying your monthly rate of pay times twelve (12).  If you are a regular part-time Employee, the annual rate of base compensation is determined by multiplying your hourly rate by the product of (i) the normally scheduled weekly work hours divided by forty (40) hours, times (ii) 2,080 hours.  All computations of Base Salary shall be made by the Plan Administrator and be final and binding.

**Benefit Determination Date** – A date on which the Company determines, in its sole discretion, in order to adjust for your breaks in service, to comply with any purchase or sale agreement covenant, or for any other purposes.

**Board** – The Board of Directors of the Company.

**Cause** – The occurrence of any of the following with respect to a Participant:

- Conviction of any felony or of a misdemeanor involving moral turpitude;

- Willful failure to perform duties or responsibilities;

- Engaging in conduct that is injurious (monetarily or otherwise) to the Company or any of their affiliates (including, without limitation, misuse of the Company's or affiliate's funds or other property);

- Engaging in business activities that are in conflict with the business interests of any the Company;

- Insubordination;

- Engaging in conduct that is in violation of applicable safety rules or standards or which otherwise causes or may cause injury to another employee or any other person;

- Engaging in conduct that is in violation of any applicable policy or work rule; or

- Engaging in conduct that is in violation of the Company's Code of Business Conduct and Ethics or which is otherwise inappropriate in the office or work environment.

No act or failure to act will be considered willful unless it is done, or omitted to be done, in bad faith or without reasonable belief that your act or omission was in the best interests of the Company.  Any act, or failure to act, based upon authority given pursuant to a resolution duly adopted by the Board or based upon the advice of counsel for the Company shall be conclusively presumed to be done, or omitted to be done, by you in good faith and in the best interests of the Company.

**Change of Control** – The occurrence of any one or more of the following:

- (i) The acquisition by any individual, entity or group (a "Person") of beneficial ownership of twenty percent (20%) or more of either (A) the then outstanding shares of common stock of the Company (the "Outstanding Company Common Stock") or (B) the combined voting power of the then outstanding voting securities of the Company entitled to vote generally in the election of directors (the "Outstanding Company Voting Securities"); provided, however, that the following acquisitions shall not constitute a Change of Control:  (w) any

**Occidental [Ping Lu] 000342**

acquisition directly from the Company, (x) any acquisition by the Company, (y) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Company or any corporation controlled by the Company, or (z) any acquisition pursuant to a transaction that complies with clauses (A), (B) and (C) of subsection (iii) of this definition; or

- (ii) Individuals who, as of the Plan's effective date, constitute the Board (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board; provided, however, that any individual becoming a director subsequent to the effective date of the Plan whose election, or nomination for election by the Company's shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board; or

- (iii) Consummation by the Company of a reorganization, merger or consolidation or sale or other disposition of all or substantially all of the assets of the Company or the acquisition of assets of another entity (a "Business Combination"), in each case, unless, following such Business Combination, (A) all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Company Common Stock and Outstanding Company Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than sixty percent (60%) of, respectively, the then outstanding shares of common stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such Business Combination (including, without limitation, a corporation which as a result of such transaction owns the Company or all or substantially all of the Company's assets either directly or through one or more subsidiaries) in substantially the same proportions as their ownership, immediately prior to such Business Combination of the Outstanding Company Common Stock and Outstanding Company Voting Securities, as the case may be; (B) no Person (excluding any employee benefit plan (or related trust) of the Company or such corporation resulting from such Business Combination) beneficially owns, directly or indirectly, twenty (20%) or more of, respectively, the then outstanding shares of common stock of the corporation resulting from such Business Combination or the combined voting power of the then outstanding voting securities of such corporation except to the extent that such ownership existed prior to the Business Combination; and (C) at least a majority of the members of the board of directors of the corporation resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement, or of the action of the Board, providing for such Business Combination; or

- (iv) Approval by the shareholders of the Company of a complete liquidation or dissolution of the Company.

**Code** – The Internal Revenue Code of 1986, as amended, and any regulations or other authoritative guidance thereunder.

**Occidental [Ping Lu] 000343**

**Committee** – The Anadarko Petroleum Corporation Health and Welfare Benefits Administrative Committee, as appointed by the Company.  The Committee is also the Plan Administrator.

**Date of Hire** – The most recent date on which you were hired by the Company.

**Employee** – An individual on the Company's United States payroll and who is classified by the Company as being a regular full-time or regular part-time employee.  The term Employee does not include:

- Anyone on the payroll classified by the Company as having any status other than regular full-time or regular part-time (including but not limited to individuals classified as being "limited benefit employees," "temporary employees," or an equivalent classification); or

- any individual who is considered by the Company to be an independent contractor, temporary worker, staffing worker, or employee of a third-party on the Company's records, even if such individual is retroactively classified by the Company or a governmental authority as an Employee.

**Good Reason** - The occurrence of one or more of the following:

- A material and adverse reduction of your duties and responsibilities as compared to those immediately prior to the Change of Control;

- A material reduction in your Base Salary as compared to your Base Salary immediately prior to the Change of Control;

- A material reduction in the aggregate value of your Base Salary plus Total Target Incentive Compensation compared to such value immediately prior to the Change of Control;

- A change in your required worksite location to more than 25 miles from your location immediately prior to the Change of Control;

- A requirement that you take an assignment or position that requires you to travel on frequent overnight trips resulting in extended stays away from home on a consistent basis and to a substantially greater extent compared to required business travel prior to the Change of Control (excluding assignments or positions that may require temporary travel for a specified, short duration of time); and/or

- A requirement, without your prior written consent, to perform a job for which you are not skilled or trained.

**Monthly Salary** – Your Annual Compensation divided by twelve.

**Participant** – An Employee who meets the Plan's eligibility requirements.

**Person** – An individual, a corporation, a limited liability company, a partnership, an association, a trust or any other entity or organization, including any governmental authority.

**Required Base Salary** – The higher of (1) your Base Salary in effect immediately prior to a Change of Control and (2) your highest Base Salary in effect any time thereafter.

**Sale of Business** –  The occurrence of the Company or any affiliate of the Company  selling or otherwise distributing or disposing of the subsidiary, branch or other business unit in which the Participant was employed before such sale, distribution or other disposition.

**Separation Benefits** – Payments and benefits due pursuant to the Plan.

**Occidental [Ping Lu] 000344**

**Target Bonus** – A Participant's annual target bonus opportunity under the Company's Annual Incentive Program, but excluding any other annual incentive bonus plan, policy or program of the Company unless specifically designated by the Plan Administrator as an included plan at the time of the Change of Control.

**Target Long-Term Incentive Compensation** – The Participant's annual target long-term incentive compensation opportunity under the Company's long-term incentive plan, but excluding any other similar long-term incentive plan, policy or program of the Company unless specifically designated by the Administrator as an included plan at the time of a Change of Control; provided, that, as determined by the Company, the Participant's job grade is a job grade with respect to which long-term-term incentive compensation is considered a normal and regular compensation element.

**Total Target Incentive Compensation** – With respect to any Participant, the sum of the Participant's Target Bonus and Target Long-Term Incentive Compensation.

**Year of Service** –The full year and any prorated portion of a year included in your continuous employment by the Company beginning with your Date of Hire or your Benefit Determination Date, as the case may be, to your termination date (determined by subtracting the Date of Hire or Benefit Determination Date from the termination date, whichever produces the greater number of Years of Service).


## CLAIMS PROCEDURES

(a) Denial of Claim.  In the case of the denial of a claim respecting benefits paid or payable to or on behalf of a Participant, a written notice will be furnished to the Participant or other appropriate Person (referred to as the "Claimant") within 90 days of the date on which the claim is received by the Plan Administrator.  If special circumstances (such as for a hearing) require a longer period, the Claimant will be notified in writing, prior to the expiration of the 90-day period, of the reasons for an extension of time; provided, however, that no extension will be permitted beyond 90 days after expiration of the initial 90-day period.

(b) Reasons for Denial.  A denial or partial denial of a claim will be dated and signed by the Plan Administrator and will clearly set forth:

   (i)      the specific reason or reasons for the denial;

   (ii)     specific reference to pertinent Plan provisions on which the denial is based;

   (iii)    a description of any additional material or information necessary for the Claimant to perfect the claim and an explanation of why such material or information is necessary; and

   (iv)     an explanation of the procedure for review of the denied or partially denied claim set forth below, including the Claimant's right to bring a civil action under ERISA Section 502(a) following an adverse benefit determination on review.

(c) Review of Denial.  Upon denial of a claim, in whole or in part, a Claimant or his duly authorized representative will have the right to submit a written request to the Plan Administrator for a full and fair review of the denied claim by filing a written notice of appeal with the Plan Administrator within 60 days of the receipt by the Claimant of written notice of denial of the claim. A Claimant or the Claimant's authorized representative will have, upon request and free of charge,

Occidental [Ping Lu] 000345

reasonable access to, and copies of, all documents, records, and other information relevant to the Claimant's claim for benefits and may submit issues and comments in writing.  The review will take into account all comments, documents, records, and other information submitted by the Claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

If the Claimant fails to file a request for review within 60 days of the denial notification, the claim will be deemed abandoned and the Claimant precluded from reasserting it.  If the Claimant does file a request for review, his request must include a description of the issues and evidence he deems relevant.  Failure to raise issues or present evidence on review will preclude those issues or evidence from being presented in any subsequent proceeding or judicial review of the claim.

(d)  Decision Upon Review.  The Plan Administrator will provide a prompt written decision on review.  If the claim is denied on review, the decision shall set forth:

(i)     the specific reason or reasons for the adverse determination;

(ii)    specific reference to pertinent Plan provisions on which the adverse determination is based;

(iii)   a statement that the Claimant is entitled to receive, upon  request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the Claimant's claim for benefits; and

(iv)   a statement describing any voluntary appeal procedures offered by the Plan and the Claimant's right to obtain the information about such procedures, as well as a statement of the Claimant's right to bring an action under ERISA Section 502(a).

A decision will be rendered no more than 60 days after the Plan Administrator's receipt of the request for review, except that such period may be extended for an additional 60 days if the Plan Administrator determines that special circumstances (such as for a hearing) require such extension. If an extension of time is required, written notice of the extension will be furnished to the Claimant before the end of the initial 60-day period.

To the extent of its responsibility to review the denial of benefit claims, the Plan Administrator will have full authority to interpret and apply in its discretion the provisions of the Plan including, without limitation, rendering factual determinations.  The decision of the Plan Administrator will be final and binding upon any and all Claimants and other Persons, including, but not limited to, Participants, and any other individuals making a claim through them.

(e)  Other Procedures.  Notwithstanding the foregoing, the Plan Administrator in its discretion, may adopt different procedures for different claims without being bound by past actions.  Any procedures adopted, however, shall be designed to afford a Claimant a full and fair review of his claim and shall comply with applicable regulations under ERISA.

(f)  Finality of Determinations; Exhaustion of Remedies.  To the extent permitted by law, decisions reached under the claims procedures set forth in this Section shall be final and binding on all parties.  No legal action for benefits under the Plan shall be brought unless and until the Claimant has exhausted his remedies under this Section.  In any such legal action, the Claimant may only present evidence and theories which the Claimant presented during the claims procedure.  Any claims which the Claimant does not in good faith pursue through the review stage of the procedure shall be treated as having been irrevocably waived.  Judicial review of a Claimant's denied claim shall be limited to a determination of whether the denial was an abuse of discretion based on the

Occidental [Ping Lu] 000346

evidence and theories the Claimant presented during the claims procedure.  **Any suit or legal action initiated by a Claimant under the Plan must be brought by the Claimant no later than one year following a final decision on the claim for benefits by the Plan Administrator**.  The one-year limitation on suits for benefits will apply in any forum where a Claimant initiates such suit or legal action.

(g)  <u>Effect of Plan Administrator Action</u>.  The Plan shall be interpreted by the Plan Administrator in accordance with the terms of the Plan and their intended meanings.  However, the Plan Administrator shall have the discretion to make any findings of fact needed in the administration of the Plan, and shall have the discretion to interpret or construe ambiguous, unclear or implied (but omitted) terms in any fashion that the Plan Administrator deems to be appropriate in its sole judgment.  The validity of any such finding of fact, interpretation, construction or decision shall not be given *de novo* review if challenged in court, by arbitration or in any other forum, and shall be upheld unless clearly arbitrary or capricious.  To the extent the Plan Administrator has been granted discretionary authority under the Plan, the Plan Administrator's prior exercise of such authority shall not obligate it to exercise its authority in a like fashion thereafter.  If, due to errors in drafting, any Plan provision does not accurately reflect its intended meaning, as demonstrated by consistent interpretations or other evidence of intent, or as determined by the Plan Administrator in it sole and exclusive judgment, the provision shall be considered ambiguous and shall be interpreted by the Plan Administrator in a fashion consistent with its intent, as determined by the Plan Administrator in its sole discretion.  The Plan Administrator, without the need for approval by the Board or any other Person, may amend the Plan retroactively to cure any such ambiguity.  These Claims Procedures may not be invoked by any person to require the Plan to be interpreted in a manner that is inconsistent with its interpretation by the Plan Administrator.  All actions taken and all determinations made in good faith by the Plan Administrator shall be final and binding upon all persons claiming any interest in or under the Plan.

**Occidental [Ping Lu] 000347**

**ANADARKO PETROLEUM CORPORATION**
**CHANGE OF CONTROL SEVERANCE PLAN**
**GOOD REASON CLAIM SUMMARY**

| |
|---|
| **Name:** Ping Lu (Employee ID 156083) |
| **Title:** Manager of Data Science & Advanced Analytics |

**Summary of Relevant Facts:**

**Before Merger:**
- Data Science Internship Program – He indicated that he was responsible for recruiting and interviewing candidates; deciding which data science interns should be brought back the following summer or hired full-time; providing mentorship, management, project achievement and input in internship program.
- Geophysical R&D Budget – He stated that the AAET budget was $37.5 million and the R&D budget was $4 million and this provided the ability to research and collaborate with third parties/external technology organizations.
- Developing Deep-Learning Models – He indicated that he led the effort to develop deep-learning models for geophysical projects.
- Research and Publication – He stated that he had access to all seismic data sets to conduct research and generate content for external publications.
- Developing Deep-Learning Models for Geophysical R&D Projects – He stated that one of his duties was to collaborate with 10 geophysicists and 2 data engineers on deep-learning models for geophysical R&D projects.
- Leadership Responsibilities for Geophysical R&D – He stated that he was always made aware of and invited to technical discussions.
- Research Freedom – He stated that he had freedom to initiate research topics and select the approach.
- Budget Cuts for Attending Conferences – He stated that he was approved to attend a conference at the company's cost.

.

**After Merger:**
He indicated that the following items changed following the COC:
- No longer had any of the responsibilities listed above.
- Only have 4 to 6 hours of work each day.
- The Data Science Internship Program was cancelled.
- AAET budget was reduced by 88%.
- Geophysical R&D project budget was reduced from $4 million to $0.
- Responsibility for developing Deep-Learning Models was terminated due to decrease in the R&D budget.

DB1/ 111544902.1

**Occidental [Ping Lu] 000348**

- Oxy reduced licensing seismic data sets by 60%, which has in turn led to 80% of his research topics being terminated.
- The 10 geophysicists that he previously collaborated with left, moved to Total or report to new business units and one data engineer reports to another business unit and the other resigned. Because he no longer had partners to collaborate with, he felt he was no longer able to develop any deep-learning models for geophysical R&D projects.
- No longer made aware of and invited to technical discussions, so he felt his leadership responsibilities were diminished.
- Discretion for selection of research topics has been reduced and this caused a narrower scope of responsibilities.
- Request for approval to attend a conference paid for by the company was denied.

Correspondence from David Bowlby on November 5, 2019:
- Mr. Bowlby confirmed that Mr. Lu did not have a material job reduction.
- Stated that Mr. Lu referenced smaller specific areas of his job in the Good Reason Inquiry submission, but his overall job did not change.
- Noted that the company is going through transition and the plan was to offer Mr. Lu a very equivalent job. It was communicated to Mr. Lu that some areas would be lessened but more focus would be applied in other areas. Mr. Lu quit before the formal offer was made.
- There was numerous requests for Mr. Lu to do work, but Mr. Lu refused or delayed doing the work, which is the reason for the research/conference diminishment.

Correspondence from Reza Rastegar on November 5, 2019:
- Mr. Rastegar noted he had email communications, which document the opposite of what Mr. Lu has claimed in his Good Reason Inquiry submission.
- Mr. Rastegar noted that Mr. Lu refused to work on a seismic data science problem.

Discussion with Donald Iacobell and Reza Rastegar November 8, 2019:
- Mr. Iacobell confirmed there was no material diminishment in duties and job responsibilities after the COC for Mr. Lu and Mr. Lu's job duties did not change.
- Mr. Iacobell indicated that projects were regularly provided to Mr. Lu that were consistent with his prior duties with Anadarko.
- Mr. Rastegar indicated that projects assigned to Mr. Lu was enough work to keep Mr. Lu busy on the full-time basis.
- Mr. Rastegar stated that Mr. Lu was asked by Oxy's Chief Geophysicist, Mr. Koster, to apply an algorithm Mr. Lu created and published to Oxy data as part of a project, but Mr. Lu refused to do so.
- Oxy made numerous attempts to leverage work products previously created by Mr. Lu and asked Mr. Lu to apply it to Oxy data. No significant results were produced for nearly 3 months when Mr. Lu was asked to apply his algorithm to Oxy geophysical data.
- Mr. Rastegar indicated that the internship program was not cancelled and although there was discussion about consolidating the internship programs, no final decision was made about the internship program.

Occidental [Ping Lu] 000349

> - Mr. Rastegar reported that while Mr. Lu initially had 3 direct reports, one data engineer in Mr. Koster's group was going to continue to support Mr. Lu and an additional team member was going to be reporting to Mr. Lu to support him.

**Claimed Good Reason Event:**

| | |
|---|---|
| X | Duties and responsibilities were materially and adversely diminished in comparison to employee's duties and responsibilities immediately prior to closing |
| | Required to be based at a location more than 25 miles from the primary location where employee was based and performed services immediately prior to closing |
| | Required to take an assignment or position that requires travel on frequent overnight trips resulting in extended stays away from home on a consistent basis and to a substantially greater extent than immediately prior to closing |
| | Required to perform in a job position or a substantial job assignment for which employee is not skilled or trained |

Occidental [Ping Lu] 000350

[EXTERNAL EMAIL]

**From:** Barton, Lisa H (Morgan Lewis & Bockius)
**Sent:** Tuesday, November 5, 2019 10:27 AM
**To:** Bowlby, David <David_Bowlby@oxy.com>; Rastegar, Reza <Reza_Rastegar2@oxy.com>
**Cc:** Iacobell, Donald L <Don_Iacobell@oxy.com>
**Subject:** RE: Ping Lu COC Inquiry

Got it.  Thank you.

Please let me know if it is easier to talk by phone or if you want to keep responding via email.

Thank you!

**From:** Bowlby, David <David_Bowlby@oxy.com>
**Sent:** Tuesday, November 5, 2019 10:26 AM
**To:** Barton, Lisa H (Morgan Lewis & Bockius) <Lisa_Barton@oxy.com>; Rastegar, Reza <Reza_Rastegar2@oxy.com>
**Cc:** Iacobell, Donald L <Don_Iacobell@oxy.com>
**Subject:** RE: Ping Lu COC Inquiry

Lisa,

That is a very long COC, I don't know how much you want to address each point, but bottom line is this; he is listing smaller specific areas of his job, but his overall job did not change.  The company is going through transition and we had full plans of offering him a very equivalent job and it was communicated that while certain areas would be lessened, we would apply more focus in other areas and he prematurely quit before a formal offer could be made and reviewed.  There have been numerous requests for him to do work, which he has refused or delayed, which is why some of the research/conferences area were diminished (i.e. he wasn't getting his core work done).  Bottom line, we can respond to it, but given the length, we need to give Reza a little bit of time to go through it.  I am cc'ing Don because he has been involved in Ping's performance history since the integration and he may wish to add comments as well.

**From:** Barton, Lisa H (Morgan Lewis & Bockius) <Lisa_Barton@oxy.com>
**Sent:** Tuesday, November 5, 2019 10:07 AM
**To:** Bowlby, David <David_Bowlby@oxy.com>; Rastegar, Reza <Reza_Rastegar2@oxy.com>
**Subject:** RE: Ping Lu COC Inquiry

David,

Thanks for getting back to me so quickly.

We need to resolve this week because although he just submitted – his 90-day good reason event date is this week.

1

Occidental [Ping Lu] 000351

Attached is his form.  Can we talk later today?  Or within the next hour?  I would like to get this in front of the Subcommittee ASAP.

Thank you!

**From:** Bowlby, David <David_Bowlby@oxy.com>
**Sent:** Tuesday, November 5, 2019 10:03 AM
**To:** Barton, Lisa H (Morgan Lewis & Bockius) <Lisa_Barton@oxy.com>; Rastegar, Reza <Reza_Rastegar2@oxy.com>
**Subject:** RE: Ping Lu COC Inquiry

Lisa, he did not have a material job reduction.  If you can send us his specific COC we can refute it.

**From:** Barton, Lisa H (Morgan Lewis & Bockius) <Lisa_Barton@oxy.com>
**Sent:** Tuesday, November 5, 2019 9:51 AM
**To:** Bowlby, David <David_Bowlby@oxy.com>
**Subject:** Ping Lu COC Inquiry

David,

Hi!  I'm assisting the Good Reason Subcommittee of the Anadarko Change of Control Severance Plan.  Ping Lu submitted a Good Reason inquiry for material job reduction.  If possible, please confirm today whether Mr. Lu experienced a material job reduction that would trigger a COC.  I'm also available this morning to discuss.

Thank you!

Lisa

Occidental [Ping Lu] 000352

Occidental [Ping Lu] 000353

[EXTERNAL EMAIL]

**From:** Rastegar, Reza <Reza_Rastegar2@oxy.com>
**Sent:** Friday, November 8, 2019 1:38 PM
**To:** Barton, Lisa H (Morgan Lewis & Bockius) <Lisa_Barton@oxy.com>
**Cc:** Iacobell, Donald L <Don_Iacobell@oxy.com>; Bowlby, David <David_Bowlby@oxy.com>
**Subject:** Re: Ping Lu Denial Language

Good on my side

Sent from my iPhone

On Nov 8, 2019, at 1:35 PM, Barton, Lisa H (Morgan Lewis & Bockius) <Lisa_Barton@oxy.com> wrote:

> Yes.  Here is the summary.
>
> **From:** Rastegar, Reza <Reza_Rastegar2@oxy.com>
> **Sent:** Friday, November 8, 2019 1:34 PM
> **To:** Barton, Lisa H (Morgan Lewis & Bockius) <Lisa_Barton@oxy.com>
> **Cc:** Iacobell, Donald L <Don_Iacobell@oxy.com>; Bowlby, David <David_Bowlby@oxy.com>
> **Subject:** Re: Ping Lu Denial Language
>
> Did he actually have the claim of loosing %100 data engineer support in his COC document? I don't recall that.
>
> Sent from my iPhone
>
> On Nov 8, 2019, at 1:26 PM, Barton, Lisa H (Morgan Lewis & Bockius) <Lisa_Barton@oxy.com> wrote:
>
>> Got it.  See what you think of the last paragraph.
>>
>> **From:** Rastegar, Reza <Reza_Rastegar2@oxy.com>
>> **Sent:** Friday, November 8, 2019 1:17 PM
>> **To:** Barton, Lisa H (Morgan Lewis & Bockius) <Lisa_Barton@oxy.com>

1

Occidental [Ping Lu] 000354

Cc: Iacobell, Donald L <Don_Iacobell@oxy.com>; Bowlby, David
<David_Bowlby@oxy.com>
**Subject:** Re: Ping Lu Denial Language

Looks good now except that for the last paragraph,  we may be change a few things:

Ping initially had three people reporting to him but one (data engineer) was offered a position in Klaas Koster group with the idea that he will provide the same support to Ping.  Also, in our initial organizational design I had, one other team member that I was going to put under Ping to support his work.

Sent from my iPhone

On Nov 8, 2019, at 1:06 PM, Barton, Lisa H (Morgan Lewis & Bockius)
<Lisa_Barton@oxy.com> wrote:

> Got it.  Please see updated language and let me know what you think.

> ### PROPOSED LANGUAGE FOR DENIAL LETTER

> As explained in more detail below, your Good Reason Inquiry is denied.  In speaking with Reza Rastegar and Donald Iacobell, they confirmed that your material job duties have not changed.  In fact, Mr. Iacobell indicated that projects have been presented to you on a regular basis that are consistent with your Anadarko job description ~~and you have not been willing to work on the projects~~.  Thus, the amount of work that you have had available to you that is within your original job description has not changed.

> You indicated that the Data Science Partnership ended and that was a significant part of your duties.  Mr. Rastegar indicated that you have been asked by Oxy's Chief Geophysicist to apply an algorithm you published to Oxy data ~~to the algorithm you created~~ as part of that project but that you have refused to do so.  The project that you were working on was never intended to be the only project you would ever work on.  Oxy made numerous attempts to leverage the work products you previously worked on and asked that you apply it to Oxy data.  In fact, Mr. Rastegar indicated that you were provided with a pair of projects to apply your algorithm to Oxy geophysical data ~~Oxy data to your algorithm~~ and

2

Occidental [Ping Lu] 000355

you did not ~~respond~~ produce (any?Significant?) results to the requests for nearly three months.

Since the transaction, you have been asked to work on two projects that aligned with your job description and your prior duties with Anadarko.  Nothing about this work was different or unusual nor was it diminished in any way from your prior duties.  Both projects were assigned to him by Mr. Rastegar and Klaas Koster and they offered the SME support. Mr. Rastegar indicated that this work was enough work for you to be busy on a full-time basis.  Thus, there was no reduction in your work.

The internship program was not cancelled. As you have discussed with Mr. Rastegar, there has been discussion that Oxy may consolidate the interns, but no decision has yet been made.


You indicated that you have lost 100% of the data engineers in your group.  In speaking with Mr. Rastegar ~~and Mr. Iacobell~~, he indicated that while you initially had three people reporting to you, one data engineer who was offered a position in Klaas Koster's group was going to continue to support you.  Additionally, one additional team member was going to be reporting to you to support your work.




**From:** Rastegar, Reza <Reza_Rastegar2@oxy.com>
**Sent:** Friday, November 8, 2019 12:59 PM
**To:** Iacobell, Donald L <Don_Iacobell@oxy.com>
**Cc:** Barton, Lisa H (Morgan Lewis & Bockius) <Lisa_Barton@oxy.com>; Bowlby, David <David_Bowlby@oxy.com>
**Subject:** Re: Ping Lu Denial Language

Lisa, I'd like to make a few changes here. For example, I'd like to take out "his willingness to work on the project out". He can deny that easily.

Occidental [Ping Lu] 000356

I'd like to focus more on the fact he was given two projects aligned with he did before in APC and  nothing that he was asked to do was out of his usual responsibilities. All these were assigned to him by me and Klaas Koster and I and Klaas offered the SME support. It was enough work for him to focus fulltime and his claim of not having enough work is not applicable.

Also with regards to internship, I have communication with a few people in AAET team stating that HR is working on consolidating the internship program and there was no mention of internships getting cancelled.

Sent from my iPhone

On Nov 8, 2019, at 9:42 AM, Iacobell, Donald L <Don_Iacobell@oxy.com> wrote:

> Lisa:
>
> Some things you attributed to me I believe came from Reza, who would be in more of a position to know.  Most of what I know about the situation came from my conversations with Reza.  Kicking to Reza for his thoughts.  My suggested changes are in dark red.
>
> Thanks!
>
> Don Iacobell
> Consultant HR
> Occidental Petroleum
> (713) 215-7494
>
>
>
> **From:** Bowlby, David <David_Bowlby@oxy.com>
> **Sent:** Friday, November 8, 2019 8:21 AM
> **To:** Barton, Lisa H (Morgan Lewis & Bockius) <Lisa_Barton@oxy.com>; Rastegar, Reza <Reza_Rastegar2@oxy.com>; Iacobell, Donald L <Don_Iacobell@oxy.com>
> **Subject:** RE: Ping Lu Denial Language
>
> My changes below on the opening paragraph, Reza and Don will have to fill in the reminder.
>
> **From:** Barton, Lisa H (Morgan Lewis & Bockius) <Lisa_Barton@oxy.com>
> **Sent:** Friday, November 8, 2019 5:08 AM
> **To:** Rastegar, Reza <Reza_Rastegar2@oxy.com>; Iacobell, Donald L <Don_Iacobell@oxy.com>; Bowlby, David <David_Bowlby@oxy.com>
> **Subject:** Ping Lu Denial Language

4

Occidental [Ping Lu] 000357

Good morning!  Below is a proposed response for his denial based on our discussion.  Please review and provide any comments.  There were a few points that he raised that I was not able to elaborate on.

I would like to try to get this denial out today if we can – so if you can review today, that would be great.

I'm available to discuss by phone as well.

\*\*\*\*\*\*\*\*

**PROPOSED LANGUAGE FOR DENIAL LETTER**

As explained in more detail below, your Good Reason Inquiry is denied.  In speaking with Reza Rastegar and Donald Iacobell, they confirmed that your material job duties have not changed.  In fact, Mr. Iacobell indicated that projects have been presented to you on a regular basis that are consistent with your Anadarko job description and you have not been willing to work on the projects.  Thus, the amount of work that you have had available to you that is within your original job description has not changed.

You indicated that the Data Science Partnership ended and that was a significant part of your duties.  Mr. Rastegar indicated that you have been asked by Oxy's Chief Geophysicist to apply an algorithm you published to Oxy data ~~to the algorithm you created~~ as part of that project but that you have refused to do so.  The project that you were working on

5

was never intended to be the only project you would ever work on.  Oxy made numerous attempts to leverage the work products you previously worked on and asked that you apply it to Oxy data.  In fact, Mr. Rastegar indicated that you were provided with a pair of projects to apply your algorithm to Oxy geophysical data ~~Oxy data to your algorithm~~ and you did not ~~respond~~ produce (any?Significant?) results to the requests for nearly three months.

[NOT SURE HOW TO ADDRESS THAT R&D WAS REDUCED]

[PLEASE ADD SOMETHING ABOUT THE SEISMIC LICENSING ISSUE]

You indicated that you have lost 100% of the data engineers in your group.  In speaking with Mr. Rastegar ~~and Mr. Iacobell~~, they indicated that this is not true as there continue to be data engineers on the team who are willing and want to work with you.  However, as stated above, you have not been interested in working with them.  *((Not sure this catches the spirit of what was said.  Ping still had 2 data scientists and 1 data engineer working for him when he resigned. The people that were willing to work with him that he didn't engaged with were actually outside of his team.  Kicking to Reza for his thoughts.))*

[PLEASE ADD SENTENCE ABOUT DIMINISHED MANAGERIAL DUTIES AND PUBLICATION WITHDRAWAL]

Occidental [Ping Lu] 000359

Occidental [Ping Lu] 000360

[EXTERNAL EMAIL]

**From:** Koster, Klaas <Klaas_Koster@oxy.com>
**Sent:** Monday, March 9, 2020 3:24 PM
**To:** Barton, Lisa H (Morgan Lewis & Bocki) <Lisa_Barton@oxy.com>
**Subject:** Ping Lu email chain wrt 'CS reconstruction'

Lisa,

As mentioned, please find enclosed the email chain where I try to engage Ping and his team based on a technical article they published (!) on 'CS reconstruction'.
The thought was that if you feel good enough about your capabilities to publish, then you ought to be able to do a project on the topic for your employer...

Klaas

---

**From:** Koster, Klaas
**Sent:** Tuesday, October 8, 2019 7:30 AM
**To:** Yanyan_Zhang@oxy.com <Yanyan_Zhang@oxy.com>
**Cc:** Xiao, Yuan <Yuan_Xiao@oxy.com>; Lu, Ping <Ping_Lu@oxy.com>
**Subject:** RE: Anadarko CS reconstruction

I rescheduled for today.

**From:** Yanyan_Zhang@oxy.com <Yanyan_Zhang@oxy.com>
**Sent:** Thursday, October 3, 2019 4:42 PM
**To:** Koster, Klaas <Klaas_Koster@oxy.com>
**Cc:** Xiao, Yuan <Yuan_Xiao@oxy.com>; Lu, Ping <Ping_Lu@oxy.com>
**Subject:** RE: Anadarko CS reconstruction

Hi Klaas,

I personally have doctor appointment on Next Monday so couldn't visit GW5.
We'll investigate on the data further and let you know the progress later.

Thanks.

Best,
Yanyan

1

Occidental [Ping Lu] 000361

**From:** Koster, Klaas <Klaas_Koster@oxy.com>
**Sent:** Thursday, October 3, 2019 3:50 PM
**To:** Zhang, Yanyan <Yanyan_Zhang@oxy.com>
**Cc:** Xiao, Yuan <Yuan_Xiao@oxy.com>; Lu, Ping <Ping_Lu@oxy.com>
**Subject:** RE: Anadarko CS reconstruction

Yanyan,

I know that you are using GANs, Ive read the TLE article. I am interested in comparing results, not underlying methods. I'm not sure when I am next at APC, so let's start with a meeting at GW5 to show you what the problem is we have solved using low-rank matrix completion.
I'm sure Maks and Reza will be part of the discussion here.

Klaas

**From:** Yanyan_Zhang@oxy.com <Yanyan_Zhang@oxy.com>
**Sent:** Thursday, October 3, 2019 3:44 PM
**To:** Koster, Klaas <Klaas_Koster@oxy.com>
**Cc:** Xiao, Yuan <Yuan_Xiao@oxy.com>; Lu, Ping <Ping_Lu@oxy.com>
**Subject:** RE: Anadarko CS reconstruction

Hi Klaas,

Since I'd need invite Cody and my other colleagues to help me explain, can we meet on a day that you'll be in APC instead of me going to GW5?
Also, we're not using linear algebra or transformation methods to solve the problem, so I'm afraid some experience might not be easily transferable.

Thanks!

Best,
Yanyan

**From:** Koster, Klaas <Klaas_Koster@oxy.com>
**Sent:** Thursday, October 3, 2019 3:16 PM
**To:** Zhang, Yanyan <Yanyan_Zhang@oxy.com>
**Cc:** Xiao, Yuan <Yuan_Xiao@oxy.com>; Lu, Ping <Ping_Lu@oxy.com>
**Subject:** RE: Anadarko CS reconstruction

Yes, of course. Right now Monday looks like a good day with relatively few meetings.
If you come to GW5 then I can show you all the work we have already done on CS with low-rank matrix completion and matching-pursuit Fourier interpolation.

**From:** Yanyan_Zhang@oxy.com <Yanyan_Zhang@oxy.com>
**Sent:** Thursday, October 3, 2019 3:09 PM
**To:** Koster, Klaas <Klaas_Koster@oxy.com>
**Cc:** Xiao, Yuan <Yuan_Xiao@oxy.com>; Lu, Ping <Ping_Lu@oxy.com>
**Subject:** RE: Anadarko CS reconstruction

Hi Klaas,

Occidental [Ping Lu] 000362

If you have time, can I request to schedule a meeting with you in person?
I'd like to explain our current problem and the difficulty we have to apply our method towards this problem, so that you can have a better understanding.

Thanks!

Best,
Yanyan

**From:** Koster, Klaas <Klaas_Koster@oxy.com>
**Sent:** Thursday, October 3, 2019 2:34 PM
**To:** Rastegar, Reza <reza_rastegar2@oxy.com>; Zhang, Yanyan <Yanyan_Zhang@oxy.com>
**Cc:** Xiao, Yuan <Yuan_Xiao@oxy.com>; Lu, Ping <Ping_Lu@oxy.com>; Pryporov, Maksym <Maksym_Pryporov@oxy.com>
**Subject:** RE: Anadarko CS reconstruction

Yanyan,

There is no fundamental difference between reconstruction of a single 3D pre-stack shot-gather, or a single 3D post-stack volume. Both can be simply represented as a sequence of 2D slices.

The whole point of compressive sensing is to sparsely sample the data non-uniformly and then reconstruct it to what you would have measured on a dense regular grid. So, I have no idea what the difficulty is.
Perhaps you are saying that you need some dense and uniformly sampled data for your training images? We have those of course.

Klaas

**From:** Rastegar, Reza <Reza_Rastegar2@oxy.com>
**Sent:** Thursday, October 3, 2019 2:26 PM
**To:** Zhang, Yanyan <Yanyan_Zhang@oxy.com>
**Cc:** Xiao, Yuan <Yuan_Xiao@oxy.com>; Lu, Ping <Ping_Lu@oxy.com>; Koster, Klaas <Klaas_Koster@oxy.com>; Pryporov, Maksym <Maksym_Pryporov@oxy.com>
**Subject:** Re: Anadarko CS reconstruction

Thanks Yanyan. I'm including Klaas in the conversation.

Klaas, please see the update. Any thought?

Sent from my iPhone

On Oct 3, 2019, at 1:43 PM, "Yanyan_Zhang@oxy.com" <Yanyan_Zhang@oxy.com> wrote:

> Reza,
>
> We're in the process of reviewing the data. The problem is actually not what we have published, we were working with
> post-stack migrated seismic, but this data is about pre-stack gathers. What's more important is this data is non-uniform sampled, which is different to our work.
>
> Best,

3

Occidental [Ping Lu] 000363

Yanyan

Get Outlook for Android

**From:** Rastegar, Reza <Reza_Rastegar2@oxy.com>
**Sent:** Thursday, October 3, 2019 7:12:36 AM
**To:** Zhang, Yanyan <Yanyan.Zhang@anadarko.com>; Xiao, Yuan
<Yuan.Xiao@anadarko.com>
**Cc:** Lu, Ping <Ping_Lu@oxy.com>
**Subject:** RE: Anadarko CS reconstruction

Team,

Were you able to get the data and try what Klaas was asking?

Thanks,
Reza

**From:** Koster, Klaas <Klaas_Koster@oxy.com>
**Sent:** Thursday, September 26, 2019 3:26 PM
**To:** Zhang, Yanyan <YANYAN.ZHANG@ANADARKO.COM>; Xiao, Yuan
<YUAN.XIAO@ANADARKO.COM>
**Cc:** Pryporov, Maksym <Maksym_Pryporov@oxy.com>; Rastegar, Reza
<Reza_Rastegar2@oxy.com>; Lu, Ping <Ping_Lu@oxy.com>
**Subject:** RE: Anadarko CS reconstruction

Yuan/Yanyan,

I'd like to see your DL compressive sensing reconstruction (TLE, September 2019) applied to
the enclosed shot gather.
I enclosed the mask that was applied to the full dataset, so you know which seismic traces are
missing.
The dataset itself is on the Geophysics Function MS Teams site, Yuan has access to it:
DUG_rec_sampled_pkl

Klaas


Example of Python code to read data:
import pickle as pkl
nxs = 641
P  = np.zeros((nxs,nxs),dtype=bool)
P =  pkl.load(open( 'DUG_ReceiverMask_pkl', "rb" ))




**From:** Cody_Comiskey@oxy.com <Cody_Comiskey@oxy.com>
**Sent:** Friday, September 13, 2019 4:42 PM
**To:** Koster, Klaas <Klaas_Koster@oxy.com>; Comiskey, Cody <Cody_Comiskey@oxy.com>;
Lu, Ping <Ping_Lu@oxy.com>
**Subject:** Re: Anadarko CS reconstruction

Sounds good. I would reach out to Ping and his team. My group wasn't involved in the project.

4

Occidental [Ping Lu] 000364

Thanks Klaas, have a good weekend

Cody


Sent from my Verizon, Samsung Galaxy smartphone


-------- Original message --------
From: "Koster, Klaas" <Klaas_Koster@oxy.com>
Date: 9/13/19 16:36 (GMT-06:00)
To: "Comiskey, Cody" <Cody_Comiskey@oxy.com>, "Comiskey, Cody"
<Cody_Comiskey@oxy.com>, "Lu, Ping" <Ping_Lu@oxy.com>
Subject: RE: Anadarko CS reconstruction

Thanks for the info. R&D is fine, possibly still good enough to attempt our benchmark.

**From:** Cody_Comiskey@oxy.com <Cody_Comiskey@oxy.com>
**Sent:** Friday, September 13, 2019 4:34 PM
**To:** Koster, Klaas <Klaas_Koster@oxy.com>; Comiskey, Cody <Cody_Comiskey@oxy.com>;
Lu, Ping <Ping_Lu@oxy.com>
**Subject:** Re: Anadarko CS reconstruction

Klaas, this project was a collaboration between the data science team and geophysical
technology and was an initial test in using ML for projects like this. I will defer to Ping on the
status of the work but at our last discussion, this was a strictly R&D project.

Cody


Sent from my Verizon, Samsung Galaxy smartphone
_____

**From:** Rastegar, Reza <Reza_Rastegar2@oxy.com>
**Sent:** Thursday, October 3, 2019 7:12:36 AM
**To:** Zhang, Yanyan <Yanyan.Zhang@anadarko.com>; Xiao, Yuan <Yuan.Xiao@anadarko.com>
**Cc:** Lu, Ping <Ping_Lu@oxy.com>
**Subject:** RE: Anadarko CS reconstruction

Team,

Were you able to get the data and try what Klaas was asking?

Thanks,
Reza

**From:** Koster, Klaas <Klaas_Koster@oxy.com>
**Sent:** Thursday, September 26, 2019 3:26 PM
**To:** Zhang, Yanyan <YANYAN.ZHANG@ANADARKO.COM>; Xiao, Yuan <YUAN.XIAO@ANADARKO.COM>
**Cc:** Pryporov, Maksym <Maksym_Pryporov@oxy.com>; Rastegar, Reza <Reza_Rastegar2@oxy.com>; Lu,
Ping <Ping_Lu@oxy.com>
**Subject:** RE: Anadarko CS reconstruction

Occidental [Ping Lu] 000365

Yuan/Yanyan,

I'd like to see your DL compressive sensing reconstruction (TLE, September 2019) applied to the enclosed shot gather.
I enclosed the mask that was applied to the full dataset, so you know which seismic traces are missing.
The dataset itself is on the Geophysics Function MS Teams site, Yuan has access to it:
DUG_rec_sampled_pkl

Klaas

Example of Python code to read data:
```
import pickle as pkl
nxs = 641
P  = np.zeros((nxs,nxs),dtype=bool)
P = pkl.load(open( 'DUG_ReceiverMask_pkl', "rb" ))
```

**From:** Cody_Comiskey@oxy.com <Cody_Comiskey@oxy.com>
**Sent:** Friday, September 13, 2019 4:42 PM
**To:** Koster, Klaas <Klaas_Koster@oxy.com>; Comiskey, Cody <Cody_Comiskey@oxy.com>; Lu, Ping <Ping_Lu@oxy.com>
**Subject:** Re: Anadarko CS reconstruction

Sounds good. I would reach out to Ping and his team. My group wasn't involved in the project.

Thanks Klaas, have a good weekend

Cody

Sent from my Verizon, Samsung Galaxy smartphone

-------- Original message --------
From: "Koster, Klaas" <Klaas_Koster@oxy.com>
Date: 9/13/19 16:36 (GMT-06:00)
To: "Comiskey, Cody" <Cody_Comiskey@oxy.com>, "Comiskey, Cody" <Cody_Comiskey@oxy.com>, "Lu, Ping" <Ping_Lu@oxy.com>
Subject: RE: Anadarko CS reconstruction

Thanks for the info. R&D is fine, possibly still good enough to attempt our benchmark.

**From:** Cody_Comiskey@oxy.com <Cody_Comiskey@oxy.com>
**Sent:** Friday, September 13, 2019 4:34 PM

Occidental [Ping Lu] 000366

**To:** Koster, Klaas <<u>Klaas_Koster@oxy.com</u>>; Comiskey, Cody <<u>Cody_Comiskey@oxy.com</u>>; Lu, Ping <<u>Ping_Lu@oxy.com</u>>
**Subject:** Re: Anadarko CS reconstruction

Klaas, this project was a collaboration between the data science team and geophysical technology and was an initial test in using ML for projects like this. I will defer to Ping on the status of the work but at our last discussion, this was a strictly R&D project.

Cody


Sent from my Verizon, Samsung Galaxy smartphone

**Occidental [Ping Lu] 000367**

Occidental [Ping Lu] 000368

[EXTERNAL EMAIL]

**From:** Barton, Lisa H (Morgan Lewis & Bocki)
**Sent:** Thursday, March 12, 2020 10:16 AM
**To:** Rastegar, Reza <Reza_Rastegar2@oxy.com>
**Cc:** Bowlby, David <David_Bowlby@oxy.com>; Koster, Klaas <Klaas_Koster@oxy.com>
**Subject:** RE: Ping Lu Claim Denial Letter - Please Review

Fantastic.  Thank you so much for reviewing so quickly.  I will add the points you mention.


**From:** Rastegar, Reza <Reza_Rastegar2@oxy.com>
**Sent:** Thursday, March 12, 2020 10:11 AM
**To:** Barton, Lisa H (Morgan Lewis & Bocki) <Lisa_Barton@oxy.com>
**Cc:** Bowlby, David <David_Bowlby@oxy.com>; Koster, Klaas <Klaas_Koster@oxy.com>
**Subject:** Re: Ping Lu Claim Denial Letter - Please Review

Thanks Lisa. This is good on my side, except that I'd like to add something along
1) we never communicated the internship program will go away and he wont have interns in the next summers

2) I told him in person several times that his team will grow. This was not done in a written form given that our HR was working on the details of the process.

Sent from my iPhone


On Mar 12, 2020, at 10:00 AM, Barton, Lisa H (Morgan Lewis & Bocki) <Lisa_Barton@oxy.com> wrote:


David, Reza and Klaas,

Good morning!  Below is a summary of the reasons that are being used to deny Ping's claim.  Please review and let me know if you have any comments.  I'm happy to provide the emails referenced as well.

I would like to send out tomorrow, if possible.  I look forward to your comments and so appreciate your assistance with this matter.

Best,

Lisa


**Facts and Analysis of your Claim**

1

Occidental [Ping Lu] 000369

The Committee confirmed the facts of your Claim by meeting and speaking with David Bowlby, Reza Rastegar and Klaas Koster to ensure its understanding of your pre-COC and post-COC duties and responsibilities.

We understand from Mr. Bowlby, Mr. Rastegar and Mr. Koster that you were informed that your job would continue at Oxy and the role of your work would expand. While certainly there were changes that were being made to the Oxy during the reorganization, some of the changes were transitional and as part of the COC and Mr. Rastegar and Mr. Koster worked to engage you during this transition.

You raised several issues in your Claim. The first issue related to the Internship Program. In your Claim, you explained in great detail your role in the internship program. During our discussion with Mr. Bowlby, Mr. Rastegar and Mr. Koster we understand that the internship program was a very small part of your overall responsibilities. In fact, while we understand that the internship program was something that you enjoyed, it was not a material part of your position or your role at Anadarko so any changes at Oxy that were made to the program were not material diminishments of your duties and responsibilities.

You indicated that that the Geophysical R&D budget was decreased preventing you from pursuing collaborative research. Additionally, you indicated that this budget decrease prevented you from developing deep-learning models. Mr. Koster indicated that he attempted to engage you and your team on several occasions to continue to work on research and development but that you were not responsive. In the Exhibit 8 email that you provided in your Claim dated October 3, 2019, Mr. Koster in fact was asking you and your team to participate in a research and development project. While you indicate in your Claim that you were not addressed directly in the email, you were the manager of the team included on the email, so you were responsible. As a manager, your job was to ensure that your team completed projects that were requested and assigned. By including you on the email, Mr. Koster was engaging you as you were in charge of the team. Your lack of response to accept a project that would have been very similar to work you were performing does not mean that work wasn't available. Significant amounts of similar work were available to you and you chose not to do the work.

Additionally, in Exhibit 13 to your Claim, Mr. Rastegar, in an email dated October 23, 2019, was asking you for a status of projects and explained that a project on which you did not want to work was in fact within your expertise and within the scope of your duties and responsibilities. This is another example of a project that was available to you that you refused to perform.

Further, with respect to Exhibit 9 in your Claim in an email dated September 6, 2019, you were invited to present at a meeting because Mr. Bowlby and Mr. Rastegar were trying to engage you as a leader in the group. While you did indicated that you did not perform the research in the area and did not understand why you were being asked to present, someone with your level of skills and expertise should be able to digest and present the information. Asking you to do so was not outside the scope of your duties and responsibilities and your hesitation to participate further reflects that you were not willing to engage in work that was available to you. It also reflects that while you indicated management and leadership skills were taken away from you, these opportunities were continued to be made available.

You indicated that the sale of Mozambique to Total reduced your ability to research because the overall assets of the company were reduced. As a Manager of Data Science & Advanced Analytics, your role is to perform research and analyze data associated with the assets and projects that are supported by the company. This was true at Anadarko and remained true at Oxy. The fact that you preferred to perform one project over another does not mean that there was a material and adverse diminishment of your duties and responsibilities. In your role, you worked on many different projects in the organization as they were prioritized by the organization. Changing projects does not change your duties and responsibilities. Thus, reducing the assets of the organization does not correlate with less research and development opportunities.

Occidental [Ping Lu] 000370

You stated that you lost 100% of the Data Engineers in your group. In speaking with Mr. Rastegar, we understand that while you initially had three people reporting to you, one data engineer was offered a position in Mr. Koster's group and was designated to continue to support you. Additionally, one additional team member was going to be reporting to you to support your work. However, you terminated employment during the Oxy transition period before this was able to happen.

You indicated that you were required to withdraw publications and cease pursuing new opportunities. You cited an email where you were asked not to attend a conference as evidence of this fact. As is clear in the email to you from Mr. Rastegar dated October 18, 2019 and pursuant to <u>Exhibit 15</u> of your Claim, Mr. Rastegar was supportive of your publishing your paper but declined your participation in the conference due to the demands arising from the COC and the more urgent business tasks that you had been assigned. This in no way suggested that you would forever be barred from participating in conferences. Again, this was a transition period immediately following the COC and not indicative of how things would operate going forward.

**Lisa H. Barton**
**Morgan, Lewis & Bockius LLP**
One Federal Street | Boston, MA 02110-1726
Direct: +1.617.341.7522 | Main: +1.617.341.7700 | Fax: +1.617.341.7701
lisa.barton@morganlewis.com | www.morganlewis.com
Assistant: Patricia A. Romzy | +1.412.560.3331 | patricia.romzy@morganlewis.com

DISCLAIMER
This e-mail message is intended only for the personal use
of the recipient(s) named above. This message may be an
attorney-client communication and as such privileged and
confidential and/or it may include attorney work product.
If you are not an intended recipient, you may not review,
copy or distribute this message. If you have received this
communication in error, please notify us immediately by
e-mail and delete the original message.

**Occidental [Ping Lu] 000371**

# Morgan Lewis

**Lisa H. Barton**
Partner
+1.617.341.7522
lisa.barton@morganlewis.com

May 21, 2020

**VIA EMAIL and VIA U.S. FIRST CLASS MAIL**

Ping Lu
124 South Brooksedge Circle
The Woodlands, TX 77382
xiaomadawolewo@gmail.com

Re:     Second Request for Documents

Dear Mr. Lu:

On behalf of the Health and Welfare Benefits Administrative Committee (the "Benefits Administrative Committee"), I am responding to your second request for documents, dated April 29, 2020, under the Anadarko Petroleum Change of Control Severance Plan (the "COC Plan") regarding your claim appeal.

**Request for Documents Regarding Your Former Supervisor**
In your email, you asked for documents relating to any investigation of your former supervisor, Reza Rastegar, stemming from complaints made by you and former coworkers.  The Benefits Administrative Committee understood that the allegations made against Mr. Rastegar were unsubstantiated and that it was determined that no violations occurred.  The documents relating to any investigation of Mr. Rastegar, other than the fact that the complaints were determined to be unsubstantiated, are not relevant to your claim appeal as your claim relates to whether or not you satisfied the Good Reason provisions of the COC Plan.  Therefore, these

**Request for Documents Regarding Certain Former Employees' Job Duties**
In your email, you also asked for documents relating to the job duties of Alex Bayeh, Dingzhou Cao[1] and Natalia Berestovsky before and after the change in control.  Whether a Good Reason event has occurred involves a review of the facts and circumstances specific to an individual.  The specific facts and circumstances are unique to each claim.  The documents relating to other former employees' job duties are not relevant.

**Request for Documents Regarding Certain Other Decisions**
In your email, you also asked for documents relating to the Good Reason Subcommittee of the COC Plan's (the "Subcommittee") decisions to approve the Good Reason events for Bayeh, Dingzhou Cao and Natalia Berestovsky.  Whether a Good Reason event has occurred involves a review of the facts and circumstances specific to an individual.  The specific facts and

---

[1]     You requested documents relating to "Natalie Berestovsky" and "Ding Cao."  We interpret these requests to be related to Natalia Berestovsky and Dingzhou Cao.

**Morgan, Lewis & Bockius LLP**

One Federal Street
Boston, MA  02110-1726        ☏ +1.617.341.7700
United States                          ℻ +1.617.341.7701

**Occidental [Ping Lu] 000372**

Ping Lu
May 21, 2020
Page 2

circumstances are unique to each claim.  The documents relating to the Subcommittee's decisions to approve or deny severance benefits for other former employees are not relevant. Additionally, the circumstances and decisions of Good Reason Inquiry submissions of current or former employees may not be disclosed due to confidentiality reasons. The details regarding each person's situation is confidential as it relates to that person's employment.

While we believe that we have provided you with the documentation that we are required to provide in accordance with ERISA, if there are additional documents that you believe you are entitled to receive, please send your request to my attention or to the Oxy Good Reason in-box (goodreason@oxy.com) and identify the materials to which you believe you are entitled and the basis for your request.

Very truly yours,

Lisa H. Barton
LHB/ss



**David M. Minces**
Board Certified Labor & Employment Law
Texas Board of Legal Specialization

December 30, 2020

Occidental Petroleum Corporation                    *__Via Email and FedEx__*
APC Change of Control Severance Plan
Health and Welfare Benefits Administrative Committee
5 Greenway Plaza, Suite 110
Houston, Texas 77046

Re:    Ping Lu | Appeal of adverse benefit determination

Dear Committee:

My law firm represents Ping Lu, and this letter constitutes Mr. Lu's appeal of the Committee's determination that he is not entitled to severance benefits. This appeal is timely submitted because Occidental Petroleum Corporation ("Oxy") extended Mr. Lu's deadline to file this appeal as a result of the ongoing COVID-19 pandemic.[1]

I encourage the Committee to carefully consider this letter and the attached documents supporting Mr. Lu's request for benefits. In its totality, the evidence plainly establishes that Mr. Lu's resignation was for "Good Reason" as defined by Anadarko's Change of Control Severance Plan ("Plan") because his job duties and responsibilities were materially and adversely diminished after the merger between Anadarko and Oxy.[2] Accordingly, Mr. Lu seeks a determination that (1) his resignation was for Good Reason; and (2) he is entitled to severance benefits as provided by the Plan.

## OVERVIEW

### A. Mr. Lu's employment at Anadarko

Mr. Lu began working for Anadarko in 2017 as a Senior Data Scientist. At the time of Anadarko's Change of Control, Mr. Lu was a Manager of Data Science & Advanced Analytics. Mr. Lu's role was part of Anadarko's Advanced Analytics & Emerging Technology ("AAET") department. Anadarko's AAET department had four primary "teams" which served different functions: (1) data science, (2) engineering, (3) emerging geoscience, and (4) geoscience technology.

Before the Change of Control, Mr. Lu was part of the data science team, and he had four direct reports: (1) a data scientist, (2) a senior data scientist, (3) a staff data

---

[1]  *See* <u>Exhibit A</u>, email from Lisa Barton dated May 21, 2020.
[2]  Pursuant to the Plan, Good Reason is triggered by a "material reduction in the nature or scope of aggregate responsibilities as compared to those immediately prior to the Change of Control."

Occidental [Ping Lu] 000374

engineer, and (4) a contract data engineer. Mr. Lu and his team collaborated with the emerging geoscience and geotechnology teams.

### B. Mr. Lu's employment at Oxy

After the Change of Control, Mr. Lu's duties were materially and adversely diminished in the following ways:

1. Oxy cancelled the Data Science Internship Program, which had previously served a critical support function for his group's research and development.

2. The AAET project and product development budget for 2020 was reduced by 88%. Notably, Anadarko's $4 million geophysical research and development budget for 2020 was reduced to $0 at Oxy. The effect of these drastically cut budgets necessarily reduced Mr. Lu's job duties.

3. Seismic licensing was reduced by 60%, which limited Mr. Lu's access to data that was necessary for performing his ordinary research and publication responsibilities. As a result of the licensing reduction, approximately 80% of the research topics Mr. Lu was tasked with prior to the Change of Control were eliminated.

4. Mr. Lu no longer had a single geophysicist collaborator to develop deep-learning models for geophysical research and development projects.

5. Mr. Lu no longer had a single Data Engineer on his team to assist him with research and development projects.

6. Mr. Lu was denied the opportunity to attend professional events and submit publications, which damaged his reputation and thwarted his future growth.

These examples and others were thoroughly discussed in Mr. Lu's Good Reason Inquiry Form[3] and Claim for Severance Benefits.[4]

### C. Mr. Lu's voluntary resignation for Good Reason

The Change of Control occurred on August 8, 2019. Pursuant to the Plan, Good Reason occurs when:

> The Participant's duties and responsibilities as an Employee are materially and adversely diminished in comparison to the duties and responsibilities enjoyed by the Participant immediately prior to the Change of Control.[5]

---

[3]   *See* Exhibit B, Good Reason Inquiry Form with exhibits.
[4]   *See* Exhibit C, Claim for Severance Benefits with exhibits.
[5]   *See* Plan, p. 6, Art. II (s)(i).

Health and Welfare Benefits Administrative Committee
December 30, 2020
Page 3 of 17

Under the Plan, the employee must terminate their employment within ninety days of the Good Reason occurrence to be entitled to separation benefits.[6] As required, Mr. Lu voluntarily and timely resigned for Good Reason on November 1, 2019.

In denying Mr. Lu's request for benefits, the Committee relied on speculative, unsubstantiated, potential future events that would have theoretically occurred outside of the ninety-day window Mr. Lu was afforded in which to resign for Good Reason and be eligible for severance benefits.

### D. The denial of Mr. Lu's request for benefits

Mr. Lu submitted a detailed claim, which was supported by voluminous documentary evidence. The Committee's hopelessly vague denial of Mr. Lu's request constituted one and one-half pages addressing his claim. The Committee's denial was bereft of detail or supporting evidence and was based on information that was false and inconsistent with the documentary evidence before it. Collectively, this amounts to an abuse of discretion and perhaps bad faith.

For example, oral statements by David Bowlby, Reza Rastegar, and Klaas Koster were the only information the Committee relied on in reaching their decision, beyond the over 100 pages of supporting arguments and documents Mr. Lu provided.[7] Mr. Lu cannot possibly know what Mr. Bowlby, Mr. Rastegar, and Mr. Koster told the Committee, because neither minutes nor audio of the Committee's discussions or meetings were provided to him. However, the threadbare nature of the denial suggests that the majority–if not the totality–of their statements to the Committee were misleading half-truths and perhaps outright fabrications. Following is a table that compares the Committee's analysis with the truth.

---

[6]  *See* Plan, p. 6, Art. VI, §§ 4.1 and 4.2(a)(ii).

[7]  All three were unfamiliar with Mr. Lu's job duties before the Change of Control. Several employees, including Mr. Lu's supervisor before the Change of Control, submitted various complaints about Mr. Rastegar and Mr. Bowlby's conduct—including their propensity for telling Mr. Lu's team members contradicting information. Mr. Koster did not work in the same group as Mr. Lu, and as Mr. Lu explained in his Good Reason Inquiry Form and Claim for Severance Benefits, Mr. Koster expressly told Mr. Lu and others in a meeting that his group did not support geophysical R&D activities and that his team would not collaborate with geophysical R&D.

**Occidental [Ping Lu] 000376**

| Committee's Analysis[8] | The Facts/Evidence |
|---|---|
| The Committee misrepresented that the status of the internship program was undecided. The false statement was as follows:<br><br>"As a result of our discussions with Mr. Bowlby, Mr. Rastegar and Mr. Koster, we understand that *it was never decided or communicated that* the internship program would go away." | As the Committee knew when it denied Mr. Lu's claim, the internship program was deemed to be "effectively dead" six months earlier. On September 11, 2019, former supervisor Jeremy Graybill emailed Mr. Lu and the Data Science team, stating as follows:<br><br>"I was told today, and it's supported in the presentation linked to below and the information in the attached email, that *the Data Science Internship program is effectively dead*, in that we will not be making any offers to any of our 2019 summer interns (as repeat interns or college new hires), and that we need to cancel all of our existing scheduled campus informational sessions, recruiting sessions, and interviewing sessions, as *we will not be continuing with a Data Science internship program for the summer of 2020*. As far as a timeline, this means that *none of you will have any of the following job responsibilities related to our Data Science internship program*, in comparison to previous APC job responsibilities you potentially had:"[9]<br><br>Mr. Graybill's email lists eight specific job responsibilities that Mr. Lu was assigned at Anadarko but would no longer be assigned at Oxy.<br><br>Not a single data science intern was selected for Mr. Rastegar's team in the summer of 2020. This confirms that Mr. Lu would not have had any of the eight specific job responsibilities he had in his role at Anadarko due to the discontinuation of the program, at least as it related to his group. |

---

[8]   *See* <u>Exhibit D</u>, letter from Lisa Barton dated March 13, 2020, denying Mr. Lu's claim for benefits.

[9]   *See* <u>Exhibit C</u>, exhibit 4, email from Jeremy Graybill.

**Occidental [Ping Lu] 000377**

| Committee's Analysis | The Facts/Evidence |
|---|---|
| The Committee misrepresented that the internship program was "a very small part" of Mr. Lu's responsibilities–so small that it was not "material." The false statement was as follows:<br><br>"The internship program was a very small part of your overall responsibilities. In fact, while we understand that the internship program was something that you enjoyed, it was not a material part of your position or your role at Anadarko." | As the Committee knew when it denied Mr. Lu's claim, the internship program was a considerable part of Mr. Lu's responsibilities and was material to his ability to perform the responsibilities that were explicitly outlined in his Anadarko job description, including the responsibilities to "lead the execution of wide range of projects across core focus areas of AAET," "provide leadership within various Data Science & Advanced Analytics sub-functions," "lead advanced analytics projects using ML and Deep Learning."[10]<br><br>It is undisputed that the internship program was taken from Mr. Lu following the Change of Control. |
| The Committee misrepresented that it never told Mr. Lu that his role with the internship program would change. The false statement was as follows:<br><br>"Further, it was never communicated to you that your role with the [internship] program would change." | As the Committee knew when it made this false statement, Mr. Graybill said the opposite six months earlier when he emailed on September 11, 2019 to inform Mr. Lu and others that they would no longer have duties relating to the internship program.[11] Between the date Mr. Graybill sent Mr. Lu this email and the date Mr. Lu resigned for Good Reason, no one at Oxy ever said otherwise. |

---

[10]  *See* <u>Exhibit C</u>, exhibit 1, job description.

[11]  *See* <u>Exhibit C</u>, exhibit 4, email from Jeremy Graybill ([T]his means that *none of you will have any of the following job responsibilities related to our Data Science internship program*, in comparison to previous APC job responsibilities you potentially had:").

Occidental [Ping Lu] 000378

| Committee's Analysis | The Facts/Evidence |
|---|---|
| The Committee intimated that the budget was not decreased and that even if it was, that decrease would not materially reduce Mr. Lu's job responsibilities.<br><br>"You indicated that the Geophysical R&D budget was decreased thus preventing you from pursuing collaborative research. Additionally, you indicated that this budget decrease prevented you from developing deep-learning models." | The Committee knows better. As Oxy's own internal budget presentations establish, the Geophysical R&D budget was decimated.[12] Such a drastic decrease in budget necessarily triggers a decrease in duties and responsibilities when such duties and responsibilities rely on funding. |
| The Committee misrepresented that Mr. Lu was unresponsive to work-related requests from Mr. Koster. This fabrication is embodied in the following excerpt from the denial letter:<br><br>"Mr. Koster indicated that he attempted to engage you and your team on several occasions to continue to work on research and development, but you were not responsive." | As the Committee knew when it made this false statement, Mr. Lu and his team completed all assigned projects. Without saying so expressly the Committee's analysis intimates that Mr. Lu did not manage his team's completion of assigned projects. It should be noted that Mr. Lu was not directly addressed or assigned work on several of the projects referenced, and in some cases was excluded from communications about them. Nonetheless, he managed his team's completion of assigned work and there was still not enough work for him to fill a full workday. |
| The Committee misrepresented that Mr. Lu had plenty of work to do but was unwilling. Here is the misrepresentation:<br><br>"Significant amounts of similar work were available to you, and you chose to not do the work." | As the Committee knew when it made this false statement, this statement is a fabrication that is not supported by a scintilla of documentary evidence. |

---

[12]  *See* Exhibit C, exhibit 5, pp. 5, 11.

Health and Welfare Benefits Administrative Committee
December 30, 2020
Page 7 of 17

| Committee's Analysis | The Facts/Evidence |
|---|---|
| In furtherance of its attempt to prove that Mr. Lu was unwilling to perform his job duties, the Committee cites an example of Mr. Lu being assigned work that was outside his area of expertise and inconsistent with his prior duties. Here is the first example:<br><br>"This is another example of a project that was available to you that you refused to perform."[13] | As the Committee knew when it proffered this misleading example, Mr. Lu is a scientist, and because there was no budget to support his work after the Change in Control, Mr. Rastegar asked Mr. Lu to perform tasks that were outside the scope of his responsibilities prior to the Change of Control.<br><br>For example, Mr. Rastegar assigned Mr. Lu mathematical projects and attempted to rebrand Mr. Lu as "a mathematician." In reality, Mr. Lu never worked on a mathematical project while performing his duties in AAET at Anadarko. He was neither required nor qualified to absorb duties and responsibilities that were outside of the scope of his expertise.<br><br>Taken as true, this particular example illustrates that Mr. Lu's duties and responsibilities were materially and adversely diminished as a result of the Change of Control. In an apparent effort to paper the file, Mr. Rastegar tried to replace Mr. Lu's ordinary job duties with work of a totally different character. This square-peg, round-hole maneuver is a shameless obfuscation that should be given no credence. |

---

[13]   Referencing Exhibit C, exhibit 13.

| Committee's Analysis | The Facts/Evidence |
|---|---|
| Here is the second example of the Committee trying to characterize different duties as the same and–based on that misrepresentation–claim that Mr. Lu simply did not want to do his job:<br><br>"While you indicated that you did not perform the research in the area and did not understand why you were being asked to present, someone with your level of skills and expertise should be able to digest and present the information. Asking you to do so was not outside of the scope of your duties and responsibilities, and your hesitation to participate further reflects that you were not willing to engage in work that was available to you. It also reflects that while you indicated that management and leadership skills were taken away from you, these opportunities continued to be made available."[14] | The Committee knows better. This is yet another example of Mr. Rastegar attempting to assign off-point work to Mr. Lu because there was not enough work for him to perform within the scope of his duties and responsibilities after  the Change of Control. Mr. Rastegar emailed Alex Bayeh and Mr. Lu the following: "I'd like to invite you both to visit Greenway Plaza this coming Monday to present your work on log and seismic interpretation/compressed sensing/toppicking/fault detection etc. Let's make the presentation very detailed and technical as I'm trying to give the rest of the team in Greenway Plaza [a chance] to see your projects." Neither Mr. Bayeh or Mr. Lu were responsible for the work that Mr. Rastegar refers to in his email as "your work." Mr. Rastegar also asks that Mr. Bayeh and Mr. Lu make the presentation "very detailed and technical" and again characterizes the work Mr. Bayeh and Mr. Lu did not do as "your projects." This is why Mr. Lu's supervisor, Jeremy Graybill, contacted David Bowlby to express his concerns about Mr. Rastegar assigning Mr. Lu presentations on work that he did not perform (because it was far afield from his duties).<br><br>In an email, Mr. Graybill expresses confusion because Mr. Lu and a colleague were being asked to give presentations about projects they were unfamiliar with: "The lack of information and the conflicting information is really difficult for people. As one example, Ping and Alex are confused why they were the ones invited by Reza to |

---

[14] Referencing Exhibit C, exhibit 9.

| Committee's Analysis | The Facts/Evidence |
|---|---|
|  | provide deep technical details in some domains where neither of them performed the work, when other individuals were not invited. That also leads to assumptions being made, when nobody has any information on what to expect for the future for themselves and their colleagues."<br><br>Mr. Graybill's email is consistent with the rest of the evidence, which establishes that Mr. Rastegar and Mr. Bowlby assigned duties and responsibilities to Mr. Lu that were never assigned to Mr. Lu prior to the Change of Control, and they did this to fill in the massive gaps left by his lack of work after the Change of Control. However, replacing one species of work with another cannot undo the fact that Mr. Lu's job duties and responsibilities were materially and adversely diminished after the merger. |
| The Committee misrepresented that the sale of Mozambique assets did not diminish Mr. Lu's duties. Here is one such false statement:<br><br>"You indicated that the sale of Mozambique to Total reduced your ability to research because the overall assets of the company were reduced…In your role, you worked on many different projects in the organization as they were prioritized by the organization. Changing projects does not change your duties and responsibilities. Thus, reducing the assets of the organization does not correlate with fewer research and development opportunities." | After the Mozambique assets were sold, Mr. Lu was removed from at least eight specific projects, each of which had clearly defined tasks and responsibilities that extended until late 2021. Thereafter, Mr. Lu was neither told what projects would replace this work nor assigned tasks that in fact filled the void. |

Occidental [Ping Lu] 000382

Health and Welfare Benefits Administrative Committee
December 30, 2020
Page 10 of 17

| Committee's Analysis | The Facts/Evidence |
|---|---|
| The Committee pretended that Mr. Lu was still supported by data engineers. Here is the specific misrepresentation:<br><br>"You stated that you lost all of the data engineers in your group. In speaking with Mr. Rastegar, we understand that while you initially had three people reporting to you, one data engineer was offered a position in Mr. Koster's group and was designated to continue to support your work." | In reality, neither Mr. Rastegar nor Mr. Koster nor anyone else ever told Mr. Lu that the data engineer transferred to Mr. Koster's group (Yuan Xiao) would continue to support Mr. Lu or his group. Before the Change in Control, Mr. Xiao was 100% dedicated to Mr. Lu's group. After the Change in Control, Mr. Xiao–who was transferred to Mr. Koster's group in October 2019–did not support Mr. Lu's group at all. Moreover, Mr. Xiao has not been asked to informally or unofficially support or collaborate with Mr. Rastegar's group during the year since Mr. Lu resigned for Good Reason. |

Occidental [Ping Lu] 000383

Health and Welfare Benefits Administrative Committee
December 30, 2020
Page 11 of 17

| Committee's Analysis | The Facts/Evidence |
|---|---|
| Elaborating on its misrepresentation that Mr. Lu's work was still going to be supported—by "team members," not necessarily the critical data engineers needed for his work, the Committee stated:<br><br>"Additionally, one additional team member was going to be reporting to you to support your work. Mr. Rastegar indicated that he communicated to you in person several times that your team would grow. However, you terminated employment during the Oxy transition period before this was able to happen." | There were no additional team members supporting Mr. Lu's group. Mr. Lu was never told or otherwise made aware of any plans for Oxy to hire a new team member for his group. Oxy also never specified what title, role, or qualifications the alleged prospective team member would have, much less that the team member would be a data engineer. Data engineers were a key part of research and development activities in AAET (one of Mr. Lu's primary job responsibilities prior to the Change of Control) and with none left, all research and development activities in Mr. Lu's group would eventually cease. Mr. Lu resigned with Good Reason within the time he was required to in order to remain eligible for benefits pursuant to the Plan. The Committee's contention that Mr. Lu should have waited until the speculative statement that Mr. Lu's team would grow came to fruition—without a shred of evidence to support holding out for such an event—is inconsistent with the requisite to resign for good reason within ninety-days of the triggering event. Over a year has passed since Mr. Lu's team was allegedly supposed to grow. The Committee did not review any evidence that Mr. Rastegar's speculation materialized, nor could it. Mr. Rastegar's group has not hired any additional team members nor transferred any existing employees to Mr. Lu's former team since his resignation for Good Reason. |

Health and Welfare Benefits Administrative Committee
December 30, 2020
Page 12 of 17

| Committee's Analysis | The Facts/Evidence |
|---|---|
| The Committee first misrepresented that the company supported Mr. Lu's publication opportunities and then blamed its denial of such opportunities on Mr. Lu. Here is the relevant quote:<br><br>"You indicated that you were required to withdraw publications and cease pursuing new opportunities…Mr. Rastegar was supportive of your publishing your paper but declined your participation in the conference due to the demands arising from the COC and the more urgent business tasks that you had been assigned." | As the Committee knew when it attempted to bend the truth, a condition precedent to Mr. Lu's ability to submit the paper was his ability to participate in the conference.  Mr. Rastegar knew this because Mr. Lu told him this via email. By denying Mr. Lu the opportunity to attend or present at the workshop, Mr. Rastegar also forced Mr. Lu to withdraw his paper.<br><br>Further, and equally important, Mr. Rastegar admitted that Mr. Lu missed out on this opportunity as a result of "budget constraints" and not because Mr. Lu had more important matters to attend to. This not only debunks the Committee's justification but also proves one of Mr. Lu's points–his team's budget was substantially reduced (and in some areas completely zeroed out), and this in turn eliminated some of his duties and reduced others. |

Occidental [Ping Lu] 000385

| Committee's Analysis | The Facts/Evidence |
|---|---|
| The Committee then drew an unsupported assumption that Mr. Lu would be permitted to participate in future conferences:<br><br>"This in no way suggested that you would forever be barred from participating in conferences. Again, this was a transition period immediately following the COC and not indicative of how things would operate going forward." | As Mr. Lu explained in his claim for benefits, Mr. Rastegar also denied his request to attend and present a paper at a conference in December 2019, and never responded to Mr. Lu's request to organize trainings from Google Brain. Mr. Rastegar denied Mr. Lu's team members similar requests to attend workshops and pursue publications. It was clear how things would operate going forward. Mr. Lu would no longer have the duties and responsibilities of generating and presenting material at conferences and workshops, a key duty he had at Anadarko.[15]<br><br>Again, the Committee seems to attempt to avail itself of the benefit of foresight that Mr. Lu was not entitled to under the specific time-constraints of the Plan. Moreover, the Committee did not evaluate any actual evidence of "how things would operate going forward" being any different than Mr. Lu's experience. |

### E.  The denial of Mr. Lu's request for benefits

Mr. Lu's entitlement to benefits was made very clear in both his Good Reason inquiry form and his claim for benefits. The Committee's denial of Mr. Lu's request for benefits was improper for four separate reasons.

### 1.  The Committee's denial relied on false statements from people with a retaliatory motive.

The Committee's denial of Mr. Lu's request for benefits relied on inaccurate statements by Mr. Rastegar, Mr. Bowlby, and Mr. Koster, none of whom had first-hand knowledge of Mr. Lu's job duties before the Change of Control. On top of this, Mr. Rastegar, Mr. Bowlby, and Mr. Koster had all been subject to formal and/or informal complaints from Mr. Lu, Mr. Graybill, and others within Mr. Lu's group. Their characterizations of Mr. Lu's role after the Change of Control were biased and as outlined above, contained demonstrable falsehoods. Allowing these people to

---

[15] *See* Exhibit C, exhibit 1, job description.

become the *de facto* decisionmakers in Mr. Lu's request for benefits was arbitrary and capricious because all of them had an obvious bias.

**2. After approving benefits for others who were harmed by Mr. Rastegar's dishonesty, the Committee arbitrarily and capriciously relied on dishonest statements from Mr. Rastegar in denying Mr. Lu's request for benefits.**

As mentioned, Mr. Lu, and several others on his team (including his former supervisor, Jeremy Graybill) made numerous complaints about Mr. Rastegar. Mr. Graybill provided human resources, Mr. Bowlby, and other members of management with a thorough analysis of his concerns following the Change of Control, many of which stemmed from Mr. Rastegar's dishonesty. Below is an excerpt from one of Mr. Graybill's complaints to Mr. Bowlby regarding Mr. Rastegar:

> [Mr. Rastegar's] flip-flopping and lack of any consistency in his interviews was very pronounced and concerning to the entire team, as it showed them that they couldn't trust anything he was saying, one way or another. *He also provided different information to different individuals on similar topics, strategy, and policies, likely due to ulterior motives, which again led to the development of a deep mistrust across the team.* In addition, Reza bad mouthed people including yourself to several of my employees, stating that you were not very knowledgeable or smart. He also made disparaging remarks about individuals and teams within the Oxy business as well. All of these comments further eroded any trust or respect from the team, and led my entire organization to question his motives and ethics. Many of the team is even concerned about retaliation activities from Reza in the future, based on some of the things he has said and some of his actions to date, including *Reza mentioning finding ways to fire people for cause (without COC) if they didn't do as he said in the future roles which he would assign them to.*[16]

Mr. Graybill's complaints were corroborated by others, including but not limited to: Alex Bayeh, Natalia (Natalie) Berestovsky, Dingzhou (Ding) Cao, and Yanyan Zhang, all of whom received benefits at the same time under the Plan after a complaint against Mr. Rastegar was filed with Oxy's compliance department. Nonetheless, the Committee apparently "understood that the allegations made against Mr. Rastegar were unsubstantiated and that it was determined that no violations occurred."[17] Apparently the Committee's understanding did not rely upon a single document, because none were provided to Mr. Lu.

---

[16] *See* <u>Exhibit C</u>, exhibit 17, emphasis added.

[17] *See* <u>Exhibit E</u>, letter from Lisa Barton dated May 21, 2020, in response to Mr. Lu's request for all documents he was entitled to under the Plan.

It is hard to imagine that the swath of consistent complaints against Mr. Rastegar, who provided the bulk of the information relied upon by the Committee in reaching their decision to deny Mr. Lu's benefit claim, "are not relevant to" Mr. Lu's claim appeal.[18] On top of this, similar concerns were raised about Mr. Bowlby, the other primary contributor to the Committee's decision to deny Mr. Lu's benefits.[19] Based on the lack of documents provided to Mr. Lu, the Committee was unaware of the complaints and potential investigation against Mr. Bowlby either.

### 3. Oxy has refused to provide Mr. Lu with documents regarding the Committee's decision to award benefits for similarly situated claims.

More than once, Mr. Lu requested all of the documents he is entitled to under the Plan. He has specifically requested the documents relating to the job duties and approval of benefits of similarly situated former coworkers, including Alex Bayeh, Natalie Berestovsky, and Ding Cao, who were managers of the data science team.

In response, Oxy has refused to provide Mr. Lu with these documents because it unilaterally deemed them "not relevant." While I understand the Committee's decision is unique to the circumstances of each Plan participant, the documents Mr. Lu requested are nevertheless highly relevant because Mr. Rastegar and Mr. Bowlby are the two principal people on whom the Committee has relied upon in denying Mr. Lu's claim. Their statements regarding the duties and responsibilities of similarly situated employees following the Change of Control are clearly relevant, and Mr. Lu should be entitled to compare their previous statements (made in conjunction with the coworkers' claims) to the statements they have made in relation to his claim. If, as suspected, their prior statements are inconsistent with their more recent statements, then the Committee's ongoing denial of Mr. Lu's claim is unsupportable.

Because Oxy has provided no documents proving that the Committee reviewed and compared similarly-situated claims or the statements Mr. Rastegar and/or Mr. Bowlby provided in response to those claims, it can be inferred that the Committee did not consider this information before it denied Mr. Lu's claim. Before the Change of Control, the AAET department had five managers, including Mr. Lu. All four of the other managers received benefits after the Change of Control. In addition, 10 of 12 non-management members of Mr. Lu's team received benefits under the Change of Control. This raises a strong inference that the Committee's decision to deny Mr. Lu's claim was either not based on a thorough evaluation of Mr. Lu's claim or was made with flagrant disregard for the evidence. In either scenario, the decision was arbitrary and capricious.

---

[18] *See* <u>Exhibit E</u>.

[19] *See* <u>Exhibit C</u>, exhibit 16. (Regarding complaints made about Mr. Rastegar to Mr. Bowlby: "The individuals on my team have not been pleased with David's response, and do not feel that their concerns have been heard at all.").

### 4. The Committee relied on unsubstantiated information about potential future job duties that would be given to Mr. Lu after he was required to resign for Good Reason.

Mr. Lu was required to initiate the termination of his employment within 90 days of the event triggering his right to terminate for Good Reason—in his case, a material and adverse diminishing of his job duties after the Change of Control. Immediately following the Change of Control on August 8, 2019, Mr. Lu's job duties were materially and adversely diminished. Accordingly, he did exactly what the Plan required in order to preserve his rights when he resigned for Good Reason on November 1, 2019—85 days after it became clear that his new job looked nothing like his old job.

The Committee's denial of Mr. Lu's claim for benefits is replete with "woulds"— crystal ball predictions about what duties Mr. Lu might have had at Oxy if he had only continued to hold out hope for the tides to turn once his eligibility to apply for benefits under the Plan had expired. Mr. Lu's claim for benefits was based on the reality he experienced—a material and adverse reduction of job duties and responsibilities, with no indication that his team was going to suddenly grow or win back the millions of dollars that had been slashed from the budgets that funded his work.

Perhaps more egregious is the fact that the Committee did not rely on any *concrete evidence* that Mr. Lu's role would grow in the manner prophesied by Mr. Rastegar and Mr. Bowlby. Even in the months that have passed since Mr. Lu's termination for Good Reason and the Committee's consideration of his claim, the Committee has yet to furnish a single page of documentary evidence to support the notion that Mr. Lu's team was growing or would grow or that the material and adverse reduction of duties and responsibilities Mr. Lu experienced was just part of a "transition period" that was "not indicative of how things would operate going forward."[20]

In the year that has passed since Mr. Lu's resignation for Good Reason, none of Mr. Lu's former team members absorbed any of the duties Mr. Rastegar or Mr. Bowlby insisted Mr. Lu would have. This is why the overwhelming majority of Mr. Lu's team was given benefits after the Change of Control because, like Mr. Lu, colleagues experienced a material and adverse diminishing of duties. Nobody was hired to fill Mr. Lu's role, and nobody took on the speculative duties that Mr. Rastegar and Mr. Bowlby told the Committee Mr. Lu was going to have after the "transition period." Hollow assurances fall short of good faith, especially when they are negated by hard evidence, and Mr. Rastegar and Mr. Bowlby's speculation should be given no weight.

### CONCLUSION

---

[20] *See* Exhibit D.

Health and Welfare Benefits Administrative Committee
December 30, 2020
Page 17 of 17

Mr. Lu was clearly entitled to benefits pursuant to the Plan when he resigned for Good Reason on November 1, 2019. He submitted a detailed Good Reason Inquiry Form, followed by a thorough Claim for Severance Benefits. The Committee denied Mr. Lu's claim by ignoring the black and white evidence, and relying on the false narratives provided by Mr. Rastegar, Mr. Bowlby and Mr. Koster.

Mr. Lu is entitled to severance benefits under the Plan. He has fulfilled his obligations and urges the Committee to fulfill its obligations. A thorough review of this appeal and its attachments overwhelmingly support Mr. Lu's entitlement to benefits. Any other finding would be arbitrary, capricious, unjust, and inconsistent with the Plan. Mr. Lu seeks his severance benefits without further delay and urges the Committee to make the right decision.

Sincerely,

David M. Minces

# EXHIBIT  A

Occidental [Ping Lu] 000391

**From:** "Barton, Lisa H." <lisa.barton@morganlewis.com>
**Date:** May 21, 2020 at 10:36:32 AM CDT
**To:** Ping Lu <xiaomadawolewo@gmail.com>
**Subject: RE:  Document Request Response**

Good morning!  You are correct in your understanding of the timing for providing your appeal – subject to what I added below.  It is the "earlier of" the two dates you provided.

Also attached is the response to your document request.  Please let me know if you have any questions.

Best,

Lisa

**Lisa H. Barton**
**Morgan, Lewis & Bockius LLP**
One Federal Street | Boston, MA 02110-1726
Direct: +1.617.341.7522 | Main: +1.617.341.7700 | Fax: +1.617.341.7701 | Mobile: +1.412.418.3640
lisa.barton@morganlewis.com | www.morganlewis.com
Assistant: Patricia A. Romzy | +1.412.560.3331 | patricia.romzy@morganlewis.com

**From:** Ping Lu <xiaomadawolewo@gmail.com>
**Sent:** Tuesday, May 12, 2020 12:52 PM
**To:** Barton, Lisa H. <lisa.barton@morganlewis.com>

Occidental [Ping Lu] 000392

**Cc:** peter lu <xiaomadawolewo@gmail.com>
**Subject:** Re: Document Request Response

[EXTERNAL EMAIL]

Dear Lisa,

I have not heard back from you regarding my email on May 6, 2020. I am writing to confirm that my request for review **is not due until <span style="color:red">the earlier of (i)</span> 120 days after the pandemic is declared over or <span style="color:red">(ii)</span> May 12, 2021.** I understand you are still getting clarification about the exact due date. I would appreciate a response regarding the new due date and the additional documents I requested at your earliest convenience. Thank you!

Best regards,

Ping

On Wed, May 6, 2020 at 10:57 PM Ping Lu <xiaomadawolewo@gmail.com> wrote:

> Dear Lisa,
>
> Thank you for your response. I understand you cannot confirm if my request for review must be filed by May 12, 2021, but to clarify, the earliest my request would be due is 120 days from the date the Department of Labor or IRS ends the COVID-19 national emergency, correct? So, practically speaking, the earliest my request for review is due would be 120 days from tomorrow?
>
> In the interim, I would like to re-urge my request for the following documents:
>
> 1. Documents relating to any investigation of my former supervisor Reza Rastegar. It was my understanding that my former coworkers had similar complaints about Reza and that he was investigated on at least one occasion as a result. My former coworkers and I were not provided with updates regarding the outcome of any investigation into our complaints.
>
> 2. Documents relating to Alex Bayeh, Dingzhou Cao, Natalie Berestovsky, and Yanyan Zhang's job duties before and after the change of control.
>
> 3. Documents relating to Oxy's decision to award Alex Bayeh, Dingzhou Cao, Natalie Berestovsky, and Yanyan Zhang severance benefits.
>
> Best regards,
>
> Ping
>
>
> On Wed, May 6, 2020 at 3:44 PM Barton, Lisa H. <lisa.barton@morganlewis.com> wrote:
>> Ping,
>> Good afternoon! We had not responded because we were reviewing new
>> guidance from the Department of Labor regarding claim/appeal deadlines.

**Occidental [Ping Lu] 000393**

As you know, you were originally required to submit notice of your appeal by May 12, 2020. Now, in response to the COVID-19 pandemic, the DOL has extended the amount of time you have to appeal your claim. You have until 120 days after the announced end of the COVID-19 National Emergency (or other deadline established by the Department of Labor/Internal Revenue Service) or May 12, 2021, if earlier, to file your appeal. Unfortunately, we do not currently know when the end of the COVID-19 National Emergency will be announced. Therefore, we cannot confirm at this time if your claim appeal must be filed by May 12, 2021 or an earlier date.

Please let me know if you have any questions.

Best,

Lisa

**Lisa H. Barton**
**Morgan, Lewis & Bockius LLP**
One Federal Street | Boston, MA 02110-1726
Direct: +1.617.341.7522 | Main: +1.617.341.7700 | Fax: +1.617.341.7701 | Mobile: +1.412.418.3640
lisa.barton@morganlewis.com | www.morganlewis.com
Assistant: Patricia A. Romzy | +1.412.560.3331 | patricia.romzy@morganlewis.com

**From:** Ping Lu <xiaomadawolewo@gmail.com>
**Sent:** Tuesday, May 5, 2020 9:54 AM
**To:** Barton, Lisa H. <lisa.barton@morganlewis.com>
**Cc:** peter lu <xiaomadawolewo@gmail.com>
**Subject:** Fwd: Document Request Response
[EXTERNAL EMAIL]
Dear Lisa,
I hope you are doing well. I am writing to follow up on my time-sensitive email below from April 29. Thank you.
Best regards,
Ping
---------- Forwarded message ---------
From: **Ping Lu** <xiaomadawolewo@gmail.com>
Date: Wed, Apr 29, 2020 at 12:24 PM
Subject: Re: Document Request Response
To: Barton, Lisa H. <lisa.barton@morganlewis.com>
Cc: peter lu <xiaomadawolewo@gmail.com>
Dear Lisa,
Thank you for your prompt response. I would like to also request the following documents:
1. Documents relating to any investigation of my former supervisor Reza Rastegar. It was my understanding that my former coworkers had similar complaints about Reza and that he was investigated on at least one occasion as a result. My former coworkers and I were not provided with updates regarding the outcome of any investigation into our complaints.
2. Documents relating to Alex Bayeh, Ding Cao, and Natalie Berestovsky's job duties before and after the change of control.

3. Documents relating to Oxy's decision to award Alex Bayeh, Ding Cao, and Natalie Berestovsky severance benefits.

I would also like to request an extension to submit my request for review due to the COVID-19 pandemic and the amount of time that passed before I was provided documents relevant to my claim.

Best regards,

Ping

On Mon, Apr 27, 2020 at 8:53 AM Barton, Lisa H. <lisa.barton@morganlewis.com> wrote:

The Health and Welfare Benefits Administrative Committee reviewed the summary, your claim documents (which I did not send back to you because they were so voluminous and we believe you have them) and the attached documents that were originally presented to the Good Reason Subcommittee. We also sent you emails – which you did not mention below – so I'm reattaching. If you would like me to re-send you a copy of your claim documents, please let me know.

This includes all of the documents. Please let me know if you have any questions. We also sent the documents to you via regular mail.

Lisa

**Lisa H. Barton**
**Morgan, Lewis & Bockius LLP**
One Federal Street | Boston, MA 02110-1726
Direct: +1.617.341.7522 | Main: +1.617.341.7700 | Fax: +1.617.341.7701 | Mobile: +1.412.418.3640
lisa.barton@morganlewis.com | www.morganlewis.com
Assistant: Patricia A. Romzy | +1.412.560.3331 | patricia.romzy@morganlewis.com

**From:** Ping Lu <xiaomadawolewo@gmail.com>
**Sent:** Friday, April 24, 2020 11:20 AM
**To:** Barton, Lisa H. <lisa.barton@morganlewis.com>
**Cc:** peter lu <xiaomadawolewo@gmail.com>
**Subject:** Re: Document Request Response

[EXTERNAL EMAIL]

Dear Ms. Barton,

Thank you for providing these documents. I received the Severance Plan, Summary Plan Description, your letter from April 22, 2020, a summary of my claim, and my claim letter with attachments. In your letter you mention email correspondence and documents presented to the Health and Welfare Benefits Administrative Committee. I do not believe these were included in the documents you provided to me, unless the only document presented to the Committee (in addition to the Plan documents and my claim letter with attachments), was the summary of my claim.

Please confirm that you have provided me with all of the documents I am entitled to receive free of charge under the Plan, as referenced in the denial letter sent to me on March 13, 2020. I would appreciate a response within the next week because the deadline to submit my request for review is quickly approaching. Thank you.

Best regards,

Occidental [Ping Lu] 000395

Ping

On Wed, Apr 22, 2020 at 7:53 PM Barton, Lisa H. <lisa.barton@morganlewis.com> wrote:

This is being sent on behalf of the Health and Welfare Benefits Administrative Committee. Please let me know if you have any questions. We are also sending via hardcopy.

**Lisa H. Barton**

**Morgan, Lewis & Bockius LLP**

One Federal Street | Boston, MA 02110-1726

Direct: +1.617.341.7522 | Main: +1.617.341.7700 | Fax: +1.617.341.7701 | Mobile: +1.412.418.3640

lisa.barton@morganlewis.com | www.morganlewis.com

Assistant: Patricia A. Romzy | +1.412.560.3331 | patricia.romzy@morganlewis.com

DISCLAIMER

This e-mail message is intended only for the personal use of the recipient(s) named above. This message may be an attorney-client communication and as such privileged and confidential and/or it may include attorney work product. If you are not an intended recipient, you may not review, copy or distribute this message. If you have received this communication in error, please notify us immediately by e-mail and delete the original message.

Occidental [Ping Lu] 000396

# EXHIBIT B

Occidental [Ping Lu] 000397

**ANADARKO PETROLEUM CORPORATION**
**CHANGE OF CONTROL SEVERANCE PLAN**
**GOOD REASON INQUIRY FORM**

On August 8, 2019, Occidental Petroleum Corporation ("Oxy") acquired Anadarko Petroleum Corporation ("Anadarko") pursuant to that certain merger agreement by and among Anadarko, Oxy and a subsidiary of Oxy ("the Merger Agreement"), which acquisition constituted a Change of Control under the Anadarko Petroleum Corporation Change of Control Severance Plan (the "COC Plan").  Among other things, the COC Plan provides that Participants may resign their employment within 90 days of a Good Reason event occurring and receive Separation Benefits from the COC Plan.  The option to resign for a Good Reason event is available only for such events occurring before August 9, 2020.

The COC Plan allows Participants to resign their employment and claim Severance Benefits under the COC Plan if the Participant incurs a Good Reason event.  This Good Reason Inquiry Form ("Form") has been approved by the Plan Administrator to allow Participants to inquire as to whether they have incurred a Good Reason event without having first resigned employment.  All capitalized terms in this Form have the meaning provided for in the COC Plan unless a definition is provided in this Form.

If you believe you have experienced a "Good Reason" event as defined under the COC Plan and you have not resigned your employment, please complete and submit this Form to the address below.  For more information about the Good Reason provision, including a discussion and examples, please click here. As stated in the Summary Plan Description, you may be entitled to Separation Benefits "*if your employment terminates for Good Reason within one year after the occurrence of a Change of Control, **provided that you initiate the termination of your employment** within 90 days of the event triggering your right to terminate for Good Reason.*"  **By signing and submitting this Form, you confirm your desire and intent to initiate the termination of your employment**.

All determinations of Good Reason will be made by the Plan Administrator in its sole discretion.  Please note that the Plan Administrator, in evaluating this Form, may communicate with your supervisor and other individuals who might have knowledge of facts relating to whether a Good Reason event has occurred.  As such, your submission of this Form should not be considered a confidential or private matter.

In those cases where the situation is clear and the Plan Administrator can readily determine that a Good Reason event has occurred, you will be promptly notified that the circumstances you reported constitute a Good Reason event under the COC Plan.  Company management will contact you separately regarding your last day of work ("Last Day").  Your Last Day will be determined by the Company in order to provide for an orderly transition, but in no case will your last day of work be later than 90 days after the Good Reason event occurred.

At any time prior to your Last Day, you may rescind your resignation by sending a notice to GoodReason@oxy.com stating that you rescind your Good Reason resignation.  If you timely

rescind your Good Reason resignation, you will remain an employee under the same terms and conditions and with continued participation under the COC Plan, except that you will not be able to assert the Good Reason event submitted in this Form as a severance event under the COC Plan (if 90 days have passed since it occurred).

In cases that are less clear or are lacking in merit, the Plan Administrator will advise you that it cannot be readily determined that a Good Reason event has occurred.  You then have the option, in your complete discretion, of resigning your employment within 90 days of the Good Reason event that you believe may have occurred and filing a formal claim for benefits as a Claimant under Section 9.2 of the COC Plan.  Your claim for benefits will then be administered by the Plan Administrator under Article IX of the COC Plan document.

In all cases of Good Reason assertion, in order to receive Severance Benefits under the COC Plan, (i) the Plan Administrator must determine that a Good Reason event has occurred, (ii) you must terminate your employment within 90 days of the occurrence of the Good Reason event, and (iii) you must execute and not revoke the release of claims agreement that will be provided by Oxy.

For additional information on the process of making a Good Reason Inquiry, please also here.

| **Name:** Ping Lu | | **Employee ID:** 156083 |
|---|---|---|
| **Address:** 124 South Brooksedge Circle | | |
| **City:** The Woodlands | **State:** Texas | **Zip:** 77382 |
| **Title:** Manager of Data Science & Advanced Analytics | **Work Location:** The Woodlands, Texas | |
| **Supervisor Name:** Reza Rastegar | | |
| **Email Address:** xiaomadawolewo@gmail.com | | |

Under the COC Plan, you may be eligible for Severance Benefits if, **prior to August 9, 2020**, you experience any of the events detailed in the chart below.  Please indicate which Good Reason event you believe applies to your situation, including the date on which such event first occurred, and provide any and all additional details in the space provided on page 3.  If you need more space, please attach an extra sheet.

Date on which you believe the Good Reason event first occurred:  August 12, 2019

| | |
|---|---|
| ✓ | Your duties and responsibilities were materially and adversely diminished in comparison to your duties and responsibilities immediately prior to closing |
| | Your Base Salary was materially reduced in comparison to your Base Salary immediately prior to closing |
| | The aggregate value of your Base Salary plus Total Target Incentive Compensation was materially reduced in comparison to the aggregate value of your Base Salary plus Total Target Incentive Compensation immediately prior to closing |

Occidental [Ping Lu] 000399

| | |
|---|---|
| | You are required to be based at a location more than 25 miles from the primary location where you were based and performed services immediately prior to closing |
| | You were required to take an assignment or position that requires travel on frequent overnight trips resulting in extended stays away from home on a consistent basis and to a substantially greater extent than immediately prior to closing (this excludes assignments or positions that might require temporary travel for a specified, short duration of time, regardless of whether such assignment or position is the result of circumstances related to the transactions contemplated by the Merger Agreement) |
| | You are required to perform in a job position, or a substantial job assignment, for which you are not skilled or trained |

Provide any and all additional detail supporting the Good Reason event in the space below:

I have led R&D efforts within the Data Science team for over two years. In April 2019, prior to the acquisition, I was promoted to Manager of Data Science & Advanced Analytics. My duties have been materially and adversely diminished since closing. In my role prior to the acquisition the responsibilities listed on the attached job description (Exhibit 1) were representative of my duties. I no longer have any of the responsibilities listed in Exhibit 1.

Before the closing I was consistently busy and had enough tasks to fill and often exceed a 40 hour workweek. Since closing I only have enough work to keep me busy for about 4-6 hours per week.

I have attached a detailed explanation of my diminished duties that includes specific examples.

*[Signature Page to Follow]*

Occidental [Ping Lu] 000400

**Occidental [Ping Lu] 000401**

**SIGNATURE**

By signing this Form, I agree that submitting this Form serves as my notice of resignation and that submitting this Form does not guarantee that I will receive severance benefits under the COC Plan. If the Plan Administrator determines that a Good Reason event has occurred, I understand that I will be resigning my employment on the Last Day identified by the Company but that I will have the option of rescinding my resignation as set forth in this Form.

I acknowledge that this is not a claim for benefits under Section 9.2 of the COC Plan. I further acknowledge that I have received and have read the *Anadarko Petroleum Corporation Change of Control Severance Plan Summary Plan Description* and the *Anadarko Petroleum Corporation Change of Control Severance Plan document.*

By: *Ping Lu*

Printed Name: Ping Lu

Date: November 1, 2019


**Submit your completed form to: GoodReason@oxy.com or APC Change of Control Severance Plan, 5 Greenway Plaza, Suite 110, Houston, TX 77046, Attn: Health and Welfare Benefits Administrative Committee.**

Occidental [Ping Lu] 000402

**FOR ADMINISTRATIVE USE ONLY**

| Name: | Employee ID: |
|---|---|

| | |
|---|---|
| Employee-reported date of Good Reason event (from page 1) | |
| Company date of Good Reason Event, if different | |
| Confirmation of Good Reason event by Company (yes or no) | |
| 90 days from Good Reason event (last day worked cannot be later than this date) | |
| Employee termination date, as determined by supervisor | |
| Notification sent to employee (indicate date) | |

Occidental [Ping Lu] 000403

# EXHIBIT 1

Occidental [Ping Lu] 000404



# JOB DESCRIPTIONS: AAET DATA SCIENCE

DIRECTOR OF DATA SCIENCE & ADVANCED ANALYTICS

MANAGER OF DATA SCIENCE & ADVANCED ANALYTICS

AAET DATA SCIENTIST

AAET DATA ENGINEER



Occidental [Ping Lu] 000405



## MANAGER OF DATA SCIENCE & ADVANCED ANALYTICS

### SUMMARY

The AAET group serves as a centralized innovation and excellence organization responsible for identifying and developing Advanced Analytics and Emerging Technologies which provide differentiating capabilities across Anadarko's business.

The Manager of Data Science & Advanced Analytics leads the Data Science efforts for various AAET initiatives, working very closely with counterparts in the Geoscience and Petroleum Engineering domains within AAET and Geoscience Technology, along with AAET's Application Development organization, in leading applied research and development in generating advanced data driven solutions for challenging and high impact problems within the E&P operations domains.

### QUALIFICATIONS

- Strong background and broad expertise in Data Science disciplines, including Mathematics, Statistics, Computer Science, Machine Learning, Data Engineering, Spatial Analytics, and/or Applied Physics
- Strong quantitative and problem-solving skills, including strong mathematical, statistical, and technical knowledge and skills
- Demonstrated ability to lead and deliver applied research and development projects for new technologies in oil and gas
- Recognized thought leadership and technical expertise with established credibility both internally and externally
- Strong programming and scripting skills, with languages such as Python, C#, C++, and Java
- Strong experience with modern ML and Deep Learning frameworks including TensorFlow, PyTorch, Keras, Theano, and Caffe
- Strong experience with modern ML and Data Science libraries including Pandas, Numpy, Scikit-Learn, NLTK, Seaborn, Dplyr
- Excellent understanding of ML techniques & algorithms, such as ANNs, SVM, GBM, Decision Forests, k-NN, Naive Bayes, etc.
- Master's Degree and/or PhD strongly preferred in Computer Science, Computational Mathematics, Applied Mathematics, Statistics, Engineering, Physics, or related quantitative field

### RESPONSIBILITIES

- Work intimately and collaboratively with business SMEs (Petroleum Engineers and Geoscientists) in leading advanced applied research and development for challenging and high impact problems within the E&P operations domains
- Lead the execution of a wide range of projects across core focus areas of AAET, leveraging significant data and real-time surveillance within the operational, production, and financial domains, for all core E&P business functions (US Onshore, GOM, and International), to deliver tangible business value
- Lead algorithm deployment and maintenance for E&P project domains including seismic acquisition, processing, inversion, and interpretation; subsurface characterization, field development, planning, and optimization; geologic and petrophysical analysis, offshore advanced process analytics, and digital operations
- Provide leadership within various Data Science & Advanced Analytics sub-functions, including Data Science Advanced Research & Development, Data Science Center of Excellence, Data Science Fleet Performance Optimization, Data Science Technology Advancement, Data Strategy & Analytics, and Embedded Data Science & Analytics teams
- Leverage statistical analysis, mathematical modeling, pattern recognition, and ML and deep learning frameworks (including TensorFlow, PyTorch, and Keras) towards recommending, selecting, developing, and integrating any Artificial Intelligence, Machine Learning, and Deep Learning algorithms and approaches required to provide requested capabilities
- Network internally and externally to build relationships that foster technology transfer and collaboration
- Work with external technology organizations including joint industry projects, external industry technology organizations, and key university departments through research consortiums, to improve digital capabilities
- Lead the promotion of digital transformation, training and development of other Data Scientists, Citizen Data Scientists, and other peers throughout the organization
- Lead advanced analytics projects using ML and Deep Learning, heavily utilizing GPU hardware stacks (including dedicated DGX boxes) and Google Cloud Platform infrastructure (Cloud Composer, CMLE, GKE, BigQuery, DataFlow, Pub/Sub, etc.)
- Pursue continuous learning, literature, and training opportunities, to keep up with academic and industry research and trends, and ensure that the most advanced technologies and capabilities are being leveraged and implemented
- Generate content for external publications and presentations in conference and scientific journals, participating and presenting in external conferences and meetings to promote Anadarko's name as a leader in technology

# EXHIBIT C

Occidental [Ping Lu] 000407

December 12, 2019

Health and Welfare Benefits Administrative Committee
Occidental Petroleum Corporation
5 Greenway Plaza, Suite 110
Houston, TX 77046

Re:     Ping Lu – Claim for Benefits

Dear Committee,

My duties as the Manager of Data Science & Advanced Analytics were materially and adversely diminished since the change of control. Because of this, I resigned for good reason under Anadarko Petroleum Corporation's Change of Control Severance Plan on November 1, 2019.

At the time of my resignation, I was no longer tasked with any of the responsibilities in my job description.[1] This claim specifically details how numerous significant responsibilities I had before the change of control were eliminated after the change of control. I did not have enough responsibilities to even occupy a part-time workweek. The attached calendars for 2019 are just one illustration of how materially my job duties were diminished since the change of control in August.[2]

As you will see in this detailed letter and the exhibits attached, my resignation was involuntary and for good reason as defined by the Plan. The evidence of this is overwhelming and my entitlement to benefits under the Plan is the only accurate finding for my claim.

**Overview of the AAET and my role**

Advanced Analytics & Emerging Technology ("AAET") has four primary functional units (1) Data Science Team, (2) Engineering Team, (3) Emerging Geoscience Team, and (4) Geoscience Technology Team. I worked in the AAET department during my time at Anadarko Petroleum Corporation ("APC"). After the acquisition closed, Occidental Petroleum ("OXY") defunctionalized and decentralized the entire AAET team and disbursed the team members to individual functional groups within OXY.

The Advanced Analytics R&D team is a sub-team of the Data Science team. I was the manager of this team with four direct reports: one data scientist, one senior data scientist, one staff data engineer, one data engineer (contractor). We worked and collaborated closely with colleagues from the Geoscience Team and Geotechnology Team.

As APC's CEO Al Walker stated, "[t]he AAET will be an entrepreneurial organization focused on developing new technologies and next-generation capabilities. Including those for our digital operations, reservoir characterization and modeling, and geophysical analysis," the core functionality of AAET focusing on R&D is no longer a continuation after the acquisition.

---

[1] Exhibit 1, Job description.
[2] Exhibit 2, Outlook calendars for 2019.

Occidental [Ping Lu] 000408

**I. OXY's cancellation of the Data Science Internship Program absolved me of the substantial duties I had relating to the program.**

One of my job duties at APC was to lead the promotion of digital transformation, training and development of other Data Scientists, Citizen Data Scientists, and peers throughout the organization. A major component of this job duty was the Data Science Internship Program.

In 2018 and 2019, my group was assigned four interns. I was actively involved in the internship program including assisting with the campus information session, recruiting session, interviewing sessions, proposing and determining projects for the interns, mentoring, management, project advisement, publications, and making decision on extending employment offers.

The Data Science Internship Program was a success. Below are some examples of our interns' work.

1. 2018 Intern Program

    a. Arkabandhu Chowdhury (Rice University, PhD student - Computer Science) worked on projects titled "Generation of synthetic geological seismic and label data using deep-learning model" during summer 2018.

    b. Mostafa Karimi (Texas A&M University, PhD student - Electrical & Computer Engineering) worked on projects titled "Development of deep convolutional neural network architecture for seismic interpretation" during summer 2018.

    c. Mostafa Karimi's developments enabled us to publish a paper at the Thirty-second Conference on Neural Information Processing Systems, held in Montreal in 2018.

2. 2019 Intern Program

    a. Xing Zhao (Texas A&M University, PhD student - Computer Science) worked on "Deep learning approach on seismic noise attenuation: case studies for gaussian noise and swell noise" during summer 2019.

    b. Xing Zhao's work was integral to two journal publications, one of which was published in "The Leading Edge" and another submitted to "Geophysics."

    c. Rebecca Li (University of Houston, PhD student - Computer Science) worked on projects titled "Seismic compressive sensing technology through deep learning models" during summer 2019.

    d. Rebecca Li's work during her internship led to the publication of a paper in "The Leading Edge" journal and a paper at the Thirty-third Conference on Neural Information Processing Systems held in Vancouver in 2019.

For the 2018 intern program, I was responsible for: (1) assigning interns' projects and mentors, (2) making decisions on extending employment offers to interns, and (3) providing recommendations for interns' projects. For the 2019 intern program, I was responsible for: (1)

Occidental [Ping Lu] 000409

assigning interns' projects and mentors, (2) making decisions on extending employment offers to interns, and (3) coordinating intern recruiting events.

Summer interns were critical to support my group's research activities and functionality, which were necessary for success and development. OXY would not be making any offers to APC's 2019 summer interns (as repeat interns or employees).

OXY delivered a recruiting presentation on August 28, 2019.[3] OXY ended the Data Science Internship Program and accordingly cancelled all of APC's scheduled campus informational sessions, recruiting sessions, and interviewing sessions. My former supervisor, Jeremy Graybill (Director of Data Science), provided the presentation information to those involved with the internship program before the change of control. Mr. Graybill described the program as "effectively dead."[4] OXY's human resources presentation was not provided to Anadarko's human resources department, nor did OXY provide it to me directly.

I was never given any documentation or had any conversations with Reza Rastegar (my direct supervisor after the change of control, Director of Data Analytics) or anyone else at OXY about the continuation of the internship program. The information communicated in OXY's August 28 presentation was the only information I was provided about the program.

Without having the internship program in 2020, the number of resources that can be dedicated to my research topics and projects in my group was largely reduced.

The cancellation of the Data Science Internship Program meant that I did not have any of the following job responsibilities that I previously had at APC:

    a. Providing input into or making a decision on which Data Science candidates should be hired as returning interns for next summer, or as new hires after graduation.

    b. Recruiting Data Science candidates at the various college campuses and through other recruiting efforts.

    c. Interviewing Data Science candidates for summer 2020 internship opportunities, both through recruiting efforts and formal scheduled interviews.

    d. Providing input and deciding which candidates will be selected to receive internship offers.

    e. Extending offers to Data Science intern candidates.

    f. Determining which Data Science projects the interns work on and preparing for the Data Science summer internship program.

---

[3] Exhibit 3, Fall Internship Recruiting Update.
[4] Exhibit 4, September 11, 2019 email from Jeremy Graybill.

Occidental [Ping Lu] 000410

g. Providing individual mentorship, management, project advisement, and general internship program mentorship and input throughout the program.

**II. Geophysical R&D was allocated $0 in the 2020 budget, which decimated my individual and collaborative research duties.**

In my role at APC I was tasked with working with external technology organizations including joint industry projects, external industry technology organizations, and key university departments through research consortiums to improve digital capabilities. I was also in charge of leading algorithm deployment and maintenance for E&P project domains including seismic acquisition, processing, inversion, and interpretation; subsurface characterization, field development, planning, and optimization; geologic and petrophysical analysis, offshore advanced process analytics, and digital operations. These tasks require support through third party R&D.

During the past two years I was involved in the following activities, which required investments totaling well over $6.6 million.

a. AAET collaborated with Bluware to build a powerful, interactive interpretation package to deploy our geophysical deep-learning models. (over $750,000)

b. AAET and Schlumberger signed a contract to develop the Delfi environment where our deep-learning models could be deployed and a user-interface with GUI capability could be built for geophysicists to provide training labels and QC results from those models. ($750,000)

c. AAET spent approximately $5.1 million on the Geophysical R&D team during 2018 and 2019, including internal labor of $3.3 million and $1.8 million in capital and operating expenses.

d. AAET planned to collaborate with CGG on re-processing the BOA project to incorporate dirty salt/inclusions from APC's deep-learning predictions into vendor processing workflow.

e. AAET worked on a collaboration with WesternGeco to leverage the GPU technology in seismic processing for the BEVO project with the integration of the deep-learning models.

f. AAET planned to continue to participate in consortiums through the University of Texas at Austin – Bureau of Economic Geology and Georgia Tech University's ML4Seismic, as well as took considerations of joining consortiums through Stanford University, SEG SEAM AI, University of Leeds, Fraunhofer Institute

g. AAET collaborated with Halliburton for development of fault segmentation tool

h. AAET invested Topcoder for seeking solutions with fault segmentation solutions

Occidental [Ping Lu] 000411

During a meeting on September 6, OXY communicated its decision to reduce the investment for AAET project and product development from $37.5 million to $4.6 million (a reduction of 88%).[5] Specifically, all the Geophysical R&D projects have been held completely at a standstill, with no budget allocation for 2020.[6] Prior to the acquisition, APC had allocated $4 million to Geophysical R&D for the year 2020.[7]

Before the change of control, I was actively involved in the following Core R&D projects listed on the AAET website:[8]

    a.  Machine Augmented Seismic Interpretation

- DL- based seismic fault interpretation

- DL- based seismic salt interpretation

- DL- based seismic stratigraphic interpretation

    b.  Advanced Reservoir Characterization & Quantitative Interpretation Solutions

- ML- based seismic inversion

- ML- based noise attenuation

With the Geophysical R&D budget slashed to zero, all the on-going and backlogged R&D projects were suspended. After the change of control, I did not perform any duties related to the projects listed above. Like the Geophysical R&D budget, my responsibility for these R&D activities was reduced by 100%.

With a zeroed-out budget, all R&D research and collaborations with third parties were terminated. The deep-learning models that I had developed will no longer have commercial platforms to deploy in the future. The critical research projects that were no longer being funded were a major supplement to the R&D activities within my group. In addition, promotion of the technologies developed, one of my responsibilities at APC, had been totally eliminated.

**III. One of my key responsibilities, developing deep-learning models, was also terminated by the slashing of the Geophysical R&D budget.**

In my role at APC, I was leading the effort to develop deep-learning models for geophysical projects. There were several topics that have been identified as collaborations with the geophysical team at AAET, Geoscience Technology, and Asset teams. Prior to the change of control, the R&D geophysical projects that I was involved with were:

    a.  Channel detection for the assets in Mozambique, Horn Mountain, Ghana

---

[5] <u>Exhibit 5</u>, AAET Portfolio – Evaluation progress update, p. 4.
[6] <u>Exhibit 5</u>, p. 5.
[7] <u>Exhibit 5</u>, p. 11.
[8] <u>Exhibit 6</u>, AAET website "Core R&D" page.

Occidental [Ping Lu] 000412

    b.   Salt/Salt inclusion detection for the assets in GoM K2, BOA, BEVO

    c.   MTC detection for the assets in Columbia, GoM

    d.   Horizon pickings for the assets in GoM Cretaceous, Horn Mountain, Ghana

    e.   Sand thickness detection for the assets in Mozambique, Horn Mountain

    f.   Seismic bandwidth extension for the assets in Mozambique, Horn Mountain

    g.   AVO anomaly detection for the assets in Mozambique

    h.   Attenuations of multiples for the assets in GoM K2

All the in-flight and future projects were well defined prior to the change of control. My responsibilities for those projects were to: (1) roadmap for geophysical DL projects and (2) roadmap salt identification projects. As shown in the memorandum from CTO Sanjay Paranji to the Governance and Risk Committee, in November 2018, it was estimated that "2-3 years of R&D" would be "required to get through it all."[9]

After the change of control, the work I did on these projects ceased. Before the change of control, a significant portion of my daily work was spent on these projects. None of the eight listed projects were discussed after the change of control. I was not provided with any individual projects to fill this reduction and the only two projects assigned to my group were directly relevant to my team members' work, not mine. The "compressive sensing" and "deployment of fault detection" projects assigned by Klaas Koster (OXY's Chief Geophysicist) and Mr. Rastegar after the change of control do not have any tasks relevant to my duties, as described below.

    a.  **Compressive sensing.** Mr. Koster assigned the compressive sensing project to my team members Yanyan Zhang, Yuan Xiao, and Nikos Mitsakos. Mr. Koster did not assign me any work for this project in his emails to the team.[10]

       Mr. Koster sent several emails to Yanyan and Yuan asking them for input on the project. Mr. Koster also invited them to have a meeting with him at OXY's office. Mr. Koster did not request my input or my presence at the meeting.

       Mr. Koster explicitly expressed that he only wanted to see the DL compressive sensing reconstruction to apply to another dataset. Mr. Koster did not express or imply that he would like to continue any R&D collaborations even though the potential for this was brought to his attention. I had no responsibility on the project without any R&D collaboration.

    b.  **Deployment of fault detection.** Before the change of control, Yanyan was exclusively responsible the deployment tasks relevant to fault detections. Yanyan was solely responsible for relevant interactions with counterparts and performance of all data science

---

[9] Exhibit 7, Memorandum dated November 16, 2018.
[10] Exhibit 8, September 26, 2019 email chain from Klaas Koster.

Occidental [Ping Lu] 000413

work. After the change of control, Yanyan continued to maintain responsibility of the fault deployment work. I was not assigned any work on this project.

Mr. Rastegar requested that I present technical details about these projects to his team members during a group meeting on October 14, 2019. I was not involved in any work on these projects. Mr. Graybill emailed David Bowlby (VP Data Management & Analytics) and described that I was not involved in either of the projects. As Mr. Graybill explained, I was confused about why Mr. Rastegar invited me to present "deep technical details in some domains where neither of them performed the work, when other individuals were not invited."[11] Ultimately, Nikos presented the compressive sensing work, Yanyan presented the fault deployment work, and I presented the introduction of team members, deep-learning workflows and challenges.

**IV. OXY has reduced seismic licensing, which left me with limited access to data and hindered me from performing my research and publication duties.**

At APC, my job required that I: (1) lead the execution of a wide range of projects across core focus areas of AAET, leveraging significant data within the operational and production domains for all core E&P business functions, to deliver tangible business value and (2) generate content for external publications and presentations in conference and scientific journals, participating and presenting in external conferences and meetings to promote APC's name as a leader in technology.

The Geophysical R&D research topics required large volumes of datasets to support my R&D activities. Access to these datasets provided me with the requisite background information for the development of deep-learning models designed for each individual research topic and integration of regional deep-learning models to commercial platforms. APC purchased access to all the seismic datasets from assets in the Gulf of Mexico and international assets including Mozambique, Ghana, Colombia, Argentina, and more.

OXY largely reduced the budget for licensing seismic data from major vendors in the Gulf of Mexico region. In addition, OXY no longer has ownership of the international assets, like Mozambique that was owned by APC, which has been sold to Total. OXY and Total continued to work towards closing the remaining transactions for African assets in Algeria, Ghana and South Africa pursuant to their agreement signed in August 2019. The investment on licensing of seismic data had been reduced by about 60% after the change of control. None of the licensed data for international areas had been relicensed and most of the onshore data was not relicensed either.[12]

Without continued licensing of the datasets, which I was able to access before the change of control, most of my research activities, particularly relying on the characterizations of the various seismic datasets, could not be conducted. Because of this, 80% of my research topics were terminated, since I could not successfully develop deep-learning models and test the ideas with developing models in the absence of these datasets.

Also, I was no longer able to publish scientific papers relevant to the data that had been sold to other companies or no longer continued to be licensed by OXY. For instance, the Mozambique dataset was used for publications for several research topics including channel, sand detection, and

---

[11] Exhibit 9, September 5, 2019 emails between Jeremy Graybill and David Bowlby.

[12] Exhibit 10, Email from Cody Comiskey (Supervisor of Geophysical Team) regarding seismic licensing.

Occidental [Ping Lu] 000414

bandwidth extension projects. Without access to these datasets, none of the publications, including any of the previous work developed and based on the African assets, could be developed in the future. One paper that had been accepted from The Leading Edge had to be withdrawn in November 2019 due to the lack of seismic licensing for Mozambique.

**V. I lost all geophysicist collaborators and as a result was no longer be able to develop deep-learning models for Geophysical R&D projects.**

In my position at APC, two of my duties were to (1) work intimately and collaboratively with business Geophysicists in leading advanced applied research and development for challenging and high impact problems within the E&P operations domains and (2) network internally and externally to build relationships that foster technology transfer and collaboration.

Prior to the acquisition, I closely collaborated with ten Geophysicists from AAET and Geophysics Technology. Creating deep-learning models for Geophysical R&D projects requires the input, support and time of geophysicists with specialized knowledge and expertise. Before the change of control, I depended on the following Geophysicists for research in specific areas.

  a.  Channel detection: Karilys Castillo and Cody Comiskey

  b.  Salt/Salt inclusion detection: Hunter Danque and Cody Comiskey

  c.  MTC detection: Matt Morris and Cody Comiskey

  d.  Horizon pickings: Matt Morris, Carrie Kidd and Cody Comiskey

  e.  Sand thickness detection: Stan Morris, Grace Yu, Scott Geauner, Lin Yang and Mike Seeber

  f.  Seismic bandwidth extension: Stan Morris, Grace Yu, Scott Geauner, Lin Yang and Mike Seeber

  g.  AVO anomaly detection: Olga Brusova, Karilys Castillo and Cody Comiskey

  h.  Attenuation of multiples: David Sixta, Jianxiong Chen and Mike Seeber

My ability to successfully perform this key duty depended on the expertise of geophysicists who defined the scope of geophysical R&D and built connections with the business units.

All ten of my prior collaborators have either taken volunteer or change of control severance packages, moved to Total, or report to a new business unit or the new functional group lead by Mr. Koster. During a meeting on August 21, 2019 Mr. Koster stated that his group does not support Geophysical R&D activities and that his team will not collaborate with Geophysical R&D.

Occidental [Ping Lu] 000415

Because collaborative efforts ceased with the change of control, my job duties no longer included the following:

   a.  Planning meetings, which were held with Cody and Mike's team, to initiate R&D efforts between geophysicists and my team, by presenting the scope of the project, exchange opinions, and understand the feasibility of developing deep-learning models for the tasks.

   b.  Interactions with prior collaborators or new collaborators from OXY. Mr. Koster directly delivers the data to my team.

   c.  Providing my opinions and ideas based on technical information shared between R&D and geophysicists. Mr. Koster and his team members do not request my input nor provide me with technical information they have.

Because I no longer had partners to collaborate with, I was not able to develop any deep-learning models for Geophysical R&D projects. OXY does not have any plan to rebuild a centralized team to support collaborative activities.

**VI. After the change of control, I lost 100% of the Data Engineers on my team, reducing my ability to perform R&D activities and thwarting all R&D potential.**

A large part of my role at APC was providing leadership support to various positions within my team, including data engineering. My team before the change of control had two Data Engineers, Yuan Xiao and Jerry Xiao. Both had very strong coding capability and geophysical backgrounds.

Yuan was the first data engineer hired at AAET in June 2017. He was brought onboard to work closely with me to provide dedicated Geophysical R&D research data. All of the team members from my group and the geophysical group, myself included, relied heavily on Yuan's work. Yuan's work included:

   a.  Managing the design and development of all seismic data workflows and pipelines to support my research activities.

   b.  Connecting the gap between data scientists and geophysicists. The programs and codes developed by Yuan provided a significant backbone for my daily work.

   c.  Assisting with all Geophysical R&D projects (including interns' projects), activities, and interactions.

   d.  Engaging in collaboration activities with external vendors to develop tools to integrate the deep-learning capabilities for the developed geophysical projects.

Jerry Xiao focused on the Geophysical R&D projects by developing and conducting:

   a.  Algorithms for seismic interpretation projects and supports for geophysicists.

   b.  Research of 3D visualization and quality control tools for seismic data and deep-learning output.

Occidental [Ping Lu] 000416

    c.   Support for deep-learning research activities (including interns' projects).

    d.   Geologically synthetic models, which can be used for training the deep-learning models.

Jerry resigned on September 21, 2019. On October 17, 2019, Yuan was transferred to Mr. Koster's Geophysical group. There were no longer any Data Engineers working in my group. There were plans to hire any new Data Engineers for my group. Mr. Rastegar nor anyone else ever told me that OXY planned to hire another team member to report to me, nor that Yuan would continue to support me and my group. After Yuan was transferred to Mr. Koster's group, he was fully occupied by tasks in his new role, as a Senior Geophysicist. Prior to the acquisition, Yuan dedicated 100% of his time to my group and was involved in all the projects for my group. With no Data Engineers, all R&D activities were slated to eventually cease.

**VII. My team leadership responsibilities were significantly diminished because I was excluded from communications, meetings and activities in Geophysical R&D.**

As a manager leading the Geophysical R&D activities, before the change of control, I was always invited and made aware of technical discussions with collaborators and my supervisor, as I was considered a technical lead. I was invited to all Geophysical R&D meetings and activities and involved with all Geophysical R&D projects. I was made aware of all project plans and collaborations.

Before the change of control, I was invited to make suggestions and decisions for project planning, research direction, joining consortiums, and reporting project progress (fault deployment). Some of my other leadership responsibilities included:

    a.   Steering the research direction for internal project planning.

    b.   Instructing the technical advisor regarding research direction for external collaborations.

    c.   Interacting with researchers from University of Texas at Austin regarding R&D efforts.

    d.   Presenting Geophysical R&D program to the Executive Committee.

    e.   Attending the Joint Anadarko Executive engagement with Google at San Jose.

    f.   Leading external R&D efforts in collaboration with Google.

Following the change of control, Mr. Koster and Yongfeng Li (Lead Technical Analytics) bypassed most of my leadership responsibilities. After the change of control, Mr. Koster sent several emails directly to my team members (Yanyan Zhang and Yuan Xiao), requesting that they perform deep-learning work. Mr. Koster did not copy me on these emails or communicate these assignments to me. Mr. Koster also requested Yuan's attendance at several of his team meetings without me ever being invited to or made aware of these meetings. On August 23, 2019, I raised concerns to my manager Jeremy Graybill about my team members being asked to attend meetings that I was not invited to or aware of. Despite my report, Mr. Koster and Mr. Li continued to email my team members directly, without copying me, requesting that they perform certain tasks and inviting them to meetings that I was unaware of.

Occidental [Ping Lu] 000417

On October 8, 2019, Mr. Koster sent emails directly to Yanyan and Yuan asking them to travel to OXY's office to have technical discussions. On October 9, 2019, Maksym Pryporov (Mathematical Scientist) sent a technical paper to Yanyan and Yuan for comments and suggestions without including me.[13] On October 21, 2019, Mr. Li directly called Yanyan asking her to perform a task without my knowledge.[14]

I was excluded from key communications related to my job duties. This undermined my position as a manager and my ability to keep abreast of the tasks my team members were performing. My responsibility to lead my team was materially reduced.

**VIII. My project assignments at OXY came with extremely reduced discretion and a much narrower scope than my responsibilities before the change of control.**

The responsibility of the advanced analytics R&D team is to focus on development of deep-learning models by providing the most advanced technologies and capabilities for the problems brought to my group. At APC, I had the freedom to initiate research topics and engage as much or as little as I felt necessary with existing projects. I was given the discretion to select the most appropriate approach to conduct the research in order to produce the most compelling results for projects. Below are numerous examples of some my initiatives before the change of control.

a. On November 10, 2017, I proposed the idea of starting a technical collaboration regarding fault extraction with Xinming Wu, a post-doctoral researcher from the University of Texas at Austin.

b. On March 12, 2018, I proposed my ideas and plans to Christian Noll (Manager of Emerging Geoscience), Mr. Graybill, and Sanjay Paranji (VP of Technology) about how to develop a deep-learning model to assist seismic projects.

c. On November 12, 2018, I initiated the bandwidth extension research topic and sought collaborations with the Geophysics team.

d. On January 15, 2019, I steered the direction of a research topic for collaborative efforts with the Geophysics team and planned next steps.

e. On February 12, 2019, I proposed to review the progress and next steps for research of bandwidth extension with the Geophysics team.

f. On March 11, 2019, I initiated the meetings with the Geophysics team to report progress and goals of collaborative projects. I also drafted a spreadsheet including all the current projects and tasks associated with Geophysical team and advanced Analytics R&D team.

g. On March 20, 2019, I introduced the idea of leveraging a deep-learning approach to geophysicists from Geoscience Technology to begin a collaboration for seismic inversion projects. Within this collaboration, I have determined the research direction, and assigned tasks to those involved in the collaboration including Geoscience Technology, the asset

---

[13] Exhibit 11, October 9, 2019 email from Maksym Pryporov.

[14] Exhibit 12, October 21, 2019 email from Yanyan.

Occidental [Ping Lu] 000418

team and my team. I served as the project manager in organizing and reporting progress to stakeholders on a quarterly basis.

h. On March 21, 2019, I proposed and steered an effort to Cody Comiskey (Supervisor of geophysics), Mr. Noll, and Mr. Graybill to develop a global deep-learning model for fault detections.

i. On April 3, 2019, I proposed a meeting with the Geophysics team to discuss the research topics and challenges regarding bandwidth extension with development of deep-learning models.

j. On April 24, 2019, I provided my feedback and directions to Mr. Comiskey to address the backlog of geophysical projects.

k. On May 15, 2019, I provided my feedback to Mike Seeber (Director of Geophysics), Mr. Graybill, Mason Dykstra (Director of Geoscience Technology), Stan Morris (Distinguish Geophysicist), David Sixta (Distinguish Geophysicist), Grace Yu (Senior Geophysicist), and Jianxiong Chen (Geophysicist) and managed the direction for the ongoing collaborated projects with Geoscience Technology.

l. On May 29, 2019, I provided my feedback and directions to Mr. Comiskey regarding the roadmap of geophysical projects.

m. I had the support of Mr. Graybill, Mr. Comiskey, and Mr. Noll, with my own discretion to decide if a project was suitable for the deep-learning approach or not.

After the change of control, I did not engage in any similar work or get delegated responsibilities analogous to those listed above.

All the deep-learning models that my team developed and applied to the Geophysical R&D projects during the past two years were compiled with the latest deep-learning frameworks—TensorFlow or PyTorch. All the developed deep-learning models heavily leverage the GPUs or TPUs and cloud technologies. After the change of control, the deep-learning method used at APC was made all but obsolete. OXY urged me and my team to use methods that were outside of our areas of expertise and allowed minimal discretion.

One example of this arose on the compressive sensing project, one of two projects assigned to my team. The compressive sensing project was not conducive to the deep-learning model used before the change of control. Yanyan and Yuan, the team members working on this task explained this to Mr. Koster on numerous occasions. After Yanyan and Yuan explained this to Mr. Koster, Mr. Rastegar asked me to provide a plan for the compressive sensing project. I also tried my best to explain to Mr. Rastegar numerous times about the reasons why I thought this project was very different from my team's developments and projects before the change of control. Mr. Rastegar and his team did not listen to me either.

Mr. Pryporov and Mr. Rastegar asked me to review and understand a paper that Mr. Proporov used to develop an algorithm that heavily involved mathematical formulas, and did not require the use of any GPU or deep-learning frameworks. The approach used in the paper was completely outside

Occidental [Ping Lu] 000419

the scope of my responsibilities and job description before the change of control, and was not within the framework of a data scientist's position.

Mr. Rastegar was frustrated when I told him that the task I was being asked to perform did not align with my skills or responsibilities. He insisted that I was a mathematician[15] and that using a mathematical approach to solve a compressive sensing task is relevant to my domain, however, I never worked on a mathematical project since I joined AAET in 2017. All of the projects I worked on before the change of control utilized a deep-learning model with GPU technology approach.

My prior supervisor, Mr. Graybill, sent a detailed email to Mr. Bowlby, who is Mr. Rastegar's supervisor, which discussed several ways the discretion and duties of Data Scientists, like myself, were narrowed and materially diminished after the change of control.[16] Unfortunately, Mr. Bowlby and Mr. Rastegar did not change course after Mr. Graybill's email. My duties continued to diminish and my role as a Data Scientist was reduced to that of a mathematician.

### IX. Post-acquisition budget cuts forced me to withdraw publications and cease pursuing new publication opportunities that were required of my position before the change of control.

At APC, I was tasked with generating content for external publications and presentations in conference and scientific journals, participating and presenting in external conferences and meetings to promote Anadarko's name as a leader in technology and encouraged to pursue continuous learning, literature, and training opportunities, to keep up with academic and industry research and trends, and ensure that the most advanced technologies and capabilities are being leveraged and implemented.

I was provided with the opportunities of attending, presenting, and publishing papers at several conferences, workshops, and journals at AAET during the past two and half years. AAET has reserved certain budget for attending conferences and taking training. In 2017, I attended the SEG International Exposition and 88th Annual Meeting and NIPS 2017: The Thirty-first Annual Conference on Neural Information Processing Systems. In 2018, I attended the eight conferences and workshops. In 2019, I attended six conferences and workshops before the change of control.

Before the change of control I was encouraged to write papers and submit publications. I provided technical support for ten publications. I was also encouraged to deliver technical presentations. Between 2017 and 2019, I presented seven times at various conferences and workshops across the United States. Before the change of control I participated in six consortiums. I attended three Google trainings and was given several opportunities to collaborate with Google's team.

Mr. Graybill, my supervisor before the change of control, encouraged my attendance and participation in conferences, workshops, and consortiums. After the change of control, Mr. Rastegar denied every request I made to attend conferences, which also adversely impacted my ability to have papers published.

The 2019 SEG 3rd International Workshop on Mathematical Geophysics: Traditional vs. Learning accepted a paper my team and I submitted before the change of control. The workshop was held

---

[15] Exhibit 13, October 23, 2019 emails between Mr. Rastegar and I.
[16] Exhibit 14, August 22, 2019 email from Mr. Graybill.

Occidental [Ping Lu] 000420

the week of November 4, 2019. My request to attend the workshop and present the paper was approved prior to the change of control. The expenses for this trip were also approved and reimbursed. On October 17, 2019, I emailed Mr. Rastegar for his approval to attend the event.[17] Mr. Rastegar declined my request. The reason he provided was budget constraints. I sent a follow-up email the next day. Mr. Rastegar again declined my request. Because of this, I was forced to withdraw my paper from the workshop. This is detrimental to the company's reputation and my own. I am also now at risk from being banned from publication at any future SEG event.

This was not an isolated denial. My team members were similarly denied requests to attend consortiums, workshops, and conferences. Another paper was accepted for a NIPS conference in December 2019. Mr. Rastegar also denied my request to attend this conference. I also suggested organizing trainings from Google Brain. Mr. Rastegar never responded.

My duties to generate publications, present, and promote further training and opportunities for myself and my team members was completely diminished.

### X. Mr. Rastegar's statements allegedly supporting the denial of my good reason inquiry were false and representative of his pattern of lying to me and ignoring my legitimate concerns.

Mr. Rastegar provided information that OXY relied on to deny my good reason inquiry. During the time Mr. Rastegar was my supervisor, he lied, or at the very least made inconsistent statements, to me and my team members on numerous occasions. This pattern continued in the statements he made to the Good Reason Subcommittee. Below are some examples.

1. Mr. Rastegar said that I refused to work on assigned projects. This is simply not true. This comment to the Subcommittee was not the first time Mr. Rastegar said this. He sent me an email on October 23, 2019 alleging that I said this in a staff meeting in front of my team members. I responded to this email to clarify that I never made that statement. Mr. Rastegar never replied to my email. My prior performance reviews indicate that this would be extremely out of character for me and I am confident that my team members would confirm I did not say this during our meeting on October 10, 2019.

2. Mr. Rastegar stated that I "did not produce any significant results" to requests to apply my algorithms to OXY's geophysical data "for nearly three months." The first time I was on notice of any task related to compressive sensing was on September 26, 2019, when Mr. Koster asked my team members to perform it. Once I was told about the task, I followed up with Reza to provide explanations and suggestions about the feasibility of applying deep-learning model to this task, and interacted with his team members (Yongfeng Li and Maksym Pryporov) to understand the mathematical approach developed at OXY. On October 23, 2019, I was told by Mr. Koster that he was waiting for Yanyan to complete the fault deployment task, although this task was contingent upon the completion of the work from Geophysicist. I submitted my good reason inquiry form less than five weeks after the first request. This falls far short of the three months Mr. Rastegar claims I did not provide results within. I provided technical advice as soon as I was able to, which was contingent upon the work of my team members.

---

[17] <u>Exhibit 15</u>, Emails between Mr. Rastegar and I regarding an upcoming conference.

Occidental [Ping Lu] 000421

3. Mr. Rastegar told the Subcommittee that the internship program has not been cancelled. He indicated that he verbally told me this. He did not. The only information I was provided about the internship program is Exhibit 2 to this claim, which clearly does not align with Mr. Rastegar's claim that "no decision has yet been made."

4. Mr. Rastegar claims that one data engineer would continue to support me from Mr. Koster's group. This is not true and Mr. Koster himself has confirmed that his group will not support mine. Mr. Rastegar references an "additional team member" who was going to be reporting to me and supporting my work. I am not aware of any additional team member who would be supporting my work.

Mr. Rastegar assigned me tasks that were unrelated to my job responsibilities. When I did not understand the tasks and sought clarification, assistance, and/or told Mr. Rastegar that these tasks were not part of my role as a data scientist, Mr. Rastegar threatened to "find ways to fire me for cause" so that I would not be eligible for severance benefits.

My colleagues received similar treatment from Mr. Rastegar. Mr. Graybill's emails to OXY's human resources department[18] and to Mr. Bowlby and Barbara Bergerson (SVP Technical Support) voiced accurate concerns about Mr. Rastegar's treatment of me and my team members, as well as the material diminishing of our job duties.[19] Ms. Bergerson forwarded these emails to OXY's compliance department for investigation as well. I was not provided an update regarding human resources and compliance's investigation of Mr. Graybill's concerns.

While I understand that each good reason claim is analyzed on a case-by-case basis, I believe the similarly situated good reason claims from my team members are relevant to my claim. Three managers on the Data Science team (Alex Bayeh, Ding Cao, and Natalie Berestovsky) were told by Rosaliz Ufret (Director of HR at OXY) that they qualified for severance benefits because OXY cannot find a position for them in the new organization and their job duties were materially diminished. All three of them reported to Mr. Rastegar and had similar experiences to me. Ms. Berestovsky submitted a complaint to Human Resources. I am not sure if Human Resources' investigation of any of the complaints against Mr. Rastegar factored into the good reason claims granted to my team members. I have not been provided with the findings of any investigations. At a minimum, the multitude of corroborated complaints from those within and outside of my team demonstrate that Mr. Rastegar has been untruthful and is intent on ensuring that APC employees do not qualify for benefits under the change of control, whether they are entitled to under the Plan or not.

Donald Iacobell also provided the Good Reason Subcommittee with information that is inaccurate. To my knowledge, Mr. Iacobell did not know my actual job duties before or after the change of control.

**Conclusion**

I respectfully request that this claim, including all attachments, be reviewed completely and fairly, as required by the Plan. The information provided in this claim illustrates that following the change

---

[18] Exhibit 16, September 12, 2019 email from Mr. Graybill to Lindsay Kilcrease (Senior HR Business Partner).
[19] Exhibit 17, October 1, 2019 email from Mr. Graybill to Barbara Bergerson.

Occidental [Ping Lu] 000422

of control, my duties were materially and substantially diminished in almost every way. I ask that you find my resignation was involuntary and for good reason as defined by the Plan and accordingly conclude that I am entitled to severance benefits under the Plan. In light of the overwhelming evidence, this is the only logical conclusion.

Thank you for your consideration.

Sincerely,

*Ping Lu*

Ping Lu

Occidental [Ping Lu] 000423

# EXHIBIT 1

Occidental [Ping Lu] 000424



# JOB DESCRIPTIONS: AAET DATA SCIENCE

DIRECTOR OF DATA SCIENCE & ADVANCED ANALYTICS

MANAGER OF DATA SCIENCE & ADVANCED ANALYTICS

AAET DATA SCIENTIST

AAET DATA ENGINEER





## MANAGER OF DATA SCIENCE & ADVANCED ANALYTICS

### SUMMARY

The AAET group serves as a centralized innovation and excellence organization responsible for identifying and developing Advanced Analytics and Emerging Technologies which provide differentiating capabilities across Anadarko's business.

The Manager of Data Science & Advanced Analytics leads the Data Science efforts for various AAET initiatives, working very closely with counterparts in the Geoscience and Petroleum Engineering domains within AAET and Geoscience Technology, along with AAET's Application Development organization, in leading applied research and development in generating advanced data driven solutions for challenging and high impact problems within the E&P operations domains.

### QUALIFICATIONS

- Strong background and broad expertise in Data Science disciplines, including Mathematics, Statistics, Computer Science, Machine Learning, Data Engineering, Spatial Analytics, and/or Applied Physics
- Strong quantitative and problem-solving skills, including strong mathematical, statistical, and technical knowledge and skills
- Demonstrated ability to lead and deliver applied research and development projects for new technologies in oil and gas
- Recognized thought leadership and technical expertise with established credibility both internally and externally
- Strong programming and scripting skills, with languages such as Python, C#, C++, and Java
- Strong experience with modern ML and Deep Learning frameworks including TensorFlow, PyTorch, Keras, Theano, and Caffe
- Strong experience with modern ML and Data Science libraries including Pandas, Numpy, Scikit-Learn, NLTK, Seaborn, Dplyr
- Excellent understanding of ML techniques & algorithms, such as ANNs, SVM, GBM, Decision Forests, k-NN, Naive Bayes, etc.
- Master's Degree and/or PhD strongly preferred in Computer Science, Computational Mathematics, Applied Mathematics, Statistics, Engineering, Physics, or related quantitative field

### RESPONSIBILITIES

- Work intimately and collaboratively with business SMEs (Petroleum Engineers and Geoscientists) in leading advanced applied research and development for challenging and high impact problems within the E&P operations domains
- Lead the execution of a wide range of projects across core focus areas of AAET, leveraging significant data and real-time surveillance within the operational, production, and financial domains, for all core E&P business functions (US Onshore, GOM, and International), to deliver tangible business value
- Lead algorithm deployment and maintenance for E&P project domains including seismic acquisition, processing, inversion, and interpretation; subsurface characterization, field development, planning, and optimization; geologic and petrophysical analysis, offshore advanced process analytics, and digital operations
- Provide leadership within various Data Science & Advanced Analytics sub-functions, including Data Science Advanced Research & Development, Data Science Center of Excellence, Data Science Fleet Performance Optimization, Data Science Technology Advancement, Data Strategy & Analytics, and Embedded Data Science & Analytics teams
- Leverage statistical analysis, mathematical modeling, pattern recognition, and ML and deep learning frameworks (including TensorFlow, PyTorch, and Keras) towards recommending, selecting, developing, and integrating any Artificial Intelligence, Machine Learning, and Deep Learning algorithms and approaches required to provide requested capabilities
- Network internally and externally to build relationships that foster technology transfer and collaboration
- Work with external technology organizations including joint industry projects, external industry technology organizations, and key university departments through research consortiums, to improve digital capabilities
- Lead the promotion of digital transformation, training and development of other Data Scientists, Citizen Data Scientists, and other peers throughout the organization
- Lead advanced analytics projects using ML and Deep Learning, heavily utilizing GPU hardware stacks (including dedicated DGX boxes) and Google Cloud Platform infrastructure (Cloud Composer, CMLE, GKE, BigQuery, DataFlow, Pub/Sub, etc.)
- Pursue continuous learning, literature, and training opportunities, to keep up with academic and industry research and trends, and ensure that the most advanced technologies and capabilities are being leveraged and implemented
- Generate content for external publications and presentations in conference and scientific journals, participating and presenting in external conferences and meetings to promote Anadarko's name as a leader in technology

# EXHIBIT 2

Occidental [Ping Lu] 000427

# January 2019

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY |
|---|---|---|---|---|---|
| Dec 30 | **31**<br>7:30am PTO, Thanks; Lu, Ping<br>8:30am Canceled: Geophysical ML Strat Interpretation - Daily Stand Up; *ALR-04MOBILEB (VC); Palmer, Scott [Enaxis Consulting] | **Jan 1, 19**<br>New Years Day<br>10:00am Canceled: AAET DS&AA Team Discussion; *ALR-04028 CONF (18, VC); Graybill, Jeremy | **2**<br>7:30am PTO; Lu, Ping | **3**<br>7:30amLu, Ping | **4**<br>Schedule A - Friday Off |
| **6** | **7**<br>1:00pm Canceled: ML-Inversion Deep Dive Slides Review; *ALR-04012 CONF (6, VC); Brusova, Olga | **8**<br>7:30am GSH North Technical Breakfast - Seismic Reflection Imaging with DAS Data for Long Term Reservoir Surveillance [ROOM UPDATE]; Allison Tower - Hall D; Perez, Maria<br>10:00am Canceled: AAET DS&AA Team Discussion; *ALR-04028 CONF (18, VC); Graybill, Jeremy | **9**<br>2:00pm Bandwidth extension discussion; *ALR-21047 CONF (18) (Managed); Yu, Grace | **10** | **11**<br>7:30am as<br>9:30am FW: Agenda review for GT/AAET mini conference; *ALR-04078 CONF (24,VC); Brusova, Olga |
| **13** | **14**<br>9:00am Discussion for deep dive meeting; Ping´s office; Lu, Ping<br>2:30pm Canceled: Bevo feedback discussion with WesternGeco; *ALR-04078 CONF (24,VC); Noll, Christian | **15**<br>10:00am Canceled: AAET DS&AA Team Discussion; *ALR-04028 CONF (18, VC); Graybill, Jeremy | **16** | **17**<br>8:00am   ODiSI training with Pat Connolly; AHT-11100  (Conference Rm. 6) ; Bru 5:00pm<br>8:30am Canceled: AAET Quarterly Business Review (QBR); ALR Conference Center ; RSC-Technology | **18**<br>Schedule A - Friday Off |
| **20** | **21**<br>10:30am Canceled: Slides Review for ML Inversion Deep Dive; *ALR-04044 CONF (3, VC); Brusova, Olga<br>1:00pm DRY RUN - Technology R&D Update; *ALR-04078 CONF (24,VC); John...<br>3:00pm Salt ML - Prep for Phase 1 & 2 Discussion; *ALR-04078 CONF (24,VC); P... | **22**<br>10:00am Canceled: AAET DS&AA Team Discussion; *ALR-04028 CONF (18, VC); Graybill, Jeremy<br>2:00pm Decesionspace; Hunter´s office; Lu, Ping | **23**<br>Google EBC - Placeholder; Mountain View Campus; Keister, Eric<br>8:00am | **24**<br>Rice Math Symposium | **25**<br>9:30pm |
| **27** | **28**<br>9:30am Salt ML Summary and Roadmap; *ALR-04078 CONF (24,VC); Danque, Hun...<br>9:30am Canceled: Salt prediction status from Ph1 & Phase 2 forward plan; *ALR-...<br>1:00pm Canceled: ML-Inversion Deep Dive dry run; *ALR-04078 CONF (24,VC); ...<br>2:30pm Geoscience Team meeting; *ALR... | **29**<br>9:00am Technology R&D Update; ALR-0...<br>9:00am Canceled: Technology R&D Upd...<br>10:00am Canceled: AAET DS&AA Team D...<br>11:30am Anadarko´s Risking Tables: So...<br>1:00pm GT JIP Consortium Proposal - M...<br>2:00pm Geophysical ML - Sprint Review;... | **30**<br>9:00am Info session about seismic projects; *ALR-04012 CONF (6, VC); Tobar, Ingrid<br>1:00pm Seismic ML Strat Interpretation - Sprint Retrospective & Planning; *ALR-07003 CONF (18); Palmer, Scott [Enaxis Consulting] | **31**<br>7:30am work from home<br>12:30pm Last day to cancel hotel<br>1:30pm exxon<br>2:00pm Tech Thursday Talk: AAET Leadership Hosted Discussions; ALR-04078; Garza, Selena [INSIGHT GLOBAL INC.] | **Feb 1**<br>Schedule A - Friday Off |

Occidental [Ping Lu] 000428

## February 2019

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY |
|---|---|---|---|---|---|
| Jan 27 | 28 9:30am Salt ML Summary and Roadmap; *ALR-04078 CONF (24,VC); Danque, Hun... 9:30am Canceled: Salt prediction status from Ph1 & Phase 2 forward plan; *ALR-... 1:00pm Canceled: ML-Inversion Deep Dive dry run; *ALR-04078 CONF (24,VC); ... 2:30pm Geoscience Team meeting; *ALR... | 29 9:00am Technology R&D Update; ALR-0... 9:00am Canceled: Technology R&D Upd... 10:00am Canceled: AAET DS&AA Team D... 11:30am Anadarko's Risking Tables: So... 1:00pm GT JIP Consortium Proposal - M... 2:00pm Geophysical ML - Sprint Review;... | 30 9:00am Info session about seismic projects; *ALR-04012 CONF (6, VC); Tobar, Ingrid 1:00pm Seismic ML Strat Interpretation - Sprint Retrospective & Planning; *ALR-07003 CONF (18); Palmer, Scott [Enaxis Consulting] | 31 7:30am work from home 12:30pm Last day to cancel hotel 1:30pm exxon 2:00pm Tech Thursday Talk: AAET Leadership Hosted Discussions; ALR-04078; Garza, Selena [INSIGHT GLOBAL INC.] | Feb 1 Schedule A - Friday Off |
| 3 | 4 7:30am 8:00am GT-AAET Geoscience Conference ; 2301 NORTH MILLBEND DRIVE , THE WOODLANDS, TX 77380; Jendrusch, Jennifer [Prodigy Staff Advsr] | 5 work from home 7:30am PTO, Thanks; Lu, Ping 5:30pm 7:30am GSH North Technical Breakfast - Least-Squares Full Wavefield Migration ... 8:00am GT-AAET Geoscience Conference ; 2301 NORTH MILLBEND DRIVE , THE WO... 10:00am Canceled: AAET DS&AA Team D... | 6 | 7 5:30pm 5:00pm Farewell Celebration for Travis Olbrich; The Refuge Bar & Bistro; Ridley, Gina | 8 8:00am AI Planning Workshop: Friday, 8 February - 8:30am-4:00pm (CT); Turquoise ZoomRoom; Shelly Oakley 9:00am FW: Invitation: SeismicML Phase II kickoff @ Fri Feb 8, 2019 9am - 11am (CST) (cody.comiskey@anadarko.com) Anadarko Petroleum Corporation, 1201 Lake Robbins Dr, Room ALR-21047; bha... |
| 10 | 11 9:30am otc rating 11:45am Technology Team Lunar New Year Lunch ; 4th Floor Cafe; RSC-Technology | 12 10:00am Canceled: AAET DS&AA Team Discussion; *ALR-04028 CONF (18, VC); ... 1:30pm Seismic Attribute; *ALR-21047 CONF (18) (Managed); Lu, Ping 1:30pm Low Frequency, Bandwidth Research; Mike's Office, 21079; Seeber, ... 3:30pm OTC | 13 7:00am inter 7:30am PTO, thanks; Lu, Ping 8:30am Canceled: [UPDATE] OpendTect Seismic Interpretation Software Training Session; ALR 11035; Brazell, Seth | 14 10:00am rating otc | 15 Schedule A - Friday Off |
| 17 | 18 Presidents Day | 19 10:00am Employee Town Hall; The Woodlands: Allison Hall / Denver: 7th Floor Conference Center / Midland: Green Tree Country Club; APC Communications 12:00pm Geophysical Projects; *ALR-04012 CONF (6, VC); Comiskey, Cody | 20 9:30am doctor 2:30pm Canceled: Geoscience Team meeting; *ALR-04078 CONF (24,VC); Noll, Christian | 21 11:45am lunch; allison cafe; Kara, Mustafa | 22 7:00am df |
| 24 | 25 1:00pm Historical Matching; *ALR-04028 CONF (18, VC); Lu, Ping 1:00pm Horn Mountain ; *ALR-04028 CONF (18, VC); Lu, Ping 2:00pm ML work; Maria's office; Zhang, Yanyan | 26 10:00am Canceled: AAET DS&AA Team Discussion; *ALR-04028 CONF (18, VC); ... 11:30am February & March Birthday Luncheon; Allison Hall; Walker, Al 1:30pm Carat Learning; Grace's Office; Zhang, Yanyan 3:00pm Technology Talk: One GOM Bus... | 27 8:00am updates; Stan's office; Lu, Ping 10:00am review Horn Mtn M56 reservoirs with AAET data science; *ALR-10003 CONF (18); Morris, Matt | 28 1:30pm ML work; *ALR-21053 IDEA Lab (12); Zhang, Yanyan | Mar 1 Schedule A - Friday Off |

Occidental [Ping Lu] 000429

◄ ► **March 2019**                                    Houston, Texas

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY |
|---|---|---|---|---|---|
| Feb 24 | 25 | 26 | 27 | 28 | **Mar 1** |
|  | 1:00pm Historical Matching; *ALR-04028 CONF (18, VC); Lu, Ping<br>1:00pm Horn Mountain ; *ALR-04028 CONF (18); Lu, Ping<br>2:00pm ML work; Maria's office; Zhang, Yanyan | 10:00am Canceled: AAET DS&AA Team Discussion; *ALR-04028 CONF (18, VC); ...<br>11:30am February & March Birthday Luncheon; Allison Hall; Walker, Al<br>1:30pm Carat Learning; Grace's Office; Zhang, Yanyan<br>3:00pm Technology Talk: One GOM Bus... | 8:00am updates; Stan's office; Lu, Ping<br>10:00am review Horn Mtn M56 reservoirs with AAET data science; *ALR-10003 CONF (18); Morris, Matt | 1:30pm ML work; *ALR-21053 IDEA Lab (12); Zhang, Yanyan | Schedule A - Friday Off |
| 3 | 4 | 5 | 6 | 7 | 8 |
|  | 9:00am Introduction to ENRGeo; *ALR-04028 // Skype Meeting; Johnson, Jenny | 7:30am GSH North Technical Breakfast - Automated Scanning of Fine-Scale Geological, Petrophysical and Geomech...<br>9:00am Basin Structure Group, University of Leeds; ALR 3rd floor - The Quad - Ro...<br>10:00am Canceled: AAET DS&AA Team Discussion; *ALR-04028 CONF (18, VC); ... | 8:15am Send karilys<br>1:30pm Technology Talk: Delaware Technology Review; Allison Tower Idea Theater; RSC-Technology | 9:00am Potential collaborations; Cristian's office; Lu, Ping<br>3:00pm Seismic ML Sprint 18 Review; *ALR-04028 CONF (18, VC); Passey, Karan [Enaxis Consulting] | 8:45am Send email to Scott |
| 10 | 11 | 12 | 13 | 14 | 15 |
|  | 8:30am Talk to David and Stan AVO | 10:00am ML Inversion - Time Update to accommodate your calendar; Ping's Offi...<br>1:00pm DL discussion; *ALR-05003 CONF (18); Lu, Ping<br>1:00pm Deep Learning work for seismic data; *ALR-05003 CONF (18); Lu, Ping<br>3:00pm Geophysical R&D Project Planni... | 11:00am asd<br>1:00pm ef | 7:30am sdf<br>2:00pm GTC Talk Dry Run - with Amit Vij; *ALR-04028 CONF (18, VC); Tobar, Ingrid | Schedule A - Friday Off |
| 17 | 18 | 19 | 20 | 21 | 22 |
|  | 8:00am Jeremy sal yy<br>1:30pm hunter card | 9:00am DR; *ALR-05003 CONF (18); Lu, P...<br>9:00am DR; *ALR-05003 CONF (18); Lu, P...<br>10:00am Canceled: AAET DS&AA Team D...<br>1:00pm sand detection; *ALR-05003 CO...<br>1:00pm True sand thickness detection f...<br>1:00pm Canceled: Digital Transformatio... | 2:30pm K2 Multiples; *ALR-11013 CONF (16) (Managed); Rodriguez, Arnold<br>3:00pm FW: Review Salt ML Path; *ALR-04078 CONF (24,VC); Comiskey, Cody | 8:00am Interactive Training and Prediction on Bluware; *ALR-05003 CONF (18); Comiskey, Cody | 8:00am<br>8:15am Hunter card |
| 24 | 25 | 26 | 27 | 28 | 29 |
|  | 11:30AM APC / Bluware IDL Project. ; *ALR-05003 CONF (18); Comiskey, Cody<br>1:00pm DS Leadership Discussion; *ALR-04028 CONF (18, VC); Graybill, Jeremy | 9:00am Hampson Russell Foundations and AVO Analysis ; ALR 11049 ; Chen, Jianxiong<br>10:00am Canceled: AAET DS&AA Team Discussion; *ALR-04028 CONF (18, VC); Graybill, Jeremy | 8:30am Hampson Russell Foundations and AVO Analysis ; ALR 11049 ; Chen, Jianxiong<br>10:00am Discussions on CGG's Dirty-Salt Model-Building Practice plus ML Activiti...<br>2:00pm Geoscience Team meeting; *ALR-04078 CONF (24,VC); Noll, Christian | 9:00am Optional: Intern & Co-op Project Discussion; *ALR-05053 CONF (16); Graybill, Jeremy<br>2:00pm Hunter Danque's Baby Shower; *ALR-04010 Cafe (12,VC); Jendrusch, Jennifer [Prodigy Staff Advsr] | Schedule A - Friday Off |

Occidental [Ping Lu] 000430

## April 2019

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY |
|---|---|---|---|---|---|
| Mar 31 | **Apr 1**<br>9:00am inversion workshop registration | 2<br>7:30am GSH North Technical Breakfast - Integrating Geology and Geophysics into Engineering workflows to Enhance Unconventional Production; Allison Tower - Hall D; Perez, Maria<br>10:00am Canceled: AAET DS&AA Team Discussion; *ALR-04028 CONF (18, VC); Graybill, Jeremy | 3<br>9:00am sd; *ALR-05003 CONF (18); Lu, Ping<br>9:00am bandwidth extension; *ALR-05003 CONF (18); Lu, Ping | 4<br>10:00am HGS inversion registration<br>11:00am Unconventional SIG: Artificial Intelligence for High Resolution Reservoir Characterization - Apr 4th; TGS 10451 Clay Road Houston, TX 77041-8753 | 5 |
| 7 | 8<br>2:30pm Salt inclusion; Hunter's office; Lu, Ping<br>3:00pm ML on GCP; *ALR-05086 Team (8); Comiskey, Cody | 9<br>8:30am salt inclusion excel and 3 predictions; Hunter's office; Danque, Hunter<br>10:00am Canceled: AAET DS&AA Team Discussion; *ALR-04028 CONF (18, VC); Graybill, Jeremy<br>12:00pmLi, Youxin [Apex Systems] | 10<br>9:00am Summer Intern Project; *ALR-05003 CONF (18); Zhang, Yanyan | 11<br>7:00am habitat | 12<br>Schedule A - Friday Off |
| 14 | 15<br>8:45am Conference other than cvpr<br>10:00am Employee Town Hall, Allison Hall in The Woodlands; APC Communications<br>1:30pm Corporate Headshot; Photo Stu...<br>4:00pm 8===================...<br>4:30pm Discussion; *ALR-04028 CONF (1... | 16<br>10:00am Canceled: AAET DS&AA Team Discussion; *ALR-04028 CONF (18, VC); Graybill, Jeremy | 17<br>8:30am Tell yy to work on mtc<br>2:30pm FW: Magnus/Spencer Seismic Reprocessing Close-Out Meeting ; ALR #3; Chen, Jianxiong | 18<br>7:30am      UT consortium     5:00pm | 19<br>Good Friday<br>9:00am |
| 21 | 22<br>8:00am Go through projects to make agreement, thanks!; Cody's office; Lu, Pi.<br>10:00am seismic project deliverable; Jeremy's office; Lu, Ping<br>10:00am Exploration Lookback 2016-2018; ALR 3rd Floor, Allison Hall A, ...<br>2:30pm Geoscience Team meeting; *ALR... | 23<br>8:30am Speak to cody and Yuan to feel comfortable; Tell Matt appointment an...<br>8:45am Speak to Carrie to offer help<br>10:00am Canceled: AAET DS&AA Team Discussion; *ALR-04028 CONF (18, VC); ...<br>1:00pm 2019 Q2 Product Backlog and Roadmap Review - (Geophysics Teams)... | 24<br>7:45am Bandwidth use synthetic double, grace<br>2:00pm Planning session for De-Multiple project; *ALR-05003 CONF (18); Lu, Ping | 25<br>8:00am  Student Research Conference Alumni & Industry Open House at UH<br>9:00am SEAM AI | 26<br>Schedule A - Friday Off<br>7:30am Student Research Conference Alumni & Industry Open House at UH |
| 28 | 29<br>7:45am Ask for guillaume data and David letter, place multiple in Cody excel, jerry...<br>8:30am Batch Machine Learning Development on Bluware; *ALR-05003 C...<br>3:30pm Horn Mountain Channel discussion; My office; Castillo, Karilys<br>4:00pm Backlog Grooming Session ; *AL... | 30<br>7:45am Global model<br>10:00am Canceled: AAET DS&AA Team Discussion; *ALR-04028 CONF (18, VC); Graybill, Jeremy<br>1:00pm Seismic ML Sprint 19 Review; *ALR-04028 CONF (18, VC); Passey, Karan [Enaxis Consulting] | **May 1**<br>7:30am On shore noise attenuation , meet mike & mason to layout<br>9:00am Opendtect; *ALR-05053 CONF (16); Lu, Ping<br>2:00pm RFP ML Pipeline ; *ALR-05053 CONF (16); Comiskey, Cody<br>5:00pm Eric Keister's Farewell Celebrati... | 2<br>1:00pm Discussions of paper; *ALR-05003 CONF (18); Lu, Ping<br>1:00pm paper; *ALR-05003 CONF (18); Lu, Ping<br>3:00pm summer intern project - follow up; *ALR-05003 CONF (18); Zhang, Yanya | 3 |

Occidental [Ping Lu] 000431

## May 2019

Search Calendar

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY |
|---|---|---|---|---|---|
| Apr 28 | 29 | 30 | **May 1** | 2 | 3 |
| | 7:45am Ask for guillaume data and David letter, place multiple in Cody excel, jerry... | 7:45am Global model | 7:30am On shore noise attenuation , meet mike & mason to layout | 1:00pm Discussions of paper; *ALR-05003 CONF (18); Lu, Ping | |
| | 8:30am Batch Machine Learning Development on Bluware; *ALR-05003 C... | 10:00am Canceled: AAET DS&AA Team Discussion; *ALR-04028 CONF (18, VC); Graybill, Jeremy | 9:00am Opendtect; *ALR-05053 CONF (16); Lu, Ping | 1:00pm paper; *ALR-05003 CONF (18); Lu, Ping | |
| | 3:30pm Horn Mountain Channel discussion; My office; Castillo, Karilys | 1:00pm Seismic ML Sprint 19 Review; *ALR-04028 CONF (18, VC); Passey, Karan [Enaxis Consulting] | 2:00pm RFP ML Pipeline ; *ALR-05053 CONF (16); Comiskey, Cody | 3:00pm summer intern project - follow up; *ALR-05003 CONF (18); Zhang, Yanyan | |
| | 4:00pm Backlog Grooming Session ; *AL... | | 5:00pm Eric Keister's Farewell Celebrati... | | |
| 5 | 6 | 7 | 8 | 9 | 10 |
| | 8:00am look for Guillaume: GSH invite: invite cody | 9:00am De-multiple; David's office; Lu, Ping | | 7:30am China abstract degree | Schedule A - Friday Off |
| | 2:30pm Riomar Visit to Anadarko; ALR The Quad (Room 16); Carvajal, Cristian | 10:00am Canceled: AAET DS&AA Team Discussion; *ALR-04028 CONF (18, VC); ... | | | |
| | | 11:00am Microsoft Advanced Hub Training - Session 1; *ALR-04010 Cafe (1... | | | |
| | | 1:00pm*ALR-05053 CONF (16); Lu, Ping | | | |
| 12 | 13 | 14 | 15 | 16 | 17 |
| | PTO; Zhang, Yanyan | 9:00am*ALR-05003 CONF (18); Lu, Ping | 1:30pm Website Discussion; Codys Office ; Comiskey, Cody | 8:00am RUN 200 res | |
| | 7:30am GSH North Technical Breakfast - Neural Networks 101: Math, not Magic ;... | 9:00am Ongoing projects; *ALR-05003 CONF (18); Lu, Ping | | 9:00am | |
| | 1:00pm Microsoft Advanced Hub Training - Session 2; *ALR-04010 Cafe (12,VC); Ri... | 10:00am Canceled: AAET DS&AA Team Discussion; *ALR-04028 CONF (18, VC); Graybill, Jeremy | | | |
| | 2:30pm Canceled: Geoscience Team meeting; *ALR-04078 CONF (24,VC); Noll... | | | | |
| 19 | 20 | 21 | 22 | 23 | 24 |
| | 8:00am AAET website, cody doc chevron jb | 10:00am Canceled: AAET DS&AA Team Discussion; *ALR-04028 CONF (18, VC); Graybill, Jeremy | 9:00am cancel trip | 7:00am seg beijing abstract deadline | Schedule A - Friday Off |
| | 9:00am Seismic license | | 11:30am Welcome Lunch for Xing, Rebecca and Shahin; Nick's Fish Dive & ... | 8:00am Mozambique well fault | |
| | | 2:00pm Data Science Intern Meet & Greet; *ALR-04078 CONF (24,VC); Tobar, Ingrid | 2:00pm Occidental Introductory Town H... | 8:15am QC the Seismic Data for the DL/... | |
| | | | 3:00pm one on one; Coffee bar at Aliso... | 9:00am Tech Thursday: Live Data Mining... | |
| | | | 4:30pm Whit Armstrong Farewell HH; R... | 9:45am Intern data | |
| | | | | 11:30am Denoise dataset discussion; *A... | |
| 26 | 27 | 28 | 29 | 30 | 31 |
| | Memorial Day | 7:00am VAE intern | 9:00am Machine Learning MVP1: Project Kickoff ; Jupiter; Robert Torres | 8:00am seg beijing abstract deadline | |
| | 7:00am Interpretation review | 8:00am Web Symposium by GSH and SEG: 3D Seismic Survey Design registration | 9:00am Canceled: Meeting at Bluware on Machine Learning Project Development; Bluware Offices ; Comiskey, Cody | 9:00am Project Discussion ; *ALR-05086 CONF (8, VC); Comiskey, Cody | |
| | | 9:00am Discussion of TLE paper; *ALR-0... | 4:00pm Hit Data Science out of the Park - Houston; Minute Maid Park; johnsoam... | 10:00am Horn Mountain Horizon; Matt's office; Lu, Ping | |
| | | 9:00am paper; *ALR-05003 CONF (18); L... | | | |
| | | 10:00am Canceled: AAET DS&AA Team D... | | | |

Occidental [Ping Lu] 000432

# June 2019

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY |
|---|---|---|---|---|---|
| Jun 2 | 3 | 4 | 5 | 6 | 7 |
| | Google Data Engineering training - Session 1; Hackett Tower Conf Room #7 (Computer Training Room); Graybill, Jeremy | | | | Schedule A - Friday Off |
| | 8:00am the leading edge AVO deadline | 8:15am Seis data check for paper, dental | 10:00am Using Paleoscan for Sequence Stratigraphy - Talk by Steve Tobias (NearFX) - Lunch Provided; ALR Idea Theater - Lobby Level; Kirkland, Rodney | 9:00am CS by GAN inpainting; TBD; Li, Rebecca | |
| | 9:00am Dental | 10:00am Canceled: AAET DS&AA Team Discussion; *ALR-04028 CONF (18, VC); Graybill, Jeremy | | | |
| | 10:00am Check arka Mostafa intern report turn to paper | | | | |
| | 2:30pm Geoscience Team meeting; *ALR-04078 CONF (24,VC); Noll, Christian | | | | |
| 9 | 10 | 11 | 12 | 13 | 14 |
| | | | Conference @ ICML, CVPR; Zhang, Yanyan | | |
| | | | ICML 2019 (conference); Los Angeles CA; Mitsakos, Nikolaos | | |
| | 7:30am | | va; Lu, Ping | | |
| | 7:30am | | At ICML & CVPR conferences; Long Beach; Lu, Ping | | |
| | | 10:00am Canceled: AAET DS&AA Team Discussion; *ALR-04028 CONF (18, VC); ... | | 12:30pm Ingrid Tobar's Baby Shower; *ALR-04010 Cafe (12,VC); Jendrusch, Jen... | |
| 16 | 17 | 18 | 19 | 20 | 21 |
| | | | Conference @ ICML, CVPR; Zhang, Yanyan | | |
| | | | va; Lu, Ping | | |
| | | | At ICML & CVPR conferences; Long Beach; Lu, Ping | | 5:30pm |
| | | | CVPR 2019 (conference); Los Angeles CA; Mitsakos, Nikolaos | | Schedule A - Friday Off |
| | | 10:00am Canceled: AAET DS&AA Team Discussion; *ALR-04028 CONF (18, VC); ... | | | |
| 23 | 24 | 25 | 26 | 27 | 28 |
| | | | va; Lu, Ping | | |
| | Google ASL Shadowing trip; Sunnyvale, CA; Graybill, Jeremy | | | 10:30am DS & AA Team Building event; ... | |
| | Yuan PTO; Xiao, Yuan | | 7:30am | | PTO; Lu, Ping |
| | 2:30pm Intern Mid-Summer Goals Check-In: Rebecca Li; *ALR-04060 TEAM ... | 10:00am Canceled: AAET DS&AA Team Discussion; *ALR-04028 CONF (18, VC); ... | 1:00pm Canceled: Geophysics Sprint 20 Review; *ALR-05003 CONF (18); Passey, Karan [Enaxis Consulting] | | |
| | 2:30pm Canceled: Geoscience Team meeting; *ALR-04078 CONF (24,VC); Noll... | 11:00am Mozambique LNG Final Invest... | | | **Occidental [Ping Lu] 000433** |

# July 2019

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY |
|---|---|---|---|---|---|
| Jun 30 | **Jul 1** | 2 | 3 | 4 | 5 |

From Jun 10
From Jun 26
va; Lu, Ping
PTO; Lu, Ping

| | | 10:00am Canceled: AAET DS&AA Team Discussion; *ALR-04028 CONF (18, VC); Graybill, Jeremy | | Independence Day | Schedule A - Friday Off |

| 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|

va; Lu, Ping
PTO; Lu, Ping

| | | 10:00am Canceled: AAET DS&AA Team Discussion; *ALR-04028 CONF (18, VC); Graybill, Jeremy | | | 8:00am I might arrive a bit late at the office this morning; Mitsakos, Nikolaos |

| 14 | 15 | 16 | 17 | 18 | 19 |
|---|---|---|---|---|---|

va; Lu, Ping
PTO; Lu, Ping
17: 5:30pm
18: 5:30pm

| | | 8:00am Geophysics Sprint 20 Review; *ALR-04078 CONF (24, Hub VC); Passey, Karan [Enaxis Consulting] | | 8:30am Salt ML update on labels; Hunter's office; Danque, Hunter | Schedule A - Friday Off |
| | | | | 8:30am Canceled: AAET Quarterly Business Review (QBR); ALR Conference Center; RSC-Technology | |
| | | | | 3:30pm FW: ML denoise discussion; HOU E1070 USI Client Audio Conference Roo... | |

| 21 | 22 | 23 | 24 | 25 | 26 |
|---|---|---|---|---|---|

PTO; Zhang, Yanyan

| | 7:00am SEG annual registration | 7:30am | | | |
| | 10:30am Paper Discussion ; Comiskey, Cody | 8:00am see; Lu, Ping | | | |
| | | 2:00pm Discussion on the recovery evaluation of OBN dataset; Guilaume's office@05096; Li, Rebecca | | | |

| 28 | 29 | 30 | 31 | Aug 1 | 2 |
|---|---|---|---|---|---|

| | 7:00am Seg annual registration | | | 1:00pm Machine learning approaches for uncertainty quantification of subsurface flow models; Alison Tower 3rd floor, conference room #4; Lu, Ping | Schedule A - Friday Off |
| | | | | | 2:17pm meeting; https://attend.webex.com/attend; Jelena Zhang |

**Occidental [Ping Lu] 000434**

# August 2019

◄ ►   Houston, Texas -   Today   Tomorrow   Monday
78° F / 58° F   78° F / 58° F

Search Calendar

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY |
|---|---|---|---|---|---|
| Jul 28 | 29<br>7:00am Seg annual registration | 30 | 31 | **Aug 1**<br>1:00pm Machine learning approaches for uncertainty quantification of subsurface flow models; Alison Tower 3rd floor, conference room #4; Lu, Ping | 2<br>Schedule A - Friday Off<br>2:17pm meeting; https://attend.webex.com/attend; Jelena Zhang |
| 4 | 5 | 6 | 7<br>8:00am Code and description and tle paper tablet hunter channel and horizon change benefit insider profile<br>11:00am AAET Team Photo; Allison Tower Main Entrance; RSC-Technology<br>3:00pm "AAET/AAET" Team Celebration; Churrascos - The Woodlands; RSC-Tech... | 8<br>8:00am inter<br>11:45am AAET Lunch; Brio; Johnson, Jenny<br>3:30pm De-swell; skype; Lu, Ping | 9 |
| 11 | 12<br>8:00am DMA & AAET Meet & Greet ; HT 11th Floor Conference Room C & D; Rizvi, Mustafa Y<br>10:00am AAET Portfolio Overview - Next Steps; Hackett Tower 11th Floor Conf R...<br>12:00pm Meet and Greet Reza Rastegar with Oxy; Hacket Tower Room A-B; Jend... | 13<br>9:30am PTO; Lu, Ping | 14<br>8:00am Data Science Intern Final Presentations; Idea Theater (Allison Tower); Tobar, Ingrid<br>5:00pm Final Discussion; *ALR-04078 CONF (24, Hub VC); Graybill, Jeremy<br>5:20pm Final Discussion; *ALR-04078 CONF (24, Hub VC); Graybill, Jeremy | 15<br>8:45am Breakfast served by AAET interns; *ALR-04060 TEAM (4); Li, Rebecca<br>10:00am FW: Oxy HR Informational Session- Manager Session; Skype Meeti...<br>1:00pm FW: Oxy HR Informational Session- Employee Session; Skype Meet...<br>3:00pm Code review and paper submiss... | 16<br>Schedule A - Friday Off |
| 18 | 19<br>10:00am One-on-one; Ping's office (5018); Lu, Ping | 20 | 21<br>10:30am Geophysical Interpretation ; ALR-05053; Comiskey, Cody | 22 | 23 |
| 25 | 26 | 27 | 28 | 29<br>PTO; Mitsakos, Nikolaos<br>9:00am Canceled: Bluware / Headwave Demo & Review Meetings; *ALR-10049 IDEA (14) (Managed); Comiskey, Cody<br>3:30pm Discussion; *ALR-05003 CONF (18); Graybill, Jeremy | 30<br>Schedule A - Friday Off |

Occidental [Ping Lu] 000435

Houston, Texas

Today 78° F / 58° F
Tomorrow 78° F / 58° F
Monday 78° F / 58° F

Search Calendar

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY |
|---|---|---|---|---|---|
| Sep 1 | 2 | 3 | 4 | 5 | 6 |
| | Labor Day | | | Yuan PTO; Xiao, Yuan | |
| | | | | 7:00am — 6:00pm | WFH; Mitsakos, Nikolaos |
| | | | | 7:30pm PTO; Lu, Ping | |
| 8 | 9 | 10 | 11 | 12 | 13 |
| | | | | | Schedule A - Friday Off |
| 15 | 16 | 17 | 18 | 19 | 20 |
| | 9:00am RE: Conversation; Please call my office at 713 572-5483; Bowlby, David | | | | |
| 22 | 23 | 24 | 25 | 26 | 27 |
| | 9:00am Update on the monetization on software portfolio with Yanni; *ALR-04078 CONF (24, Hub VC); Jendrusch, Jennifer [Prodigy Staff Advsr] | | | PTO; Mitsakos, Nikolaos | Schedule A - Friday Off |
| 29 | 30 | Oct 1 | 2 | 3 | 4 |
| | | 9:00am Important Update; *ALR-04078 CONF (24, Hub VC); Bowlby, David | | | |
| | | 9:00am Important Update; *ALR-04078 CONF (24, Hub VC); Jendrusch, Jennifer [Prodigy Staff Advsr] | | | |

Occidental [Ping Lu] 000436

## October 2019

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY |
|---|---|---|---|---|---|
| Sep 29 | 30 | **Oct 1**<br>9:00am Important Update; *ALR-04078 CONF (24, Hub VC); Bowlby, David<br>9:00am Important Update; *ALR-04078 CONF (24, Hub VC); Jendrusch, Jennifer [Prodigy Staff Advsr] | 2 | 3 | 4 |
| 6 | 7 | 8 | 9 | 10<br>8:00am Weekly Staff Meeting ; *ALR-04028 CONF (18, Hub VC); Jendrusch, Jennifer [Prodigy Staff Advsr] | 11<br>Schedule A - Friday Off |
| 13 | 14<br>8:30am APC Project presentation; GW5, 14.186; Li, Yongfeng | 15<br>9:00am Conversation, thanks.; Lindsay's office; Lu, Ping | 16 | 17<br>8:00am Weekly Staff Meeting ; *ALR-04028 CONF (18, Hub VC); Jendrusch, Jennifer [Prodigy Staff Advsr]<br>9:00am Seismic Project Review; Woodlands Office; Pryporov, Maksym | 18 |
| 20 | 21<br>1:00pm Seismic Algorithm Demo & Visualization; Skype Meeting; Pryporov, Maksym | 22 | 23 | 24<br>8:00am Weekly Staff Meeting ; *ALR-04028 CONF (18, Hub VC); Jendrusch, Jennifer [Prodigy Staff Advsr] | 25<br>Schedule A - Friday Off |
| 27 | 28 | 29 | 30 | 31<br>8:00am Weekly Staff Meeting ; *ALR-04028 CONF (18, Hub VC); Jendrusch, Jennifer [Prodigy Staff Advsr] | Nov 1 |

Occidental [Ping Lu] 000437

# November 2019

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY |
|--------|--------|---------|-----------|----------|--------|
| Oct 27 | 28 | 29 | 30 | 31<br>8:00am Weekly Staff Meeting ;<br>*ALR-04028 CONF (18, Hub VC);<br>Jendrusch, Jennifer [Prodigy Staff Advsr] | Nov 1 |
| 3 | 4 | 5 | 6 | 7<br>8:00am Weekly Staff Meeting ;<br>*ALR-04028 CONF (18, Hub VC);<br>Jendrusch, Jennifer [Prodigy Staff Advsr] | 8<br>Schedule A - Friday Off |
| 10 | 11 | 12 | 13 | 14<br>8:00am Weekly Staff Meeting ;<br>*ALR-04028 CONF (18, Hub VC);<br>Jendrusch, Jennifer [Prodigy Staff Advsr] | 15 |
| 17 | 18 | 19 | 20<br>PTO; Zhang, Yanyan | 21<br>8:00am Weekly Staff Meeting ;<br>*ALR-04028 CONF (18, Hub VC);<br>Jendrusch, Jennifer [Prodigy Staff Advsr] | 22<br>Schedule A - Friday Off |
| 24 | 25 | 26 | 27<br>PTO; Zhang, Yanyan | 28<br>Thanksgiving Day<br>8:00am Weekly Staff Meeting ;<br>*ALR-04028 CONF (18, Hub VC);<br>Jendrusch, Jennifer [Prodigy Staff Advsr] | 29<br>Thanksgiving Day After<br>Occidental [Ping Lu] 000438 |

◀ ▶  December 2019

Houston, Texas

Today
78°F

Tomorrow
78°F / 58°F

Monday
78°F / 58°F

Search Calendar

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY |
|---|---|---|---|---|---|
| Dec 1 | 2 | 3 | 4 | 5 | 6 |
| From Nov 27 | | | | 8:00am Weekly Staff Meeting ; *ALR-04028 CONF (18, Hub VC); Jendrusch, Jennifer [Prodigy Staff Advsr] | ▌Schedule A - Friday Off |
| 8 | 9 | 10 | 11 | 12 | 13 |
| PTO; Zhang, Yanyan | | | | 8:00am Weekly Staff Meeting ; *ALR-04028 CONF (18, Hub VC); Jendrusch, Jennifer [Prodigy Staff Advsr] | |
| 15 | 16 | 17 | 18 | 19 | 20 |
| | | | | 8:00am Weekly Staff Meeting ; *ALR-04028 CONF (18, Hub VC); Jendrusch, Jennifer [Prodigy Staff Advsr] | ▌Schedule A - Friday Off |
| 22 | 23 | 24 | 25 | 26 | 27 |
| PTO; Zhang, Yanyan | | ▌Christmas Eve | ▌Christmas | 8:00am Weekly Staff Meeting ; *ALR-04028 CONF (18, Hub VC); Jendrusch, Jennifer [Prodigy Staff Advsr] | |
| 29 | 30 | 31 | Jan 1, 20 | 2 | 3 |
| PTO; Zhang, Yanyan | | | | 8:00am Weekly Staff Meeting ; *ALR-04028 CONF (18, Hub VC); Jendrusch, Jennifer [Prodigy Staff Advsr] | |

PTO; Zhang, Yanyan (Dec 1)
PTO; Zhang, Yanyan (Dec 8)
PTO; Zhang, Yanyan (Dec 15)
PTO; Zhang, Yanyan (Dec 22)
PTO; Zhang, Yanyan (Dec 29)

Occidental [Ping Lu] 000439

# EXHIBIT 3

Occidental [Ping Lu] 000440

**Fall 2019 Campus Recruitment Overview (08-28-19, afternoon)**



Occidental [Ping Lu] 000441



Gregory, KC [15:4:00 ]

Good afternoon all! If you have any questions throughout the presentation please feel free to put them in the chat and I will have the presenters answer them!

Occidental [Ping Lu] 000442

# Occidental: Premier, Complementary Global Asset Portfolio

- No. 1 producer in the Permian Basin of West Texas and southeast New Mexico

- No. 1 in carbon dioxide enhanced oil recovery projects ($CO_2$ EOR)

- No. 1 producer in the Denver-Julesburg Basin of Colorado

- No. 1 producer in the Uinta Basin of Utah

- No. 1 independent producer in Oman

- No. 1 independent producer in Oman

- No. 4 producer in the Gulf of Mexico

- Leading position in Colombia

- Top 3 producer of polyvinyl chloride (PVC), chlorine and caustic soda

- Leading international midstream assets and master limited partnership (MLP)



Occidental [Ping Lu] 000443

3

## Occidental Overview

Focus
Discipline
Performance

### Oil and Gas

- Exploration and production activities focused in the United States, Middle East, Latin America and Africa
- Domestic operations in the Permian Basin of West Texas and Southeastern New Mexico, focused in the Delaware, Midland and Central basins; Colorado; Utah; and Wyoming
- International operations in: Oman, United Arab Emirates and Qatar in the Middle East; Colombia in Latin America; and, Mozambique, Ghana, South Africa and Algeria in Africa
- Global leader in the application of enhanced oil recovery (EOR) techniques, such as carbon dioxide ($CO_2$) and water flooding

### Midstream and Marketing

- Purchases, markets, gathers, processes, transports and stores oil, condensate, natural gas liquids (NGLs), natural gas, carbon dioxide ($CO_2$) and power

### Oxy Low Carbon Ventures

- Wholly owned subsidiary focused on carbon capture, utilization and storage projects and technologies that source manmade $CO_2$ for use in global oil and gas projects. OLCV is advancing innovative low-carbon technology solutions that will economically grow our business, while reducing emissions.

### OxyChem

- Wholly owned subsidiary that manufactures and markets basic chemicals and vinyls with plants in 11 U.S. states, Canada and Chile

### Western Midstream Partners, LP

- A publicly traded master limited partnership and consolidated subsidiary of Occidental engaged in the business of acquiring, owning, developing and operating midstream assets.



## Select Awards and Rankings

### World's Most Admired Companies

- Fortune Magazine has ranked Occidental among its Most Admired Companies in the Mining, Crude-Oil Production category every reported year since 2008, including the No. 1 ranking 10 times.

### Fortune Blue Ribbon Company

- Occidental has been named a Fortune Magazine Blue Ribbon Company for appearing on four of its annual rankings in 2018, including the Fortune 500, World's Most Admired Companies, Businessperson of the Year and Most Powerful Women.

### Thomson Reuters Top 100 Global Energy Leader

- Thomson Reuters honored Occidental as a Top 100 Global Energy Leader, in recognition of excelling in a complex business environment by balancing financial demands with regulatory, risk, legal, social and environmental needs.

### Houston Chronicle Top 100 Companies

- The Houston Chronicle ranked Occidental No. 10 among the largest publicly traded companies in the Houston area as part of its 2018 Chronicle 100 list.





# University Recruiting Strategy 2019 – 2020

With increasing competition in the market, we need to ensure our recruitment strategy is geared for easy execution to attract the top talent on university campuses

## Our goals:

| | |
|---|---|
| Identify talent at the career fairs | Interview for 1st round virtually within 1 week of career fair |
| Prepare offer post-interview for interns | Schedule 2nd round interviews on-site for full-time candidates |

*Please see workflow for recruitment champ process.

Occidental [Ping Lu] 000446

# University Relations Program History

| Year | Full Time | Intern |
|------|-----------|--------|
| 2015 | 74 | 97 |
| 2016 | 26 | 55 |
| 2017 | 33 | 75 |
| 2018 | 44 | 75 |
| 2019 | 72 | 96 |
| 2020 | 27 | 93 |



### New Grads & Intern Hires by Year

*46 offers extended: 39 offers accepted, 7 offers pending, 0 declines!*



Occidental [Ping Lu] 000447

7

# 2020 Summer Intern Program by Discipline

## Oil & Gas

| Discipline | # of Internships |
|---|---|
| Data Management | 4 |
| Office Engineers (Houston) | 19 |
| Field Engineers | 5 |
| Geoscience | 7 |
| HES | 1 |
| Integrated Supply | 4 |
| Land | 4 |
| Low Carbon Ventures | 2 |
| Petrophysics | 3 |
| TOTAL OOG | 49 |

## OPC

| Discipline | # of Internships |
|---|---|
| Accounting | 4 |
| IT | 14 |
| HES | 1 |
| Midstream & Marketing | 1 |
| Real Estate | 1 |
| TOTAL OPC | 21 |

## OxyChem

| Discipline | # of Internships |
|---|---|
| Accounting | 2 |
| Supply Chain | 2 |
| Sales | 1 |
| Engineering | 18 |
| TOTAL OCC | 23 |



Occidental [Ping Lu] 000448

8

# Approved University List

Colorado School of Mines
Louisiana State University
Missouri S&T University
Rice University
Texas A&M University
Texas Tech University
Tuskegee University

University of Houston
University of Oklahoma
University of Texas
University of Tulsa
University of Wyoming

*Auburn University\**
*Baylor University\**



*Strategic University for OxyChem Recruitment

Occidental [Ping Lu] 000449

9

# Universities and Disciplines – Career Fair Dates

## Colorado School of Mines
- Sep 10 – Engineering (O&G, Chem)
- Sep 10 – Geoscience (O&G)

## Louisiana State University
- Sep 10 – Engineering (O&G, Chem)

## Missouri S&T University
- Sep 24 – Engineering (O&G, Chem)

## Rice University
- Sep 24 – Engineering (O&G)

## Texas A&M University
- Sep 4 – Engineering (O&G, Chem)
- Sep 19 – Industrial Distribution (PAID)
- Sep 25 – Accounting, IT, SCM (O&G, Chem)

## Texas Tech University
- Aug 22 – Land (O&G)
- Sep 18 – Engineering (O&G, Chem)
- Oct 2 – IT, SCM (O&G)

## Tuskegee University
- Sep 26 – Engineering (O&G, Chem)

## University of Houston
- Sep 12 – Engineering (O&G, Chem)
- Sep 13 – Accounting, IT (O&G)

## University of Oklahoma
- Sep 12 – Engineering (O&G)

## University of Texas
- Sep 4 – Accounting, IT (OPC)
- Sep 11 – Engineering (O&G)
- Sep 18 – Geoscience (O&G)

## University of Tulsa
- Sep 11 – Engineering (O&G)
- Sep 19 – Land (O&G)

## University of Wyoming
- Oct 1 – Engineering (O&G)

### Addt'l Recruitment Events
- Sep 5 - AAPG (Geo)
- Sep 16-17 - Rocky Mountain Rendezvous (Geo)



Occidental [Ping Lu] 000450

10

# 2019 Intern Class

## Oxy Legacy

- No full time opportunities at this time
- Encourage to go to career fair
- Ask them to check in with the University Relations team if they receive an offer

## APC Legacy

- Decision made to hold on offers for both interns and full-time
- Pending approval from GOM and the Rockies
  - Interns eligible for repeat internships would have priority in consideration for these roles





# Workflow of UR Campus Recruitment

| | | | |
|---|---|---|---|
| **Job Postings** *Aug-Sep* | 1-1.5 months prior to Career Fair | University Relations Team | Posted on Career Center Job Sites & Taleo |
| **Info Sessions** *Sep-Oct* | The evening prior or evening of Career Fair | On-Campus Reps | Provide overview of Oxy |
| **Career Fairs** *Sep-Oct* | Career Fair Day | On-Campus Reps & Student Ambassadors | Review resumes & Identify interview candidates |
| **Interviews (All Students)** *Sep-Oct* | 1-2 weeks after career fair | Core Interview Team | Interviews conducted virtually |





Occidental [Ping Lu] 000452

12

# Workflow of UR Campus Recruitment

## *Continued*

| | | | |
|---|---|---|---|
| **2nd Round Interviews (Full-Time)** *Sep-Oct* | **After virtual interviews** | Work with UR & HR to schedule 2nd round interviews on-site | HR to determine interview team and schedule |
| **Offers (Interns)** *Sep-Oct* | **After virtual interviews** | Notify UR & HR with interview feedback & recommendation | Candidate has 5 business days to respond |
| **Offers (Full-Time)** *Sep-Oct* | **After 2nd round on-site interviews** | Notify UR & HR with interview feedback & recommendation | |
| **Regrets** *Sep-Oct* | **After students accept offer / position is filled** | Close Position in Taleo | |



# Virtual Interview Process

We are moving all on-campus interviews to virtual interviews for the Fall 2019 recruitment season



Timeline for interviews will be within 1-2 weeks after the career fair for each respective university.



# Unconscious Bias in Recruiting



INFLUENCED BY OUR

⊘ BACKGROUND

⊘ CULTURAL ENVIRONME

PERSONAL EXPERI

?          ?

# Booth Setup

**Preferred booth setup:**
move table(s) to side to
maximize space and let
candidates into area to talk
to representatives

Mobile registration



# Mobile Registration Forms



- Each career fair will have 1 or 2 framed QR code documents at the booths
- **QR Codes:** Link to registration form to request school, major, grad date, GPA, etc.
- **COMMUNICATE TO STUDENTS TO REGISTER**
- UR will send application instructions to all registered students who qualify

  



Occidental [Ping Lu] 000457

17



# New Giveaways!

Bluetooth Speakers

Easy to carry bags

Reusable straws

Eyewear retainers

Occidental [Ping Lu] 000458

18

# Next Steps!

## University Relations Team

- Finalize campus teams
- Schedule breakout sessions per university to help further prepare for on-campus events
- Send calendar invites for all on-campus events

## On-Campus Representatives

- Respond to UR meeting invite for breakout session
- Ask UR if you need a navy polo (if this is your first time recruiting for us)
- Make travel reservations once you receive your university confirmation





Occidental [Ping Lu] 000460

# EXHIBIT 4

Occidental [Ping Lu] 000461

| | |
|---|---|
| **From:** | University Relations |
| **Sent:** | Thursday, August 29, 2019 11:19 AM |
| **Cc:** | University Relations; Tucker, Keri; Whitley, Erin; Collins, Keely M |
| **Subject:** | University Relations Update- Oxy Fall Recruiting |

To all Legacy APC UR Discipline Leads, former Campus Recruiters, and Summer 2019 Intern Supervisors:

Things are happening quickly with Fall Campus Recruiting and messaging to our summer 2019 interns. Here's a rundown:

- The email below was sent to summer 2019 interns this morning. This information was developed based on information from Oxy UR.
- Oxy has requested 1-2 legacy APC campus recruiters to participate at fall campus recruiting events. Discipline leads submitted names to us recently. Legacy APC UR is inviting them to Oxy-led prep meetings as they are scheduled. Not everyone who recruited in the past will be invited. Those who never recruited will not be considered this semester.
- We will communicate with discipline leads and potential campus recruiters on a "we need you now" basis. That's the best we can do as we have very little lead time on planning and are doing the best we can with limited info.
- Thank you for your patience. We recognize this is not an ideal situation and more planning would have been helpful. We are working to do right by our interns and give them the best chance possible. We also need to be very direct and not give false hopes or string them along.

Please coordinate with your discipline lead when feasible and reach out to us at UniversityRelations@Anadarko.com as needed for critical questions.

Thank you for your efforts to look out for our talented and eager summer 2019 interns! We love them as much as you do and will continue to work to give them support and clarity.

Keely Collins
HR- University Relations & Onboarding
Anadarko Petroleum Corporation, a wholly owned subsidiary of Occidental Petroleum Corporation
O: 832-636-3158
M: 210-471-1833

If you are not the intended recipient of this email message, any use, distribution or copying of the message is prohibited. Please let me know immediately by return email if you have received this message by mistake, then delete the email message. Thank you.

---

**From:** University Relations <UniversityRelations@anadarko.com>
**Sent:** Thursday, August 29, 2019 9:56 AM
**To:** University Relations <UniversityRelations@anadarko.com>
**Subject:** Oxy Employment and Internship Opportunities

Summer 2019 Anadarko Interns,

Greetings from your legacy Anadarko University Relations team. We hope your semester is getting off to a great start. We have some new information to share with you regarding employment opportunities.

Occidental [Ping Lu] 000462

- Full-time Opportunities - If you are interested in a full-time opportunity with Oxy there are no positions available at this time.
- Summer 2020 Internships - If you are interested in a Summer 2020 internship with Oxy, check your career services for Oxy events on campus this fall. Currently scheduled campus events are listed here: LinkedIn Oxy Career Fairs
    - Oxy needs an updated resume from you, please apply via their website. LINK: www.oxy.com/careers

For more updates as they become available visit www.oxy.com/careers and follow Oxy on LinkedIn at: www.linkedin.com/company/oxy

Thank you,

**Anadarko University Relations**
UniversityRelations@Anadarko.com

**Occidental [Ping Lu] 000463**

| | |
|---|---|
| **From:** | Graybill, Jeremy |
| **Sent:** | Wednesday, September 11, 2019 3:43 PM |
| **To:** | Bayeh, Alex; Berestovsky, Natalie; Cao, Dingzhou; Lu, Ping; Tobar, Ingrid; LeMoine, Vincent; Akkam Veettil, Dilshad; Kara, Mustafa; Zhan, Cheng; Fernandez, Ricardo; Madarshahian, Ramin; Teixeira de Moraes, Luis Felipe; Ben, Yuxing; Perrotte, Michael; Mitsakos, Nikolaos; Xiao, Yuan; Zhang, Yanyan; Gupta, Himanshu |
| **Subject:** | Data Science Internship Program Update |
| **Attachments:** | University Relations Update- Oxy Fall Recruiting; Oxy_Fall_Internship_Recruiting_Update_ 2019.pptx |

Since all of you have been involved in our Data Science internship program, I wanted to provide you with an update on the program and additional information.

I was told today, and it's supported in the presentation linked to below and the information in the attached email, that the Data Science Internship program is effectively dead, in that we will not be making any offers to any of our 2019 summer interns (as repeat interns or college new hires), and that we need to cancel all of our existing scheduled campus informational sessions, recruiting sessions, and interviewing sessions, as we will not be continuing with a Data Science internship program for the summer of 2020.  As far as a timeline, this means that none of you will have any of the following job responsibilities related to our Data Science internship program, in comparison to previous APC job responsibilities you potentially had:

1. Providing input into or making a decision on which Data Science candidates should be hired as returning interns for next summer, or as college new hires after graduation. (Fall 2019)
2. Recruiting Data Science candidates at the various college campuses and through our other recruiting efforts. (Fall 2019)
3. Interviewing Data Science candidates for potential 2020 summer internship opportunities, both through recruiting efforts and formal scheduled interviews. (Fall 2019)
4. Providing input and deciding which Data Science candidates will be selected to receive internship offers. (Fall 2019)
5. Extending offers to Data Science intern candidates for the summer 2020 internship program. (Fall 2019)
6. Determining which Data Science projects the interns work on, and preparing for the Data Science summer internship program. (Spring 2020)
7. Providing individual mentorship, management, project advisement, and general internship program mentorship and input throughout the Data Science internship program. (Summer 2020)
8. Providing input into or making a decision on which Data Science candidates should be hired as returning interns for the following summer, or as college new hires after graduation. (Summer to Fall 2020)

To save you time, I've listened to the HR University Relations presentation linked to in the forwarded email below, and documented the most pertinent facts for our program as listed below.  I've also attached a presentation which provides all of the screen shot grabs, since the PowerPoint presentation used in the HR presentation wasn't provided by Oxy HR to our HR department.

**Slide 8**
**5:14** - "This is what we're going to campus for this year" which doesn't include any Data Science internships.
**6:15** - "For international students, typically we will look at international students on the specialized side, so petrophysical roles, often times PhD roles.  There are some opportunities on the engineering side, where we need that level of student, so that's where that might come in."  Again, this does not include Data Science internships, and

1

**Occidental [Ping Lu] 000464**

historically, 11 out of 12 of our Data Science interns over the past 2 summers have been international students, due to the required capabilities for Data Science interns.

**Slide 10**
This provides all of the Career Fair possibilities for this year.  No Data Science related Career Fairs exist or will be scheduled, and we were not contacted by Oxy to be included in this discussion, any of the recruiting events, or any future discussions.

**Slide 11**
No offers, full time or for interns are being provided.  In addition, APC Legacy interns are treated differently than Oxy Legacy interns, and are not encouraged to go to Career Fairs or to check with University Relations, while Oxy Legacy interns are encouraged.

**Slide 12**
**14:05** - "All positions have already been posted on our Oxy careers website, as well as external websites."  This did not include any Data Science positions.

**Slide 13**
**16:38** - "We target to extend offers immediately as soon as possible whenever you guys tell us 'Hey, we thought this candidate was a rock star who's a must' we'll be extending those offers as soon as possible. We try to be as quick as possible."  So even if we were moving forward with a Data Science intern program, this means that we are no longer able to provide on the spot job offers to outstanding candidates as we have been able to do in the past.

**Slide 14**
**17:48** - "We do our behavioral based training versus a full on technical interview session for our interns."  Oxy is changing the interviews from in person interviews to virtual interviews, and changing the structure to be behavioral based instead of technical based, which obviously has many issues for identifying the highest qualified Data Science interns, even if we were continuing with the Data Science internship program.

Thanks,
-Jeremy


---

**From:** Tucker, Keri <Keri.Tucker@anadarko.com>
**Sent:** Wednesday, September 11, 2019 10:58 AM
**To:** Graybill, Jeremy <Jeremy.Graybill@anadarko.com>
**Subject:** FW: Oxy Recruiting Overview Presentation

Hi Jeremy,

Please see the instructions below to view the Oxy recruiting presentation.

Thank you,

*Keri Tucker*

University Relations Representative
1201 Lake Robbins Dr.
The Woodlands, TX 77380
(832) 636-3963
Keri_Tucker@oxy.com

Occidental [Ping Lu] 000465

**From:** University Relations
**Sent:** Tuesday, September 3, 2019 3:39 PM
**Subject:** Oxy Recruiting Overview Presentation

Legacy APC Recruiters,

If you were unable to attend the Oxy Recruiting Overview last week, Oxy has made the presentation available to view via this external link: <u>Fall 2019 Campus Recruitment Overview (08-28-19, afternoon)</u>

Please note that you will need to enter the password in order to view: ***OxyUniversityRelations***

Thank you,

**Anadarko University Relations**
<u>UniversityRelations@Anadarko.com</u>

**Occidental [Ping Lu] 000466**

# EXHIBIT 5

Occidental [Ping Lu] 000467



# AAET Portfolio – Evaluation progress update

August 28th, 2019

Occidental [Eng Lu] 000468

# Executive summary

PRELIMINARY

- Evaluated 23 of the largest products in the AAET portfolio (Chiefs+DMA+IT)

- Majority of products will be "Archived" (i.e. eliminate costs, preserve IP):

  - **Archive 11 products**

  - **Merge 2 products,** capabilities being evaluated for potential inclusion in Oxy platform

  - **Sustain use for 8 products,** due to business continuity and risk mitigation, with "**keep the lights on" spend levels**

  - Continue usage & **roll-out of 2 products** based on **high operational reliance** and **high potential for legacy-Oxy assets**

- **88% reduction in go-forward addressable spend on AAET products ($4.6 MM out of $37.5 MM baseline)**

- **Fixed cost commitments total ~$7.5 MM per year** for Google Cloud, Kelvin, and other contracts being examined (not included in addressable spend)

- **Unclassified cost of $4.9 MM** needs to be further evaluated (not included in addressable spend)

- Next steps
  - Refine estimates of go-forward maintenance, unclassified and fixed cost commitments
  - Explore downstream impact of data collection spend
  - Prepare integration plans for technologies to be adopted or sustained
  - Local analytics team portfolio analysis (not part of AAET)



**Occidental [Ping Lu] 000469**

2

# Objectives of the discussion today

**1** **Summarize recommendations from SME evaluations**

**2** **Review IT dependencies and costs going forward**

**3** **Next steps**

**4** **Deep-dive on products recommended for sustain or expand as needed**



Occidental [Ping Lu] 000470

3

# 1 Recommendations for portfolio result in 88% reduction in addressable spend

PRELIMINARY

| Product recommendation | Definition | # of products | Spend summary, $MM | | |
|---|---|---|---|---|---|
| **Archive Or Merge** | ▪ **No additional funding**<br>▪ Allow code to be accessed and key modules incorporated into Oxy Platforms<br>▪ Cost of migrating data into Oxy platforms is TBD | **13** | 20.0 | 20.0 **-100%** | 0 |
| **Sustain** | ▪ **Fund "keep the lights on" maintenance** to sustain current functionality<br>▪ Cost of migrating tools into Oxy systems is TBD | **8** | 6.6 | 5.3 **-80%** | 1.3[2] |
| **Expand** | ▪ **Consider deployment into legacy Oxy BUs**<br>▪ In-flight development projects to be rationalized with DMA roadmap | **2** | 10.9 | 7.6 **-70%** | 3.3[3] |
| **Total** | | **21** | 37.5 | 32.9 **-88%** | 4.6 |

AAET 2020 addressable forecast spend[1]     Synergy savings     Go-forward cost to Oxy per year



1 Full 2020 estimate provided by AAET is $50 MM. Excluded from addressable spend is $4.9 MM of "unclassified" costs and estimated $7.6 MM spend on DMA

2 Cost estimates for sustain include basic maintenance and assumed IT / cloud expense

3 Cost estimates for expand include recommended development and roll-out spend, maintenance, and IT / cloud expenses

Occidental [Ping Lu] 000471

4

# **1** 8 products are recommended to **Sustain** and 2 to **Expand**

PRELIMINARY

**Annual go-forward spend, $MM**

G&G product | Eng. product

| | Product | Summary | Evaluator | Deploy/ develop[1] | Maintenance + IT / cloud | Total | Comments |
|---|---|---|---|---|---|---|---|
| **Products to Expand** | **IPSO Offshore** | Surveillance and res. management | M. Hackworth, J. Keating, D. Le, SP Singh | 0.9 | 0.9 | 1.8 | In active use for all offshore platforms, recommended to be maintained and updated for GOM BU |
| | **IPSO Onshore** | Surveillance and res. management | M. Hackworth, S. Lauver, S. Liu | 0.9 | 0.7 | 1.6 | In active use by legacy-APC DB team, recommended to maintain in short term and combine with other Oxy systems for surveillance in legacy Oxy BUs |
| **Products to Sustain** | **FiDO** | Uncertainty analysis package | J. Keating, SP Singh | 0 | 0.6 | 0.6 | In active use by GOM teams. Similar but less capable vendor products available at less cost, sustaining is least disruptive option |
| | **DXP (development planning module)** | Dev. plan optimization | S. Lauver | 0 | 0.1 | 0.1 | Dev. planning modules are in early deployment but can be supported at low incremental cost |
| | **LogQC (standalone), IP Toolkit (2 products)** | Petrophysical tools, plug and play | K. Newsham | 0 | 0.1 | 0.1 | Will be incorporated into existing platforms at very low cost |
| | **Geophysical ML, ARCQis, SaltID, & CTL (4 products)** | Geophysical interpretation and ML tools | K. Koster | 0 | 0.4 | 0.4 | Will be available for expert users with 1-3 Headwave licenses for $300k annually, TBC |
| | | | **Total** | **1.8** | **2.8** | **4.6** | |



1 Includes development of select in-flight projects and deployment/roll-out costs

Cost estimates are preliminary, and reconciliation with Value Capture targets is underway

Occidental [Ping Lu] 000472

# **1** 13 products / initiatives are recommended to **Archive or Merge**

PRELIMINARY

Legend: G&G product | Eng. product | Other

| | Product | Evaluator | Addressable spend saved[1] $MM | Comments |
|---|---|---|---|---|
| **Products to Archive** | **LogQC (cloud)** | K. Newsham | 1.5 | Clould-based products associated with the Lithos platform are still in development, and were determined to be high cost relative to existing solutions in use at Oxy |
| | **PetroPT** | K. Newsham | 1.5 | |
| | **Tops Propagation Tool** | K. Newsham | 1.5 | |
| | **Lithos Toolkit** | K. Newsham | 2.5 | |
| | **Multiscale Facies Mapping** | K. Newsham | 2.2 | |
| | **Geomechanical Reservoir Characterization** | K. Newsham | 0.1 | |
| | **Advanced Geologic Modeling** | D. Hoffman | 0 | Future development should be cancelled, existing Petrel plug-ins should be made available |

| | Product | Evaluator | Addressable spend saved[1] $MM | Comments |
|---|---|---|---|---|
| **Products to Archive** | **Next Gen 3D Visualization** | D. Hoffman | TBD | Associated with Lithos and recommended for cancellation |
| | **DXP (exploration module)** | B. Bullock | TBD | Exploration module can be Archived for potential future use, but no current applicability to Oxy |
| **Products to Merge** | **FPO – Real Time Drilling** | J. Mejia | 4.1 | Highest-value capabilities being examined for potential inclusion in ODA |
| | **FPO – Real Time Completion** | J. Mejia | 2.3 | Highest-value capabilities being examined for potential inclusion in ODA |
| | **Open Innovation** | M. Hackworth | 1.7 | Crowd-sourcing program recommended for cancellation |
| | **Emerging Technologies[2]** | M. Hackworth | 2.0 | Incubator program recommended for cancellation, BUs may continue to fund specific programs as needed |

**Total addressable spend saved:**   **$20 MM**   Associated headcount and synergy opportunities is being analyzed

Occidental [Ping Lu] 000473



1 Represents total estimated development and maintenance costs provided by AAET
2 Total provided for Emerging Technologies is $6.3 MM; $4.3MM is assumed to be fixed cost associated with Kelvin and other vendors and removed from addressable spend, TBC

# ② Fixed cost commitments of $7.5 MM are associated with the portfolio

PRELIMINARY

| Contract | Annual contract amount, $MM | Contract end date | Comments |
|---|---|---|---|
| **Google Cloud** | 3.2 | Oct 1, 2021 | Exit options being evaluated |
| **Kelvin** | 3.0 | May 1, 2020 | IoT technology used for production optimization in DJ, and used by RTD (recommended for archiving). Evaluators recommendation is to continue where in active use |
| **MapR** | 1.0 | Jan 31, 2021 | Phase-out options being evaluated. Used by IPSO |
| **StreamBase, MongoDB** | 0.3 | TBD | Mongo is also used by Oxy, may consolidate contracts |
| **Total** | 7.5 | | |



**Occidental [Ping Lu] 000474**

1. Improve understanding of costs for maintenance, data transfer, and integration

2. Integrate recommendations with Value Capture initiatives for DMA

3. Finalize path forward for targeted adoption of analytics algorithms and high-potential modules



**Occidental [Ping Lu] 000475**

# BACKUP



Occidental [Ping Lu] 000476

# The AAET technology portfolio by type and function

**Recommendation**
○ Archive  ● Merge  ● Sustain  ○ Expand



**Functional categories**

AAET product | Evaluator

✓ Potential overlap with Oxy technology, to be further evaluated

| Technology types | Geophysics | Petrophysics and earth modeling | | Field development + appraisal | Reservoir management | Drilling and completion | Facilities |
|---|---|---|---|---|---|---|---|
| **Data analytics** | ● Geophysical ML — Geophysical interpretation using deep learning — **Klaas Koster** | ● LogQC and PetroPT — ML for accelerated petrophysical QC and log-based basin interpretation — **Kent Newsham** | ● Multi-scale Facies Mapping — Data-driven facies characterization and basin mapping — **Mary Parke** | ● DXP — Data analytics for exploration and appraisal — **Brian Bullock** | | | ● APA — Predict and study facility shutdowns — **Matt Hackworth** |
| **Real time operations** | | | | | | ● FPO – RT Drilling — Real-time ops, incl. edge computing at rig site ● FPO – RT Completion — Stage-level cost opt., Frac hit monitoring, Frac diagnostics — **Juan Mejia** | |
| **Workflow automation / accelerated interpretation** | ● ARCqis and Salt ID — Accelerated seismic processing — **Klaas Koster** | ● Tops Propagation Tool — Basin-wide stratigraphic framework — **Mary Parker** | ● Geomech. Res. Char. — Accelerated basin-wide geomechanical modeling — **K. Newsham & J. Kessler** | | | | ● Open Innovation + Emerging Technologies — Additional technologies in development, not shown here or with limited deployment to date, from the Open Innovation and Emerging Tech groups — **Matt Hackworth** |
| **Integrated platforms / visualization products** | ● Close-the-Loop — Integration of seismic data with static models — **Klaas Koster** | ● Lithos Toolkit — Integrated characterization platform — **Kent Newsham** ● IP Toolkit — Petrophysical plugins for IP software — **Kent Newsham** | ● Adv. Geo. Modeling — Integrated characterization platform — **Brian Bullock** ● Next generation 3D Visualization — GPU-based visualization — **Dave Hoffman** | ● FiDO — Uncertainty analysis and dev. plan. optimization — **James Keating** | ● IPSO Offshore — Integrated field, well, reservoir, and facility optimization — **M. Hackworth & SP Singh** ● IPSO Onshore — Integrated field, well, reservoir, and facility optimization — **M. Hackworth & S. Lauver** | | ● Foundational data management + cloud capabilities — Data infrastructure and cloud requirements across technologies — **Randy Volkin & Mustafa Rizvi** |

**IT Lead:** Randy Volkin
**Occidental [Ping Lu] 000477**
**DMA Lead:** Reza Rastegar

10

# AAET spend forecast for 2020

PRELIMINARY

| Product Lines[1] | Cpx $MM | Opx $MM | FTEs $MM | Total $MM | # Contrs | # FTEs |
|---|---|---|---|---|---|---|
| **AAET Cloud Eng & Infrastructure** | 0.5 | 1.2 | 2.1 | 3.8 | 6 | 5 |
| **Advanced Reservoir Characterization** | 0.6 | 0.1 | 1.5 | 2.2 | 2 | 4 |
| **DL-Based Geophysics** | 1.0 | 0.1 | 2.9 | 4.0 | 3 | 7 |
| **DSRV (Geomechanical Simulator)** | 0.1 | 0.0 | 0.0 | 0.1 | 0 | 0 |
| **Emerging Tech** | 0.0 | 4.7 | 1.5 | 6.3 | 16 | 4 |
| **FiDO (Field Devp Optimization)** | 1.4 | 0.1 | 1.2 | 2.6 | 5 | 3 |
| **IPSO Offshore** | 4.3 | 0.4 | 1.4 | 6.1 | 16 | 3 |
| **IPSO Onshore** | 3.1 | 0.2 | 1.5 | 4.8 | 11 | 4 |
| **Lithos Toolkit (Unconventionals)** | 1.8 | 1.9 | 3.5 | 7.1 | 12 | 9 |
| **Open Innovation** | 0.0 | 1.3 | 0.4 | 1.7 | 4 | 1 |
| **RTC (Real-time Completions)** | 1.0 | 0.0 | 1.3 | 2.3 | 3 | 3 |
| **RTD (Real-time Drilling)** | 2.7 | 0.2 | 1.3 | 4.1 | 10 | 3 |
| **TCoE (Unclassified costs)** | 0.0 | 2.5 | 2.4 | 4.9 | 8 | 6 |
| **Total Spend** | **16.4** | **12.7** | **20.9** | **50.0** | **96** | **52** |

**A more complete understanding of the costs will require which platforms are supported by Google Cloud, whose contract carries a $300M / month commitment for 3 years ($10.8 MM)**



1 Costs are provided by APC and only cover the major products / platforms;

**Occidental [Ping Lu] 000478**

# EXHIBIT 6

Occidental [Ping Lu] 000479



# Core R&D

Product and Product Lines with direct enterprise mission impact; aimed at specific business objectives with surgical precision.



## Advanced Process Analytics

Reduces the equipment and facility downtime by using machine learning to predict and resolve issues.

 digital ops



## Advanced Reservoir Characterization & Quantitative Interpretation Solutions (ARCqis)

Developing advanced reservoir characterization solutions, such as novel approaches to seismic inversion, to predict reservoir properties from seismically derived attributes.

core  dwgom success



## High Density L48 Characterization

New toolsets for petrophysicists and geologists to efficiently create high-density datasets for next generation subsurface characterization.

 l48 expansion



## Intelligent Production Surveillance

Enables Reservoir and Production Engineers to interrogate, understand, and optimize well performance using real-time surveillance and automated algorithms.

core  digital ops



Occidental [Ping Lu] 000480



## L48 Exploration & Development with Hyper-Cubes

Data-driven toolkit for rapid analysis of inter- and intra-basin datasets to derive insights for exploration screening and well campaign development planning.

`core` `l48 expansion`



## Machine Augmented Seismic Interpretation

Applying deep learning to seismic datasets to create more efficient & robust frameworks and property estimations than current methods are able to provide today.

`core` `dwgom success`



## Next Gen Reservoir Simulation

Through fit-for-purpose reservoir characterization and modeling technology, we provide frameworks that drive robust decision making under uncertainty, from exploration to production.

`core` `l48 expansion` `dwgom success`



## Real Time Well Construction Optimization

"Intelligent" control and edge computing in Drilling and Completions for fleet performance optimization (FPO). FPO enables real-time monitoring, automation, and optimization of drilling and completions."

`core` `digital ops`



ANADARKO
Technology

Send us an email at
**technology@anadarko.com**
We'll be glad to help!

| Launch Pad | Engage | Connect |
|---|---|---|
| IPSO | Emerging Technology | Press |
| RTD | Geoscience Technology | Submit an Idea |
| RTC | Open Innovation | |
| FiDO | Videos | |
| RS Prism | | |

Occidental [Ping Lu] 000481



## Machine Augmented Seismic Interpretation

core    dwgom success



### DL-based Seismic Fault Interpretation

Deep learning workflow for generating robust fault probability predictions across offshore and onshore seismic datasets



### DL-based Seismic Salt Interpretation

Harnessing deep learning to efficiently identify salt bodies and salt inclusions for enhancing velocity modeling, subsalt imaging, and drilling hazard identification



### DL-based Seismic Stratigraphic Interpretation

Deep learning workflow for classifying deep-water stratigraphic geometries such as channel complexes and MTC's in seismic data

DL-based Seismic Fault Interpretation          DL-based Seismic Salt Interpretation          DL-based Seismic Stratigraphic Interpretation

## About

Deep Learning and Machine Learning are exercises in human imitation. If I teach a machine to classify cats and dogs across thousands of images, chances are when the machine sees a new image it's never seen before, it will be able to recognize if there is a cat or dog in the picture much like a human would be able to do. It is a classification problem and you and I do it all the time when we recognize faces, shapes, or more complex patterns.

We are using this same technique to train a machine to pick geologic features we are attempting to identify – everything from a fault or salt structure to other stratigraphic features. So what is the purpose of doing this at scale? Instead of manually interpreting just a small subset of data, we are able to interpret every single pixel of seismic imagery that we have within petabytes of data using a computer. Thus, we can train a machine to pick broader scale exploration features or finer features in a development optimization context.

Occidental [Ping Lu] 000482

Decision makers now have the power to use this extraordinarily high density feature classification (faults, salts, and stratigraphy) to explore for oil and gas accumulations by tracing fluid migration patterns. Similarly, we can infer better development patterns in the form of placement and number of infill wells to optimally drain a reservoir.

## Value Opportunity

Inferring geologic context from seismic data requires geoscientists to recognize patterns in the data. These patterns are learned after years of studying textbook diagrams, doing field work, and learning from experience. Armed with these experiences, geoscientists can interpret the rock record to better understand its origins and implications for E&P success. Since Machine Learning algorithms can excel in detecting patterns in data, it stands to reason that this technique might also be applied to detect and map stratigraphic features in 3D seismic data. A mature set of detection algorithms could be built up to interpret a whole host of geologic features. These could include:

- horizons likes mudlines & basements;
- architectures like deepwater channels, mass transport complexes, shelf foresets, lobes & levees;
- seismic irregularities like AVO anomalies, flat spots, & gas chimney clouds;
- and perhaps even source rock & reservoir intervals themselves.

And all of these could be done in the same amount of time as a coffee break. This has the potential to vastly improve the speed and precision of seismic data analysis.

## Roadmap

DL-based Seismic Stratigraphic Interpretation Roadmap



Send us an email at
**technology@anadarko.com**
We'll be glad to help!

| Launch Pad | Engage | Connect |
|---|---|---|
| IPSO | Emerging Technology | Press |
| RTD | Geoscience Technology | Submit an Idea |
| RTC | Open Innovation | |
| FiDO | Videos | |
| RS Prism | | |

Occidental [Ping Lu] 000483



# Advanced Reservoir Characterization & Quantitative Interpretation Solutions (ARCqis)

core   dwgom success



### Data Driven Low Frequency Models

Generate seismically driven low frequency models that will directly impact the estimations of rock properties away from control points



### ML-based Seismic Inversion

ML-based alternative stochastic inversion technique for seismically constrained property distributions for enhanced exploration and development campaign success



### ML-based Noise Attenuation



### Waveform Similarity Workflow

**Occidental [Ping Lu] 000484**

Explore current advancements in noise attenuation within the machine learning field in order to apply them to seismic data

Advanced solution for establishing similarities between seismic waveforms for geologic feature delineation, data classification, and comparison of seismic volumes

[Data Driven Low Frequency Models](#)          [ML-based Seismic Inversion](#)          [ML-based Noise Attenuation](#)          [Waveform Similarity Workflow](#)

## About

Many of the subsurface properties that affect reservoir performance aren't readily observable in seismic data. Instead, engineers and geophysicists must develop inferential models to relate our seismic data measurements to reservoir and fluid properties. This effort is two parts science and one part art. To drive the science, we are tapping into new technologies like deep learning and voice recognition algorithms. To drive the art, we are building advanced interpretation tools to integrate data-driven results with more subjective model-driven estimates. The combination of the two will yield enhanced insight to drive reservoir development and optimization decisions.

## Value Proposition

Noise attenuation is a crucial part of seismic data analysis. Most of the time pre-stack data delivered from processing shops can be further improved in some aspects such as removing residual noise or further correction of move-out misalignment. It is especially important for inversion since the prediction is directly derived from pre-stack of partially stacked seismic data. When seismic data is contaminated with noise or multiples, those problems will propagate to the inversion results. It is quite challenging to work in pre-stack domain due to large amounts of data. We are exploring machine learning applications for noise attenuation as well as aiming to leverage our cloud computing capabilities to better handle these large datasets.

## Roadmap

[ML-based Noise Attenuation Roadmap](#)



**ANADARKO Technology**

Send us an email at
**technology@anadarko.com**
We'll be glad to help!

| Launch Pad | Engage | Connect |
|---|---|---|
| IPSO | Emerging Technology | Press |
| RTD | Geoscience Technology | Submit an Idea |
| RTC | Open Innovation | |
| FiDO | Videos | |
| RS Prism | | |



Occidental [Ping Lu] 000485

# EXHIBIT 7

Occidental [Ping Lu] 000486

# MEMORANDUM

| TO: | Governance and Risk Committee | DATE: | Nov 16, 2018 |
|---|---|---|---|
| FROM: | Sanjay Paranji, Chief Technology Officer | | |
| RE: | Advanced Analytics and Emerging Technologies (AAET) Update | | |

## Executive Summary

The AAET team continues to make good progress on the following strategic objectives:

- Digitalizing operations with automated surveillance and intelligent control
- Increasing velocity and quality of Lower 48 (L48) basin evaluations
- Optimizing field development (onshore & offshore)
- Enhancing exploration through advanced seismic imaging

AAET's organizational structure has evolved with end-to-end capabilities from ideation to in-house software development skills allowing us to sustainably deliver our products to the end-user and co-develop business-driven technical functionality in concert with business units. We have brought AAET and Geoscience Technology together into one team to foster increased connectivity between research & development and deployment efforts, and are developing a more robust data infrastructure with a dedicated DataOps team to support the migration of our analytics workloads to the Google Cloud Platform (GCP). Our stakeholder engagement is on a positive trajectory and has measurably increased with the engagement of over 380 users across the 6 distinct R&D product-lines now deployed to the asset teams corresponding to strategic objectives above.

AAET and IT have entered into a commercial agreement with Google for usage of Google Cloud Platform (GCP) with a negotiated commitment of $10MM in spend over the next 3 years. GCP is the preferred cloud platform for the continued development of AAET's next-generation applications and analytics and provides access to proprietary hardware specifically designed for Artificial Intelligence and Machine Learning, a more compelling technology stack for application developers, data-scientists and considerably faster GPU hardware adoption. The softer and intangible benefits of the agreement surround access to Google Engineering teams and the opportunity for our people to collaborate and learn from Google's experts to help solve some of our most difficult problems and help guide their future roadmaps as they pertain to Oil and Gas problems.

## Analysis

### Digitalizing Operations with Automated Surveillance and Assisted Control

At the end of January 2018, the AAET team in collaboration with our DW GoM team, successfully deployed a production surveillance and optimization system called IPSO. IPSO's purpose is to optimize base production through real-time surveillance and efficient reservoir management.

Occidental [Ping Lu] 000487

IPSO now covers approximately 150 wells across all deep-water facilities (16 operated and non-operated facilities in GoM and Ghana) and extended to the Onshore Delaware Basin team with ~1000 horizontal wells. Following the successful scale out in the Delaware Basin, we will shift focus to the Powder River Basin (PRB), expanding functionality to an emerging asset. The next major release, set for January 2019, will incorporate integrated forecasting and scheduling (IFS) for all DW GoM assets to enable real-time tracking of production and downtime performance against forecast. This unified framework is intended as a management tool providing the ability to measure forecast accuracy over time. Two critical components of IPSO Onshore include the development of productivity index (PI) based forecasting functionality which assesses well performance, even under infrastructure rate constraints, and the development of high density mapping functionality to spatially represent all information available in IPSO. Together these features impact both the financial and technical post appraisal workflows the asset teams perform today.

The AAET team's work with real time drilling and completions is ongoing and we have achieved a significant milestone in our first Internet of Things (IoT) driven initiative. All onshore rigs and frac vans are now equipped with data-gathering black boxes with data streaming into our high performance historian at 1-second frequency and 2-3 second latency. Thus far we have aggregated approximately 4 billion rows of data with auto-detected drilling and completion states. As of October 2018, we released both real-time drilling (RTD) and real-time completions (RTC) models to the end user community for monitoring of rig and frac fleets and will be incorporating additional cost monitoring and optimization functionality based on user feedback. RTD has released deepwater drilling and tripping KPI dashboards to aid in rig efficiency optimization, and for USON, has released a general drilling performance dashboard, automated days vs depth charts, KPIs (on and off bottom time metrics, footage analytics, and connection time performance), and 2-D/3-D directional analysis tools to compare planned and actual well paths. The first release of RTC went live in November 2018 and provides a real-time data viewing platform where all users can see near real-time data from all frac vans. Future releases will include functionality for real-time cost calculations, pump schedule management, and stage performance comparisons.

The AAET team also partnered with the DJ Operations team in our first successful intelligent (autonomous) control pilot to improve production across the well life cycle. In January 2018, we began testing control on 23 artificial lift wells (plungers) through a pilot with an IoT company, Kelvin. Results indicate an average production uplift of 5% coupled with increased uptime and projected NPV benefits around $10MM in the first year under a full-field implementation scenario. By Q1 2019 we plan to scale across all ~1500 horizontal wells and extend to an additional ~3000 vertical wells later in 2019.

*Increasing Velocity and Quality of L48 Basin Evaluations*
As of July 2018, we completed Generation 2 of the rapid basin evaluation workflows using machine-assisted log reconstruction, petrophysics and automated top-picking of geological

2

horizons. We recently acquired ~400K triple combo logs in addition to the existing 300K triple combo logs we currently own.  This gives us coverage across every known petroleum system in the L48 and we are planning to use the generation 2 workflows against the entire L48 data coverage.   This is an ambitious attempt to predict commercial sweet spots and production deliverability across the entire L48 and this effort is being jointly kicked off with exploration with validation against previous work in Louisiana Gulf Coast and Delaware. We are also working with the Delaware basin asset team and using the increased data coverage of approximately 6500 wells to produce higher resolution margin to margin basin maps which will have both lithological and geomechanical characterization.  We believe this can be used for development campaign optimization purposes at a greater resolution than we have ever done before.

*Optimizing Field Development (Onshore & Offshore)*
The AAET team delivered a multivariate analysis (MVA) workflow product to the Delaware Basin team that enhances development optimization decision-making and can also be used in business development applications to quickly evaluate acreage trades. We have incorporated public data of ~5000 wells, evaluated 183 input variables sampled from 124 maps and 59 well design/production variables and created economic maps at the basin scale for all operators and any proposed development plan scenarios in relation to completion design and inter-well spacing. The Delaware Basin team is currently evaluating the tool through a proof of concept on 13 wells and thus far have found the tool saves the development team approximately 10 hours on each well proposal compared to the previous workflow.

*Enhancing Exploration through Advanced Seismic Imaging*
The AAET team achieved early success utilizing a cutting-edge machine learning approach with Generative Adversarial Network GAN-based super-sampling for fault picking, and more recently have been testing algorithms for salt features. We have delivered fault probability cubes to the Colombia team covering the entire Esmerelda 3D dataset, GoM teams working in the Lucius/Phobos areas, and two new prediction models to Wattenberg in Q3. This approach allows us to turn around fault predictions in two business days and these insights are being used to explore additional subsalt traps, assess tectonics and hydrocarbon systems evolution, and identify possible conduits between the hypothesized source rock and reservoir rocks. We continue to meet with teams to assess the business need for fault prediction projects and have over a dozen additional projects in the backlog.

Using our proprietary deep neural network architecture, we have prototyped multi-realization probability cubes that provide an interpreter with a quantitative confidence score for the presence or absence of salt in every voxel across the entire Bevo survey.  Additionally, the salt probability cube prototype has been used to locally update the traditional velocity model generated by the vendor, WesternGeCo (WGC). The team has also created a catalog of stratigraphic features that could be systematically and efficiently identified in seismic data if machine learning is injected into the interpretation workflow.  As there are 2-3 years of R&D required to get through it all, the catalog has been circulated amongst staff and exploration leadership to prioritize by business

3

**Occidental [Ping Lu] 000489**

needs.  Our first two attempts at detecting stratigraphic features using ML yielded moderate success, with iterative improvements arriving in the coming quarters.

**<u>Conclusion</u>**

Enhanced stakeholder engagement remains a key focus for the AAET team throughout 2018. We now have a roadmap for each of our 15 project teams with a plan to continue engaging end-users in the delivery of application platforms and products to the company. Across four of our AAET platforms, we have engaged with over 380 users with over 100 new users added in October.  We are forming deployment teams in both the engineering and geoscience domains with a dedicated focus on the integration and scale out of AAET products.

4

# EXHIBIT 8

Occidental [Ping Lu] 000491

**From:** Yanyan_Zhang@oxy.com
**Sent:** Thursday, October 03, 2019 4:42 PM
**To:** Koster, Klaas
**Cc:** Xiao, Yuan; Lu, Ping
**Subject:** RE: Anadarko CS reconstruction

Hi Klaas,

I personally have doctor appointment on Next Monday so couldn't visit GW5.
We'll investigate on the data further and let you know the progress later.

Thanks.

Best,
Yanyan

---

**From:** Koster, Klaas <Klaas_Koster@oxy.com>
**Sent:** Thursday, October 3, 2019 3:50 PM
**To:** Zhang, Yanyan <Yanyan_Zhang@oxy.com>
**Cc:** Xiao, Yuan <Yuan_Xiao@oxy.com>; Lu, Ping <Ping_Lu@oxy.com>
**Subject:** RE: Anadarko CS reconstruction

Yanyan,

I know that you are using GANs, Ive read the TLE article. I am interested in comparing results, not underlying methods.
I'm not sure when I am next at APC, so let's start with a meeting at GW5 to show you what the problem is we have
solved using low-rank matrix completion.
I'm sure Maks and Reza will be part of the discussion here.

Klaas

---

**From:** Yanyan_Zhang@oxy.com <Yanyan_Zhang@oxy.com>
**Sent:** Thursday, October 3, 2019 3:44 PM
**To:** Koster, Klaas <Klaas_Koster@oxy.com>
**Cc:** Xiao, Yuan <Yuan_Xiao@oxy.com>; Lu, Ping <Ping_Lu@oxy.com>
**Subject:** RE: Anadarko CS reconstruction

Hi Klaas,

Since I'd need invite Cody and my other colleagues to help me explain, can we meet on a day that you'll be in APC
instead of me going to GW5?
Also, we're not using linear algebra or transformation methods to solve the problem, so I'm afraid some experience
might not be easily transferable.

Thanks!

Best,
Yanyan

Occidental [Ping Lu] 000492

**From:** Koster, Klaas <Klaas_Koster@oxy.com>
**Sent:** Thursday, October 3, 2019 3:16 PM
**To:** Zhang, Yanyan <Yanyan_Zhang@oxy.com>
**Cc:** Xiao, Yuan <Yuan_Xiao@oxy.com>; Lu, Ping <Ping_Lu@oxy.com>
**Subject:** RE: Anadarko CS reconstruction

Yes, of course. Right now Monday looks like a good day with relatively few meetings.
If you come to GW5 then I can show you all the work we have already done on CS with low-rank matrix completion and matching-pursuit Fourier interpolation.

**From:** Yanyan_Zhang@oxy.com <Yanyan_Zhang@oxy.com>
**Sent:** Thursday, October 3, 2019 3:09 PM
**To:** Koster, Klaas <Klaas_Koster@oxy.com>
**Cc:** Xiao, Yuan <Yuan_Xiao@oxy.com>; Lu, Ping <Ping_Lu@oxy.com>
**Subject:** RE: Anadarko CS reconstruction

Hi Klaas,

If you have time, can I request to schedule a meeting with you in person?
I'd like to explain our current problem and the difficulty we have to apply our method towards this problem, so that you can have a better understanding.

Thanks!

Best,
Yanyan

**From:** Koster, Klaas <Klaas_Koster@oxy.com>
**Sent:** Thursday, October 3, 2019 2:34 PM
**To:** Rastegar, Reza <reza_rastegar2@oxy.com>; Zhang, Yanyan <Yanyan_Zhang@oxy.com>
**Cc:** Xiao, Yuan <Yuan_Xiao@oxy.com>; Lu, Ping <Ping_Lu@oxy.com>; Pryporov, Maksym <Maksym_Pryporov@oxy.com>
**Subject:** RE: Anadarko CS reconstruction

Yanyan,

There is no fundamental difference between reconstruction of a single 3D pre-stack shot-gather, or a single 3D post-stack volume. Both can be simply represented as a sequence of 2D slices.

The whole point of compressive sensing is to sparsely sample the data non-uniformly and then reconstruct it to what you would have measured on a dense regular grid. So, I have no idea what the difficulty is.
Perhaps you are saying that you need some dense and uniformly sampled data for your training images? We have those of course.

Klaas

**From:** Rastegar, Reza <Reza_Rastegar2@oxy.com>
**Sent:** Thursday, October 3, 2019 2:26 PM
**To:** Zhang, Yanyan <Yanyan_Zhang@oxy.com>

Occidental [Ping Lu] 000493

**Cc:** Xiao, Yuan <Yuan_Xiao@oxy.com>; Lu, Ping <Ping_Lu@oxy.com>; Koster, Klaas <Klaas_Koster@oxy.com>; Pryporov, Maksym <Maksym_Pryporov@oxy.com>
**Subject:** Re: Anadarko CS reconstruction

Thanks Yanyan. I'm including Klaas in the conversation.

Klaas, please see the update. Any thought?

Sent from my iPhone

On Oct 3, 2019, at 1:43 PM, "Yanyan_Zhang@oxy.com" <Yanyan_Zhang@oxy.com> wrote:

> Reza,
>
> We're in the process of reviewing the data. The problem is actually not what we have published, we were working with
> post-stack migrated seismic, but this data is about pre-stack gathers. What's more important is this data is non-uniform sampled, which is different to our work.
>
> Best,
> Yanyan
>
> Get Outlook for Android
>
> **From:** Rastegar, Reza <Reza_Rastegar2@oxy.com>
> **Sent:** Thursday, October 3, 2019 7:12:36 AM
> **To:** Zhang, Yanyan <Yanyan.Zhang@anadarko.com>; Xiao, Yuan <Yuan.Xiao@anadarko.com>
> **Cc:** Lu, Ping <Ping_Lu@oxy.com>
> **Subject:** RE: Anadarko CS reconstruction
>
> Team,
>
> Were you able to get the data and try what Klaas was asking?
>
> Thanks,
> Reza
>
> **From:** Koster, Klaas <Klaas_Koster@oxy.com>
> **Sent:** Thursday, September 26, 2019 3:26 PM
> **To:** Zhang, Yanyan <YANYAN.ZHANG@ANADARKO.COM>; Xiao, Yuan <YUAN.XIAO@ANADARKO.COM>
> **Cc:** Pryporov, Maksym <Maksym_Pryporov@oxy.com>; Rastegar, Reza <Reza_Rastegar2@oxy.com>; Lu, Ping <Ping_Lu@oxy.com>
> **Subject:** RE: Anadarko CS reconstruction
>
> Yuan/Yanyan,
>
> I'd like to see your DL compressive sensing reconstruction (TLE, September 2019) applied to the enclosed shot gather.
> I enclosed the mask that was applied to the full dataset, so you know which seismic traces are missing.
> The dataset itself is on the Geophysics Function MS Teams site, Yuan has access to it:
> DUG_rec_sampled_pkl

Occidental [Ping Lu] 000494

Klaas

Example of Python code to read data:
import pickle as pkl
nxs = 641
P  = np.zeros((nxs,nxs),dtype=bool)
P =  pkl.load(open( 'DUG_ReceiverMask_pkl', "rb" ))

**From:** Cody_Comiskey@oxy.com <Cody_Comiskey@oxy.com>
**Sent:** Friday, September 13, 2019 4:42 PM
**To:** Koster, Klaas <Klaas_Koster@oxy.com>; Comiskey, Cody <Cody_Comiskey@oxy.com>;
Lu, Ping <Ping_Lu@oxy.com>
**Subject:** Re: Anadarko CS reconstruction

Sounds good. I would reach out to Ping and his team. My group wasn't involved in the project.

Thanks Klaas, have a good weekend

Cody

Sent from my Verizon, Samsung Galaxy smartphone

-------- Original message --------
From: "Koster, Klaas" <Klaas_Koster@oxy.com>
Date: 9/13/19 16:36 (GMT-06:00)
To: "Comiskey, Cody" <Cody_Comiskey@oxy.com>, "Comiskey, Cody"
<Cody_Comiskey@oxy.com>, "Lu, Ping" <Ping_Lu@oxy.com>
Subject: RE: Anadarko CS reconstruction

Thanks for the info. R&D is fine, possibly still good enough to attempt our benchmark.

**From:** Cody_Comiskey@oxy.com <Cody_Comiskey@oxy.com>
**Sent:** Friday, September 13, 2019 4:34 PM
**To:** Koster, Klaas <Klaas_Koster@oxy.com>; Comiskey, Cody <Cody_Comiskey@oxy.com>;
Lu, Ping <Ping_Lu@oxy.com>
**Subject:** Re: Anadarko CS reconstruction

Klaas, this project was a collaboration between the data science team and geophysical
technology and was an initial test in using ML for projects like this. I will defer to Ping on the
status of the work but at our last discussion, this was a strictly R&D project.

Cody

Sent from my Verizon, Samsung Galaxy smartphone

4

Occidental [Ping Lu] 000495

**From:** Rastegar, Reza <Reza_Rastegar2@oxy.com>
**Sent:** Thursday, October 3, 2019 7:12:36 AM
**To:** Zhang, Yanyan <Yanyan.Zhang@anadarko.com>; Xiao, Yuan <Yuan.Xiao@anadarko.com>
**Cc:** Lu, Ping <Ping_Lu@oxy.com>
**Subject:** RE: Anadarko CS reconstruction

Team,

Were you able to get the data and try what Klaas was asking?

Thanks,
Reza

---

**From:** Koster, Klaas <Klaas_Koster@oxy.com>
**Sent:** Thursday, September 26, 2019 3:26 PM
**To:** Zhang, Yanyan <YANYAN.ZHANG@ANADARKO.COM>; Xiao, Yuan <YUAN.XIAO@ANADARKO.COM>
**Cc:** Pryporov, Maksym <Maksym_Pryporov@oxy.com>; Rastegar, Reza <Reza_Rastegar2@oxy.com>; Lu, Ping <Ping_Lu@oxy.com>
**Subject:** RE: Anadarko CS reconstruction

Yuan/Yanyan,

I'd like to see your DL compressive sensing reconstruction (TLE, September 2019) applied to the enclosed shot gather.
I enclosed the mask that was applied to the full dataset, so you know which seismic traces are missing.
The dataset itself is on the Geophysics Function MS Teams site, Yuan has access to it:
DUG_rec_sampled_pkl

Klaas


Example of Python code to read data:
import pickle as pkl
nxs = 641
P  = np.zeros((nxs,nxs),dtype=bool)
P =  pkl.load(open( 'DUG_ReceiverMask_pkl', "rb" ))

---

**From:** Cody_Comiskey@oxy.com <Cody_Comiskey@oxy.com>
**Sent:** Friday, September 13, 2019 4:42 PM
**To:** Koster, Klaas <Klaas_Koster@oxy.com>; Comiskey, Cody <Cody_Comiskey@oxy.com>; Lu, Ping <Ping_Lu@oxy.com>
**Subject:** Re: Anadarko CS reconstruction

Sounds good. I would reach out to Ping and his team. My group wasn't involved in the project.


Thanks Klaas, have a good weekend

5

Cody


Sent from my Verizon, Samsung Galaxy smartphone


-------- Original message --------
From: "Koster, Klaas" <Klaas_Koster@oxy.com>
Date: 9/13/19 16:36 (GMT-06:00)
To: "Comiskey, Cody" <Cody_Comiskey@oxy.com>, "Comiskey, Cody"
<Cody_Comiskey@oxy.com>, "Lu, Ping" <Ping_Lu@oxy.com>
Subject: RE: Anadarko CS reconstruction

Thanks for the info. R&D is fine, possibly still good enough to attempt our benchmark.

---

**From:** Cody_Comiskey@oxy.com <Cody_Comiskey@oxy.com>
**Sent:** Friday, September 13, 2019 4:34 PM
**To:** Koster, Klaas <Klaas_Koster@oxy.com>; Comiskey, Cody <Cody_Comiskey@oxy.com>; Lu, Ping
<Ping_Lu@oxy.com>
**Subject:** Re: Anadarko CS reconstruction

Klaas, this project was a collaboration between the data science team and geophysical
technology and was an initial test in using ML for projects like this. I will defer to Ping on the
status of the work but at our last discussion, this was a strictly R&D project.


Cody


Sent from my Verizon, Samsung Galaxy smartphone

Occidental [Ping Lu] 000497

# EXHIBIT 9

Occidental [Ping Lu] 000498

**From:**                  Graybill, Jeremy
**Sent:**                Friday, September 06, 2019 2:35 AM
**To:**                   Bayeh, Alex; Lu, Ping
**Subject:**           FW: Presentation

FYI…since you two are part of this conversation as well.

Thanks,
-Jeremy

---

**From:** Graybill, Jeremy
**Sent:** Thursday, September 5, 2019 1:21 PM
**To:** Bowlby, David <David_Bowlby@oxy.com>
**Subject:** RE: Presentation

David,

I'm sorry you aren't feeling well, and I hope you get to feeling better soon.  Unfortunately, as I let Mustafa know, I won't be able to attend the meeting tomorrow, since it is my Friday off and I had previous plans to be out of town and unavailable at that time.  I look forward to hearing about the plans and strategy for each of the products, and what that means for moving forward.

Yes, I agree that my employees are free to interact as they would like.  Since I am still their manager, that is likely why they are still reaching out and voicing their concerns to me.  Yes, we will all assume best intentions from everyone, even though I've heard from them that it's difficult for people to feel like Oxy has the best intentions of the legacy APC employees in mind at this point.  The lack of information and the conflicting information is really difficult for people.  As one example, ==Ping and Alex are confused why they were the ones invited by Reza to provide deep technical details in some domains where neither of them performed the work, when other individuals were not invited.==  That also leads to assumptions being made, when nobody has any information on what to expect for the future for themselves and their colleagues.  I only want what's best for each of my employees, whether that ends up being them deciding to stay with Oxy, or otherwise.  I know this process is difficult for you all as well, so it will be better for everyone when more clarity is provided in the coming weeks and people can make their decisions with more information.

Thanks,
-Jeremy

---

**From:** Bowlby, David <David_Bowlby@oxy.com>
**Sent:** Thursday, September 5, 2019 12:31 PM
**To:** Graybill, Jeremy <Jeremy_Graybill@oxy.com>
**Subject:** Re: Presentation

Jeremy, I am out today and not feeling well and just realized you are coming in tomorrow, so we can speak then.  In our last conversation, while we did not agree on all points, I thought I was clear that although you want to be in all conversations with your employees, the fact that they have a sense of loyalty to you may diminish any chance of them becoming an Oxy employee so we want to give them some free space to interact with other Oxy employees.  You should be able to work coordination with Reza, and as stated, if something of a significant nature arises they are free to call me or HR, but if it is just a general complaint, than it is counter productive as I can't take any action on something non-specific.

1

The potential for a company buyout of AAET is a developing item which is why we scheduled a meeting to discuss it tomorrow so everyone is as caught up as we can be.  Christian called me regarding contract support so I went ahead and filled him in and asked him to pass along the info prior to the meeting.

I am going to continue to assume best intentions on everyone's part and asking you to do the same.

->

On Sep 5, 2019, at 7:41 AM, Bowlby, David <David_Bowlby@oxy.com> wrote:

> Jeremy,
>
> Since you are not available until later, I will email. Reza is still your manager, and as we discussed, if an HR worthy issue arises, the employee can contact me or HR, but If it is anything other than that you need to work it directly through Reza.  I spoke with Reza this morning and he can work through any concerns regarding IP with you and he can reach out to our attorneys if needed.  Reza is traveling there today and as we also discussed, although there is discontent, people need to still be professional and HR will be communicating employee options beyond VSP's, but until that time you will need to work it through him.
>
> We have the meeting tomorrow regarding roadmaps and we can also discuss where we are at in the process of potentially selling as that is very recent information.
> ->

On Sep 4, 2019, at 11:30 PM, "Jeremy_Graybill@oxy.com" <Jeremy_Graybill@oxy.com> wrote:

>> David,
>>
>> Can I please ask what the original email below is in relation to?  As I mentioned to you last week, the team would like me included on any requests or communications by Reza, given previous incidents and concerns that I shared with you via email and you and I discussed, and clearly that request has not been honored in this case.
>>
>> I heard today that Oxy may have interests in selling Lithos to an outside party.  If that is the case, then sharing any of the technical details of those products to a wider audience is not appropriate, as that would complicate the process of selling and transferring the IP, and could have a serious negative impact monetarily for Oxy.  Since any individuals who are tied to that effort may be included in such a sale as well, it would not be appropriate for them to transfer any of their known IP.  In addition, since much of the seismic work listed below has been related to Mozambique data, which we have not received confirmation that Oxy has licensed appropriately for wider use across Oxy, there could be significant issues with any of that being presented to a wider audience.  As you're likely aware, any violation around seismic data could result in significant lawsuits for Oxy.  Any presentation of this sort of technical work would require the Geoscientists and Geophysicists involved, to include Christian Noll, Cody Comiskey, Matt Morris, Michael Ashby, Seth Brazell, etc., since they are much more aware of many aspects around licensing and IP, and what can and can't be shown, and therefore these sessions would not be appropriate to conduct otherwise.  Therefore, any such sessions should be conducted in The Woodlands with the appropriate audience, and not in Greenway.
>>
>> Finally, I mentioned to some of the team that you'd welcome speaking individually with them, and so as Alex requested, please meet with him prior to any further discussions between he and Reza.  Just an FYI that Ping informed me he is not feeling well, and will be taking PTO tomorrow.

2

Occidental [Ping Lu] 000500

Thanks,
-Jeremy

---

**From:** Bayeh, Alex <Alex.Bayeh@anadarko.com>
**Sent:** Wednesday, September 4, 2019 8:16 PM
**To:** Bowlby, David <David_Bowlby@oxy.com>
**Cc:** Lu, Ping <Ping.Lu@anadarko.com>; Graybill, Jeremy
<Jeremy.Graybill@anadarko.com>
**Subject:** FW: Presentation

Hello David,

Based on mine and my peers' previous discussions and circumstances, I would like to
speak with you before further speaking with Reza, as I do not trust and respect him.
We can arrange for me to show my work in The Woodlands, as I am not interested in
traveling to Greenway Plaza at this time given recent events. Please let me know
when you would like to speak with me.

Thank you,
Alex Bayeh

---

**From:** Rastegar, Reza <Reza_Rastegar2@oxy.com>
**Sent:** Wednesday, September 4, 2019 6:43 PM
**To:** Bayeh, Alex <Alex.Bayeh@anadarko.com>; Lu, Ping <Ping.Lu@anadarko.com>
**Cc:** Li, Yongfeng <Yongfeng_Li@oxy.com>
**Subject:** Presentation

Hi Alex and Ping,

I'd like to invite you both to visit Greenway Plaza this coming Monday to
present your work on log and seismic interpretation/compressed sensing/top
picking/fault detection etc. Let's make the presentation very detailed and
technical as I'm trying to give the rest of the team in Greenway Plaza to see
your projects. The week after that I'll be on vacation but as soon as I'm back
I'll ask the team in Greenway Plaza to present to you as well. Yongfeng will
set the meeting up.

Hope with integration meetings getting fewer on my side, very soon we can
start having regular meetings and information exchanges on weekly activities,
ideas, etc.

Alex, I'll be in Woodlands tomorrow and I'll stop by to chat.

Reza

Occidental [Ping Lu] 000501